**No. 25-1735**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, AN UNINCORPORATED ASSOCIATION; AND ADVENTIST RISK MANAGEMENT, INC.,

*Plaintiffs-Appellants,*

v.

CLEVELAND L. HORTON, II; GLENDORA C. HUGHES; STEPHANIE SUERTH; JANSSEN E. EVELYN; EILEEN M. LEVITT; ANGELA SCOTT; MAGDALENA S. NAVARRO; JEFF ROSEN; GINA MCKNIGHT-SMITH; NOAH THOMAS METHENY; AND ANTHONY G. BROWN,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Maryland, Southern Division
Case No. 8:24-cv-02866 – Hon. Theodore D. Chuang

## APPELLANTS' OPENING BRIEF

Todd R. McFarland
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, MD 20904

Eric S. Baxter
Nicholas R. Reaves
Andrea R. Butler
Amanda G. Dixon
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES .................................................................. 1

INTRODUCTION ............................................................................... 2

STATEMENT OF THE CASE ............................................................. 5

   A. The Seventh-day Adventist Church's beliefs and mission. ............. 5

   B. The Maryland Fair Employment Practices Act
      and its exceptions. ................................................................. 11

   C. The restrictive reading of MFEPA's religious exemption. ........... 13

   D. The Church's actions in light of MFEPA's changes. .................... 15

SUMMARY OF ARGUMENT ............................................................ 16

STANDARD OF REVIEW ................................................................. 18

ARGUMENT ..................................................................................... 19

   I. The Church has shown likelihood of success. ............................... 19

      A. MFEPA's selective religious exemption interferes
         with the Church's religious autonomy. ................................. 19

         1. Church autonomy protects hiring decisions
            made for religious reasons. ................................................. 20

         2. Church autonomy's associational protections
            reinforce the Church's right to make employment
            decisions based on religion. ............................................... 24

         3. Applying MFEPA's selective exemption
            to the Church violates its religious autonomy ..................... 28

B. Applying MFEPA's selective exemption to Church employment will entangle courts in religious questions and religious decision-making. ................... 32

C. Maryland's refusal to extend MFEPA's religious exemption to the Church violates the free exercise clause. ............................................. 38

    1. Preventing the Church from requiring employees to embrace its faith burdens the Church's religious exercise. .................................. 39

    2. MFEPA's nondiscrimination requirements are not generally applicable. ................................ 39

    3. MFEPA's nondiscrimination requirements are not neutral. ................................................ 47

    4. MFEPA's prohibition on mission-aligned hiring cannot satisfy strict scrutiny. ............................ 48

II. The Church satisfies the remaining injunction factors. ................................................... 53

III. The district court erred in dismissing Counts II and IV. .................................................. 55

CONCLUSION ............................................................. 57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ass'n of Pol. Consultants, Inc. v. FCC*,
  923 F.3d 159 (4th Cir. 2019)..............................................................50

*Aparicio v. Christian Union, Inc.*,
  No. 18-cv-592, 2019 WL 1437618
  (S.D.N.Y. Mar. 29, 2019)....................................................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................19

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ..........................................................46

*Bear Creek Bible Church v. EEOC*,
  571 F. Supp. 3d 571 (N.D. Tex. 2021)................................................42

*Bell v. Presbyterian Church (USA)*,
  126 F.3d 328 (4th Cir. 1997) ..............................................................34

*Billard v. Charlotte Catholic High Sch.*,
  101 F.4th 316 (4th Cir. 2024) .......................................................23, 32

*Bouldin v. Alexander*,
  82 U.S. 131 (1872)...............................................................................25

*Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*,
  796 N.E.2d 286 (Ind. 2003) ................................................................24

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)........................................................................52, 53

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) ......................................................21, 23

*Butler v. St. Stanislaus Kostka Catholic Academy*,
  609 F. Supp. 3d 184 (E.D.N.Y. 2022)................................................23

*Cahaly v. Larosa,*
796 F.3d 399 (4th Cir. 2015)............................................................ 49

*Canaan Christian Church v. Montgomery Cnty.,*
29 F.4th 182 (4th Cir. 2022) ........................................................... 46

*Carson v. Makin,*
596 U.S. 767 (2022)............................................................ 32, 33, 37

*Catholic Charities Bureau, Inc. v.*
*Wisconsin Labor & Indus. Rev. Comm'n,*
605 U.S. 238 (2025)....................................................... 27, 47, 48, 57

*Cent. Radio Co. Inc. v. City of Norfolk,*
811 F.3d 625 (4th Cir. 2016) ........................................................... 50

*Centro Tepeyac v. Montgomery Cnty.,*
722 F.3d 184 (4th Cir. 2013) ..................................................... 53, 54

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006)...................................................... 27, 30

*Church of Lukumi Babalu Aye, Inc. v.*
*City of Hialeah,*
508 U.S. 520 (1993).............................................................. 47, 48, 50

*City of Boerne v. Flores,*
521 U.S. 507 (1997)........................................................................ 39

*Colorado Christian Univ. v. Weaver,*
534 F.3d 1245 (10th Cir. 2008)....................................................... 57

*Corp. of Presiding Bishop v. Amos,*
483 U.S. 327 (1987).............................................................. 22, 25, 35

*Darren Patterson Christian Acad. v. Roy,*
699 F. Supp. 3d 1163 (D. Colo. 2023) ............................................ 24

*dmarcian, Inc. v. dmarcian Eur. BV,*
60 F.4th 119 (4th Cir. 2023) ..................................................... 18, 53

*Doe v. Catholic Relief Servs.*,
300 A.3d 116 (Md. 2023) ............................................................ *passim*

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*,
100 F.4th 1251 (10th Cir. 2024) ...................................................... 37

*Duquesne Univ. of the Holy Spirit v. NLRB*,
947 F.3d 824 (D.C. Cir. 2020) ......................................................... 35

*EEOC v. Roman Catholic Diocese of Raleigh*,
213 F.3d 795 (4th Cir. 2000) ...................................................... 21-22

*EEOC v. Townley Eng'g & Mfg. Co.*,
859 F.2d 610 (9th Cir. 1988) ........................................................... 31

*Elegant Massage, LLC v. State Farm
Mut. Auto. Ins. Co.*,
95 F.4th 181 (4th Cir. 2024) ..................................................... 55, 56

*Everson v. Bd. of Educ.*,
330 U.S. 1 (1947) ............................................................................ 36

*Everson v. Mich. Dep't of Corr.*,
391 F.3d 737 (6th Cir. 2004) ........................................................... 45

*Fellowship of Christian Athletes v.
San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ..................................................... 41, 46

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ................................................................. *passim*

*Garrick v. Moody Bible Inst.*,
412 F. Supp. 3d 859 (N.D. Ill. 2019) ............................................... 24

*Grimmett v. Freeman*,
59 F.4th 689 (4th Cir. 2023) ........................................................... 18

*Harmon v. Kaiser Permanente Ins. Co.*,
No. 2122, 2025 WL 2080740
(Md. App. Ct. July 24, 2025) .......................................................... 31

*Holt v. Hobbs,*
   574 U.S. 352 (2015) ..................................................................... 51

*Hosanna-Tabor Evangelical Lutheran*
   *Church & Sch. v. EEOC,*
   565 U.S. 171 (2012) ..................................................... 19, 20, 27

*Kedroff v. St. Nicholas Cathedral of*
   *Russian Orthodox Church in N. Am.,*
   344 U.S. 94 (1952) ............................................ 19, 20, 25, 26

*Kennedy v. Bremerton Sch. Dist.,*
   597 U.S. 507 (2022) ............................................................. 37, 39

*Kennedy v. St. Joseph's Ministries, Inc.,*
   657 F.3d 189 (4th Cir. 2011) ............................................... 25

*Kim v. Board of Education of*
   *Howard County,*
   93 F.4th 733 (4th Cir. 2024) ............................................... 44

*Larson v. Valente,*
   456 U.S. 228 (1982) ............................................................... 57

*Leaders of a Beautiful Struggle v.*
   *Balt. Police Dep't,*
   2 F.4th 330 (4th Cir. 2021) ................................................. 54

*Legend Night Club v. Miller,*
   637 F.3d 291 (4th Cir. 2011) ............................................... 53

*Loe v. Jett,*
   No. 23-cv-1527, 2025 WL 2430572
   (D. Minn. Aug. 22, 2025) ..................................................... 43

*Mahmoud v. Taylor,*
   145 S. Ct. 2351 (2025) ..................................................... 39, 53

*Manning v. Caldwell for City of Roanoke,*
   930 F.3d 264 (4th Cir. 2019) ............................................... 38

*Markel v. Union of Orthodox Jewish
Congregations of Am.*,
124 F.4th 796 (9th Cir. 2024) ............................................. 37

*Mast v. Fillmore County*,
141 S. Ct. 2430 (2021)........................................................ 51

*People ex rel. McCollum v. Bd. of Educ. of
Sch. Dist. No. 71*,
333 U.S. 203 (1948)............................................................ 36

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ............................................. 54

*Montrose Christian Sch. Corp. v. Walsh*,
770 A.2d 111 (Md. 2001) .................................................. 52

*Myers v. Loudoun Cnty. Pub. Sch.*,
418 F.3d 395 (4th Cir. 2005) ............................................ 38

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................ 54

*NLRB v. Catholic Bishop*,
440 U.S. 490 (1979)............................................... 32, 34, 36

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020)........................................ 20-21, 28, 31

*Presbyterian Church in U.S. v. Mary Elizabeth
Blue Hull Mem'l Presbyterian Church*,
393 U.S. 440 (1969)............................................................ 37

*Ray v. Roane*,
948 F.3d 222 (4th Cir. 2020)............................................. 18

*Rayburn v. General Conf. of
Seventh-day Adventists*,
772 F.2d 1164 (4th Cir. 1985)................................... *passim*

*Redeemed Christian Church of God v.*
   *Prince George's County*,
   17 F.4th 497 (4th Cir. 2021) ............................................................ 48

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ...................................................................... 27

*Rux v. Republic of Sudan*,
   461 F.3d 461 (4th Cir. 2006) ........................................................... 1

*Schultz v. Alabama*,
   42 F.4th 1298 (11th Cir. 2022) ...................................................... 56

*Scott v. Fam. Dollar Stores*,
   733 F.3d 105 (4th Cir. 2013) .................................................... 55, 57

*Seattle's Union Gospel Mission v. Woods*,
   142 S. Ct. 1094 (2022) .................................................................. 19

*Serbian E. Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) ................................................................ 20, 36

*Shapolia v. Los Alamos Nat'l Lab'y*,
   992 F.2d 1033 (10th Cir. 1993) ...................................................... 31

*Slattery v. Hochul*,
   61 F.4th 278 (2d Cir. 2023) ........................................................... 28

*Smith v. City of Atl. City*,
   138 F.4th 759 (3d Cir. 2025) ......................................................... 46

*Spencer v. World Vision, Inc.*,
   633 F.3d 723 (9th Cir. 2011) ......................................................... 30

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ................................................................ *passim*

*Tandon v. Newsom*,
   992 F.3d 916 (9th Cir. 2021) ......................................................... 44

*Thomas v. Rev. Bd.*,
   450 U.S. 707 (1981) ...................................................................... 39

*Union Gospel Mission of Yakima v. Ferguson*,
  No. 1:23-cv-3027, 2024 WL 4660918
  (E.D. Wash. Nov. 1, 2024) .................................................... 42, 44, 52

*Walz v. Tax Comm'n*,
  397 U.S. 664 (1970) ...................................................................... 32, 37

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872) ............................................................ 22

*Winter v. NRDC*,
  555 U.S. 7 (2008) .................................................................. 18, 53, 54

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................................ 21

*WV Ass'n of Club Owners & Fraternal Servs.,
  Inc. v. Musgrave*,
  553 F.3d 292 (4th Cir. 2009) ............................................................ 53

**Statutes**

28 U.S.C. § 1292 .................................................................................... 1

28 U.S.C. § 1331 .................................................................................... 1

28 U.S.C. § 1343 .................................................................................... 1

42 U.S.C. § 2000e-1 ............................................................................. 51

Ariz. Rev. Stat. § 41-1462 ................................................................... 51

Ark. Rev. Stat. § 16-123-103 .............................................................. 51

Cal. Gov't Code § 12940 ...................................................................... 51

Colo. Rev. Stat. § 24-34-402 ............................................................... 51

D.C. Code § 2-1401.03 ......................................................................... 51

Fla. Stat. § 760.10 ................................................................................ 51

Haw. Stat. § 378-3 ................................................................................ 51

Ind. Code § 22-9-5-22.....................................................................51

Internal Revenue Code § 501 ......................................................40

Iowa Code § 216.6.......................................................................51

Mass. Stat. 151B § 4....................................................................51

Md. Code Regs. 14.03.02.08 .......................................................46

Md. Code, State Gov't § 20-601 .............................................12, 40

Md. Code, State Gov't § 20-605 .........................................12, 40, 45

Me. Stat. 5 § 4573-A....................................................................51

Minn. Stat. § 363A.26.................................................................51

Mo. Stat. § 213.010.....................................................................51

Mont. Stat. § 49-2-101.................................................................51

N.H. Rev. Stat. § 354-A:18 ..........................................................51

N.J. Stat. § 10:5-12 .....................................................................51

N.M. Stat. § 28-1-9 .....................................................................51

N.Y. Exec. Law § 296 ..................................................................51

Ohio Stat. § 4112.02 ...................................................................51

Pa. Stat. § 955 ............................................................................51

R.I. Stat. § 28-5-6........................................................................51

S.C. Stat. § 1-13-80.....................................................................51

S.D. Stat. § 20-13-18....................................................................51

Tex. Lab. Code § 21.109 .............................................................51

Utah Stat. § 34A-5-102................................................................51

Va. Code § 2.2-3905 ................................................................ 51

Vt. Stat. tit. 21, § 495 ........................................................... 51

Wis. Stat. § 111.337 ............................................................... 52

Wyo. Stat. § 27-9-102 ............................................................ 52

**Other Authorities**

*2022 SUSB Annual Data Tables by Establishment Industry:*
  *The Number of Firms and Establishments, Employment,*
  *Annual Payroll, and Receipts by State, Industry, and*
  *Enterprise Employment size: 2022*, U.S. Census Bureau
  (April 10, 2025) ................................................................... 12

Stephanie H. Barclay, *Untangling Entanglement*,
  97 Wash. U. L. Rev. 1701 (2020) .................................. 36, 37

*Climate Campaign Representative*,
  Sierra Club, Maryland Chapter ........................................ 42

Luke W. Goodrich, *Religious Hiring*
  *Beyond the Ministerial Exception,*
  101 Notre Dame L. Rev. ___ (forthcoming 2026) ........................ 21, 42

Douglas Laycock, *Towards A General Theory of*
  *the Religion Clauses: The Case of Church Labor*
  *Relations and the Right to Church Autonomy*,
  81 Colum. L. Rev. 1373 (1981) ............................................ 26

Christopher C. Lund, *In Defense of the Ministerial Exception*,
  90 N.C. L. Rev. 1 (2011) ..................................................... 31

## JURISDICTIONAL STATEMENT

The district court has jurisdiction over Appellants' federal claims under 28 U.S.C. §§ 1331 and 1343. This Court has appellate jurisdiction to review the district court's denial of Appellants' motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1). The district court denied that motion on June 18, 2025. JA649. Appellants timely appealed on June 25, 2025. JA650. Under *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006), this Court also has pendent appellate jurisdiction over two claims dismissed by the district court in the same order.

## STATEMENT OF ISSUES

Whether Appellants—the Seventh-day Adventist Church's highest ecclesiastical and administrative body and a closely affiliated church entity—have a First Amendment right to require all their employees to uphold the Church's religious beliefs and practices.

# INTRODUCTION

Appellants General Conference of Seventh-day Adventists, the highest ecclesiastical body of the Seventh-day Adventist Church, and Adventist Risk Management, an entity that exclusively serves the Church, have always required their employees to be Adventists. The Church is a community of faith. The Church's purpose is to promote the faith. And the Church teaches the faith as sacred truth. The Church's mission would therefore be frustrated if its own employees rejected the faith. Because faith-based hiring is central to the Church's mission—as it is for many faiths—it is implicitly protected by the First Amendment's Religion Clauses. The Establishment Clause prohibits the government from dictating the religious qualifications for Church employees, and the Free Exercise Clause protects the Church's right to select its own to carry out its mission.

Federal and state statutes mirror these constitutional guarantees. Title VII, for example, explicitly exempts religious organizations when making employment decisions based on religion. And in Maryland, where the Church has its worldwide ecclesiastical offices, the Maryland Fair Employment Practices Act (MFEPA) long did the same. Indeed, historically, the Church has never been subjected to any federal or state law that would impose liability for unlawful discrimination simply because it requires its employees to be faithful believers.

But in 2023, that changed. The Maryland Supreme Court, eschewing any legislative or textual guidance, concluded that "American society" has "changed radically" since the Maryland Legislature first adopted MFEPA's religious exemption. The court therefore constrained the exemption, holding it applies only to employment decisions affecting individuals who "directly" advance a religious organization's "core" missions. For employees "one or more steps removed" from advancing a core mission, the Church is now subject to civil penalties and injunctive relief if it takes any employment action based on an individual's religious qualifications to carry out its work beliefs. And that is not all: The Church now must affirmatively accommodate the religious needs of employees of other faiths it may be compelled to hire. In short, the Seventh-day Adventist Church—and every other church in Maryland—has been pressed into the service of promoting others' religion, at the expense of its own.

One other state supreme court—Washington's—recently took a similar tack. But a Washington federal district court has already deemed that approach unconstitutional. This Court should do the same here for at least three reasons. First, the Religion Clauses' church autonomy doctrine ensures a sphere of independence for religious organizations to govern their internal religious affairs without state interference. For a church, few questions are of greater significance than who is religiously qualified to carry out its work. Maryland's new rule restricting religious

standards for church employees violates the Church's autonomy to make such decisions for itself.

Second, the Religion Clauses' anti-entanglement principle bars courts from resolving religious questions or scrutinizing religious decision-making. Secular courts lack competence to discern religious truths, and even the process of investigating internal religious decisions pressures religious institutions to bend toward bureaucratic preferences. Yet, here, the Maryland Supreme Court has held that—regardless of a Church's "genuinely" subscribed-to "tenet[s]"—it is ultimately for courts to decide which church missions are sufficiently "direct" and "core" to justify religious hiring preferences. And in making such determinations, courts must review the "totality of pertinent circumstances," including how a church describes its mission "to the public and/or regulators," the "services [it] provides," the "people [it] seeks to benefit," and how its "funds are allocated"—inviting endless trolling through a church's internal governance. Such religious entanglement is a separate violation of the First Amendment.

Finally, the Free Exercise Clause prohibits Maryland from denying the Church a religious exemption from MFEPA while granting secular exemptions to others. And MFEPA is rife with secular exemptions. As just two examples, it categorically exempts all businesses with fewer than fifteen employees, and it provides discretionary exemptions for business with "bona fide occupational qualifications" for specific

4

positions. Because these and other secular exemptions undermine MFEPA's stated antidiscrimination interests for no compelling reason, the state cannot deny the Church a religious exemption without violating its free exercise rights.

The question in this case is thus simple but profound: May a church require its own employees to embrace and uphold its mission? The First Amendment answers with a resounding "yes." Because the Church is thus likely to succeed on the merits of its constitutional claims and meets the other requirements for a preliminary injunction, the Court should reverse the district court and protect the Church's religious hiring practices for the pendency of this litigation.

## STATEMENT OF THE CASE

### A. The Seventh-day Adventist Church's beliefs and mission.

The Seventh-day Adventist Church is a religious body embracing over twenty-two million Seventh-day Adventists worldwide, with extensive ministries providing spiritual enlightenment, humanitarian services, education, and other charitable relief. JA16. Seventh-day Adventists share many common Protestant tenets—such as beliefs in salvation through Jesus Christ, the Trinitarian nature of God, and the divine inspiration of the Old and New Testaments. They also hold unique convictions that distinguish their faith. Unlike most Protestants, for example, Seventh-day Adventists observe a Saturday Sabbath. JA17. Because they believe the body is the living temple of the Holy Spirit, they

5

also promote a whole-food, plant-based diet, while abstaining from foods like pork and shellfish that are identified in Scripture as unclean. JA17. Tobacco and alcohol are also forbidden, while coffee, tea, and caffeinated drinks are discouraged. JA17. Seventh-day Adventists also have distinctive practices around tithes. All members are "encouraged to faithfully return a tithe"—"one tenth of their increase or personal income"—to the denomination. JA187; *see also* JA315. These tithes are "held sacred for the work of the ministry, for Bible teaching, and for the support of conference administration in the care of the churches and of field outreach (missionary) endeavors." JA188.

Appellant The General Conference of Seventh-day Adventists ("General Conference") is an unincorporated association formed by the Church to provide spiritual leadership to its members and to manage its administrative affairs. The General Conference is the highest ecclesiastical and administrative body of the Church, with leaders selected every five years by delegations of members from around the world. JA14-15. Appellant Adventist Risk Management ("ARM") is a religious non-profit that serves as the insurance and risk management arm of the Church worldwide. Its exclusive role is to "protect the ministries of the Seventh-day Adventist world church," JA15, by providing risk management and insurance services to the Church's ministries and affiliates, which include more than 97,000 churches, 9,800 schools, and 1,900 hospitals. JA15.

6

Notwithstanding distinct administrative roles, the General Conference and ARM are embodiments of the Church, whose essential purpose—its *raison d'etre*—is to carry out the "divinely appointed ministry" of helping every person "understand the Bible and find freedom, healing and hope in Jesus." JA17. Both entities thus require all employees to be fully aligned with this mission. JA18, JA314, JA455. In addition to being "baptized, tithe-paying member[s] in regular standing," employees must "demonstrate an exemplary commitment to the Lord and the teaching of His Church." JA18. This includes adhering to the Church's beliefs and practices regarding Sabbath observance, tithing, healthful living. JA314, JA327, JA455. It also means eschewing "the use of alcoholic beverages, tobacco in any form; illegal possession/misuse of drugs, etc.; use of profanity; immoral conduct including … fornication, adultery and homosexual practices; [and] remarriage without Biblical grounds, as defined in the Church Manual." JA314; *see also* JA455. It even includes keeping "jewelry limited to a simple wedding band," JA314, consistent with the Church's beliefs that "the wearing of jewelry is contrary to the will of God" and that members should dress "in modest apparel, with propriety and moderation." JA198 (quoting *1 Tim.* 2:9 (KJV)); *see also* JA327, JA455, JA457-458. In all they do, employees must "truly reflect commitment to the highest levels of Christian values." JA457.

The General Conference and ARM will not hire individuals who do not meet these spiritual requirements, and it is their policy to include these requirements in their employee handbooks and in all job listings, and to inform all applicants of the requirements early in the application process. JA20, JA315 ("each individual … informed in writing" at "time of employment" and "subject to an annual review"). If either organization learns that an employee is out of compliance with the Church's teachings, they may conduct an investigation and take action to try to reconcile the employee's conduct with the Church's standards of conduct. JA20. If reconciliation is not possible, both organizations consider the "[f]ailure to practice the fundamental teachings and standards" of the Church as potential grounds for termination of employment. JA20, JA336.

These religious expectations for Church employees are essential to the work of the Church. For the Church to carry out its mission, employees must sincerely reflect the beliefs of the Church, demonstrating the blessings of following God's word. JA18-19, JA315. Such fidelity to the Church's teachings is crucial to ensuring that employees can accurately and faithfully represent the Church and its beliefs to members who visit the Church's ecclesiastical offices, to non-members who interact with the Church, and to pastors and others who look to Church employees for guidance on myriad issues. JA18-19.

Employees are also expected to contribute to the Church's internal religious environment, engendering a spirit of unity and hope in

advancing the gospel of Jesus Christ. JA18-19. Faith permeates every aspect of Church work, culture, and environment. JA18-19. Both the General Conference and ARM begin each day with worship services for employees "designed to encourage a spirit of loyalty and devotion to the Lord" and to "assist in creating an atmosphere of spiritual unity" within both organizations. JA329. These services include devotional speakers, interactive prayer, hymns and other musical worship, and Bible study from the Church's Sabbath School curriculum. JA19, *see also* JA329. And employees throughout the organizations share responsibility for planning and leading both large-group and smaller departmental worship services. JA19.

The Church also expects employees to support and encourage the Church's congregations and other ministries—such as those for which ARM provides risk-management products—when employees interact with them. JA19. This often involves sharing spiritual encouragement and prayer. JA19. For example, it is common for employees to open internal meetings with prayer, to pray for one other, and to seek spiritual discernment for resolving challenges that arise in the course of their duties. JA19. The Church believes that all organizational decisions must be guided by its religious teachings, regardless of whether any particular matter at issue is directly related to faith or doctrine. JA19. Thus, it is essential for all employees to understand the Church's beliefs and

practices to ensure that all operations are consistent with the Adventist mission. JA19.

And Church members, whose tithes support the Church, deserve to "see in church workers a fidelity to basic principles which is unequivocal." JA315. Employees who flout Church beliefs could engender concerns of hypocrisy against the Church, cause members to lose their faith, or lead them to question whether the Church appreciates the sacrifice their tithing entails. Thus, to ensure that God's work is "jealously safeguarded," leaders and employees at every level are issued credentials and licenses confirming their standing and "authority … to represent the Church as pastors and gospel workers." JA80. These credentials and licenses must be renewed on a regular basis and may be recalled "for cause at any time." JA80.

Finally, the Church's employment practices are also motivated by its Sabbatarian beliefs. Seventh-day Adventists consider the Sabbath "a symbol of our redemption in Christ, a sign of our sanctification, a token of our allegiance, and a foretaste of our eternal future in God's kingdom." JA17. Thus, a Saturday Sabbath is observed weekly as a day of rest focused on one's relationship with God and in communion with others. JA17. The Church sets a four-day work week to allow all employees time to prepare for and observe each Sabbath, which begins Friday at sundown. JA19, JA321. Because of this Saturday-sabbath observance, Seventh-day Adventists often face challenges on the job market because

10

many jobs require Saturday work. It is thus part of the Church's mission to make all internal positions available to Church members to allow them to express their unique talents in positions that also respect their faith commitments. JA19.

The General Conference and ARM have maintained their worldwide ecclesiastical offices in Maryland for decades. And until the recent re-interpretation of Maryland law, these longstanding religious hiring practices were explicitly protected by both Maryland and federal law.

## B. The Maryland Fair Employment Practices Act and its exceptions.

First enacted in the 1960s on the tails of federal employment protections such as Title VII, the Maryland Fair Employment Practices Act ("MFEPA") generally prohibits employment discrimination based on protected categories such as "race, color, religion, sex, age, … sexual orientation, gender identity, [or] military status." Md. State Gov't § 20-606(a)(1)(i). But the law makes multiple exceptions, including one for religious organizations, which explicitly protects religious hiring practices like those relied on by the Church to advance its religious mission. Specifically, MFEPA's religious exemption provides that MFEPA "does not apply" to a religious organization "with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity." *Id.* § 20-604(2). Relying on this

exemption and as required by their faith, the General Conference and ARM have always required all their employees to be members of the Church in regular standing.

MFEPA includes multiple other exceptions as well. It fully exempts small employers with fewer than fifteen employees. *Id.* § 20-601(d). This exemption makes MFEPA inapplicable to the overwhelming majority of Maryland employers.[1] MFEPA also does not apply to any employment decision based in a "bona fide occupational qualification" that is "reasonably necessary to the normal operation of [the employer's] business." Md. State Gov't § 20-605(a)(1). Nor does the law apply to any "educational institution" when "employing employees of a particular religion," as long as the institution is affiliated with, or its curriculum propagates, "a particular religion." *Id.* § 20-605(a)(3). And the law also allows exceptions for employers "observing the terms of a bona fide seniority system or any bona fide employee benefit plan." *Id.* § 20-605(a)(4).

---

[1] *See 2022 SUSB Annual Data Tables by Establishment Industry: The Number of Firms and Establishments, Employment, Annual Payroll, and Receipts by State, Industry, and Enterprise Employment size: 2022*, U.S. Census Bureau (April 10, 2025), https://bit.ly/41D8rHl [hereinafter *2022 SUSB Data*] (dividing Maryland total firms by the sum enterprises with <5, 5-9, and 10-14 employees).

**C. The restrictive reading of MFEPA's religious exemption.**

In August 2023, the Maryland Supreme Court handed down a novel interpretation of MFEPA's religious exemption, giving it the "narrowest reasonable reading." *Doe v. Catholic Relief Servs.*, 300 A.3d 116, 132 (Md. 2023) ("*CRS*"). The consequence of that decision is that religious entities are entitled to invoke MFEPA's religious exemption *only* as to "employees who perform duties that directly further the core mission(s) of the religious entity." *Id.* at 138.

In so holding, the court first noted that the exemption applies to individuals who "perform work connected with the activities of the religious organization," finding this phrase "ambiguous." *Id.* at 131, 132. And because the statute's "plain text" gives no "further guidance as to what constitutes 'work connected with the activities' of a religious entity," the Court provided its own interpretation. *Id.* at 133.

In doing so, the court found significant that Maryland's General Assembly "added sexual orientation as a protected category … —and to its religious entity exemption—in 2001, not in 1972-73," when the provision had last been amended. *Id.* at 135. The court concluded that, because "American society changed radically in its views toward homosexuality between 1973 and 2001" leading to "increased … support for LGBTQ rights," the General Assembly presumably could not have meant the exemption to apply to "*all* types of work performed by *all* employees of a religious entity." *Id.* (emphasis added). The court

therefore presumed that the phrase "connected with" suggested application to only limited employees: those whose duties "directly further the core mission(s)—religious or secular, or both—of the religious entity." *Id.* at 136.

The Maryland high court acknowledged that determining what it means to "directly further" a "core mission" is a "fact-intensive inquiry." *Id.* Thus, to assist in this analysis, the Court identified several points of guidance. It emphasized that "directly" means "directly": employees with duties just "one or more steps removed from taking the actions that effect the goals of the entity" are not subject to the exemption. *Id.* While leaving the question of which employees "directly" advance "core" missions to a case-by-case analysis, *id.* at 137 & n.20, the court provided two examples. First it stated that a "janitor who cleans the headquarters office of a religious entity" with a core mission of "supplying housing to low-income communities" would not be subject to MFEPA's religious exemption. *Id.* at 136. Per the Court, such work only "indirectly furthers the core mission of the religious entity" and is thus not implicated. *Id.* In contrast, the "executive director of a medium-sized religious charity" with a mission of raising funds to "build new schools in underserved communities" *would* by impacted by the religious exemption—"[a]ssum[ing] that this person's job duties include managing other staff members to ensure that all fundraising events are scheduled, advertised, and ultimately successful" and that the entity "uses the proceeds … to help pay for the construction

14

of new schools." *Id.* There, the impact on mission would be sufficiently direct to trigger the religious entity exemption. *Id.*

The court further noted that "the size of the religious entity may be relevant." *Id.* Thus, a "30-person" religious entity "may well have" greater leeway to engage in religious hiring than "an organization with a 300-person staff." *Id.* Finally, the Court emphasized that a religious entity may have multiple "core" missions—both religious and secular. *Id.* To identify them, courts may consider the "totality of the pertinent circumstances," including how the entity describes "its mission(s)" to "public and/or regulators"; "the services [it] provides"; "the people [it] seeks to benefit"; and "how [its] funds are allocated." *Id.* at 137. Even if a religious organization "genuinely subscribe[s] to the tenet that all of its employees' work … is inextricably intertwined with the values of its religion," according to the court, that determination was tasked by "the Legislature" to the courts, "not Maryland's religious entities." *Id.* at 137 n.20.

### D. The Church's actions in light of MFEPA's changes.

In light of this new construction, the Church fears that the MFEPA now makes its religious hiring practices illegal. The General Conference and ARM require all employees to be members in regular standing of the Church—regardless of their job title and responsibilities. This includes employees with obviously religious roles (such as pastors and ministers) and those whose roles may not typically be deemed religious (such as

information technology personnel and maintenance workers). JA26. And they are currently hiring for a variety of roles. JA26-27. With the Maryland Supreme Court's change in MFEPA's longstanding religious exemption, the Church now faces significant uncertainty and fears that continuing with its current hiring practices could lead to liability and compelled hiring of employees who reject its religious mission. JA27.

In light of these concerns, the General Conference and ARM filed their complaint on October 2, 2024. JA10. Soon after, on October 3, 2024, they moved for a preliminary injunction to allow them to continue to operate normally while the litigation proceeds. *See* JA5. On November 11, 2024, Defendants moved to dismiss all claims. *See* JA7. After a combined hearing on both motions, *see* JA8, the district court denied the General Conference and ARM a preliminary injunction and dismissed Counts II, IV, VI, and VII of their complaint. JA649. The General Conference and ARM timely filed this appeal. JA650.

## SUMMARY OF ARGUMENT

This Court should grant Appellants General Conference and ARM (the "Church") a preliminary injunction because the First Amendment protects the Church's right to hire and retain only employees who share and uphold its faith.

The Church has shown likelihood of success on multiple overlapping constitutional doctrines.

*First*, the church autonomy doctrine ensures that religious organizations remain free to make internal church management decisions—including hiring decisions rooted in sincere religious beliefs—without fear of government penalties. This constitutional protection covers all employees as long as the employment decision is rooted in a sincere religious belief.

*Second*, the First Amendment's prohibition against excessive entanglement, rooted in both Religion Clauses, prohibits courts from answering religious questions or scrutinizing internal religious decision-making. Here, the very process by which secular courts would apply MFEPA's narrowed religious exemption—independently evaluating an employee's role and whether it directly furthers a core religious mission based on a review of all relevant factors—requires courts to answer religious questions and is deeply entangling.

*Third*, applying MFEPA's religious nondiscrimination requirement to the Church's mission-aligned hiring violates the Free Exercise Clause because the law is not generally applicable. MFEPA includes numerous secular exceptions covering over 80% of Maryland employers. Granting secular exceptions but not religious exceptions triggers strict scrutiny—a standard the government cannot meet.

The remaining preliminary injunction factors also favor protecting the Church's religious exercise. As the Supreme Court has recently emphasized—"[t]he loss of First Amendment freedoms, for even minimal

17

periods of time, unquestionably constitutes irreparable injury." And the public interest and the balance of the equities also favor the Church, as Maryland has no interest in enforcing an unconstitutional statute.

Finally, this Court should exercise pendent appellate jurisdiction to reverse the district court's order dismissing the Church's claims for excessive entanglement and denominational discrimination. The district court's dismissal of these claims rises and falls with its erroneous analysis on the preliminary injunction. Accordingly, the dismissal of these claims is "inextricably intertwined" with the issues on appeal before this Court and should be reversed.

## STANDARD OF REVIEW

A preliminary injunction is required when the plaintiff establishes: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in his favor"; (4) "and that an injunction is in the public interest." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 138 (4th Cir. 2023) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). This Court reviews "legal conclusions de novo." *Grimmett v. Freeman*, 59 F.4th 689, 692 (4th Cir. 2023). Because the district court's order turned solely on its assessment of whether the Maryland law is constitutional, this Court analyzes the legal issues with "fresh eyes." *Id.*

This Court's review of a district court's grant of a motion to dismiss is also *de novo. Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). To survive

a motion to dismiss, a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

## ARGUMENT

## I. The Church has shown likelihood of success.

Like many religious groups, the Church's "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., and Kagan, J., concurring). And those who serve on the Church's behalf are at the heart of its religious identity and mission. Maryland's interference with the Church's hiring practices thus "undermine[s] not only the autonomy" of the Church, but its "continued viability." *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (statement of Alito, J.). The Church is therefore likely to succeed in showing that such interference violates the First Amendment for at least three reasons.

### A. MFEPA's selective religious exemption interferes with the Church's religious autonomy.

The church autonomy doctrine preserves a "spirit of freedom for religious organizations"—the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Within this sphere, courts

must defer to the decisions of religious organizations "on matters of discipline, faith, internal organization, [and] ecclesiastical rule, custom, or law." *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713 (1976). This protection against "secular control or manipulation," *Kedroff*, 344. U.S. at 116, is essential for upholding the "basic freedom" of "churches in their collective capacities" to "believe as [they] wish[] and to practice that belief according to the dictates of [their] conscience," *Rayburn v. General Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985).

### 1. Church autonomy protects hiring decisions made for religious reasons.

Church employment is a key area in which the First Amendment preserves this foundational autonomy. The Supreme Court has recently expounded church autonomy's protection for employment decisions concerning ministerial employees—those who "minister to the faithful" or help "shape [the church's] own faith and mission." *Hosanna-Tabor*, 565 U.S. at 188-89. In that context, the "authority to select and control" employees "is the church's alone"—regardless of whether the employment decision "is made for a religious reason." *Id.* at 194-95. The First Amendment protects "the act of [the] decision" itself, and not just the "motivation behind it." *Rayburn*, 772 F.2d at 1169.

But church autonomy does not end with this absolute freedom in "the selection of the individuals who play certain key roles." *Our Lady of*

*Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Rather, the ministerial exception is one "component" of the broader church autonomy doctrine. *Id.*; *see* Luke W. Goodrich, *Religious Hiring Beyond the Ministerial Exception,* 101 Notre Dame L. Rev. ___, 51-54 (forthcoming 2026). Indeed, church autonomy "shelters" any religious employment decisions necessary "to preserve the independence of religious institutions in performing their spiritual functions." *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000). So even though the ministerial exception "would not apply to employment decisions concerning purely custodial or administrative personnel," the broader church autonomy doctrine applies wherever some "spiritual function is involved." *Id*.

In other words, church employment decisions, whether ministerial or not, are protected to the extent they are "rooted in religious belief." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 657 (10th Cir. 2002) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). Questions about an employee's *religious* qualifications to work for the church are simply off limits to a secular court. *See Rayburn*, 772 F.2d at 1171 (employment decisions "subject to … scrutiny" only where "decision does not involve the church's spiritual functions"). Rather, the "ecclesiastical government" of "all the individual members, congregations, and officers" is the "unquestioned prerogative" of the church. *Roman Catholic Diocese*

*of Raleigh*, 213 F.3d at 800 (cleaned up) (quoting *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 728-29 (1872)).

The federal courts have long rooted religious hiring protections in the First Amendment. The Supreme Court's ruling in *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327 (1987), is illustrative. There, a building engineer at the church's nonprofit gymnasium sued under Title VII after being terminated for violating the church's religious precepts. *Id.* at 330. After the church asserted Title VII's religious exemption, the employee countered that it violated the Establishment Clause by "allow[ing] religious employers to discriminate on religious grounds in hiring for nonreligious jobs." *Id.* at 331. But the Court upheld the exemption, in part because of constitutional concerns that would otherwise arise. It would be "a significant burden" for a religious organization, "on pain of substantial liability, to predict which of its activities a secular court will consider religious." *Id.* at 336. And that "[f]ear of … liability might affect the way an organization carried out what it understood to be its religious mission." *Id.* A "categorical rule" allowing religious organizations to make religious hiring decisions was, thus, "a suitable means to avoid chilling the exercise of religion." *Id.* at 345 (Brennan, J., concurring).

This Court too has recognized that Title VII's statutory protection for religious hiring by religious organizations is "constitutionally inspired, implementing the First Amendment's command to avoid 'intrusive

22

inquiry into religious belief.'" *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024). And other Courts of Appeal have reached the same conclusion. In *Bryce v. Episcopal Church,* for example, a church employee sued under Title VII, alleging that church officials' statements opposing homosexuality and her same-sex union constituted sex discrimination. 289 F.3d at 651-53. The Tenth Circuit declined to decide whether the plaintiff was a "minister" for purposes of the ministerial exception. *Id.* at 658 n.2. Instead, it held that the "broader church autonomy doctrine" "extends beyond the specific ministerial exception" to include "personnel decision[s]" "rooted in religious belief." *Id.* at 656-57, 658 n.2. Because the plaintiff challenged "a personnel decision based on religious doctrine," her suit was barred. *Id.* at 660.

Other courts have also applied church autonomy to bar employment claims even when the employee wasn't a minister, so long as the employment decision was based in religion. For example, in *Butler v. St. Stanislaus Kostka Catholic Academy*, the court found that, "[e]ven if [plaintiff] did not qualify as a ministerial employee," the "long recognized" and "broader" "church autonomy doctrine" barred a Title VII sexual-orientation discrimination claim. 609 F. Supp. 3d 184, 198, 204 (E.D.N.Y. 2022). The court found that the religious employer had established a valid reason for the plaintiff's termination just days into his tenure: that he violated Catholic beliefs. *Id.* at 203. Thus, his claim could survive only if he submitted sufficient evidence to show that this

religious reason was pretextual—which he didn't. *Id.*; *see also, e.g., Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1174, 1185 (D. Colo. 2023) (protecting religiously motivated employment decisions for non-ministers from imposition of non-discrimination standards); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871-73 (N.D. Ill. 2019) (applying "overarching principle of religious autonomy" to dismiss challenge to doctrinally rooted employment decision, regardless of whether plaintiff was a minister); *Aparicio v. Christian Union, Inc.*, No. 18-cv-592, 2019 WL 1437618, at *9 (S.D.N.Y. Mar. 29, 2019) (Free Exercise Clause barred non-minister's Title VII sex discrimination claim); *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 293-94, 296 (Ind. 2003) (citing *Bryce* to bar tortious-interference claim against Archdiocese, though plaintiff lacked "ministerial-type duties").

The district court's conclusion that the church autonomy doctrine extends only to the ministerial exception, but no further, JA619, is thus not only wrong, but flies in the face of statements of the Supreme Court and holdings of multiple courts that have concluded the opposite.

## 2. Church autonomy's associational protections reinforce the Church's right to make employment decisions based on religion.

Church autonomy protections for defining membership and engaging in expressive association further support the Church's religious hiring practices. The Supreme Court has long acknowledged that courts have

24

"no power to revise or question ordinary acts of church discipline, or of excision from membership." *Bouldin v. Alexander*, 82 U.S. 131, 139 (1872). Courts "cannot decide who ought to be members of the church" and may not question "whether the excommunicated have been regularly or irregularly cut off." *Id.* at 139-40. Rather, "[a]ll who unite themselves to such a body do so with an implied consent" to the "ecclesiastical government of all the individual members … and officers." *Kedroff*, 344 U.S. at 114. Allowing members to appeal membership and service qualifications "to the secular courts," would "lead to the total subversion of such religious bodies." *Id.* at 114-15.

For many religious organizations, including the Church, employment is inextricable from membership. Religion includes "important communal elements." *Amos*, 483 U.S. at 341 (Brennan, J., concurring). Believers thus "exercise their religion through religious organizations," which become "organic entit[ies] not reducible to a mere aggregation of individuals." *Id.* at 341-42. And in many faith traditions—as with the Church—the religious body calls upon its own members to carry out its work. JA17; *see also, e.g.*, *Amos*, 483 U.S. at 330 & n.4. Indeed, Title VII was specifically intended "to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'" *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011).

Especially considering the biblical admonition to "not be as the hypocrites," *Matthew* 6:5; *see also* JA119-120 (quoting *1 Tim*. 3:2-13); *Matthew* 7:5; *Mark* 7:6, the Church believes it has a religious charge from God for its employees to exemplify the Church's teachings. JA17-19. Together they are asked to model the body of the Church, sincerely reflecting its religious aspirations for a more holy society. JA18-19. Members, whose tithes are paid at significant personal sacrifice, JA18; *see also* JA187 (defining tithes as returning ten percent of income to the denomination), may lose confidence in the Church if their tithes are used to compensate employees who reject, or even flout, the Church's religious beliefs and practices. It simply makes no sense to say courts are barred from interfering in who can be a member of the church yet can scrutinize who is given the religiously "more important" responsibility to represent the church to the world and to participate in its organizational advancement. Douglas Laycock, *Towards A General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373, 1408 (1981). Thus, "[w]hen an employee agrees to do the work of the church, he must be held to submit to church authority in much the same way as a member." *Id*. at 1409; *see also Kedroff*, 344 U.S. at 114 ("All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it."). The Church's right to decide who is religiously qualified

for membership inherently includes the right to decide who is religiously qualified to work on its behalf.

The free association aspects of church autonomy further reinforce this point. The "freedom to … worship" includes a "correlative freedom to engage in group effort" to that end. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984); *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Indus. Rev. Comm'n*, 605 U.S. 238, 257 (2025) (Thomas, J., concurring) ("implicit" in "right to engage" in First Amendment activities is "corresponding right to associate with others"). Indeed, "[r]eligious groups are the archetype of associations formed for expressive purposes." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., and Kagan, J., concurring). Their "very existence is dedicated to the collective expression and propagation of shared religious ideals." *Id.*

For the Church, a crucial part of that effort is persuading others to sincerely abide by its religious precepts, including exercising faith in Jesus Christ, observing the Saturday Sabbath, maintaining biblical mores around family and sexuality, and upholding the Church's health and diet standards. *See* JA361. "It would be difficult," to say the least, for the Church "to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006); *cf. Agency for Int'l Develop. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219 (2013) (rejecting

27

accommodation that would protect "express[ion] [of] beliefs only at the price of evident hypocrisy"). Church autonomy protects a church's "independence" in such "matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 591 U.S. at 747. There is "no clearer example of an intrusion into" internal governance than "a regulation that forces the group to accept members it does not desire." *Slattery v. Hochul*, 61 F.4th 278, 286-87 (2d Cir. 2023). The Church's freedom to associate thus reinforces its church autonomy right to decide which employees are religiously qualified to help carry out its mission.

### 3. Applying MFEPA's selective exemption to the Church violates its religious autonomy.

Narrowing MFEPA's religious exemption to limit religious hiring by the Church drastically interferes with both its religious decision-making on who it hires and the Church's ability to carry out its religious mission. As previously noted, the Seventh-day Adventist faith requires significant sacrifice of its members, who, among other things, are asked to return ten percent of their income to the Church as tithes, to abstain from employment and other work from Friday sundown to Saturday sundown, to abstain entirely from alcohol, tobacco, and certain foods, and to live consistent with the teachings of Jesus Christ. *See* JA17-18, JA187.

And the "central objective" of all of the Church's organizations is "to proclaim the gospel to all the world" for "the salvation of man," and "every

denominational employee has a responsibility to participate in [that] mission." JA361. Employees are expected to act as a community of believers who encourage and support one another as they seek to advance the aims of the Church. JA18-19. They also "represent Christ to each other and to those visiting" the Church's facilities. JA327. They are charged with creating a culture that reinforces the Church's beliefs and practices, demonstrating the spiritual blessings that come from personal sacrifice, Sabbath observance, healthy living, and submission to God's will. JA18-19. Their workplace is infused with religious observance. All employees are expected to attend "daily worship" that "is designed to encourage a spirit of loyalty and devotion to the Lord" and to "assist in creating an atmosphere of spiritual unity" within the organizations. JA329; *see also* JA321. And employees regularly participate in "interactive prayer, singing and musical worship, and Bible study from the Church's Sabbath School curriculum," and "shar[e] spiritual encouragement and prayer … [with] each other throughout the workday." JA19. As members of the Church and friends of other faiths (or no faith at all) visit the Church's world headquarters, all employees are asked to be "exemplary witness[es]" in living the Seventh-day Adventist faith and to be ready always to help visitors understand and appreciate their beliefs and practices. JA18-19, JA455. And all of the organizational decisions made by Appellants "are guided by Church teachings, regardless of whether the matter at issue is directly related to

29

faith or doctrine" to "ensure all operations are consistent with their Adventist identities." JA19. This is the work and purpose of the Church and its employees.

Yet, under *CRS*, only those employees who "directly" further a "core" mission of the Church—as determined by a civil court—can be asked to embrace its religious beliefs and practices. 300 A.3d at 132. Any employee just "one or more steps" removed from advancing a core mission may not be required to uphold the Church's beliefs or practices. *Id*. at 136. The Church thus may be compelled to hire Christians who observe a Sunday Sabbath and individuals who drink alcohol and smoke or violate other faith practices. It could not categorically refuse to hire non-Christians or atheists. Nor could it exclude even individuals who actively speak out against particular Church teachings and practices. This would change the very nature of the Church and its institutions, causing the Church "as it currently identifies itself to cease to exist." *Christian Legal Soc'y*, 453 F.3d at 863; *see also Spencer v. World Vision, Inc.*, 633 F.3d 723, 742 (9th Cir. 2011) (Kleinfeld, J., concurring) ("[C]oerced staffing of religious institutions by persons who rejected or even were hostile to the religions the institutions were intended to advance … would destroy the freedom of Americans to practice their religions.").

Even beyond disrupting the Church's existing religious mission and culture, MFEPA now requires the Church to actively accommodate the religious preferences of employees of other faiths, even if they directly

violate Seventh-day Adventist precepts or undermine its Church-centered work environment. *Harmon v. Kaiser Permanente Ins. Co.*, No. 2122, 2025 WL 2080740, at *3 (Md. App. Ct. July 24, 2025) (religious discrimination includes "failure to accommodate"). They could be compelled to accommodate employees who want to observe a Sunday instead of a Saturday Sabbath, to provide prayer rooms for Muslims and Jews, or to make any number of other religious accommodations in direct contradiction of their own mission to advocate Adventist practices. They would have to excuse employees from organization-wide religious observances like daily worship. *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 621 (9th Cir. 1988) (requiring option for employees to skip on-site worship services). And they would have to shield non-believing employees from the many aspects of Church employment permeated with religion. *See Shapolia v. Los Alamos Nat'l Lab'y*, 992 F.2d 1033, 1036 (10th Cir. 1993) (noting that analogous provisions in "Title VII ha[ve] been interpreted to protect against requirements of religious conformity"). Forcing the Church to "hire people utterly inconsistent with their mission and utterly opposed to their values," Christopher C. Lund, *In Defense of the Ministerial Exception*, 90 N.C. L. Rev. 1, 30 (2011), would thus deprive them of that "independence in matters of faith and doctrine and in closely linked matters of internal government" to which they are entitled under the church autonomy doctrine, *Our Lady*, 591 U.S. at 747. The district court erred in concluding otherwise.

**B. Applying MFEPA's selective exemption to Church employment will entangle courts in religious questions and religious decision-making.**

The distinct First Amendment doctrine against excessive entanglement likewise bars the MFEPA inquiry imposed by the Maryland Supreme Court's ruling in *CRS*. Excessive entanglement is primarily concerned with the way secular courts approach religious questions and interact with religious organizations. *Walz v. Tax Comm'n*, 397 U.S. 664, 670 (1970) (the Religion Clauses "mark boundaries to avoid excessive entanglement"); *see also Billard*, 101 F.4th at 325 (Religion Clauses "confine[] the state and its civil courts to their proper roles"). Thus, any attempt to "scrutiniz[e] whether and how a religious [entity] pursues its … mission … raise[s] serious concerns about state entanglement with religion." *Carson v. Makin*, 596 U.S. 767, 787 (2022). Yet, that is precisely what the MFEPA religious-exception inquiry now demands.

The Supreme Court's ruling in *NLRB v. Catholic Bishop*, 440 U.S. 490 (1979), is instructive. There, the NLRB ordered two Chicago-area Catholic schools to bargain collectively with their "lay teachers"—*i.e.*, those ostensibly not playing a religious role. *Id.* at 494-95. The Supreme Court, however, rejected the NLRB's action because it "would give rise to serious constitutional questions." *Id.* at 501. The Court emphasized that resolving labor disputes between the teachers and schools, particularly when the schools asserted their practices "were mandated by their

religious creeds," would "necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id.* at 502. Thus, the Court held, the "very process of inquiry" into that dispute, much less "the conclusions that may be reached by the Board," "may impinge on rights guaranteed by the Religion Clauses." *Id.*

The entanglement is even worse here. For every non-ministerial Church position, the Maryland Supreme Court has imposed a "fact-intensive inquiry" as to whether MFEPA's religious exemption applies. *CRS*, 300 A.3d at 136. Without any deference to the religious organization's sincere religious beliefs, *id.* at 137 n.20, a court must first identify a religious organization's "core" missions, *id.* at 136. Then, a court must determine whether each particular employee advances that mission "directly" or from a place "one or more steps removed." *Id.* at 136. In making these determinations, courts are encouraged to consider "the totality of the pertinent circumstances." *Id.* At minimum, these include an investigation into the church's own "description of its mission(s)" as provided "to the public and/or regulators"; the actual "services the entity provides"; the "people [it] seeks to benefit"; and even how its "funds are allocated." *Id.* at 137 & n.20.

This is precisely the type of "scrutinizing" a religious entity that "raise[s] serious concerns about state entanglement with religion." *Carson*, 596 U.S. at 787. First, it inevitably entangles courts in religious

33

questions, because determining which missions are "core" requires weighing an organization's religious beliefs to understand which employment tasks are sufficiently important to trigger protection. For example, Appellants assert that one of their core missions for employees is to exemplify the faith to members and visitors and to create a work environment that sincerely reflects the faith's religious aspiration to create a harmonious society. JA18-19. Yet, under *CRS*, even though the Church "genuinely subscribe[s] to [this] tenet," a court must separately "analyze the activities" of the Church to see if *the court* believes the tenet is sufficiently "core … for the purpose of applying the exemption." *CRS*, 300 A.3d at 137 n.20. Such second-guessing of a church's stated religious mission is just one obvious form of prohibited entanglement. And there are myriad such questions regarding the religious mission underlying each church-employment position.

Second, the very "process of inquiry," *Catholic Bishop*, 440 U.S. at 502, is also unconstitutionally entangling. Forcing the Church to justify its religious hiring practices based on how they have publicly "descri[bed]" a particular employment position or "allocated" funding, *CRS*, 300 A.3d at 137, would alter the character of the Church by encouraging it to make hiring and operation decisions with an eye toward the government's "[b]ureaucratic suggestion" rather than its "own perception of its needs and purposes." *Rayburn*, 772 F.2d at 1171; *see also Bell v. Presbyterian Church (USA)*, 126 F.3d 328, 331-32 (4th Cir. 1997) ("focus[ing] on

how … churches spend their … funds" would unlawfully "interpose the judiciary into the Presbyterian Church's decisions"). Court-imposed "remedies" and the costs related to post-litigation "compliance" would further pressure conformity to secular priorities. *Rayburn*, 772 F.2d at 1171. This "prospect of government intrusion" risks that "the community's process of self-definition would be shaped in part by the prospects of litigation" and the "case-by-case analysis" of all its activities. *Amos*, 483 U.S. at 343-44 (Brennan, J., concurring). Indeed, because religion infuses everything the Church does, the scrutiny imposed by *CRS* threatens to "involve the [courts] in 'nearly everything that goes on'" within the Church. *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 829 (D.C. Cir. 2020). By "both produc[ing] excessive government entanglement" and "creat[ing] the danger of chilling religious activity," *Amos*, 483 U.S. at 344 (Brennan, J., concurring), the MFEPA, as interpreted by *CRS*, violates the Religion Clauses.

This religious scrutiny is *particularly* problematic here because it applies to "the church itself, the institution with which the danger of entanglement is most sensitive." *Rayburn*, 772 F.2d at 1170. The General Conference is the highest body within the Church, and ARM is a closely linked ministry whose exclusive mission is "to protect the ministries of the Seventh-day Adventist world church." JA15. These are precisely the kind of religious bodies whose operational choices are infused with "matters of … faith and doctrine" such that their internal decisions

35

cannot be second-guessed without forcing the state into "a religious thicket." *Milivojevich*, 426 U.S. at 719, 722. The entanglement required by *CRS* poses an all-too-real "possibility of secular approval granted or withheld from religious denominations." *Rayburn*, 772 F.2d at 1170 n.7 (citing *Catholic Bishop,* 440 U.S. at 502).

The district court ignored all this on the ground that entanglement as a cause of action is the progeny of *Lemon v. Kurtzman* alone and died alongside it. JA621-624. Neither premise holds up. First, the Supreme Court recognized that religious entanglement violates the First Amendment's Religion Clauses long before the ill-fated *Lemon* test was announced. Indeed, the "idea of entanglement linked to government control over religion and intermeddling with religious practices" was present at the founding. Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash. U. L. Rev. 1701, 1721 (2020). And the Court's seminal Establishment Clause case sought to define the line maintaining "separate spheres" between "religion and civil authority" as "the First Amendment drew them." *Everson v. Bd. of Educ.*, 330 U.S. 1, 63 (1947) (Rutledge, J., dissenting).[2] The anti-entanglement principle is thus

---

[2]  *See also, e.g., id.* at 16 (majority opinion) ("Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups."); *People ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71*, 333 U.S. 203, 210-11 (1948) (same).

inherent in the First Amendment's Religion Clauses.[3] And the Court again construed the anti-entanglement principle "to include an approach focused on protecting the autonomy of the religious organization" in 1970—before *Lemon* was decided. Barclay, 97 Wash. U. L. Rev. at 1707 (citing *Walz*, 397 U.S. at 680); *see also Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (forbidding civil courts from resolving controversies over religious doctrine or practice).

Second, the Supreme Court has continued to apply this form of the anti-entanglement principle post-*Lemon*. In *Carson*, for example, the Court warned against interpretations that "raise serious concerns about state entanglement with religion and denominational favoritism." 596 U.S. at 787. Recent decisions from other courts of appeals confirm this understanding. *See Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 808 (9th Cir. 2024) ("fundamental purpose" of Establishment Clause "was to disentangle government and religion, or to prevent excessive entanglement."); *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1270 (10th Cir. 2024) (inquiries regarding religious belief or practice can be sufficient to "violate[] the Establishment

---

[3] This is consistent with the district court's acknowledgement that, post-*Lemon*, the Establishment Clause must be construed "by 'reference to historical practices and understandings' and … focus on 'original meaning and history.'" JA621 (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535-36 (2022)).

Clause's prohibition of excessive entanglement between religion and government, and is therefore unconstitutional") (cleaned up).

Even if, as the district court claimed, entanglement comprised a "novel legal theory" based on Supreme Court cases that "merely caution against or raise questions regarding government entanglement with religion," JA623, JA637, the district court was wrong to disregard it. "[L]ower courts grappling with complex legal questions of first impression must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019) (en banc). Even if dicta, "observations by the Court, interpreting the First Amendment and clarifying the application of its Establishment Clause jurisprudence, constitute the sort of dicta that has considerable persuasive value in the inferior courts." *Myers v. Loudoun Cnty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). But here, a long history since the founding confirms that the First Amendment prohibits government entanglement in religious affairs. Because *CRS* makes such entanglement endemic, the trial court erred in denying a preliminary injunction.

## C. Maryland's refusal to extend MFEPA's religious exemption to the Church violates the Free Exercise Clause.

Under the Free Exercise Clause, laws that burden religious exercise and are not both generally applicable and neutral are subject to strict

scrutiny. *Kennedy,* 597 U.S. at 525. Here, there is no question that MFEPA is neither generally applicable nor neutral. Thus triggering strict scrutiny, MFEPA fails this "most demanding" constitutional standard. *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

### 1. Preventing the Church from requiring employees to embrace its faith burdens the Church's religious exercise.

Neither the district court nor Maryland below disputed that MFEPA burdens the Church's religious beliefs in prohibiting its mission-aligned hiring practices. JA626. Nor could they. The Church's religious exercise includes creating a community and workplace composed of those who share its faith. JA18. MFEPA forbids this religious exercise, instead requiring Appellants to hire certain employees regardless of whether they are willing to embrace and uphold its religious beliefs and practices. This burdens the Church's religious exercise because it interferes with the Church's ability to "live out [its] faiths … through the performance of religious acts." *Mahmoud v. Taylor*, 145 S. Ct. 2351 (2025); *see also*, *Thomas v. Rev. Bd.*, 450 U.S. 707, 717-18 (1981) ("[A] burden upon religion exists" where government "compel[s] a violation of conscience" or "pressure[s] … an adherent" to "violate his beliefs.").

### 2. MFEPA's nondiscrimination requirements are not generally applicable.

A law is not "generally applicable" when it either treats "comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), or "invites the government to consider

the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (cleaned up). MFEPA fails under both *Tandon* and *Fulton*: it treats comparable secular activity more favorably by granting categorical exceptions and it permits individualized exceptions from its nondiscrimination requirement.

***Comparable secular exceptions.*** MFEPA creates at least four categories of exceptions:

(1) It exempts employers with less than fifteen employees, Md. Code, State Gov't § 20-601(d)(i)(2);

(2) it exempts "bona fide private membership club[s] … exempt from taxation under § 501(c) of the Internal Revenue Code," *id.* at § 20-601(d)(3);

(3) it allows religious "school[s], college[s], and universit[ies]" controlled by a religious entity or "directed toward the propagation of a particular religion" to employ only "employees of a particular religion," *id.* at § 20-605(a)(3); and

(4) it exempts employers if they are "observing the terms of a bona fide seniority system or any bona fide employee benefit plan," *id.* § 20-605(a)(4).

These exceptions allow other organizations to make employment decisions under MFEPA that are comparable to the Church's religious hiring practices now prohibited by *CRS*.

40

Comparability is "judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. Thus, if a law "prohibits religious conduct while permitting secular conduct that undermines the governments asserted interests in a similar way," strict scrutiny is triggered. *Fulton*, 593 U.S. at 534. Here, the small-business exemption alone allows most for-profits to make the same decisions the Church does simply due to their size.[4] And, taken together, MFEPA's categorical exceptions, which excuse over 80% of Maryland employers from complying with any aspect of the law,[5] undermine the government's asserted interest in preventing discrimination in the precise same way as (and to a *much greater* degree than) would granting the Church a religious accommodation. That easily triggers strict scrutiny, as—for the same reason—do the exceptions for private clubs, religious educational institutions, and employers with bona fide seniority systems and employment benefit plans. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (categorical exceptions trigger strict scrutiny under "bedrock requirement[] of the Free Exercise Clause").

---

[4] *See 2022 SUSB Data, supra* n.1, https://bit.ly/41D8rHl (dividing Maryland total firms by the sum enterprises with <5, 5-9, and 10-14 employees).

[5] *Id.*

At least two courts have held that categorical exemptions from employment discrimination laws trigger strict scrutiny. *See* Goodrich, *Religious Hiring Beyond the Ministerial Exception*, 101 Notre Dame L. Rev at 79-82. For example, in *Union Gospel Mission of Yakima v. Ferguson*, the court found that Washington's employment non-discrimination law was not generally applicable because it exempted employers with fewer than eight employees, "putting for-profit, non-religious organizations on unequal footing" with organizations that, as a matter of religious belief, hired only employees who shared the organization's faith. No. 1:23-cv-3027, 2024 WL 4660918, at *3 (E.D. Wash. Nov. 1, 2024). The small-employer exemption alone was enough for the court to conclude that the law was not generally applicable. *Id*. And in *Bear Creek Bible Church v. EEOC*, a court held that Title VII's small-employer exemption rendered the law not-generally-applicable, because it "undercut" the government's purported "interest in eradicating all forms of discrimination." 571 F. Supp. 3d 571, 613 (N.D. Tex. 2021), *rev'd in part on other grounds*, 70 F.4th 914 (5th Cir. 2023).

Moreover, secular organizations in Maryland can and do require employee alignment with their missions.[6] Under MFEPA, they are free

---

[6]  *See, e.g.*, *Climate Campaign Representative*, Sierra Club, Maryland Chapter, https://perma.cc/74B3-KCJA (a "successful candidate must" be "committed to continuously deepening and evolving [his] own understanding of systems of oppression through study, openness, and

to curate their organizational culture hiring only individuals who embrace and uphold their secular missions. But religious organizations risk liability if they require religious alignment from their employees. This implicit exception treats the interests of secular mission-driven organizations as more worthy of accommodation than the Church's religious beliefs, thus triggering strict scrutiny. *Tandon*, 593 U.S. at 62 (treating "*any* comparable secular activity more favorably than religious exercise" triggers strict scrutiny); *see also Loe v. Jett*, No. 23-cv-1527, 2025 WL 2430572, at *17 (D. Minn. Aug. 22, 2025) (prohibition on religious faith statements but not secular mission statements "is not generally applicable").

The district court concluded that MFEPA's categorical exceptions do not undermine general applicability because both religious and secular employers qualify for the exemptions. JA627-630. But this misunderstands the inquiry. It's not whether secular *employers* are treated more favorably, it's whether secular *interests* are favored over religious ones. In *Tandon*, for example, the Supreme Court "summarily rejected" a similar argument. There, the district court had upheld a rule that—in an effort to slow the spread of COVID—prohibited all home gatherings, because it prohibited secular and religious gatherings alike. The Supreme Court reversed, however, because the rule exempted

---

humility" and "easily recognize your [his] relationship to privilege and power").

43

"commercial activity in public buildings" that equally threatened the government's asserted health interest. *Compare Tandon*, 593 U.S. at 64, *with Tandon v. Newsom*, 992 F.3d 916, 923 (9th Cir. 2021). Similarly, in *Union Gospel Mission*, 2024 WL 4660918, at *4, "[f]or purposes of examining whether a law [was] neutral or generally applicable," it was "insufficient to examine how the law treat[ed] … a religious employer with five employees and a secular employer with five employees." Rather, the court had to consider whether *any* religious organization was treated "differently" than *any* exempted organization. *Id*. The same is true here.

*Kim v. Board of Education of Howard County*, 93 F.4th 733 (4th Cir. 2024), relied on by the district court, JA629, JA631, is not to the contrary. In *Kim*, this Court held that a county's procedure allowing public-school students to vote for a student school board representative was generally applicable because the county "barr[ed] non-public-school students, religious and nonreligious alike, from choosing or serving as the student member." *Kim,* 93 F.4th at 748. But the parties there didn't identify any exemptions to the county's general rule that favored secular interests over religious ones. *Id.* at 747-49. That's not the case here. Maryland cannot tell the Church its sincere religious beliefs don't merit an exception to its non-discrimination requirements when it gives exceptions from the same requirement to private clubs, unions, small employers, or even other religious employers. *Fulton*, 593 U.S. at 534.

44

***Individualized discretion.*** MFEPA separately fails general applicability because the Commission also has discretion to grant case-by-case exceptions from MFEPA's religious nondiscrimination requirement. As MFEPA explains, the law "does not prohibit" hiring decisions based on "sex, age, religion, national origin, disability, or military status" when those characteristics are "bona fide occupational qualification[s] reasonably necessary to the normal operation of that business or enterprise." Md. Code, State Gov't § 20-605(a)(1). Determining whether a BFOQ is "reasonably necessary" to an employer's "normal operation," however, is an inherently discretionary, case-by-case determination that puts significant authority in the Commission's hands to apply and enforce this broadly worded standard. *See, e.g.*, *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 760-61 (6th Cir. 2004) (recognizing "the case-by-case nature of the BFOQ analysis"). Allowing "exemptions based on the circumstances underlying each application" triggers strict scrutiny. *Fulton,* 593 U.S. at 534.

The district court declined to apply strict scrutiny because it held that MFEPA's individualized exemptions are not discretionary *enough* to trigger it. JA607, JA613. But *Fulton*, *Sherbert*, and *Lukumi*, all stand for the principle that "'individualized exemptions' are those that look to the particular justifications of an individual and weigh them under overly flexible and discretionary standards like 'good cause' or 'necessity' or 'reasonableness,' and without objective standards." *Canaan Christian*

45

*Church v. Montgomery Cnty.*, 29 F.4th 182, 203 (4th Cir. 2022) (Richardson, J., concurring). MFEPA's BFOQ analysis fits that description precisely. And the supposed "criteria set forth in Maryland regulations" that the district court deemed to adequately cabin the Commission's discretion, JA633, are not objective at all. Rather, the cited regulations allow a BFOQ defense if the challenged qualification is "reasonably necessary," if the employer's needs cannot be addressed with "reasonable accommodations," or if it's "highly impractical" to evaluate a particular qualification on an individual basis. Md. Code Regs. 14.03.02.08(A). To say such a scheme isn't discretionary blinks reality.

Multiple circuits have rejected the district court's approach. For example, in *FCA*, the Ninth Circuit sitting en banc held that "[t]he [defendant's] assertion that *Fulton* was only concerned with 'unfettered' discretion, is overly narrow. Properly interpreted, *Fulton* counsels that the mere existence of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable." 82 F.4th at 687-88; *see also Smith v. City of Atl. City*, 138 F.4th 759, 771 (3d Cir. 2025) (regime allowing decision-makers with "built-in discretion" to "deviate" from the rule is not generally applicable). And *Axson-Flynn v. Johnson*, decided before *Fulton* strengthened this requirement, also recognized that "case-by-case determinations" can trigger strict scrutiny. 356 F.3d 1277, 1298 (10th Cir. 2004).

As these cases confirm, "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 523 (cleaned up). Nothing in *Fulton* suggests that discretion must be wholly unbounded, and the district court erred in concluding otherwise.

### 3. MFEPA's nondiscrimination requirements are not neutral.

The First Amendment also demands "neutrality" and "subjects any state-sponsored denominational preference to strict scrutiny." *Catholic Charities Bureau,* 605 U.S. at 241. Differential treatment of religious groups based on what those groups believe renders a law not neutral for Free Exercise purposes. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 536-37 (1993). When a government "differentiat[es] between religions based on theological choices" in granting religious exemptions, "it imposes a denominational preference" that must satisfy strict scrutiny. *Catholic Charities Bureau*, 605 U.S. at 250, 254.

The Maryland Supreme Court's interpretation of MFEPA's religious exemption violates this principle. Under *CRS*, the availability of MFEPA's religious exemption turns on factors like the "services the entity provides," "the people the entity seeks to benefit," and "how the entity's funds are allocated," all of which are rooted in the Church's

47

theological beliefs. 300 A.3d at 136-37. These factors favor certain religious groups over others in *the same way* that the Wisconsin Supreme Court's unconstitutional religious-exemption test did in *Catholic Charities Bureau*—"along theological lines." 605 U.S. at 249-50. For the Church (and many other religious groups) determining who to serve, what services to provide, and how to spend their money are "inherently religious choices." *Id.* at 250; *see* JA17-20 (describing religious motivations for employment policies). Thus, *CRS*'s conditioning of MFEPA's religious exemption on such religious decisions is a "paradigmatic" example of a "denominational preference" requiring strict scrutiny. *Catholic Charities Bureau*, 605 U.S. at 249-50.

### 4. MFEPA's prohibition on mission-aligned hiring cannot satisfy strict scrutiny.

Having triggered strict scrutiny, MFEPA cannot satisfy it. "[S]trict scrutiny requires the State to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.'" *Tandon*, 593 U.S. at 64-65 (quoting *Lukumi*, 508 U.S. at 546). Defendants bear the burden on this showing. *Redeemed Christian Church of God v. Prince George's County*, 17 F.4th 497, 510 (4th Cir. 2021). But, as applied to the Church, MFEPA's interest in preventing religious discrimination is not compelling, especially considering that it has been a long-standing practice nationwide and explicitly allowed under Title VII and even under Maryland law before *CRS*. *See CRS*, 300 A.3d at 133-34

(acknowledging that "as of 1973 [Title VII and MFEPA] exempted religious discrimination claims against a religious entity").

Even assuming the government's interest in preventing religious discrimination *by churches* is important in the abstract, strict scrutiny does not permit the government to rely on such "broadly formulated interests" when denying religious accommodations. *Fulton*, 593 U.S. at 541. The inquiry is not whether Defendants "ha[ve] a compelling interest in enforcing [their] non-discrimination policies generally, but whether [they] ha[ve] such an interest in denying an exception" to the Church specifically. *Id.* Defendants have *never* asserted a specific interest in requiring the Church to forgo its long-standing employment practices, nor can it make any such showing.

Further, MFEPA's numerous secular exceptions—already covering large swaths of Maryland's workforce—belie Defendants' claimed interest in enforcing MFEPA against the Church. *See Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) ("underinclusive" regulations fail strict scrutiny). MFEPA's fifteen-employee threshold exempts roughly 80% of employers in Maryland, and its exception for certain religious schools, colleges, and universities is constitutionally indistinguishable from the religious accommodation the Church seeks here. *Cf. Rayburn*, 772 F.2d at 1170 (constitutional concerns are "all the more serious" when Title VII is applied to churches rather than religious schools). This is the exact type of statutory "loophole" that "actually authorizes a broad swath" of

49

conduct "incompatible with the … interests justifying the ban" that fails strict scrutiny. *Am. Ass'n of Pol. Consultants, Inc. v. FCC,* 923 F.3d 159, 169-70 (4th Cir. 2019); *see also Fulton*, 593 U.S. at 542 (exemption belies any assertion that the government's interest can "brook no departures."). As applied the Church, Defendants' interests aren't compelling.

Nor is outlawing the Church's mission-aligned hiring the least restrictive means of advancing this asserted interest. Laws that are "overbroad or underinclusive in substantial respects" fail this prong of strict scrutiny. *Lukumi*, 508 U.S. at 546; *see also Am. Ass'n of Pol. Consultants*, 923 F.3d at 167 & n.9. Thus, even assuming a compelling interest in preventing religious discrimination, MFEPA is incredibly underinclusive: As noted earlier, MFEPA does not apply to the vast majority of Maryland employers and is rife with other exceptions. Most Maryland employers could adopt the same policies and make the same decisions as the Church without any risk of liability. A law shot through with that many exceptions is so "hopelessly underinclusive" that enforcing it against the Church *cannot* be the approach least restrictive of religious exercise. *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 634 (4th Cir. 2016).

The experience of other states and the federal government also confirms that Maryland can achieve its interest in preventing invidious religious discrimination without restricting the Church's religiously motivated hiring practices. When "so many" other jurisdictions

accommodate a particular religious exercise, the government "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt v. Hobbs*, 574 U.S. 352, 369 (2015); *Mast v. Fillmore County*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J., concurring) (When other governments could accommodate religious exercise, the defendant "bore the burden of presenting a 'compelling reason why' it cannot offer the [plaintiff] this same alternative." (quoting *Fulton*, 593 U.S. at 542)).

By Appellants' count, 31 states, D.C., and the United States either don't regulate employment discrimination at all or have a statutory religious exemption that would likely cover the Church's hiring practices.[7] Of the states with a nondiscrimination requirement and an

---

[7]   Alabama (no law); Arizona (Ariz. Rev. Stat. § 41-1462); Arkansas (Ark. Rev. Stat. § 16-123-103); California (Cal. Gov't Code § 12940(j)(4)(B)); Colorado (Colo. Rev. Stat. § 24-34-402(6)); District of Columbia (D.C. Code § 2-1401.03(b)); Florida (Fla. Stat. § 760.10(9)); Hawaii (Haw. Stat. § 378-3(5)); Indiana (Ind. Code § 22-9-5-22); Iowa (Iowa Code § 216.6(6)(d)); Maine (Me. Stat. 5 § 4573-A(2)); Massachusetts (Mass. Stat. 151B § 4(18)); Minnesota (Minn. Stat. § 363A.26); Mississippi (no law); Missouri (Mo. Stat. § 213.010(8)); Montana (Mont. Stat. § 49-2-101(11)); New Hampshire (N.H. Rev. Stat. § 354-A:18); New Jersey (N.J. Stat. § 10:5-12(a)); New Mexico (N.M. Stat. § 28-1-9(B)); New York (N.Y. Exec. Law § 296(11)); North Carolina (no law); Ohio (Ohio Stat. § 4112.02(O)); Pennsylvania (43 Pa. Stat. § 955(10)); Rhode Island (R.I. Stat. § 28-5-6(9)(ii)); South Carolina (S.C. Stat. § 1-13-80(I)(5)); South Dakota (S.D. Stat. § 20-13-18); Texas (Tex. Lab. Code § 21.109); United States (42 U.S.C. § 2000e-1(a)); Utah (Utah Stat. § 34A-5-102(1)(i)(ii)); Vermont (Vt. Stat. tit. 21, § 495(e); Virginia (Va. Code § 2.2-3905(E));

explicit religious exemption, Appellants are aware of only two states—Maryland and Washington—that have recently reinterpreted their state statutes to forbid co-religionist hiring. And those arose not out of legislative choice but from recent innovations in statutory interpretation by state courts which upended decades of consistent application in line with other states and the federal government. And the Washington approach has already been held by a federal district court to violate the Free Exercise Clause for some of the same reasons asserted here. *Union Gospel Mission*, 2024 WL 4660918, at *3-4. That so many other jurisdictions can advance their interest in preventing employment discrimination without burdening religious exercise confirms Maryland could too.

Finally, the government fails strict scrutiny because it cannot point to an "'actual problem' in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). For decades prior to *CRS*, MFEPA exempted the Church's mission-aligned hiring practice. *See, e.g., Montrose Christian Sch. Corp. v. Walsh*, 770 A.2d 111, 120 (Md. 2001) ("[S]tate law, like its federal counterpart, does not prohibit discrimination by religious organizations based on religious creed."). And there is no indication that the prior scheme did not serve the state's asserted interest, nor is there any indication that the state legislature considered exempting churches

---

Wisconsin (Wis. Stat. § 111.337(2)(a)); Wyoming (Wyo. Stat. § 27-9-102(b)).

problematic. Rather, the Maryland Supreme Court reinterpreted the law without textual support or any record of problems. *CRS*, 300 A.3d at 133 ("plain text of the statute does not provide any further guidance"). Absent evidence of an "actual problem" this change was designed to solve, MFEPA cannot survive strict scrutiny as applied. *Brown*, 564 U.S. at 799.

## II. The Church satisfies the remaining injunction factors.

Because the Church is likely to prevail on their First Amendment claims, they are entitled to a preliminary injunction if they also show they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *dmarcian, Inc.*, 60 F.4th at 138 (quoting *Winter*, 555 U.S. at 20). Appellants easily satisfy these remaining factors.

***Irreparable harm.*** Where First Amendment rights are involved, "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). This is because—as both the Supreme Court and the Fourth Circuit have emphasized—"[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*, 145 S. Ct. at 2364 (2025); *see also Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (same); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (same).

53

The Church faces irreparable harm because MFEPA deprives them of the right to continue hiring and employing individuals that share their faith and support their mission. MFEPA requires that the Church give up its religiously motivated hiring practices or risk liability. Such a loss of First Amendment freedom is per se irreparable harm.

***Balance of equities and public interest.*** The last two preliminary injunction factors—the balance of equities and public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Reviewing this factor, "courts must balance … the effect on each party of granting or withholding the requested relief." *Winter*, 555 U.S. at 24 (cleaned up).

In this particular context, the public interest favors enjoining an unconstitutional restriction. The Fourth Circuit has repeatedly held that "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (quoting *Centro Tepeyac*, 722 F.3d at 191). "If anything, the system is improved by such an injunction." *Id.*

Nor is government substantially harmed by an injunction that simply allows the Church to carry on with hiring practices that have been permitted for decades under Maryland law. The Church has engaged in mission-aligned hiring for years. And MFEPA still allows over 80% of

54

Maryland employers to make the same hiring decisions as the Church here. *See supra* n.1. A preliminary injunction is in the public interest.

## III. The district court erred in dismissing Counts II and IV.

This Court has pendent appellate jurisdiction over the district court's dismissal of Appellants' excessive entanglement and denominational discrimination claims, and it should reverse those dismissals.[8]

The court "may review an issue not otherwise subject to immediate appeal when the issue is so interconnected with an issue properly before [it] as to warrant concurrent review." *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 95 F.4th 181, 188 (4th Cir. 2024) (cleaned up). This occurs "when an issue is inextricably intertwined with a question that is the proper subject of an immediate appeal." *Scott v. Fam. Dollar Stores*, Inc., 733 F.3d 105, 111 (4th Cir. 2013) (cleaned up). Separate rulings are inextricably intertwined if "the same specific question will underlie both the appealable and the non-appealable order, such that resolution of the question will necessarily resolve the appeals from both orders at once." *Elegant Massage*, 95 F.4th at 188. Because questions of entanglement and neutrality are common to the preliminary injunction and dismissal of the excessive entanglement and denominational discrimination claims, "concurrent review" is warranted here.

---

[8] Appellants maintain that the district court erred in dismissing any of their claims but do not ask this Court to exercise pendent appellate jurisdiction over its vagueness and assembly claims.

*Excessive Entanglement.* After denying injunctive relief on the Church's entanglement claim (Count II), the district court also granted Defendants' motion to dismiss on that same claim. JA638. Whether the Church has stated a claim for relief and whether it is likely to succeed on that claim are both questions of law that turn on the merits of Appellants' First Amendment arguments. The "specific question" of the scope of the First Amendment's guarantees "necessarily resolve[s]" both issues, meaning the Court can and should decide both issues now. *Elegant Massage*, 95 F.4th at 188; *see also Schultz v. Alabama*, 42 F.4th 1298, 1313 (11th Cir. 2022) (exercising pendent appellate jurisdiction over a motion to dismiss on review of a preliminary injunction because "a litigant" must state a claim "in order to obtain a preliminary injunction").

And Appellants have stated a plausible claim for relief on these grounds. As discussed, *supra* I.B, the district court erroneously discounted the serious entanglement concerns MFEPA raises. The district court's reasoning for denying the Church's preliminary injunction on Count II rested on an incorrect legal conclusion about the viability of the Church's entanglement claims. That same legal error also dooms its dismissal of the claim.

*Denominational Discrimination.* Appellants' denominational discrimination claim (Count IV), which the district court likewise dismissed, JA641, is also inextricably intertwined with review of the preliminary injunction. To resolve Appellants' request for a preliminary

injunction on their free exercise claim, this Court will already be required to decide whether MFEPA is neutral between faith groups whose beliefs require employees to share their faith and those whose do not. *See supra* I.C.3. That determination involves the "same specific question" as whether the Church has stated a claim for relief for denominational discrimination. *Scott*, 733 F.3d at 111 (cleaned up). So pendent jurisdiction is appropriate.

The district court erred in dismissing this claim. MFEPA impermissibly discriminates on the basis of their religious beliefs. JA36. For the same reasons MFEPA is not neutral under the Free Exercise clause—that it prefers certain denominations based on how its employees further the church's mission, *see supra* I.C.3—it violates the First Amendment's prohibitions against denominational discrimination. *See Larson v. Valente,* 456 U.S. 228, 246 n.23 (1982) (First Amendment bars government "distinctions between different religious organizations."); *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (same); *see also Catholic Charities Bureau*, 605 U.S. at 252 (statutes that "favor[] some denominations over others" are subject to strict scrutiny). This Court should reverse the dismissal.

## CONCLUSION

The district court's ruling should be reversed.

Dated: September 8, 2025

Respectfully submitted,

/s/ *Eric S. Baxter*

Todd R. McFarland
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, MD 20904

Eric S. Baxter
Nicholas R. Reaves
Andrea R. Butler
Amanda G. Dixon
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

This document complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,910 words.

This document complies with the typeface requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: September 8, 2025        /s/ *Eric S. Baxter*
                                 Eric S. Baxter