## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS and
ADVENTIST RISK MANAGEMENT, INC.,

    *Plaintiffs-Appellants,*

    v.                                    Docket No. 25-1735

CLEVELAND L. HORTON II,
In his official capacity as
Acting Executive Director of the
Maryland Commission on Civil Rights, et al.,

    *Defendants-Respondents.*

---

## BRIEF AMICI CURIAE OF THOMAS MORE SOCIETY, CHRISTIAN LEGAL SOCIETY, AND NATIONAL ASSOCIATION OF EVANGELICALS IN SUPPORT OF PLAINTIFFS-APPELLANTS

---

Steven T. McFarland
    *Counsel of Record*
Director, Center for Law & Religious
Freedom, CHRISTIAN LEGAL SOCIETY
8001 Braddock Road, Suite 302
Springfield, Virginia 22151
(703) 642-1070
smcfarland@clsnet.org

Carl H. Esbeck
R.B. Price Professor of Law Emeritus
224J Hulston Hall, 820 Conley Avenue
Columbia, Missouri 65211
(573) 882-6543

J. Matthew Belz
Timothy Belz
CLAYTON PLAZA LAW GROUP, L.C.
Mary Catherine Martin
THOMAS MORE SOCIETY
112 South Hanley Road, Suite 200
St. Louis, Missouri 63105
(314) 726-2800
jmbelz@olblaw.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTERESTS OF AMICI CURIAE ......................................................... 1

DISCLOSURE STATEMENTS .............................................................. 2

SUMMARY OF ARGUMENT ............................................................... 3

ARGUMENT ........................................................................................... 7

    POINT ONE - CHURCH AUTONOMY ......................................... 15

    POINT TWO - FREE EXERCISE CLAUSE .................................. 19

    POINT THREE - FREE EXERCISE CLAUSE –
    CHURCH AUTONOMY ................................................................. 23

CERTIFICATE OF COMPLIANCE .................................................... 26

CERTIFICATE OF SERVICE ............................................................. 26

## TABLE OF AUTHORITIES

Page(s)

Cases

*Billard v. Charlotte Cath. High Sch.*,
   101 F.4th 316 (4th Cir. 2024) ................................................................. 7

*Bouldin v. Alexander*,
   82 U.S. (15 Wall.) 131 (1872) ........................................................... 14, 24

*Conlon v. InterVarsity Christian Fellowship*,
   777 F.3d 829 (6th Cir. 2015) ................................................................. 7

*Cummings v. Missouri*,
   71 U.S. 277 (1867) ........................................................................... 14

*Doe v. Catholic Relief Services*,
   300 A.3d 116 (Md. 2023) ...................................................... 4, 5, 15, 18

*Employment Div. v. Smith*,
   494 U.S. 872 (1990) ................................................... 17, 19, 20, 21

*Fulton v. Philadelphia*,
   593 U.S. 522 (2021) ......................................................................... 21

*General Conference of Seventh-Day Adventists v. Horton*,
   2025 WL 1703806 (D. Md. June 18, 2025) .......................... 14, 19, 20

*Gonzalez v. Roman Catholic Archbishop*,
   280 U.S. 1 (1929) ...................................................................... 14, 16

*Hernandez v. Commissioner*,
   490 U.S. 680 (1989) ......................................................................... 17

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012) ..................................................................... Passim

*Kedroff v. St. Nicholas Cathedral*,
   344 U.S. 94 (1952) ................................................................ 7, 11, 13

*Kreshik v. St. Nicholas Cathedral,*
363 U.S. 190 (1960) ................................................................. 13

*Maryland & Va. Churches of God v. Church at Sharpsburg,*
396 U.S. 367 (1970) ................................................................. 13

*McClure v. Salvation Army,*
460 F.2d 553 (5th Cir. 1972) ..................................................... 8

*Mitchell v. Helms,*
530 U.S. 793 (2000) ................................................................. 17

*NLRB v. Catholic Bishop of Chicago,*
440 U.S. 490 (1979) ................................................................. 14

*Order of St. Benedict of N.J. v. Steinhauser,*
234 U.S 640 (1914) ................................................................. 14

*Our Lady of Guadalupe School v. Morrissey-Berru,*
591 U.S. 732 (2020) ............................................... 8, 10, 12, 13

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Church,*
393 U.S. 440 (1969) ................................................................. 13

*Rayburn v. General Conf. of Seventh-Day Adventists,*
772 F.2d 1164 (4th Cir. 1985) ..................................................... 8

*Rector of Holy Trinity Church v. United States,*
143 U.S. 457 (1892) ................................................................. 14

*Rusk v. Espinosa,*
456 U.S. 951 (1982) ............................................................. 13, 16

*Serbian Eastern Orthodox Diocese v. Milivojevich,*
426 U.S. 696 (1976) ........................................................... 11, 13

*Shepard v. Barkley,*
247 U.S. 1 (1918) ................................................................. 13

*Thomas v. Review Bd.,*
450 U.S. 707 (1981) ........................................................... 13, 16

*U.S. v. Ballard*,
  322 U.S. 78 (1944) ............................................................................. 16

*Watson v. Jones*,
  80 U.S. 679 ................................................................. 8, 12, 13, 14, 24

Statutes

42 U.S.C. § 2000bb-2 ........................................................................... 18

42 U.S.C. § 2000cc ................................................................................ 18

IRC § 501(c)(3) ........................................................................................ 1

Md. Code Ann., State Gov't § 20-601 to 20-1203 (West 2021) ............................ 3

Rules

FRAP 26.1 ................................................................................................. 2

## INTERESTS OF AMICI CURIAE

**Thomas More Society** ("TMS") is a national public interest law firm dedicated to restoring respect in law for religious freedom. Incorporated as an IRC § 501(c)(3) not-for-profit corporation under the laws of the State of Illinois with principal offices in Chicago, TMS pursues its organizational mission through education, litigation, friend-of-the-court briefs, and related activities. It has represented many individuals and organizations in federal and state courts and has filed *amicus curiae* briefs with the aim of protecting the rights and immunities of individuals and organizations to express and practice their religion as safeguarded by the First Amendment to the U.S. Constitution and similar guarantees in state laws. TMS has numerous ecclesiastical clients. Under the State of Maryland legislation, as interpreted by its highest court, these clients would be compelled to suffer civil resolution of religious disputes and to alter their religious employment practices.

**Christian Legal Society** ("CLS") is a nonprofit, non-denominational association of Christian attorneys, law students, and law professors with members in every state. CLS believes that pluralism, essential to a free society, prospers only when the First Amendment rights of all Americans are protected regardless of the current popularity of their speech. CLS also believes that the integrity and anchoring of the mission of a religious organization depends on who the group

chooses to represent it, lead it, and be its hands and feet. So, CLS continues to prioritize defending religious hiring rights under the First Amendment, Title VII of the Civil Rights Act of 1964, and the Religious Freedom Restoration Act of 1993.

Founded in 1942, the **National Association of Evangelicals** ("NAE") is the nation's largest network of evangelical Christian denominations, individual churches, schools and colleges, campus ministries, and social-service providers, including more than 45,000 local churches from 40 denominations. These diverse organizations each have a statement of faith that informs their internal governance and selection of leaders, while motivating them to serve their communities and fellow citizens of all faiths and backgrounds. These ministries cherish their First Amendment rights and immunities, as well as the protection of the church autonomy doctrine that flows from them. Many NAE member organizations have been impacted by actual or threatened government intrusion, especially in their school and campus outreach ministries, at times based on improper application of the First Amendment and related policies and regulations that fail to respect their rights and autonomy.

## DISCLOSURE STATEMENTS

Pursuant to FRAP 26.1 and Local Rule 26.1, co-amici Thomas More Society, Christian Legal Society, and National Association of Evangelicals, each of which is a non-profit organization, make the following disclosures:

1. Is any amicus a publicly held corporation or other publicly held entity? NO

2. Does any amicus have any parent corporations? NO

3. Is 10% or more of the stock of any amicus owned by a publicly held corporation or other publicly held entity? NO

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? NO

6. Does this case arise out of a bankruptcy proceeding? NO

7. Is this a criminal case in which there was an organizational victim? NO

No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and no person other than amici curiae or their counsel contributed money intended to fund preparing or submitting this brief. The parties have consented to this filing.

## SUMMARY OF ARGUMENT

Plaintiff, the General Conference of Seventh-day Adventists ("SDA Church"), is a religious nonprofit organization with 22 million members. Adventist Risk Management, Inc. is a religious nonprofit organization that provides insurance and risk management services exclusively to the SDA Church and its social-service ministries, schools and colleges, and hospitals. Their headquarters are located in Silver Spring, Maryland.

Since its passage in 1972-73, the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't §§ 20-601 to 20-1203 (West 2021), has exempted religious employers from its nondiscrimination provisions. The religious

employer exemption was amended in 2001 and again in 2014.   In relevant part the text of the religious employer exception presently provides that MFEPA does not apply to a:

> religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion . . . to perform work connected with the activities of the religious entity.

MFEPA at § 20-604(2).[1]

This language was recently interpreted by the Maryland Supreme Court in *Doe v. Catholic Relief Services*, 300 A.3d 116, 135-37 (Md. 2023). There, the state supreme court considered competing interpretations of the religious employer exemption. The state supreme court could have interpreted the scope of the exemption narrowly—as it did—or more broadly by simply giving effect to the plain text of the statute. The court consciously chose the narrower interpretation: "As we see it, the narrowest reasonable reading of this language is that, in order for the exemption to apply, the employee's duties must directly further the core mission(s) . . . of the religious entity." *Id*. at 136.

---

[1] In quoting the religious employer exemption in the text, an ellipsis replaces the words "religious or secular, or both." For most churches—and certainly for SDA Church—it is an oxymoron to speak of a "secular mission." All missions, be they social-services or healthcare or schools, are driven by the biblical admonition to imitate Christ and are thereby religious. Accordingly, the words "religious or secular, or both" are omitted as surplusage.

The SDA Church has long followed the religious practice of employing only members of the Church. Accordingly, to obtain and keep their employment with the SDA Church, all employees must be members of the Church in good standing. The SDA Church and its co-Plaintiff contest the supreme court's decision on three bases.

POINT ONE-CHURCH AUTONOMY: As a result of the interpretive gloss by the state supreme court in *Doe v. Catholic Relief Services*, MFEPA's religious employer exemption applies only when the duties of an SDA Church employee "directly further[s] the core mission(s) . . . of the religious" employer. Such an inquiry into the centrality of a religious employer's religious beliefs or practices—i.e., sorting those beliefs and practices that "directly further" a "core mission(s)" and which do not—violates First Amendment church autonomy. One of the most ancient and fundamental rules of the church-autonomy doctrine is that civil authorities are categorically barred from weighing religious questions or taking sides in religious debate.

POINT TWO-FREE EXERCISE CLAUSE: The SDA Church consistently follows the religious practice of employing only members of the Church who are in good standing. As construed in *Doe*, MFEPA's narrow religious employer exemption substantially burdens the SDA Church by making illegal its longstanding practice of employing only co-religionists. Under the Free Exercise

Clause, when a law imposes a substantial burden, the state must show that the burden passes "strict scrutiny." The lower bar applicable to neutral laws of general applicability, emanating from *Employment Div. v. Smith*, does not apply because the state's imposition of MFEPA's religious employer exemption is not religion neutral.

POINT THREE-FREE EXERCISE CLAUSE - CHURCH AUTONOMY: Given that the SDA Church requires all employees to be members in good standing, an employee who is removed from membership also will be discharged from employment. That, however, will result in the SDA Church being exposed to MFEPA liability whenever such an employee's position does not "directly further[]" a "core mission" of the Church. In order to avoid liability, the Church will have to retain the employee who is no longer a member in good standing. This puts the Church to a cruel choice: the Church is either forced to violate its longstanding religious practice of requiring all employees to be members, which is a violation of the Free Exercise Clause, or the Church will have to allow the wayward employee to retain his membership in the Church, which violates church-autonomy doctrine by coercing the decision as to who belongs on the membership rolls of a church. Either way the First Amendment is violated.

## ARGUMENT

Because POINT ONE and POINT THREE turn on different aspects of the doctrine of church autonomy, it seems best to begin with some groundwork concerning this least understood body of First Amendment law.[2] Church autonomy protects religious freedom in a manner altogether different from the more familiar causes of action brought under the Establishment Clause and the Free Exercise Clause. It's a third way. This is because church autonomy is attributable to the Constitution's structure,[3] as opposed to being a personal constitutional right. When thinking of constitutional structure, separation of powers immediately comes to mind, as does the separation between the authority delegated to the federal government as opposed to those residual powers left to the states. Here, the separation is between that of church and government. That explains, for example, why it is said that church autonomy is not waivable. The structure of the

---

[2] The principle of church autonomy was recognized as being lodged in the First Amendment as early as *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952).

[3] *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316 (4th Cir. 2024) (rejecting wavier of church autonomy defense because the ministerial exception is structural). *See also Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015) ("The ministerial exception is a structural limitation imposed on the government by the Religion Clauses, a limitation that can never be waived."). The structural nature of church autonomy and thereby its inability to be waived can be of importance here in that the defense can be raised for the first time on appeal or raised on the court's own motion. In this sense, it is akin to a federal court's lack of subject matter jurisdiction, which is also a structural constitutional limitation.

Constitution can never be waived; it is there working its checks and balances for the protection of everyone.

The principle of church autonomy[4] was first recognized by the Supreme Court of the United States in the post-Civil War case of *Watson v. Jones*, 80 U.S. (15 Wall.) 131 (1872). And early this century, in the unanimous decision of *Hosanna-Tabor*, the theory of church autonomy took on its most fully developed form as a constitutional immunity (dubbed the "ministerial exception" by the federal circuits when the immunity arises in the context of employment nondiscrimination[5]) from government oversight that "interferes with the internal governance of the church." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). In *Watson*, the subject of internal governance

---

[4] The Supreme Court settled on the label "church autonomy" in *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 747 (2020) ("The constitutional foundation for our holding was the general principle of church autonomy to which we have already referred . . . ."). In lieu of the church autonomy label, some lower courts use the term "ecclesiastical abstention." But "ecclesiastical" is far too narrow a label to embrace the doctrine's scope. And "abstention" wrongly suggests that the doctrine is discretionary. When it applies, church autonomy is mandated by the First Amendment.

[5] The term "ministerial exception" was first used in *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985). A similar result was earlier reached in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972), but *McClure* did not coin the term ministerial exception. There has developed unease with "ministerial" as a label for the defense because one does not need to be an ordained cleric or otherwise a formal religious minister to be subject to the doctrine. As of yet, however, the courts have not settled on a more apt phrase.

that was immune from litigation was an internecine dispute over local church property that turned on the decision of the ecclesial unit within a larger denomination that had final authority to resolve the internal disagreement. Lower courts were instructed to settle the dispute by deferring to the decision of that ecclesial unit. The heart of the matter was that every church gets to choose its own polity, including the manner for resolving internal disputes. In *Hosanna-Tabor*, the subject of internal governance that was immune from litigation was a lawsuit for employment discrimination against a religious school over the dismissal of a teacher who was assigned religious duties. The heart of the matter was that every church gets to choose its own spiritual leaders.

The animating principle is that, in a nation marked by separation of church and state, the government cannot take sides in disputes over religious doctrine or practice. To do so would "establish" the doctrine chosen by the civil magistrate. Nor can civil authorities, in a republic of states that have long since disestablished their official churches, have a role in selecting and defining the job of those employees best suited to sustaining the ministry of a religious body. When framed in this manner, it is not surprising that the Supreme Court was unanimous in barring[6] the claim of discrimination in *Hosanna-Tabor*, which was more about who

---

[6] The Court wrote that the "ministerial exception *bars . . . a suit*" challenging the school's decision to dismiss the teacher. *Hosanna-Tabor*, 565 U.S. at 196 (emphasis added). The choice of the words "bars a suit" reflects that the issue here

teaches impressionable students in order that they might rightly be formed in the school's underlying faith, than it was about who ultimately determines the correct tenets of the faith. But both these variations in the disputed question fall within the zones of church autonomy.

Notwithstanding the promising unanimity in *Hosanna-Tabor*, the high court continues to regularly receive petitions to superintend church autonomy cases in the lower federal and state courts, many of which evidence a wooden understanding of those matters of interior governance that are exclusively within a church's sphere of operation. Such rigidity was exemplified by the circuit court in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020), but the Supreme Court reversed. The justices took less of a checklist approach in finding that for practical purposes classroom teachers at a K-12 religious school were functionally ministers of the faith to the next generation, thus the dismissal of an elementary teacher was categorically immune to claims of employment discrimination. *Id.* at 749-61 (alleging discrimination on the bases of sex and disability). The civil rights law cannot, consistent with church autonomy, allow civil authorities to tell a religious organization those ministers it may hire or fire.

---

is structural, i.e., if it is a church autonomy case, then the house of worship is totally immune from being sued. Of course, there often has to be a threshold determination that it is a church autonomy case.

In *Hosanna-Tabor* and *Our Lady of Guadalupe* the prevailing religious schools suffered no personal religious injury. Hiring a disabled teacher is not a religious injury. But church autonomy is not about religious injury. It is about suffering no transgression by the state into the sphere of the church. This is characteristic of the third way.

When confronted with a church autonomy defense, some lower courts are tacitly struggling with where to locate the boundary that marks off matters of internal church governance to the exclusion of the government's general regulatory powers. The U.S. Supreme Court has responded to this line-drawing task with general language, the most quoted being from *Kedroff v. St. Nicholas Cathedral*:

> [The First Amendment grants] a spirit of freedom for religious organizations, an independence from secular control or manipulation— in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

344 U.S. at 116 (footnote omitted). Similarly, *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713, 714, 724 (1976). decreed that the First Amendment allows religious organizations "to establish their own rules and regulations for internal discipline and government." Therefore, authorities must defer to decisions by such bodies "on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law," and these same civil authorities are prohibited from delving into matters of "theological controversy,

11

church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Id.*

The *Hosanna-Tabor* Court recalled a passage in *Watson* that related that "whenever the questions of discipline, or of faith or ecclesiastical rule, custom or law" have been internally determined by church officials, such matters are closed and not to be reopened by civic authorities. 565 U.S. at 185 (quoting *Watson*, 80 U.S. at 727). An equally overarching passage appeared in *Our Lady of Guadalupe* to explain the result in *Hosanna-Tabor*: "The constitutional foundation for our holding was the general principle of church autonomy to which we have already referred: independence in matters of faith and doctrine and in closely linked matters of internal government." 591 U.S. at 747. Accordingly, the theory of church autonomy casts no-go zones over those relatively few matters of internal governance, rituals, and doctrines, as well as ministerial personnel and membership rolls, that determine the future and destiny of the religious entity in question. *Id.* at 738; *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring).

While the Supreme Court's foregoing general language concerning the scope of the immunity provides helpful starting points, systemization is called for to solve the inevitable disputes over fine points and close cases. The place to begin is with the full subject-matter range of the U.S. Supreme Court's case law. In such a typology, church autonomy doctrine sets apart the following four rather limited

topical categories (or zones) where religious organizations are immune from suit:

(1) the resolution of religious questions or disputes, such as testing the validity,

meaning, or importance of an organization's religious beliefs and practices;[7] (2)

determination of a religious entity's polity, including determinations of who has

final authority within the entity to settle an ongoing dispute;[8] (3) the qualifications,

selection, promotion, supervision, and dismissal of ministers and other religious

functionaries;[9] and (4) the criteria for membership and the basis for its severance,

---

[7] *See Thomas v. Review Bd.*, 450 U.S. 707, 715-16 (1981) (holding that courts are not arbiters of scriptural interpretation and thus will not entertain testimony concerning who has correct view of Jehovah's Witnesses pacifism); *Maryland & Va. Churches of God v. Church at Sharpsburg*, 396 U.S. 367, 368 (1970) (per curiam) (in property dispute between two church factions, holding that courts cannot adjudicate doctrinal differences); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Church*, 393 U.S. 440, 449-51 (1969) (refusing to adopt departure-from-doctrine rule that, among other faults, discourages changes in doctrine); *Watson*, 80 U.S. at 725-33 (rejecting the English implied-trust rule to settle church property dispute because of its departure-from-doctrine inquiry); *see also Rusk v. Espinosa*, 456 U.S. 951 (1982) (summarily aff'd) (striking down charitable solicitation ordinance that required officials to distinguish between "spiritual" and temporal purpose behind a church's fundraising, regulating only the latter).

[8] *See Milivojevich*, 426 U.S. at 708-24 (civil courts may not probe into church polity); *Presbyterian Church*, 393 U.S. at 451 (civil courts may not interpret and weigh church doctrine); *Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 191 (1960) (per curiam) (First Amendment prevents judiciary, as well as legislature, from interfering in ecclesiastical governance of Russian Orthodox Church); *Kedroff*, 344 U.S. at 119 (same); *Shepard v. Barkley*, 247 U.S. 1, 2 (1918) (aff'd mem.) (a court may not interfere with merger of two Presbyterian denominations).

[9] *Our Lady of Guadalupe*, 591 U.S. at 751-54; *Hosanna-Tabor*, 565 U.S. at 190-95; *Milivojevich*, 426 U.S. at 708-20 (civil courts may not probe into defrocking of cleric); *Kedroff*, 344 U.S. at 116 (courts may not probe into clerical appointments);

13

including determining which ecclesial sub-entities or orders are in good standing

with the church.[10]

Of these four categories, POINT ONE below is about category (1) or the bar

on civil authorities deciding religious questions and taking sides in religious

disputes. However, the federal district court here thought the church autonomy

question was an employment matter, which is category (3).[11] That was mistaken.

_____

*Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1, 16 (1929) (declining to
intervene on behalf of petitioner who sought order directing archbishop to appoint
petitioner to ecclesiastical office). *See NLRB v. Catholic Bishop of Chicago*, 440
U.S. 490, 501-04 (1979) (refusal by Court to force collective bargaining on
parochial school because of consequential interference with employment
relationship between church superiors and lay teachers); *Rector of Holy Trinity
Church v. United States*, 143 U.S. 457, 472 (1892) (refusing to follow generally
applicable law when applied to ecclesiastical employment by church); *Cummings
v. Missouri*, 71 U.S. 277 (1867) (it was unconstitutional to prevent priest from
assuming his ecclesiastical position because of his refusal to take loyalty oath after
Civil War).

[10] *See Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139-40 (1872) ("This is not a
question of membership of the church, nor of the rights of members as such. It may
be conceded that we have no power to revise or question ordinary acts of church
discipline, or of excision from membership. . . . [W]e cannot decide who ought to
be members of the church, nor whether the excommunicated have been regularly
or irregularly cut off."); *Watson*, 80 U.S. at 733 (court has no authority over church
discipline of members or the conformity of church members to the standard of
morals required of them). *See also Order of St. Benedict of N.J. v. Steinhauser*, 234
U.S. 640, 647-51 (1914) (so long as individual voluntarily joined a religious group
and is free to leave at any time, religious liberty is not violated; church members
leaving church are bound to prior rules consensually entered, such as vow of
poverty and communal ownership of property).

[11] *See General Conference of Seventh-Day Adventists v. Horton*, 2025 WL
1703806 **5-7 (D. Md. June 18, 2025).

The matter here is not a "ministerial exception" case where ministers—but not other employees—are barred from bringing employment discrimination claims. Here, rather, the SDA Church hires exclusively co-religionists throughout its organization and missions. To have to abandon that practice is a burden on religion. Accordingly, the proper cause of action is framed as a Free Exercise Clause matter (*see* POINT TWO, below).

POINT THREE, below, is about church membership rolls, and that's a subject covered by church-autonomy category (4). In POINT THREE, *amici* will show that the *Doe* interpretation of the religious employer exemption has set up a Catch-22 between the SDA Church having its free-exercise substantially burdened, on the one hand, or its categorical autonomy over church membership rolls invaded. Either way the First Amendment is violated.

**POINT ONE-CHURCH AUTONOMY: As a result of the interpretive gloss by the state supreme court in *Doe v. Catholic Relief Services*, MFEPA's religious employer exemption applies only when the duties of an SDA Church employee "directly further[s] the core mission(s) . . . of the religious" employer. Such an inquiry into the centrality of a religious employer's religious beliefs or practices—i.e., sorting those beliefs and practices that "directly further" a "core mission" and which do not—violates First Amendment church autonomy. One of the most ancient and fundamental rules of the church autonomy doctrine is that civil authorities are categorically barred from weighing religious questions or taking sides in religious debate.**

MFEPA's religious employer exemption, as interpreted by the Maryland Supreme Court in *Doe*, requires that a civil court determine when a church's "core"

missions are "directly furthered" by a particular employee's job and when they are not. What is "core" and non-core, what activities "directly" advance a ministry and which are indirect, are just different ways of posing the forbidden "centrality test."

One of the classic marks of a state-established church is when there is a dispute over religious doctrine, and it is resolved by civil authorities rather than by the church. In the U.S., where we have long since disestablished our state churches, civil courts have followed a firm rule that government authorities have no role in unraveling religious disputes and controversies. Bluntly stated: there are no heresy trials in America.

There are, of course, many different types of religious questions. In *U.S. v. Ballard*, 322 U.S. 78 (1944), the question forbidden to the factfinder was whether a defendant in a mail fraud prosecution actually had the power to perform miracles of healing. In *Thomas v. Review Bd.*, 450 U.S. 707 (1981), the off-limits question was what Jehovah's Witnesses forbid in aid of manufacturing war materiel consistent their religious pacifism. In *Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1 (1929), the question was who within the Catholic Archdiocese for the Philippines had final authority to fill a vacant ecclesiastical office. And in *Rusk v. Espinosa*, 456 U.S. 951 (1982) (summary aff'd), the Court affirmed a lower court striking down a charitable solicitation ordinance that required municipal officials to determine whether a given charitable contribution

16

was to be used by a church for "spiritual" or temporal purposes and regulating only the latter.

That said, of all forbidden religious questions, the most frequently occurring is what has been termed the "centrality test." This is where a government official—to achieve some temporal aim down the road—is asked to determine whether some religious belief or practice is at the center of the faith or merely peripheral. Centrality tests have been condemned by the U.S. Supreme Court in the strongest terms.

> It is no more appropriate for judges to determine the "centrality" of religious beliefs before applying a "compelling interest" test in the free exercise field, than it would be for them to determine the "importance" of ideas before applying the "compelling interest" test in the free speech field. What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is "central" to his personal faith? Judging the centrality of different religious practices is akin to the unacceptable "business of evaluating the relative merits of differing religious claims" [citation omitted]. As we reaffirmed only last Term, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices of a faith, or the validity of particular litigants' interpretation of those creeds." *Hernandez v. Commissioner*, 490 U.S. [680,] 699 [(1989)]. Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.

*Employment Div. v. Smith*, 494 U.S. 872, 886-87 (1990). A centrality test was again harshly rebuked in *Mitchell v. Helms*, 530 U.S. 793, 828-29 (2000) (plurality op.) (civil authorities not to troll through the workings of private schools to determine which are "pervasively sectarian" and which are merely religiously affiliated).

Not to be left out, when enacting the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et al., Congress forbid the use of centrality tests in the act's application. The bar is not only as to RLUIPA (*id.* at § 2000cc-5(7)(A)) but also to the Religious Freedom Restoration Act of 1993 ("RFRA"). *See* 42 U.S.C. § 2000bb-2(4). Congress reached back to clarify RFRA because some federal district courts had been taking it upon themselves to "soften" the force of RFRA by reading into it a centrality test.

The court in *Doe* anticipated the difficulty of case-by-case determination of when an employee's job tasks are "core" and when "directly furthering" mission. It sought a quick fix by offering a list of five guidelines. Worse, the list was said not to be exhaustive. *Doe*, 300 A.3d at 136-37. Predictably the guidelines only made a difficult situation harder. We are told that the inquiry is "fact-intensive" and to consider "the totality of the . . . circumstances," that the size of the organization is relevant, where "smaller" is better to winning an exemption, that the organization may have one mission or many, and that in determining what is "core" the court "may" consider (along with other evidence) the organization's descriptions of itself to the public and to regulators. Even how a church's funds are allocated can be rifled through. This "guidance," essentially, opens up as inevitable a trial within the

trial, with nothing barred and all things considered. Even the church's budget! *Doe* is the very opposite of church autonomy!

As relief, *amici* respectfully request that the district court be reversed and the case remanded: –that *Doe* be held unconstitutional because it established a centrality test in its implementation of the religious employer exemption; –and that the better reading of the religious employer exemption bars a MFEPA claim whenever the employer has a sincere religious belief or practice that led to the adverse employment decision of which an employee complains.

**POINT TWO-FREE EXERCISE CLAUSE: The SDA Church consistently follows the religious practice of employing only members of the Church who are in good standing. As a result of *Doe*'s narrowing of MFEPA's religious employer exemption, the SDA Church faces a substantial burden of being unable to follow its longstanding practice of employing only co-religionists. Under the Free Exercise Clause, the burden of producing evidence now shifts to the state to show that the narrow exemption brought about by *Doe* can survive strict scrutiny. The rule of *Employment Div. v. Smith* does not apply because the state's imposition of MFEPA's religious employer exemption is not neutral as to religion.**

The federal district court here thought the Free Exercise Clause cause of action was a matter of discrimination against religion.[12] That was mistaken. Rather, the Free Exercise Clause claim is entirely ordinary and straightforward. As a prima facie matter, the SDA Church has averred that it has a longstanding religious

---

[12] See *General Conference of Seventh-Day Adventists v. Horton*, 2025 WL 1703806 **9-13 (D. Md. June 18, 2025).

19

practice of employing only co-religionists in good standing. And that religious practice is substantially burdened by the *Doe* interpretation of MFEDA's religious employer's exemption.

The facts are undisputed concerning the intensely religious workplace at the SDA Church and its auxiliary ministries of charity, education, and health care. Retaining this religiously saturated work environment is why the Church deeply values employing only co-religionists. SDA Church employees are deemed representatives of the Church and active witnesses in spreading the faith. Each workday begins with worship, prayer, and singing. There are employee Bible studies. There is an absence of work on Friday so as to prepare for the Sabbath beginning at sundown.[13]

The foregoing facts more than meet the required prima facie showing of substantial religious burden. Accordingly, the task of producing evidence shifts to the Defendants to satisfy the correct standard of review, strict scrutiny.

The lower standard of review, as applied to neutral laws of general applicability described in *Employment Div. v. Smith*, does not apply here. What took place in *Doe* was not in any sense neutral as to religion. First, in handing down *Doe*, the state supreme court knew that when it gave the religious employer

---

[13] *See General Conference of Seventh-Day Adventists v. Horton*, 2025 WL 1703806 **1-2 (D. Md. June 18, 2025).

exemption a narrow reading it was going to transgress the free-exercise practices of some religious employers. It proceeded anyway, necessitating this pre-enforcement lawsuit. Second, the religious employer exemption is explicitly and exclusively about religion—specifically, the scope of its accommodation of religious exercise. When pondering the explicit text of the religious employer exemption, it is impossible to conceive of a law more nonneutral about religion.

Consider the Supreme Court's rationale for the rule of *Smith*:

> Respondents in the present case . . . contend that their religious motivation for using peyote places them beyond the reach of a criminal law that is not specifically directed at their religious practice, [but] that is concededly constitutional as applied to those who use the drug for other reasons. . . . [For example, it] is no more necessary to regard the collection of a general tax . . . as "prohibiting the free exercise [of religion]" by those citizens who believe support of organized government to be sinful, than it is to regard the same tax as "abridging the freedom . . . of the press" of those publishing companies that must pay the tax as a condition of staying in business. It is a permissible reading of the text, in the one case as in the other, to say that if prohibiting the exercise of religion (or burdening the activity of printing) is not the object of the tax but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended.

494 U.S. at 878. That is all fine when a law that applies to all has an impact on religious exercise unique to the complainant.[14] But the free-exercise claim of the

---

[14] If the situation here were subject to the rule of *Smith*, then it would be time to reconsider *Smith*. Five of the currently sitting justices on the Court have said that *Employment Div. v. Smith* was wrongly decided. *Fulton v. Philadelphia*, 593 U.S. 522, 543 (2021) (Barrett, J., joined by Kavanaugh, J.) ("In my view, the textual and structural arguments against *Smith* are more compelling."); *id.* at 545 (Alito, J.,

SDA Church is not a "disparate impact" case. It has nothing to do with "incidental effects." Rather, it is about *Doe*'s known and thus intended effect on some religious employers. The Church's claim is about a statutory exemption intentionally and exclusively focused on religion and the business of proceeding to accommodate some religious practices while leaving other religious practices unlawful.

As relief, *amici* respectfully request that the district court be reversed and the case remanded with: a finding that the Church's religious practice of hiring only co-religionists is substantially burdened by MFEPA as construed by *Doe*; a finding that MFEPA, as construed by *Doe*, is presumptively unconstitutional because it infringes the free-exercise of religion of the SDA Church; and, that on remand Defendants be required to defend MEFPA, as construed by *Doe*, by meeting a strict scrutiny standard of review.

---

joined by Thomas and Gorsuch, JJ.) ("This case presents an important constitutional question that urgently calls out for review: whether this Court's governing interpretation of a bedrock constitutional right, the right to the free exercise of religion, is fundamentally wrong and should be corrected."). However, Justice Barrett, one of the five, said that she was not then ready to overturn *Smith* until she knew what would replace it. She then posed four questions that went to what would be *Smith*'s successor standard. The short answer to her questions is that *Smith* should be replaced by the strict scrutiny standard characterized by RFRA and RLUIPA. There is a long and successful track record under RFRA and RLUIPA, and the same standard of review will work well as the Free Exercise Clause post-*Smith*.

**POINT THREE- Free Exercise Clause - Church Autonomy: Given that the SDA Church requires all employees to be members in good standing, an employee who is removed from membership also will be discharged from employment. Under *Doe*, the SDA Church will be subject to MFEPA liability whenever a court deems that such an employee's position did not "directly further" a "core mission" of the Church. If the Church wants to avoid exposure to such liability, the employee has to be allowed to keep his employment although no longer a member in good standing. This is a cruel choice: in order to follow its longstanding religious practice of requiring all employees to be members, it must allow the wayward employee to retain his membership in the Church. The first choice is to suffer a substantial burden on the Church's free-exercise rights and the second choice violates church-autonomy doctrine with respect to membership rolls being within the sole authority of the church. Either way the First Amendment is violated.**[15]

POINT THREE builds in part on POINT TWO and MFEPA as interpreted by *Doe* putting a substantial burden on the religious employment practice of the SDA Church. However, POINT THREE newly introduces the unquestioned autonomy of churches over their membership rolls, and how the *Doe* interpretation unconstitutionally coerces the SDA Church to retain or add individuals as church members who are not religiously qualified.

Religious employers who employ only co-religionists are uniquely burdened by the *Doe* interpretation. As explained in the POINT THREE heading above, the

---

[15] *Doe* works much the same for applicants seeking employment. If someone applies for a job but is turned down because not a member of the SDA Church, the applicant can sue for employment discrimination. The subsequent liability would burden the Church's free-exercise rights. If, rather than suing, the applicant sought membership in the Church to acquire an essential qualification for the job, the Church would be coerced into granting the job applicant church membership if it is to successfully avoid liability. The latter interferes with the SDA Church membership rolls.

narrow religious employer exemption will either violate the SDA Church's free-exercise rights or coerce the Church to retain (or add) an individual as a church member who no longer meets the Church's qualifications for membership. The latter violates church autonomy.

While church autonomy violations involving membership are rare, this has not deterred the Supreme Court from speaking with confidence to the safeguarding of membership rolls. In *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139-40 (1872), the Court distinguished the lawsuit at hand, which could be adjudicated, from a conflict subject to the doctrine of church autonomy: "This is not a question of membership of the church, nor of the rights of members as such. It may be conceded that we have no power to revise or question ordinary acts of church discipline, or of excision from membership. . . . [W]e cannot decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off." Similarly, the Court in *Watson*, 80 U.S. at 733, observed that it had no authority over a church's discipline of members or the conformity of church members to the standard of morals required of them.

As relief, *amici* respectfully request that the district court be reversed and the case remanded with a finding that the religious practice of the SDA Church of hiring only co-religionists is substantially burdened by MFEPA, as construed in *Doe*; a finding that MFEPA, as construed in *Doe*, operates to violate church

autonomy by coercing the Church into retaining or adding a member to its rolls in order to avoid liability under MFEPA; and, on remand Defendants be given the opportunity to show that the religious employer exemption, as construed in *Doe*, can meet the correct standard of review, strict scrutiny.

Respectfully submitted this ninth day of September, 2025.

*/s/Steven T. McFarland*
Steven T. McFarland
   *Counsel of Record*
Director, Center for Law & Religious
Freedom, CHRISTIAN LEGAL SOCIETY
8001 Braddock Road, Suite 302
Springfield, Virginia 22151
(703) 642-1070
smcfarland@clsnet.org

Carl H. Esbeck
R.B. Price Professor of Law Emeritus
224J Hulston Hall, 820 Conley Avenue
Columbia, Missouri 65211
(573) 882-6543

J. Matthew Belz
Timothy Belz
CLAYTON PLAZA LAW GROUP, L.C.
Mary Catherine Martin
THOMAS MORE SOCIETY
112 South Hanley Road, Suite 200
St. Louis, Missouri 63105
(314) 726-2800
jmbelz@olblaw.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**
**WITH TYPEFACE AND WORD COUNT LIMITATIONS**

I, Steven T. McFarland, counsel for amici curiae, certify, pursuant to Federal

Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief is

proportionately spaced, has a typeface of 14 points or more, and contains 6,457

words.

*/s/ Steven T. McFarland*
Steven T. McFarland


**CERTIFICATE OF SERVICE**

I, Steven T. McFarland, counsel for amici curiae, certify that, on September

9, 2025, a copy of the attached Brief was filed electronically through the CM/ECF

system with the Clerk of this Court. The participants in this case are registered

CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Steven T. McFarland*
Steven T. McFarland