No. 25-1735

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, *et al.*,

*Plaintiffs-Appellants*,

v.

CLEVELAND L. HORTON, II, *et al.*,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the
District of Maryland, Case No. 8:24-cv-02866
The Hon. Theodore D. Chuang, District Judge

———————————

**BRIEF OF AMICI CURIAE COMMONWEALTH OF VIRGINIA AND
20 OTHER STATES IN SUPPORT OF PLAINTIFFS-APPELLANTS**

———————————

JASON S. MIYARES
 *Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile

KEVIN M. GALLAGHER
 *Solicitor General*

GRAHAM K. BRYANT
 *Principal Deputy Solicitor General*

MICHAEL C. DINGMAN
MEREDITH L. BAKER
 *Deputy Solicitors General*

September 15, 2025

*Counsel for the Commonwealth of
Virginia*

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, *amici curiae* are not required to file a
disclosure statement. Fed. R. App. P. 26.1(a); 4th Cir. R. 26.1.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ......................................................................... 1

IDENTITY AND INTERESTS OF *AMICI CURIAE* ............................ 2

BACKGROUND ......................................................................... 3

ARGUMENT .............................................................................. 6

   I.  The Religion Clauses protect religious organizations' right to determine their own missions and make religiously motivated employment decisions in furtherance of those missions ......................... 6

  II.  Maryland's law infringes on the SDA Organizations' First Amendment rights by requiring courts to improperly insert themselves into religious questions ..................................... 11

CONCLUSION ........................................................................... 18

COUNSEL FOR ADDITIONAL AMICI STATES ............................... 20

CERTIFICATE OF COMPLIANCE .............................................. 21

CERTIFICATE OF SERVICE ...................................................... 22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Billard v. Charlotte Cath. High Sch.*,
   101 F.4th 316 (4th Cir. 2024) ....................................................... 10, 13

*Carson v. Makin*,
   596 U.S. 767 (2022) ................................................................................. 8

*Catholic Charities Bureau, Inc. v. Wisconsin Lab. & Indus.*
   *Rev. Comm'n*,
   605 U.S. 238 (2025) ............................................................................... 14

*Corporation of the Presiding Bishop of the Church of Jesus*
   *Christ of Latter-day Saints v. Amos*,
   483 U.S. 327 (1987) ............................................................ 9, 10, 15, 18

*Demkovich v. St. Andrew the Apostle Par., Calumet City*,
   3 F.4th 968 (7th Cir. 2021) .................................................................... 8

*Doe v. Catholic Relief Servs.*,
   300 A.3d 116 (Md. 2023) ............................................................. *passim*

*General Conference of Seventh-Day Adventists v. Horton*,
   No. 24-2866, — F.Supp.3d —, 2025 WL 1703806 (D. Md.
   June 18, 2025) .................................................................................... 5, 6

*Hernandez v. Commissioner*,
   490 U.S. 680 (1989) .............................................................................. 12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.*
   *EEOC*,
   565 U.S. 171 (2012) ............................................................ 1, 6, 10, 13

*McRaney v. North Am. Mission Bd. of the S. Baptist*
   *Convention, Inc.*,
   — F.4th —, 2025 WL 2602899 (5th Cir. Sept. 9, 2025) ................. 7, 14

*NLRB v. Catholic Bishop of Chi.,*
     440 U.S. 490 (1979) ..................................................................... 9, 15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
     591 U.S. 732 (2020) .......................................... 7, 10, 12, 13

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue*
     *Hull Mem'l Presbyterian Church,*
     393 U.S. 440 (1969) ....................................................................... 8

*Rayburn v. General Conf. of Seventh-Day Adventists,*
     772 F.2d 1164 (4th Cir. 1985) ................................................... *passim*

*Serbian E. Orthodox Diocese for the U.S. of Am. & Canada v.*
     *Milivojevich,*
     426 U.S. 696 (1976) .......................................... 8, 12, 14, 17

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.,*
     363 F.3d 299 (4th Cir. 2004) ....................................................... 10, 13

*Thomas v. Review Bd. of the Ind. Emp. Sec. Div.,*
     450 U.S. 707 (1981) ...................................................................... 17

*Watson v. Jones,*
     80 U.S. 679 (1871) ................................................................... 8, 17

**Statutes**

Md. Code § 20-604 ....................................................................... 3

Md. Code § 20-606 ....................................................................... 3

**Other Authorities**

1 Corinthians 12 ......................................................................... 16

Colossians 3:23 .......................................................................... 16

Federal Rule of Appellate Procedure 29 ................................... 2

iv

## INTRODUCTION

Courts cannot—constitutionally or theologically—dictate a religious organization's mission or determine which employees are directly responsible for accomplishing that mission. But that is exactly what Maryland requires courts to do when applying its employment-discrimination laws. In Maryland's view, its courts are entitled to wade into core religious questions that courts are ill-suited to answer. Worse still, Maryland authorizes its courts to overrule the decisions of ecclesiastical bodies on these questions. Maryland thus violates the First Amendment's guarantee of religious freedom and the Supreme Court's repeated warning that doctrinal matters are for religious organizations— and only those organizations—to decide.

The district court failed to recognize these serious problems. Its denial of a preliminary injunction leaves the plaintiff religious organizations unable to fully exercise their First Amendment rights without the threat of costly litigation and potential liability. Because the Constitution "protects a religious group's right to shape its own faith *and mission*," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012) (emphasis added), this Court should reverse.

## IDENTITY AND INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are the Commonwealth of Virginia and 20 other States (collectively, the *Amici* States). *Amici* States are home to thousands of religious organizations with millions of adherents. *Amici* States have a compelling interest in protecting the constitutional right of these organizations to determine their own missions and to make employment decisions accordingly, without fear that secular courts will redefine their missions or punish them for following their religious beliefs.

The district court's decision exposes religious organizations to an invasive inquiry into—and even a rewriting of—their core missions, as well as judicial oversight of employment decisions protected by the Religion Clauses of the First Amendment. The *Amici* States have a compelling interest in ensuring that the Religion Clauses are given their full effect to protect the rights of religious organizations and their adherents.

---

[1] This brief is filed under Federal Rule of Appellate Procedure 29(a)(2).

## BACKGROUND

Maryland law prohibits employment discrimination based on various protected characteristics, including religion. Md. Code § 20-606(a)(1), (2). But the law exempts religious organizations "with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity." Md. Code § 20-604(2).

The Maryland Supreme Court, however, has sharply curtailed this exemption. That court construed the exemption to apply only to "employees who perform duties that *directly further the core mission*(*s*) of the religious entity," *Doe v. Catholic Relief Servs.*, 300 A.3d 116, 138 (Md. 2023) (emphasis added)—words found nowhere in the statute. And it tasked the *judiciary* with determining the applicability of the exemption. Maryland courts—not the relevant ecclesiastical authorities—must now determine the religious entity's "core mission" by analyzing its "activities." *Id.* at 137 n.20. And judges must now ascertain the directness of the relationship between the employee and the organization's "core mission." See *id.* at 136 (inviting courts to analyze whether duties are "one or more steps removed from taking the actions

3

that effect the goals of the entity" and thus only "indirectly" advance the religious entity's core mission). Determining whether the exemption applies thus "entails a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances." *Id.* at 136. In other words, the Maryland Supreme Court's atextual interpretation allows a court to employ a freewheeling analysis to impose its own judgment on doctrinal matters in determining what a religious organization's mission is, regardless of what the organization itself declares to be its mission.

The General Conference of Seventh-Day Adventists and Adventist Risk Management (collectively, the SDA Organizations) "believe that all their employees" represent the Seventh-Day Adventist Church "and are responsible for sharing the Church's faith with the world." JA13. Because it is "a critical component of" the SDA Organizations' "religious exercise that all their employees embrace the Church's faith, support its religious mission, and share the faith with others," the SDA Organizations require all employees "to be members of the Church in regular standing and to conduct themselves in accordance with the Church's religious beliefs." JA13.

But under the Maryland Supreme Court's recent atextual construction that dramatically narrows Section 20-604(2)'s religious exemption, the SDA Organizations' longstanding practice of hiring only Church members is now threatened. See JA13–14. Under that constrained interpretation, the SDA Organizations face liability for their religiously motivated employment decisions based on *post hoc* judicial determinations of what the organization's "core mission" is and whether an employee is "one or more steps removed from" that mission. *Catholic Relief Servs.*, 300 A.3d at 136–37.

To protect their free-exercise rights, the SDA Organizations sought injunctive relief in federal district court. But the district court denied the SDA Organizations' motion for a preliminary injunction, asserting that courts "need not evaluate religious doctrine and beliefs" to determine whether the exemption applies. *General Conference of Seventh-Day Adventists v. Horton*, No. 24-2866, — F.Supp.3d —, 2025 WL 1703806, at *7 (D. Md. June 18, 2025). Furthermore, the court held that the church autonomy doctrine does not "extend the ministerial exception" to "all employees of a religious institution." *Id.* at *6. Thus, the court held that

the SDA Organizations were unlikely to succeed on the merits of their claims. *Id.* at *7, *9, *13.

## ARGUMENT

**I.    The Religion Clauses protect religious organizations' right to determine their own missions and make religiously motivated employment decisions in furtherance of those missions**

The First Amendment's Religion Clauses guarantee religious organizations—including churches, synagogues, mosques, temples, and other entities—substantial autonomy. Together, these clauses prohibit States from "interfer[ing] with the internal governance of [a] church" and "depriving the church of control over the selection of those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 188. The Free Exercise Clause "protects a religious group's right to shape its own faith and mission through its appointments." *Ibid.* And the Establishment Clause "prohibits government involvement in . . . ecclesiastical decisions." *Id.* at 188–89. Thus, working in tandem, the Free Exercise Clause protects a religious organization's right to make its own decisions about its mission and which employees serve that mission, while the Establishment Clause prohibits the government from inserting itself into the organization's decision-making process. Put simply, this "church autonomy" doctrine protects religious organizations' "independence in matters of faith and

6

doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020).

One aspect of this doctrine is the ministerial exception, which protects religious organizations from employment-discrimination claims brought by "certain key employees." *Id.* at 737.[2] This exception reflects not only that religious organizations have the right to choose their own ministers, but also that courts "[d]eciding such questions would risk judicial entanglement in religious issues." *Id.* at 761; *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1168, 1170 n.7 (4th Cir. 1985) (warning of the "danger[] of entanglement"); see also *McRaney v. North Am. Mission Bd. of the S. Baptist Convention, Inc.*, — F.4th —, 2025 WL 2602899, at *6 (5th Cir. Sept. 9, 2025) ("[The ministerial exception] recognizes a sphere of independence that courts cannot pierce.").

But the church autonomy doctrine is much broader than just the ministerial exception. See *McRaney*, 2025 WL 2602899, at *5 (discussing

---

[2] "[T]he term 'ministerial exception' is somewhat of a misnomer." *Our Lady*, 591 U.S. at 762 n.1 (Thomas, J., concurring). The First Amendment's protection of a religious organization's employment decisions "extends to the laity, provided they are entrusted with carrying out the religious mission of the organization." *Ibid.*

the "breadth" and "wide-ranging scope" of the church autonomy doctrine). The church autonomy doctrine requires courts to accept church decisions as to "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian E. Orthodox Diocese for the U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 713 (1976); see also *Watson v. Jones*, 80 U.S. 679, 729 (1871) (explaining that "judges of the civil courts" are not "as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own"). It makes clear that a court's proper role is one of "avoidance, rather than intervention," when disputes arise "involving religious governance." *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc). And it prohibits courts from interpreting "particular church doctrines" and determining "the importance of those doctrines to the religion." *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969).

To scrutinize "whether and how" a religious organization pursues its mission would "raise serious concerns about state entanglement with religion and denominational favoritism." *Carson v. Makin*, 596 U.S. 767,

787 (2022). In fact, "the very process of inquiry" into the relationship between a religious organization's mission and its position on an employment question "may impinge on rights guaranteed by the Religion Clauses." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979). A "protracted legal process pitting church and state as adversaries" all but requires judicial involvement in religious questions. *Rayburn*, 772 F.2d at 1171. Employment-discrimination litigation can be lengthy and include "subpoena[s], discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church," and even potentially "continued court surveillance" to gauge compliance with a judgment. *Ibid.* But "[p]ervasive monitoring by public authorities infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement." *Ibid.* (cleaned up).

Even the *threat* of litigation can chill a religious organization's decision making, particularly when the line between liability and protected conduct is unclear. See *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 343–44 (1987) (Brennan, J., concurring); *Rayburn*, 772 F.2d at 1171. There is a real danger that religious organizations might make decisions

"with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments." *Rayburn*, 772 F.2d at 1171. And the government places "a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." *Amos*, 483 U.S. at 336 (majority opinion); see also *id.* at 345 (Brennan, J., concurring) ("Concern for the autonomy of religious organizations demands that we avoid the entanglement and the chill on religious expression that a case-by-case determination [of an activity's secular or religious nature] would produce.").

The upshot of the church autonomy doctrine—as it applies here—is that the First Amendment "protects a religious group's right to shape its own faith and mission." *Hosanna-Tabor*, 565 U.S. at 188. Courts accordingly defer to a religious organization's determination of its mission when resolving cases under the Religion Clauses. See *Our Lady*, 591 U.S. at 739 (discussing how an employment agreement "set out the school's 'mission'"); *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 332 (4th Cir. 2024) (deferring to a religious organization on what tasks it "considered . . . 'vital' to its religious mission"); *Shaliehsabou v. Hebrew*

*Home of Greater Washington, Inc.*, 363 F.3d 299, 301 (4th Cir. 2004) (analyzing a ministerial-exception case according to the mission set forth in the "By-Laws" of a "non-profit religious and charitable corporation"). The First Amendment requires no less.

## II. Maryland's law infringes on the SDA Organizations' First Amendment rights by requiring courts to improperly insert themselves into religious questions

The district court failed to give full effect to the Religion Clauses. The court's holding violated the church autonomy doctrine by infringing on the SDA Organizations' right to determine their own core missions and hire employees in accordance with those missions. And the district court's holding requires courts to resolve intrinsically religious questions, something they are ill-suited to accomplish.

Section 20-604(2)—as the Maryland Supreme Court has interpreted it—arrogates to the courts the power to determine a religious organization's core mission. See *Catholic Relief Servs.*, 300 A.3d at 137 & n.20. Courts "may consider" the organization's mission statement but are not required to credit it. *Id.* at 137. Instead, "[c]ourts must analyze the activities of a religious entity" and "consider the totality of the circumstances." *Id.* at 137 n.20.

This intrusion violates the First Amendment's protection of a religious organization's "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady*, 591 U.S. at 746. When a court decides what that central mission is—especially when the basis for that decision is a nebulous "totality of the circumstances" test, *Catholic Relief Servs.*, 300 A.3d at 137 & n.20— that court necessarily shapes the qualifications for "internal management decisions that are essential to" that mission, *Our Lady*, 591 U.S. at 746. In failing to recognize this problem, the district court ignored that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989). This Court should correct that error.

There are few more foundational doctrinal matters than what constitutes a religious organization's core mission, and the First Amendment forbids a court from "substitut[ing] its interpretation" of a religious organization's core mission for the organization's own. *Milivojevich*, 426 U.S. at 721. In the employment context, it is one thing to examine an employee's role in an organization, something courts may

12

be "familiar and comfortable with" doing. *Shaliehsabou*, 363 F.3d at 307; see *Our Lady*, 591 U.S. at 756 (performing that analysis). It is another to second-guess the organization's own understanding of its purpose and the role that the employee plays in furthering that purpose. The latter inquiry constitutes "government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. The Supreme Court and this Court have thus declined to engage in such second-guessing. See *id.* at 193 (evaluating the "religious mission" from "the description of the employee's position"); see also *Our Lady*, 591 U.S. at 756–57; *Billard*, 101 F.4th at 332; *Shaliehsabou*, 363 F.3d at 301.

Here, the SDA Organizations have the "right to shape [their] own faith and mission." *Hosanna-Tabor*, 565 U.S. at 188. And that is particularly true of the General Conference because it is "the highest ecclesiastical and administrative body of the Seventh-day Adventist church." JA13. The Supreme Court has made clear that courts must accept "the decisions of the highest ecclesiastical tribunal of a hierarchical church" as to "matters of discipline, faith, internal

organization, or ecclesiastical rule, custom, or law."[3] *Milivojevich*, 426 U.S. at 713. When the General Conference determines its mission, courts cannot constitutionally second-guess that mission; to do so both infringes on the General Conference's right to determine its own mission and involves courts in a quintessentially religious question. But such second-guessing is exactly what the Maryland Supreme Court requires. The district court erred in failing to appreciate—and remedy—this danger.

Section 20-604(2), as interpreted by the Maryland Supreme Court, also unconstitutionally limits application of the exemption to employees whose "duties 'directly' further[] the core mission," not those "one or more steps removed from" this mission. *Catholic Relief Servs.*, 300 A.3d at 136. In other words, the Maryland Supreme Court requires religious

---

[3] That is not to say that a hierarchical church has greater church autonomy than other churches. Such a result would constitute denominational preference forbidden by the Establishment Clause. See *Catholic Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 241, 254 (2025) (holding unconstitutional the denial of an exemption to a religious charity because the denial constituted "a denominational preference" and did not "satisfy the highest level of judicial scrutiny"); see also *McRaney*, 2025 WL 2602899, at *15–16 (recognizing that "sister courts across the country have recognized the autonomy of non-hierarchical churches" and declining "to be the first court ever to hold the church autonomy doctrine protects only hierarchically organized religious entities").

organizations to both guess at what a court will determine to be its core mission—based on a totality-of-the-circumstances test—*and* predict which employees that court will consider to "directly further" that mission. *Ibid.* That Kafkaesque exercise is unconstitutional. Aside from the impropriety of a court determining a religious organization's core mission, the inquiry that a court must undertake to determine the connection between a religious organization's mission and an employee's role impinges on First Amendment rights. See *Catholic Bishop of Chi.*, 440 U.S. at 502. Indeed, the speculative nature of this inquiry creates a perpetual threat of litigation with unpredictable outcomes, which will have a chilling effect on religious organizations and cause them to make decisions based on fear of liability instead of adherence to faith. See *Amos*, 483 U.S. at 343–44 (Brennan, J., concurring); *Rayburn*, 772 F.2d at 1171. Under the Maryland Supreme Court's test, the SDA Organizations would be forced to litigate the permissibility of religious qualifications for virtually every position except those few that are unquestionably ministerial.

Whether a religious organization's employees are performing work that directly furthers the organization's mission is an intrinsically

religious question, but the Maryland Supreme Court's construction of section 20-604(2) requires the secular judiciary to delve deep into religious doctrine. The SDA Organizations believe that all their employees represent the Seventh-Day Adventist Church and should share "the Church's faith with the world." JA13. Other Christian organizations may dispense with the idea that *any* employee is of secondary importance, based on the Bible's teaching that all work is to be performed "as working for the Lord," Colossians 3:23 (NIV), and that all Christians are important members of the body of Christ with diverse spiritual gifts to use in the church, see 1 Corinthians 12. Under the Maryland Supreme Court's direction, however, courts will be expected to decide whether work performed "as working for the Lord" falls within the core mission of an organization and, if not, analyze the number of steps between the core mission and the employee's role, with little consideration for how the religious organization itself views that role.

Compounding this problem is the fact that secular courts—the very entities tasked with completing this analysis—are particularly ill-equipped to decide what a religious organization's core mission is and which employees serve it directly enough to fall under Maryland's

exemption. The First Amendment does not permit courts to inquire into "the substantive criteria by which [church judicatories] are supposedly to decide [an] ecclesiastical question." *Milivojevich*, 426 U.S. at 713. But even if it did, religious bodies themselves are far more capable of deciding religious questions than are courts. *Watson*, 80 U.S. at 729. Courts are neither "arbiters of scriptural interpretation" nor experts on religious beliefs, which "need not be acceptable, logical, consistent, or comprehensible to others." *Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 714, 716 (1981). Given their inaptitude for the task, courts will be the proverbial bull in a china shop—putting on trials to resolve sensitive, complex, and potentially intractable questions of religious doctrine while costing the judiciary and religious organizations valuable resources.

The Maryland exemption leaves the SDA Organizations and others in a quandary. They cannot define their own core missions—they must guess at how a court might define them. They cannot freely apply religious employment qualifications based on the function of the position—they must try to determine whether the position is "one or more steps removed" from whatever a court might one day determine to be

17

their "core mission." *Catholic Relief Servs.*, 300 A.3d at 136–37. This exemption scheme threatens lengthy litigation and "substantial liability," placing "a significant burden" on these organizations by requiring them "to predict which of [their] activities a secular court will consider" to be their core missions and what classes of employees are close enough to those core missions to count. *Amos*, 483 U.S. at 336. In short, these organizations can only protect themselves by acquiescing in the chilling effect of the exemption and making decisions "with an eye to avoiding litigation" rather than religious convictions, *Rayburn*, 772 F.2d at 1171, or by moving their operations to other States. This is not the religious freedom guaranteed by the First Amendment.

## CONCLUSION

This Court should reverse the district court's denial of the SDA Organizations' motion for a preliminary injunction.

Respectfully submitted,

By:  */s/ Kevin M. Gallagher*
        KEVIN M. GALLAGHER
        *Solicitor General*

JASON S. MIYARES
  *Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile

September 15, 2025

GRAHAM K. BRYANT
  *Principal Deputy Solicitor General*

MICHAEL C. DINGMAN
MEREDITH L. BAKER
  *Deputy Solicitors General*

*Counsel for the Commonwealth of
Virginia*

## COUNSEL FOR ADDITIONAL AMICI STATES

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DAVE YOST
Attorney General
State of Ohio

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY J. JACKLEY
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 3,399 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century typeface.

*/s/ Kevin M. Gallagher*

KEVIN M. GALLAGHER
*Solicitor General*

21

## CERTIFICATE OF SERVICE

I certify that on September 15, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

*/s/ Kevin M. Gallagher*

KEVIN M. GALLAGHER
*Solicitor General*