Nos. 25-1735

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, et al.

*Plaintiffs-Appellants,*

v.

CLEVELAND L. HORTON, et al.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Maryland, Case No. 24-2866-TDC

_____

**Brief of Association of Catholic Colleges & Universities, Council for Christian Colleges & Universities, Brigham Young University, The Catholic University of America, Liberty University, Wheaton College, and Eleven Additional Religious Colleges and Universities as *Amici Curiae* in Support of Plaintiffs-Appellants and Reversal**

_____

Steven M. Sandberg
David M. Andersen
Aaron M. Worthen
Brigham Young University
Office of General Counsel
A-357 ASB
Provo, UT 84602
(801) 422-4722

Counsel for *Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF THE *AMICI* ............................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................. 3

ARGUMENT ....................................................................................... 4

I.   Religious Schools Offer Mission-driven Communities that Benefit
     Students. ................................................................................... 4

     A.   Students Enjoy Numerous Benefits from the Unique
          Communities Created by Religious Schools. ......................... 5

     B.   Religious Institutions of Higher Education Create Unique
          Campus Communities that Reflect their Religious Missions. 8

          1.   Brigham Young University ............................................. 9

          2.   The Catholic University of America ............................. 11

          3.   Cedarville University .................................................... 13

          4.   Houston Christian University ....................................... 14

          5.   Liberty University ........................................................ 15

          6.   Regent University ........................................................ 17

          7.   Wheaton College .......................................................... 19

II.  The Constitution Protects the Right of Religious Schools to
     Choose the Religious Makeup of Their Campus Communities—
     Including the Workforce. ......................................................... 21

     A. The Church Autonomy Doctrine Secures a Religious
        Community's Right to Make Faith-Based Decisions
        Regarding Its Workforce. ..................................................... 22

     B. The Church Autonomy Doctrine Requires the Title VII
        Religious Exemption. ............................................................ 25

     C. The Church Autonomy Doctrine Forbids Judicial Tests Like
        Maryland's That Entangle Courts and Remove Religious
        Autonomy. ............................................................................. 28

III. The Freedom of Association Protects the Right of Religious Schools to Exclude Any Employee Who Does Not Accept Their Preferred Religious Community.................................................31

CONCLUSION.........................................................35

# TABLE OF AUTHORITIES

## CASES

*Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316
(4th Cir. 2024) ..............................................................25, 27

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ..........................32, 34

*Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) ........................................................31

*CompassCare v. Hochul*, 125 F.4th 49 (2d Cir. 2025) ...........................34

*Corp. of Presiding Bishop of Church of Jesus Christ
of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) ............ 26, 27, 30, 35

*Doe v. Cath. Relief Servs.*, 779 F. Supp. 3d 545 (D. Md. 2025)...............30

*Gen. Conf. of Seventh-day Adventists v. Horton*, No.
CV 24-2866-TDC, 2025 WL 1703806 (D. Md. June 18, 2025)........ passim

*Hosanna-Tabor Evangelical Lutheran Church & Sch.
v. E.E.O.C.*, 565 U.S. 171 (2012) ..............................................30, 31, 32

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952)..............................................................24

*New Hope Family Services v. Poole*, 966 F.3d 145 (2d Cir. 2020) ............33

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020)..........................................................5, 25, 28, 29

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984).....................31, 32

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976)..........................................................24

*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023)...............................33, 34

*Watson v. Jones*, 80 U.S. 679 (1871) ......................................................24

## STATUTES

Title VII of the Civil Rights Act of 1964 § 702(a),
42 U.S.C. § 2000e-1(a)...............................................................22, 25

Title VII of the Civil Rights Act of 1964 § 703(e)(2),
42 U.S.C. § 2000e-2(e)(2) ...............................................................22

## OTHER AUTHORITIES

Albert Cheng & David Sikkink, *What Do They Deliver? A Report on
American Colleges and Universities*, Cardus (Feb. 10, 2020),

iii

https://www.cardus.ca/research/education/reports/what-do-they-deliver/ .................................................................................... 6

Alison Cashin, *Beyond Work, Scroll, and Repeat: Cultivating Meaning and Purpose in Gen Z*, MAKING CARING COMMON, https://mcc.gse.harvard.edu/whats-new/gen-z-meaning-purpose. ......................... 7

Anayat Durrani, *U.S. Colleges With Religious Affiliations: What Students Should Know*, USNEWS (May 8, 2024), https://www.usnews.com/education/best-global-universities/articles/us-colleges-with-religious-affiliations-what-students-should-know ............................................................... 8

Brennan Barnard, *Identity, Belonging, And College Options*, FORBES (Feb. 27, 2024), http://forbes.com/sites/brennanbarnard/2024/02/27/identity-belonging-and-college-options/. ......................... 5

*BYU Mission Statement*, BYU, https://aims.byu.edu/byu-mission-statement ................................................................................ 9, 10

C. Shane Reese, *Perspective: Becoming BYU*, DESERET NEWS (Dec. 11, 2023), https://www.deseret.com/opinion/2023/12/11/23997519/c-shane-reese-what-byu-must-become/ ........................................... 10

Henry J. Eyring, *The Innovative University*, DESERET MAG. (Sep. 14, 2022), https://www.deseret.com/2022/9/14/23319239/henry-j-eyring-byu-idaho-the-innovative-university. ..................................... 4

Ilana Horwitz, *Religion and Academic Achievement: A Research Review Spanning Secondary School and Higher Education*, 63(1) Review of Religious Research 107–54 (Mar. 1, 2021). ......................................... 6

Jacob Hess, *College Students Active in Their Faith Have Better Mental Health, Including Sexual Minorities*, DESERET NEWS (Sept. 4, 2024); W. Justin Dyer, *College Students Are Struggling with Mental Health. More Access to Religion Can Help Them*, DESERET NEWS (July 2, 2022) ........... 7

Josiah F. Marineau and Shawn Williams, *Intellectual Diversity at Religious Colleges*, 52:4 POL. SCI. & POLS. (Cambridge Univ. Press 2019)................................................................................................ 6

Josiah F. Marineau and Shawn Williams, *Intellectual Diversity at Religious Colleges*, 52:4 POL. SCI. & POLS. 711–14 (Cambridge Univ. Press 2019)................................................................................... 6

*Mission Alignment Standards*, BYU, https://aims.byu.edu/mission-alignment-standards ......................................................................... 10

*Ms. Willie, Beloved Catholic U. Lunch Lady, Gets Dining Room Named for Her*, WASH. POST, ....................................................... 13

National Center for Education Statistics, DIGEST OF EDUCATION
    STATISTICS, Table 303.90 (2021), https://nces.ed.gov/programs/digest
    /d21/tables/dt21_303.90.asp ............................................................... 8

Shane Reese, *Becoming BYU: An Inaugural Response*, BYU SPEECHES,
    (Sept. 19, 2023) ..............................................................................10

*Where Americans Find Meaning in Life*, PEW RESEARCH (Nov. 20, 2018),
    https://www.pewresearch.org/religion/2018/11/20/where-americans-
    find-meaning-in-life/ ....................................................................... 7

William C. Duncan, *The Importance of Religious Universities in the
    Ecosystem of Education*, Sutherland Institute (Oct. 7, 2022),
    https://sutherlandinstitute.org/the-importance-of-religious-
    universities-in-the-ecosystem-of-education/ ........................................ 4

## INTEREST OF THE *AMICI*[1]

The Association of Catholic Colleges & Universities, Council for Christian Colleges & Universities, Baylor University, Biola University, Brigham Young University, Brigham Young University–Hawaii, Brigham Young University–Idaho, The Catholic University of America, Cedarville University, Divine Mercy University, Ensign College, Franciscan University of Steubenville, Houston Christian University, Liberty University, Point Loma Nazarene University, Regent University, and Wheaton College (collectively, "*Amici*") are religious colleges and universities of a variety of denominations, or associations comprising those colleges and universities, which integrate faith and reason to create educational communities of inspired development and learning.

The district court's opinion threatens the constitutionally protected right of religious entities to make religious-based employment decisions to create their communities. *Amici* fear that if states are permitted to restrict the rights of other religious entities to create their preferred

---

[1] The parties have consented to the filing of this amicus brief. No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

religious communities, statutory religious exemptions for religious schools could also be inappropriately narrowed, in violation of the Constitution. In other words, religious schools may be the next target.

*Amici* respectfully ask this Court to reverse the district court's order denying plaintiffs'/appellants' motion for preliminary injunction.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Faith-based colleges and universities have long advanced our nation's economic, social, and moral needs and values. Each school seeks to form a campus community inspired by its religious convictions, because such an environment best supports community members' intellectual growth, character formation, and spiritual development— and multiple studies confirm this belief. The First Amendment protects the right of religious schools to establish and maintain these communities consistent with their faith.

Nevertheless, the district court erroneously determined that states may enact and interpret nondiscrimination laws to prohibit religious entities from making religious-based employment decisions, except in roles that directly further the institution's core mission.[2] This conclusion runs contrary to at least two fundamental principles of the First Amendment: (1) the church autonomy doctrine, which ensures that religious entities remain free to define their own doctrine and choose their community members; and (2) the freedom of association, which

---

[2] *Gen. Conf. of Seventh-day Adventists v. Horton* ("District Court Order"), No. CV 24-2866-TDC, 2025 WL 1703806, at *1 (D. Md. June 18, 2025).

guarantees that religious schools may choose to associate only with those who share their religious convictions. These doctrines provide religious institutions with the indispensable right to determine whether any particular employment position—or even all of them—should be filled by those who are aligned with or are members of the institution's religion.

For these reasons, the district court's order should be reversed.

## ARGUMENT

### I.    Religious Schools Offer Mission-driven Communities that Benefit Students.

"[H]aving a religious mission . . . gives institutions the autonomy to think differently from traditional academic models and more deliberately focus on the needs of their student communities."[3] This faith-based approach enables religious schools to establish a campus community that cultivates learning, belonging, moral formation, and service in ways that secular institutions cannot replicate.[4] Although each religious school defines its campus community differently, all share the goal of providing

---

[3] Henry J. Eyring, *The Innovative University*, DESERET MAG. (Sep. 14, 2022), https://www.deseret.com/2022/9/14/23319239/henry-j-eyring-byu-idaho-the-innovative-university.

[4] William C. Duncan, *The Importance of Religious Universities in the Ecosystem of Education*, Sutherland Institute (Oct. 7, 2022), https://sutherlandinstitute.org/the-importance-of-religious-universities-in-the-ecosystem-of-education/.

4

the most beneficial environment for their students. As the Supreme Court has recognized, "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."[5]

## A. Students Enjoy Numerous Benefits from the Unique Communities Created by Religious Schools.

As described by Cornell B. LeSane II at the College of The Holy Cross, religious schools build communities that focus on more than just academics: "Religiously affiliated colleges often provide a holistic education, emphasizing not just academic excellence but also personal development and student formation."[6]

The results of integrating faith with secular study are staggering. Students "with stronger religiosity earn better grades, are less truant in secondary school, and complete more years of higher education."[7] This is

---

[5] *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753-54 (2020).

[6] Brennan Barnard, *Identity, Belonging, And College Options*, FORBES (Feb. 27, 2024), http://forbes.com/sites/brennanbarnard/2024/02/27/identity-belonging-and-college-options/.

[7] Ilana Horwitz, *Religion and Academic Achievement: A Research Review Spanning Secondary School and Higher Education*, 63(1) Review of Religious Research 107–54 (Mar. 1, 2021). https://doi.org/10.1007/s13644-020-00433-y.

not a mere correlation; a collection of research suggests that "religion can play a causal role in academic success."[8]

Research also indicates that students attending religious schools are more likely than their peers at secular institutions to (1) feel an overall sense of belonging at the institution; (2) avoid "risky behaviors associated with drugs, alcohol, or sex"; (3) volunteer and participate in unpaid community-service efforts; and (4) be "married and never divorced," among other things.[9] Studies have even shown that religious schools "provide a surprisingly broad range of intellectual diversity compared to many college campuses."[10]

Religious schools are also well-positioned to address the historical levels of loneliness, purposelessness, and other mental health challenges currently faced by young adults. In a 2024 study, "over half of young adults (58%) said they had experienced little or no purpose or meaning in their

---

[8] *Id.* (emphasis added) (identifying and synthesizing 42 relevant studies published between 1990 and 2021, of which "95% were based exclusively on quantitative survey data").

[9] Albert Cheng & David Sikkink, *What Do They Deliver? A Report on American Colleges and Universities*, Cardus (Feb. 10, 2020), https://www.cardus.ca/research/education/reports/what-do-they-deliver/.

[10] Josiah F. Marineau and Shawn Williams, *Intellectual Diversity at Religious Colleges*, 52:4 POL. SCI. & POLS. 711–14 (Cambridge Univ. Press 2019).

lives in the previous month."[11] Studies confirm that college students who are active in their faith have better mental health outcomes and greater resilience in dealing with those mental health challenges that arise.[12] By incorporating religion into the campus community, faith-based schools can naturally provide deeper connections among students who share the same values and provide those students with greater purpose—especially for the "20% of Americans [who] say religion is the most meaningful aspect of their lives."[13]

Religious schools can also help students maintain their family values, which can strengthen family ties—the most meaningful aspect of life for another 40% of Americans.[14] As noted by Mary Banks, director of admissions consulting at Quad Education Group, "[w]hen students seek

---

[11] Alison Cashin, *Beyond Work, Scroll, and Repeat: Cultivating Meaning and Purpose in Gen Z*, MAKING CARING COMMON, https://mcc.gse.harvard.edu/whats-new/gen-z-meaning-purpose.

[12] Jacob Hess, *College Students Active in Their Faith Have Better Mental Health, Including Sexual Minorities*, DESERET NEWS (Sept. 4, 2024); W. Justin Dyer, *Perspective: College Students Are Struggling with Mental Health. More Access to Religion Can Help Them*, DESERET NEWS (July 2, 2022).

[13] *Where Americans Find Meaning in Life*, PEW RESEARCH (Nov. 20, 2018), https://www.pewresearch.org/religion/2018/11/20/where-americans-find-meaning-in-life/.

[14] *Id.*

to maintain and replicate their family values, a religious university provides a safe space."[15]

Significantly, prospective students are not limited to just a few religious schools that can provide these benefits. They can search among over 800 "religiously affiliated" institutions of higher education for a campus community that aligns with their personal goals and religious beliefs.[16] This includes schools affiliated with specific faith traditions, such as—among others—Baptist, Catholic, Episcopal, Jewish, Latter-day Saint, Lutheran, Methodist, Muslim, and Presbyterian, as well as schools that are interdenominational or nondenominational.[17]

### B. Religious Institutions of Higher Education Create Unique Campus Communities that Reflect their Religious Missions.

Although *Amici* constitute only a small portion of the religious colleges and universities throughout the nation, they provide a

---

[15] Anayat Durrani, *U.S. Colleges With Religious Affiliations: What Students Should Know*, USNEWS (May 8, 2024), https://www.usnews.com/education/best-global-universities/articles/us-colleges-with-religious-affiliations-what-students-should-know.

[16] National Center for Education Statistics, DIGEST OF EDUCATION STATISTICS, Table 303.90 (2021), https://nces.ed.gov/programs/digest/d21/tables/dt21_303.90.asp.

[17] *Id.*

compelling sample of the varied campus communities that can be created by religious schools to cater to the needs of different students. The following examples highlight some of the different options available to prospective students.

### 1.  Brigham Young University

Guided by The Church of Jesus Christ of Latter-day Saints, the mission of Brigham Young University ("BYU") is "to assist individuals in their quest for perfection and eternal life."[18] "A BYU education should be (1) spiritually strengthening, (2) intellectually enlarging, and (3) character building, leading to (4) lifelong learning and service."[19] The university accordingly seeks "to provide an environment enlightened by living prophets and sustained by those moral virtues which characterize the life and teachings of the Son of God."[20] BYU sustains this environment in large part by selecting employees whose beliefs and conduct align with its religious mission.[21] All BYU employees are expected to demonstrate

---

[18] BYU Mission Statement, BYU, https://aims.byu.edu/byu-mission-statement.

[19] *Id.*

[20] *Id.*

[21] C. Shane Reese, *Becoming BYU: An Inaugural Response*, BYU SPEECHES, (Sept. 19, 2023) ("I repeat today what has been said by my predecessor: 'The most important decisions that will be made in my

"intentionality in building faith in Jesus Christ and testimony of His restored gospel among members of the BYU community" and "a commitment to seek and be led by the Holy Ghost in all aspects of university assignments," among other expectations.[22] This ensures that every community member is dedicated to helping BYU become "the Christ-centered, prophetically-directed university of destiny and promise."[23]

Consistent with BYU's mission and aims, members of the campus community foster a spiritual atmosphere and encourage one another in their religious commitments. Students, faculty, and staff gather weekly for a campus devotional. Employees also participate in regular staff meetings that begin with prayer and a spiritual message. Because students are employed throughout the university, they often take part in these meetings and observe firsthand the examples of their supervisors and other non-student employees.

---

tenure as president at BYU are the people we hire.'"), https://speeches. byu.edu/talks/c-shane-reese/becoming-byu-an-inaugural-response.

[22] *Mission Alignment Standards*, BYU, https://aims.byu.edu/mission-alignment-standards.

[23] C. Shane Reese, *Perspective: Becoming BYU*, DESERET NEWS (Dec. 11, 2023), https://www.deseret.com/opinion/2023/12/11/23997519/c-shane-reese-what-byu-must-become/.

Unsung staff members throughout campus—including in janitorial or grounds crew positions—have a significant impact on students, as they supervise student employees and often spend more time with those students than faculty members do. The mission-centered bonds formed in these relationships often result in student employees later returning to BYU in non-student positions. For example, more than half of current staff in the university's Office of Information Technology are former student employees.

## 2. The Catholic University of America

The Catholic University of America is the national university of the Catholic Church in the United States, founded and sponsored by the United States bishops with approval of the Holy See in 1887. Catholic University is committed to being a comprehensive Catholic and American institution of higher learning faithful to the teaching of Jesus Christ as handed on by the Catholic Church. Catholic University takes seriously its sacred responsibility to uphold the traditions of the Church and desires to cultivate and impart an understanding of the Christian faith within the context of all forms of human inquiry and values. It seeks to ensure, in an institutional manner, the proper intellectual and academic

witness to Christian inspiration in individuals and in the community, and to provide a place for continuing reflection, in the light of Christian faith, upon the growing treasure of human knowledge.

It is important to Catholic University that this stated mission and identity is communicated to its students, not only in the classroom, but in the multitude of facets of campus life. For example, Catholic University staff in housing, dining, student activities, and more, all play a role in cultivating an understanding of the Christian faith in Catholic University students, even when operating outside any *explicitly* ministerial role. An excellent example of this comes from the University's long time dining services employee Ms. Willie Joyner, for whom a Catholic University dining hall was named. As noted in a recent article by the Washington Post, Ms. Willie represented to the Catholic University community the biblical ideal of a "servant's heart," spoke to the students about things like "life" and "Scripture," and demonstrated to students and alumni that "no task is too small to hold 'the immense dignity of work given by God.'"[24] Catholic University's ability to

---

[24] *Ms. Willie, Beloved Catholic U. Lunch Lady, Gets Dining Room Named for Her*, WASH. POST,

determine for itself the spiritual role of its staff members is crucial both to its identity and mission.

### 3.  <u>Cedarville University</u>

Cedarville University, established in 1887, is a religious, non-profit institution of higher education. Cedarville transforms lives through excellent education and intentional discipleship in submission to biblical authority. It is chartered by the State of Ohio, certified by the Ohio Department of Higher Education, and accredited by the Higher Learning Commission, an institutional accreditation agency recognized by the U.S. Department of Education. The University has over 7,200 students including undergraduate, graduate, and dual enrolled students, in more than 175 areas of study, from all 50 states and several other countries. The University employs over 600 full-time employees, comprised of faculty and staff, plus over 2,000 part-time employees, most of whom are students. The University Bylaws state, "Cedarville University is a Baptist university of arts, sciences, professional, and graduate programs,

---

https://www.washingtonpost.com/education/2022/12/08/ms-willie-joyner-catholic-university/ (Dec. 8, 2022).

committed to the **WORD OF GOD** and the **TESTIMONY** of **JESUS CHRIST**."

Working at Cedarville University is more than a job; it's a calling. A call to help equip students to go into the world and do great things for the Kingdom. A call to work as unto the Lord. Therefore, all employees must be a born-again Christian with a personal commitment to Jesus Christ and must agree with, and abide by, the University's Doctrinal Statement, Community Covenant, and General Workplace Standards, which must be affirmed annually by every employee. All University employees are essential in the calling to equip students. In order to fulfill this religious mission, all employees must agree with, and abide by, the University's doctrine.

### 4. <u>Houston Christian University</u>

Houston Christian University ("HCU") is a Texas nonprofit corporation located in Houston, Texas. As a Christian institution of higher education, HCU is driven by its mission of affirmatively enriching the lives of all people who may come within its ambit of influence. HCU's Christian faith permeates everything it does. It hires only faculty and staff who share this faith. While it admits students of all faiths or none,

HCU asks its students to live according to a set of Christian principles while enrolled.

### 5.    Liberty University

Liberty University has established a deliberate student development framework, designed to align all operations with any connection to the student experience with its core mission of "Training Champions for Christ." This mission is grounded in the biblical directive to "love the Lord your God with all your heart, soul, mind, and strength." *Mark* 12:30. This student development model is structured around four foundational pillars: spiritual renewal, social responsibility, intellectual rootedness, and physical and emotional resiliency. The university seeks to foster spiritual renewal in all students with a restored relationship with God through Jesus Christ, encouraging a life of obedience to Him, shaped by the transformative work of the Holy Spirit. The university promotes a commitment to social responsibility among students, meaning to live in righteous relationships and to act responsibly toward others in their community, as guided by biblical principles of humility and service. The university encourages students to be rooted intellectually through pursuit of knowledge and wisdom, applying these

virtues in their lives in accordance with divine guidance. The university emphasizes the importance of students valuing their physical and mental well-being, honoring God with their whole being, thereby developing both physical and emotional resiliency.

To effectuate this mission, Liberty University maintains a comprehensive institutional structure supported by thousands of employees. For example, the Office of Spiritual Development (OSD) alone employs over 90 full-time staff members and oversees a team of more than 1,000 student leaders, all dedicated to cultivating a robust religious community. This community framework extends beyond the OSD, encompassing all university departments in support of the faith-based mission, including the student affairs offices, campus recreation, athletics, Christian community service, and the counseling center, which are unified in their commitment to the holistic development of students as articulated in the four pillars. A faithful faculty ensures all academics are taught with a Christian worldview and admissions seeks to attract a student body desiring this experience. As part of the hiring process, all employees articulate how they will support the Christian mission of Liberty University. Once hired, employees participate in weekly

Convocation services that include Christian praise music, prayer, and inspirational teaching, uplifting and spiritually aligning the employee experience, as well. This coordinated approach ensures that the university's mission permeates every facet of its operations, fostering an environment conducive to the holistic and spiritual growth of its students.

### 6. Regent University

College students who choose a Christian college—like Regent University—expect to receive a Christian education, grounded in biblical principles, delivered by fellow Christians, and supported by fellow Christians in the student body and campus community. To provide students with the Christian education they want and deserve, Regent University has established a purposeful and integrated framework for education and student development that aligns every area of the student experience with its mission: "Regent University serves as a center of Christian thought and action to provide excellent education through a biblical perspective and global context equipping Christian leaders to change the world." This mission guides the university's holistic approach to student formation. To fulfill its mission, Regent University is

supported by a robust institutional structure composed of dedicated faculty and staff who are unified in advancing a Christ-centered educational environment. All of the university's departments, colleges, and schools play a coordinated role in shaping the spiritual and personal growth of students within the framework of Regent's mission and core values.

The Regent University Board of Trustees has approved policies that make it clear that every employee at Regent is tasked with exemplifying and upholding Regent's faith mission through both personal conduct and by engaging in ministry in their roles. Faculty members integrate faith and learning in the classroom, ensuring that all instruction is delivered from a biblical perspective. Staff members integrate faith in support services and interactions with students. As part of the hiring process, all employees are asked to articulate how they personally support and align with the university's mission and Statement of Faith. Once hired, employees are encouraged to participate in regular chapel services, prayer gatherings, and spiritual formation opportunities that foster a vibrant and unified culture of faith across the institution. Through these intentional and aligned efforts, Regent University ensures that its

Christ-centered mission permeates all aspects of campus life—nurturing students spiritually, intellectually, socially, and emotionally, and preparing them to impact the world as Christian leaders.

### 7. <u>Wheaton College</u>

Wheaton College's unique identity and mission to "serve Jesus Christ and advances His Kingdom through excellence in liberal arts and graduate programs that educate the whole person to build the church and benefit society worldwide" is predicated on its ability to hire employees who wholeheartedly align with its mission. As a Christ-centered community, each faculty and staff member must annually affirm the College's Statement of Faith as expressing their own theological convictions and agree to live by the moral standards in Wheaton's Community Covenant, modeling these commitments for the Christian formation of its students.

Wheaton's academic curriculum is titled "Christ at the Core" which represent Wheaton's world view that all academic disciplines—the humanities, natural sciences, art, communication, music, etc.—must be studied through the lens of faith integration. Wheaton believes that all

truth is God's truth and each faculty member approaches their area of expertise with this foundational belief.

Outside the classroom, other campus employees embrace these same beliefs and support students and the extended community in numerous ways. Some faith connections emerge specifically related to those in faith-focused roles such as those in the Chaplain's Office or the Office of Ministry and Evangelism, but hundreds of other employees on campus cultivate its rich Christian community with students and others regardless of their role. Some examples of how this manifests include an Office Coordinator praying with a student worker struggling with a health challenge, a Public Safety Officer offering a word of encouragement from Scripture to a student reporting a safety concern, a Facilities Manager welcoming students into his home for home cooked meals with his family, a Welcome Center receptionist answering questions from prospective students and families about the spiritual climate on campus, fundraising professionals praying with donors experiencing a family loss, an academic advisor leading a student bible study, a communications manager offering Christian hospitality to international students over the holidays, managers opening meetings

with prayer, and so on. While many more instances could be cited, these examples highlight the truth that Wheaton's ability to execute its mission relies, in large part, on the shared theological convictions and covenant commitments each member of its community lives out each day.

Each of these campus communities is established to achieve the larger goal of helping students become well-educated and well-equipped to faithfully face life's challenges. These communities are successful, in large part, because each religious school is free to choose whether to employ only members of its faith—or whether to open employment to members of other religions. After all, if a school cannot determine the religious aspect of its workforce, it cannot determine the contours of the religious community it creates for its students.

The efforts made to establish and maintain these religious campus communities—as well as countless others—are worth protecting, and the Constitution ensures their preservation.

## II.    The Constitution Protects the Right of Religious Schools to Choose the Religious Makeup of Their Campus Communities—Including the Workforce.

The Constitution has always safeguarded the autonomy and freedom of religious entities to define and uphold the religious character

of their communities. That right necessarily includes the ability to choose whether to invite members of other faiths into the community's workforce. Congress codified this principle in Section 702 of Title VII of the 1964 Civil Rights Act ("Title VII"),[25] ensuring that religious communities could employ those aligned with their faith, without intrusive judicial inquiries. The district court's approval of the Maryland Supreme Court's "core mission" test[26] departs from this constitutional guarantee, entangling courts in theological judgments and stripping religious entities of their protected autonomy.

### A. The Church Autonomy Doctrine Secures a Religious Community's Right to Make Faith-Based Decisions Regarding Its Workforce.

The right of a religious school to determine the religious makeup of its workforce is essential, as a religious campus community cannot survive if those entrusted with its work—whether they are deemed to be serving in sacred or primarily secular roles—are ambivalent or even hostile toward its religion. Yet under the district court's reasoning, governments could

---

[25] Title VII of the Civil Rights Act of 1964 § 702(a), 42 U.S.C. § 2000e-1(a). Title VII also contains a specific exception for religious schools. Title VII § 703(e)(2), 42 U.S.C. § 2000e-2(e)(2).

[26] District Court Order at *3.

deprive religious entities of their right to make faith-based employment decisions—except for those employees deemed to "directly further" the entity's "core mission."[27] If governments can remove statutory religious exemptions without offending the Constitution, a religious school could take no action against employees who openly oppose the religion. Even one such employee can fracture a faith community. But following the district court's decision would allow states to compel religious schools to fill their campus with employees unsupportive of their faith, hollowing out the very communities the First Amendment exists to protect.

The Constitution does not tolerate this. It protects a religious school's right to establish and remain an entire community of faith, not just components of that community. This protection stems from the church autonomy doctrine, rooted in both the Free Exercise Clause and the Establishment Clause. Under this doctrine and its corollary, ecclesiastical abstention, courts are "incompetent judges of matters of faith, discipline, and doctrine," and therefore must not weigh in on "theological controversy,

---

[27] District Court Order at *3.

church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them."[28]

Among other things, the church autonomy doctrine allows religious organizations (1) to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine";[29] and (2) "to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters," which "civil courts shall not disturb."[30]

Recent Supreme Court cases have applied a subset of the church autonomy doctrine, known as the ministerial exception, which prohibits courts from interfering with religious entities' employment decisions with respect to those who hold "certain important positions" within a religious organization, including those who "perform[] vital religious duties" or whose "responsibilities . . . lie at the core of the [organization's] mission." Importantly, the Supreme Court has made clear that the church autonomy doctrine applies to far more than ministers, as the First Amendment also

---

[28] *Watson v. Jones*, 80 U.S. 679, 732-33 (1871).

[29] *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952).

[30] *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 725 (1976).

guarantees religious organizations "independence in matters of faith and doctrine and in closely linked matters of internal government."[31]

To be truly independent in matters of faith, religious entities must have the right to choose the religious makeup of their workforce, including the religious conditions of employment. Court interference with these internal religious decisions undermines the constitutionally guaranteed autonomy of religious organizations to decide for themselves their own internal rules and qualifications to be part of their community.

### B. The Church Autonomy Doctrine Requires the Title VII Religious Exemption.

When Congress enacted Title VII, it adopted Section 702, a "constitutionally inspired" exemption allowing all religious entities to continue making religious-based employment decisions.[32] At first, the exemption extended only to employees engaged in religious activities—forcing courts to decide case by case which roles qualified. But just eight years later, Congress eliminated any potential constitutional tension by

---

[31] *Our Lady of Guadalupe Sch.*, 591 U.S. at 747 (recognizing that "none [of the Court's prior church autonomy cases] was exclusively concerned with the selection or supervision of clergy").

[32] *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024); Title VII at § 702(a), 42 U.S.C. § 2000e-1(a).

expanding the exemption to cover all employees. As the Supreme Court later emphasized, "[t]here was simply no need to consider the scope" of a religious entity's rights to make religious-based employment decisions "until the 1964 Civil Rights Act was passed."[33]

Because Congress quickly expanded Section 702, neither this Court nor the Supreme Court had occasion to determine whether the statute's initial exemption adequately protected the Free Exercise rights at stake.[34] Even so, in *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, the Supreme Court cautioned why a narrow exemption would have been constitutionally suspect: compelling a religious entity "to predict which of its activities a secular court will consider religious," is "a significant burden" that chills the ability of a religious entity to fulfill "what it understood to be its religious mission."[35]

Justice Brennan went further, examining the inescapable constitutional tension between an individual's religious freedom and the

---

[33] *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338 (1987).

[34] *See id.* at 336 ("We may assume for the sake of argument that the pre–1972 exemption was adequate in the sense that the Free Exercise Clause required no more.").

[35] *Id.*

"[c]oncern for the autonomy of religious organizations," which "demands that we avoid the entanglement and the chill on religious expression that a case-by-case determination would produce."[36] "Because of the nature of nonprofit activities," Justice Brennan concluded, "a categorical exemption for [nonprofit religious organizations] appropriately balances these competing concerns."[37]

Since *Amos*, the right codified in Section 702 has remained in place. Religious organizations have thus been free to choose whether to exclusively employ members of their faith, preserving their autonomy to shape their communities. Courts have consequently focused on the scope of religious entities' constitutional rights *beyond* those articulated in Section 702—most notably the ministerial exception, "which permits religious institutions, *notwithstanding Title VII*, to discriminate in their treatment of certain employees with vital religious duties."[38]

To read the ministerial exception as the exclusive scope of the church autonomy doctrine, as the district court did,[39] ignores Supreme

---

[36] *Id.* at 345–46 (Brennan, J. concurring).

[37] *Id.*

[38] *Billard*, 101 F.4th at 322 (emphasis added).

[39] District Court Order at *5.

Court precedent about the breadth of this doctrine and the First Amendment's guarantee that religious organizations must have "independence in matters of faith and doctrine and in closely linked matters of internal government."[40] This constitutionally guaranteed religious independence applies to more than just ministers. It also necessarily protects religious organizations from any government intervention that requires them to involuntarily employ members of other faiths or those who oppose or are not aligned with their faith.

### C.    The Church Autonomy Doctrine Forbids Judicial Tests Like Maryland's That Entangle Courts and Remove Religious Autonomy.

The Maryland Supreme Court's test—applied by the district court in this case—fails to honor the protections of the church autonomy doctrine. Under the test, religious entities may make religious-based employment decisions only for individuals "who perform duties that directly further the core mission (or missions) of the religious entity."[41]

The district court reasoned that this test avoids constitutional concerns because "a court expressly need not evaluate religious doctrine

---

[40] *Our Lady of Guadalupe Sch.*, 591 U.S. at 747.

[41] District Court Order at *3.

and beliefs."[42] But the test merely substitutes one entangling inquiry for another: deciding case by case whether an employee's duties "directly further" a religious organization's "core missions," rather than whether the duties are "religious." It should come as no surprise that a religious organization's "core mission" is highly likely to be "religious." Just as "judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition,"[43] they cannot be expected to know which functions "directly further" a religion's "core mission." And there are surely no judicially manageable standards under which a secular court could decide for itself which of a religious group's missions are sufficiently "core" to warrant protection.

Additionally, forcing religious organizations to anticipate which of their activities a secular court will consider to "directly further" a "core mission" imposes the same significant and chilling burden warned against in *Amos*.[44] Indeed, "the mere adjudication of such questions would pose grave problems for religious autonomy . . . with a civil

---

[42] *Id.* at *7.

[43] *Our Lady of Guadalupe Sch.*, 591 U.S. at 757.

[44] *Amos*, 483 U.S. at 336 (majority opinion).

factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission."[45] Thus, the test will cause a constitutional dilemma: courts will either impermissibly entangle themselves with religion by defining an entity's religious "core missions," or it will infringe upon the religion's free exercise rights by respecting only "core missions" that are secular.

This danger is not hypothetical. In the initial case implementing the Maryland Supreme Court's test, a district court concluded that an employee was outside the state's religions exemption because he did not "directly serve the poor and vulnerable overseas, solicit or secure funding for projects, or possess authority to determine how [the entity] would pursue its mission through its programs."[46] But the court failed to ask whether the employee's work directly advanced the entity's articulated mission of "embody[ing] Catholic social and moral teaching."[47] Ignoring that mission may have prevented excessive entanglement, but it deprived the entity of its religious autonomy. Refusing to recognize that a religious

---

[45] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 205–06 (2012) (Alito, J. concurring).

[46] *Doe v. Cath. Relief Servs.*, 779 F. Supp. 3d 545, 559 (D. Md. 2025).

[47] *Id.* at 549.

mission may advance secular purposes may also unconstitutionally discriminate on the basis of religion.[48] Courts will face this dilemma in every similar case, which is precisely why the church autonomy doctrine prohibits the type of inquiry approved by the district court.

## III. The Freedom of Association Protects the Right of Religious Schools to Exclude Any Employee Who Does Not Accept Their Preferred Religious Community.

The right of religious schools to create their desired communities is further protected by the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."[49] The freedom of association is especially relevant to the rights of religious communities because "the First Amendment . . . gives special solicitude to the rights of religious organizations."[50]

Independent from the church autonomy doctrine, the freedom of association fortifies a religious entity's right to choose whether to allow

---

[48] *Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 249 (2025) (holding unconstitutional a decision to deny an employment tax exemption to a religiously controlled charity on the basis that its charitable activities were not sufficiently religious).

[49] *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984).

[50] *Hosanna-Tabor*, 565 U.S. at 189 (majority opinion).

non-member employees into its community. Indeed, there is "no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire."[51] This is especially true for religious institutions, "whose very existence is dedicated to the collective expression and propagation of shared religious ideals."[52] Accordingly, "the forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints."[53]

As illustrated by the religious communities described above,[54] every employee within a religious institution of higher education impacts both the message sent to students and the cohesiveness of the community in which those students learn and grow. Forcing a religious school to employ a non-adherent in any position thus deprives the institution of its right to fill the role with a believer who shares its faith, is committed to advancing its religious mission, and strengthens the campus community.

---

[51] *Jaycees*, 468 U.S. at 623.
[52] *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J. concurring)
[53] *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).
[54] *See supra* Part I.B.

However, the district court stressed that this Court and the Supreme Court have yet to conclude "that employers have expressive association rights or that the act of hiring is considered to be expressive activity."[55] But these courts also have never suggested otherwise, and other courts have recognized the freedom of association in the employment context. As acknowledged by the district court, in *Slattery v. Hochul*,[56] the Second Circuit held that "forc[ing] [religious employers] to associate with employees or prospective employees whose actions indicate that they do not share their views" is a "severe burden" on the employer's expressive association rights, which subjects the law to a strict scrutiny analysis.[57]

As further noted by the district court, the Second Circuit has since provided additional direction in *CompassCare v. Hochul*.[58] But that guidance does not change the outcome here. *CompassCare* concluded that

---

[55] District Court Order at *17-18.

[56] 61 F.4th 278 (2d Cir. 2023).

[57] *Id.* at 287–90; *see also New Hope Family Services v. Poole*, 966 F.3d 145, 179 (2d Cir. 2020) (upholding religious adoption agency's freedom of association claim that challenged state law requiring placement of children with same-sex couples, in part because the agency could have to discipline employees who shared the agency's beliefs).

[58] 125 F.4th 49, 58–60 (2d Cir. 2025); District Court Order at *18.

to succeed on a free association employment claim, a religious entity must demonstrate that (1) the offending statute "burdens [the entity's] distinct associational rights by forcing it to 'employ individuals who act or have acted against' its '*very mission*'"; and (2) "that the statute burdens [the entity's] associational rights with respect to specific employment decisions."[59] Where a religious organization's very mission is to build a community of believers that adhere to the organization's religious tenets, any employee who does not share and embrace the faith inherently hinders that mission. Any statute requiring the entity to hire non-adherents as employees would burden the entity's right in every specific instance.

Finally, the district court's assertion that *Boy Scouts of America v. Dale*[60] turned on the scoutmaster's "role" in the Boy Scouts is erroneous.[61] *Dale* did not focus on the scoutmaster's role in the organization but rather his mere "presence" therein and his avowed disagreement with the organization's policy against same-sex relationships.[62] The Court concluded

---

[59] *Id.* (quoting *Slattery*, 61 F.4th at 288) (emphasis in original).

[60] *Dale*, 530 U.S. at 640.

[61] District Court Order at *17.

[62] *Dale*, 530 U.S. at 655–56.

that merely having Dale present would "force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior."[63] Likewise, the mandatory presence of any non-supportive or non-member employees would force religious schools to communicate a message that denying a specific faith tradition is an acceptable path for members of their communities. Some religious schools may choose to send that message; however, the choice should remain with the institution, not the government.

## CONCLUSION

The Constitution secures the right of religious entities to pursue autonomous community-building efforts and to freely associate only with those who accept and follow their religious standards. These protections are particularly crucial to ensure that religious institutions of higher education can continue to create a variety of meaningful religious communities in which students of faith can thrive. Because the district

---

[63] *Id.* at 653. Notably, the Court gave no indication that its conclusion would be different if Dale were an employee.

court's ruling endangers these constitutional guarantees, its denial of appellants' motion for preliminary injunction should be reversed.

Date: September 15, 2025    Respectfully submitted,

_/s/ Aaron M. Worthen_

Steven M. Sandberg
David M. Andersen
Aaron M. Worthen
Brigham Young University
Office of General Counsel
A-357 ASB
Provo, UT 84602
(801) 422-4722
steve.sandberg@byu.edu
david_andersen@byu.edu
aaron_worthen@byu.edu

Counsel for _Amici Curiae_

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,388 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/ Aaron M. Worthen*

Counsel for *Amici Curiae*

## DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1,

> Association of Catholic Colleges & Universities,
> Council for Christian Colleges & Universities,
> Baylor University,
> Biola University,
> Brigham Young University,
> BYU–Hawaii,
> BYU–Idaho,
> The Catholic University of America,
> Cedarville University,
> Divine Mercy University,
> Ensign College,
> Franciscan University of Steubenville,
> Houston Christian University,
> Liberty University,
> Point Loma Nazarene University,
> Regent University, and
> Wheaton College

who are *amici curiae*, make the following disclosure:

1. Are any *amici* a publicly held corporation or other publicly held entity? **NO**

2. Do *amici* have any parent corporations? **NO**

3. Is 10% or more of the stock of any *amici* owned by a publicly held corporation or other publicly held entity? **NO**

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? **NO**

5. Are any *amici* a trade association? **N/A**

6. Does this case arise out of a bankruptcy proceeding? **NO**

7. Is this a criminal case in which there was an organizational victim? **NO**

/s/ Aaron M. Worthen

Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on September 15, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

*/s/ Aaron M. Worthen*

Counsel for *Amici Curiae*