No. 25-1735

# In the United States Court of Appeals for the Fourth Circuit

GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS,
AN UNINCORPORATED ASSOCIATION; ADVENTIST RISK MANAGEMENT, INC.,

*Plaintiffs-Appellants,*

v.

CLEVELAND HORTON, II; GLENDORA C. HUGHES; STEPHANIE SUERTH;
JANSSEN E. EVELYN; EILEEN M. LEVITT; ANGELA SCOTT;
MAGDALENA S. NAVARRO; JEFF ROSEN; GINA MCKNIGHT-SMITH;
NOAH THOMAS METHENY; ANTHONY G. BROWN,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, Southern Division
No. 8:24-cv-02866; Hon. Theodore D. Chuang

**BRIEF OF MAJOR RELIGIOUS ORGANIZATIONS AND
RELATED ENTITIES AS *AMICI CURIAE* SUPPORTING
PLAINTIFFS-APPELLANTS AND REVERSAL**

Gene C. Schaerr
James C. Phillips
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

SEPTEMBER 15, 2025

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1735__      Caption: __General Conference of Seventh-day Adventists v. Horton__

Pursuant to FRAP 26.1 and Local Rule 26.1,

The Church of Jesus Christ of Latter-day Saints; The First Church of Christ, Scientist; BAPS Swaminarayan Sanstha; International Society for Krishna Consciousness; Orthodox Union; American Islamic Conference;

(name of party/amicus)

Coalition for Jewish Values; The Anglican Office for Government and International Affairs; The Jurisdiction of the Armed Forces and Chaplaincy; American Association of Jewish Lawyers and Jurists; Jewish Coalition for Religious Liberty

who are _____amici curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gene C. Schaerr _____    Date: _____ 09/15/2025 _____

Counsel for: Amici Curiae _____

ii

## TABLE OF CONTENTS

DISCLOSURE STATEMENT ...................................................................i

TABLE OF AUTHORITIES ..................................................................v

INTRODUCTION, INTEREST, AND SOURCE OF AUTHORITY
    OF *AMICI CURIAE* .........................................................................1

STATEMENT ........................................................................................2

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT .........................................................................................4

I.    The Ability to Employ Only the Faithful Throughout A
    Religious Organization is Vital to Its Ability to Define Itself
    and Carry Out Its Religious Missions. ......................................4

II.    It Is A Crucial Matter of Church Autonomy for A Religious
    Institution to be Able to Insist That Employees Truly
    Believe and Live the Faith. .....................................................13

    A.    The constitutional principle of church autonomy
        applies generally to religious organizations' religious
        employment decisions. .....................................................13

    B.    The Maryland statute violates a religious
        organization's constitutionally recognized autonomy
        by interfering with religious employment decisions. ......20

    C.    The Maryland statute violates the Establishment
        Clause because it entangles courts in religious
        employment decisions. .....................................................22

        1.    Non-entanglement remains an important
            Establishment Clause principle. .............................22

        2.    The MFEPA unconstitutionally requires
            significant entanglement by courts in religious
            determinations. ......................................................27

III.  The Free Exercise Clause Requires Strict Scrutiny and
      Bars the MFEPA's Enforcement Against Plaintiffs. ................29

      A.  Forcing the Church to hire employees who do not
          adhere to its faith would burden the Church's
          religious free exercise. ......................................29

      B.  Under *Fulton*, strict scrutiny is triggered if there is
          government discretion in whether to provide an
          exemption. ..................................................30

      C.  The MFEPA's religious exemption is the very
          definition of government discretion. ................31

      D.  Because the State lacks a compelling government
          interest in denying an exemption here, the State
          cannot satisfy strict scrutiny. ..........................33

CONCLUSION ..............................................................36

CERTIFICATE OF COMPLIANCE ..........................................37

ADDENDUM: List of *Amici Curiae* ....................................38

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) .............................................................. 35

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ........................................................ 34, 35

*Corp. of Presiding Bishop of Church of Jesus Christ of
  Latter-day Saints v. Amos*, 483 U.S. 327 (1987) ........................ *passim*

*Doe v. Cath. Relief Servs.*,
  300 A.3d 116 (Md. 2023) ............................................ *passim*

*Emp. Div. v. Smith*,
  494 U.S. 872 (1990) ........................................................ 30, 32

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) .................................................... *passim*

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) .............................................................. 33

*Herbert v. Lando*,
  568 F.2d 974 (2d Cir. 1977) ................................................ 32

*Hosanna-Tabor Evangelical Lutheran Church
  & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012) .................................... *passim*

*Huntsman v. Corp. of the President of the Church of
  Jesus Christ of Latter-Day Saints*, 127 F.4th 784
  (9th Cir. 2025) .................................................................... 28

*Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church
  in N. Am.*, 344 U.S. 94 (1952) .............................................. 13

*Kennedy v. Bremerton Sch. Dist.*,
  597 U.S. 507 (2022) .............................................................. 24

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) ........................................................ 22, 24

*Neb. Press Ass'n v. Stuart,*
   427 U.S. 539 (1976) ...............................................................32

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
   572 U.S. 545 (2014) ...............................................................32

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   591 U.S. 732 (2020) .................................................... *passim*

*Presbyterian Church in U.S. v. Mary Elizabeth*
   *Blue Hull Mem'l Presbyterian Church,*
   393 U.S. 440 (1969) ...............................................................19

*Sherbert v. Verner,*
   374 U.S. 398 (1963) ............................................... 29, 30, 31

*Town of Greece v. Galloway,*
   572 U.S. 565 (2014) ...............................................................24

*Walz v. Tax Comm'n,*
   397 U.S. 664 (1970) ...............................................................23

*Watson v. Jones,*
   80 U.S. 679 (1872) ........................................................ 12, 14

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ...............................................................30

**Constitutional Provision**

U.S. Const. amend. I ..................................................................8

**Statutes**

Md. Code Ann., State Gov't §20-601 ......................................34

Md. Code Ann., State Gov't §20-605 ......................................35

## Other Authorities

John Adams,
*A Defence of the Constitutions of Government of
the United States of America*, *in* 6 The Works of
John Adams, Second President of the United States,
with a Life of the Author, Notes and Illustrations
(Charles Francis Adams ed., Boston 1851) ....................................... 25

Nancy T. Ammerman,
*Religious Identities and Religious Institutions*, *in*
Handbook of the Sociology of Religion (2003) .................................... 10

Appellants' Br.,
*Corp. of Presiding Bishop of Church of Jesus Christ of
Latter-day Saints v. Amos*, 483 U.S. 327 (1987) (No. 86-179) ...... 16, 20

Stephanie H. Barclay,
*Untangling Entanglement*, 97 Wash. U. L. Rev. 1701 (2020) ............. 25

Kathleen A. Brady,
*Religious Organizations and Free Exercise: The
Surprising Lessons of* Smith, 2004 BYU L. Rev. 1633 ............... 8, 9, 11

John Donne,
*No Man Is an Island,* All Poetry ........................................................... 6

W. Cole Durham, Jr. & Alexander Dushku,
*Traditionalism, Secularism, and the Transformative
Dimension of Religious Institutions*,
1993 BYU L. Rev. 421 .................................................................... 9, 10

Émile Durkheim,
*The Elementary Forms of the Religious Life*
(Joseph Ward Swain trans., 1915) ..................................................... 10

R. Shawn Gunnarson, James C. Phillips & Christopher Bates,
*Religious Employment and the Tensions between
Liberty and Equality*, 2025 BYU L. Rev. (forthcoming 2025)......... 4, 25

Mark DeWolfe Howe,
*The Garden and the Wilderness* (1965) ........................................... 7, 10

Douglas Laycock,
*Towards a General Theory of the Religion Clauses*,
81 Colum. L. Rev. 1373 (1981).......................................... 10, 17

Letter from James Madison to Bishop Carroll
(Nov. 20, 1806), reprinted in 20 Records of the
American Catholic Historical Society (1909) .................... 26

*Matthew* 18:20 (KJV) ..................................................... 6

Michael W. McConnell,
*Establishment and Disestablishment at the
Founding, Part I: Establishment of Religion*,
44 Wm. & Mary L. Rev. 2105 (2003) ............................... 26

*Population on a Date*, U.S. Census Bureau ......................... 6

*Religion*, Gallup.............................................................. 6

Melvin Sorcher & James Brant,
*Are You Picking the Right Leaders?*, Harv. Bus. Rev.
(Feb. 2002).................................................................... 11

U.S. Census Bureau,
2021 SUSB Annual Data Tables by Establishment
Industry: U.S. and States, NAICS, detailed employment
(Dec. 21 2023)............................................................... 35

Kenneth D. Wald,
*Religion and the Workplace: A Social Science Perspective*,
30 Compar. Lab. L. & Pol'y J. 471 (2009)........................... 8

## INTRODUCTION, INTEREST, AND
## SOURCE OF AUTHORITY OF *AMICI CURIAE*[1]

To ask the question this case presents is to answer it: Whether a church's highest ecclesiastical and administrative body has a First Amendment right to require all its employees to uphold the church's religious beliefs and practices?

For religious organizations, the ability to hire, employ, and reward employees who live consistently with the organization's faith is crucial to maintaining its religious nature and accomplishing its religious mission. The district court's ruling—and the Maryland statute it upheld—gravely threatens all of that.

That is why *Amici*, who collectively represent over 15 million Americans, submit this brief. (*Amici* are listed in the Addendum.) And while *Amici* differ, often significantly, on issues of religious doctrine, they are united in their collective witness and warning on the danger of government interference in religious hiring. If allowed, such interference

---

[1] No counsel for a party authored any part of this brief. No party, party's counsel, or person other than *amici*, their members, or their counsel made a monetary contribution to fund the brief's preparation or submission. This brief is filed with the consent of all parties.

will erode faith institutions and faith itself. And the nation will be worse for that devasting loss.

## STATEMENT

The Seventh-day Adventist Church, like most if not all religious organizations, "is a community of faith." Appellants' Br. 2. And the "Church's purpose is to promote the faith." *Id*. Because that community would be threatened and that sacred purpose severely threatened if the Church cannot hire faithful adherents to be its employees, and because the Church is headquartered in Maryland, the Church's highest ecclesiastical body brought this suit.

Specifically, Appellants challenge the constitutionality of the Maryland Fair Employment Practices Act (MFEPA). As interpreted by the Maryland Supreme Court, that statute authorizes judges, in determining whether the statute's religious-organization exemption applies, to troll through the organization's religious beliefs and practices to determine how important specific employees are to the organization's mission—and even what that mission is. Notwithstanding the serious First Amendment concerns raised by that intrusive inquiry, the district

court denied Appellants' request for a preliminary injunction against the application of the MFEPA.

## SUMMARY OF ARGUMENT

Religious organizations cannot define and perpetuate their religious mission, and thus also inculcate and protect the faith of their adherents, without the ability to control which employees carry out that mission and model that faith. But the Maryland statute challenged here poses a grave threat to those religious needs by allowing courts to determine which employees "directly further" the organization's "core missions," and which missions are actually "core" to that religion.

This statute runs afoul of the First Amendment in at least three ways. First, it violates the church autonomy doctrine, which independently flows from both Religion Clauses, by interfering in internal church governance. Second, it violates the Establishment Clause's entanglement doctrine by thrusting courts into religious decisions. And third, it violates the Free Exercise Clause because it (a) burdens religion; (b) affords substantial discretion to government actors, who must apply a multi-factor, totality-of-the-circumstances-test to determine whether to grant a religious exemption; and (c) fails strict

scrutiny because the myriad of other exemptions forecloses any compelling government interest in denying an exemption to Appellants.

## ARGUMENT

**I.    The Ability to Employ Only the Faithful Throughout A Religious Organization is Vital to Its Ability to Define Itself and Carry Out Its Religious Missions.**

A religious organization's ability to employ only the faithful is vital to the organization's ability to define itself and carry out its religious missions.[2] As Justice Brennan recognized years ago, this is a matter of religious identity and mission formation, as well as building the faith and commitment necessary to perpetuate and carry out that mission. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring) ("For many individuals, religious activity derives meaning in large measure from participation in a larger religious community.") To interfere with that ability—and thereby to force an outsider into such hallowed precincts—

---

[2] Portions of this brief draw upon R. Shawn Gunnarson, James C. Phillips & Christopher Bates, *Religious Employment and the Tensions between Liberty and Equality*, 2025 BYU L. Rev. (forthcoming 2025), available at SSRN, https://tinyurl.com/y3yh3hmu.

4

would in many cases warp the religion itself and rob the institution of the faith and power to convey its message and perpetuate the faith.

1.    As this case shows, and as other faiths including *Amici* can attest, the religious institution is often a primary driver of the faith of the larger faith community. *See id.* (Brennan, J., concurring) ("Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself.") And undermining this wellspring of faith will necessarily harm the faith of those far beyond the organization. *See id.* (Brennan, J., concurring) ("Solicitude for a church's ability to do so reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well.") It is thus crucial for this Court to understand just how invasive and disruptive Maryland's statute is.

Demographic evidence confirms that religion is often not just individuals acting in solitude, but an exercise of community formation through united faith and communion with God and fellow believers. *See id.* at 342 n.3 (Brennan, J., concurring) (collecting sources). With

Christians, for example, gathering in community invites the very presence of God. *See Matthew* 18:20 (KJV) ("For where two or three are gathered together in my name, there am I in the midst of them."). Thus, what John Donne perceptively pointed out over four centuries ago is particularly true with religion: "No man is an island[.]"[3]

That reality is reflected in recent polling demonstrating the continued significance of religious group identification and participation. In 2023, Gallup found that 75% of Americans identify with a formal faith, 45% also declaring that they are "a member of a church or synagogue," and 41% "attend[ing] church or synagogue" at least monthly.[4] In raw numbers, this means over a quarter billion Americans (253.9 million) claimed affiliation with some religious community or denomination and 133.8 million attend religious services at least monthly.[5]

---

[3] John Donne, *No Man Is an Island,* All Poetry, https://allpoetry.com/No-man-is-an-island (last visited Sept. 13, 2025).

[4] *Religion*, Gallup, https://news.gallup.com/poll/1690/religion.aspx (last visited Sept. 13, 2025). This is the 2023 data. The 75% number comes from adding "Protestant," "Christian (nonspecific)," "Catholic," "Jewish," "Mormon" (or Latter-day Saint), and "Other."

[5] *Population on a Date*, U.S. Census Bureau, https://tinyurl.com/44zwuhw9 (set date to Dec. 31, 2023).

2.      Because religious institutions are not "reducible to a mere aggregation of individuals," *Amos*, 483 U.S. at 342 (Brennan, J., concurring), as one scholar observed, "religious liberty has little substance if those who join together in churches are not free to manage their ecclesiastical affairs as they choose." Mark DeWolfe Howe, *The Garden and the Wilderness* 86 (1965).

*Amici*'s collective experience confirms Justice Brennan's fundamental insight: "Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself." *Amos,* 483 U.S. at 342 (Brennan, J., concurring). And many religious organizations form their institutional identities by ensuring that "only those committed to that mission should conduct" their activities. *Id.*

This liberty to select employees who are fully committed to a religious organization's faith, and thus its religious mission, is a foundational condition of a religious organization's control over its own religious doctrine and practice. That is because, for most faith communities, "the very formulation of religious opinions takes place

within religious groups, as does the transmission and exercise of beliefs." Kathleen A. Brady, *Religious Organizations and Free Exercise: The Surprising Lessons of* Smith, 2004 BYU L. Rev. 1633, 1676.

3. Moreover, for many Americans, religious belief without religious *practice* is unimaginable, even absurd. *Accord* U.S. Const. amend. I (protecting the "free exercise" of religion). After all, religion is exercised through observances, such as avoiding work and attending worship services on one's Sabbath or participating in other holy days. And religion is also exercised through certain practices, such as adhering to standards or commandments on dress, diet, speech, and morality, to name a few.

Indeed, for many of the faithful, the demands of "faith permeate all aspects of one's life": For many, "there is no domain or decision in which religion is not, in one way or another, deeply implicated. The believer is first and foremost a religious person; all else is embellishment and detail." Kenneth D. Wald, *Religion and the Workplace: A Social Science Perspective*, 30 Compar. Lab. L. & Pol'y J. 471, 481 (2009). Hence, religious communities and organizations themselves generally "seek to put their beliefs into action in shaping organizational structure,

8

developing rules for church discipline, clarifying the rights and duties of members and employees, and fostering more informal social expectations and standards." Brady, *supra*, 2004 BYU L. Rev. at 1676.

*Amici* can likewise attest that, "[w]here individuals associate in organized religious communities, places of worship become meeting places where believers can congregate, renew their faith, and regain hope. Religious communities provide the social structures within which free individuals find themselves and explore the depth of their humanity." W. Cole Durham, Jr. & Alexander Dushku, *Traditionalism, Secularism, and the Transformative Dimension of Religious Institutions*, 1993 BYU L. Rev. 421, 437.

4.    That is no doubt why scholars have long noted the connection between religious identity formation and institutional religious autonomy. That connection is exemplified, for example, in the famous definition of "religion" by the French sociologist Émile Durkheim: He defined "religion" as "a unified system of beliefs and practices relative to sacred things"—that is, "things set apart and forbidden"—that "unite[s] into one single moral community called a Church, all those who adhere

to them." Émile Durkheim, *The Elementary Forms of the Religious Life* 47 (Joseph Ward Swain trans., 1915).

More recently, another leading sociologist of religion perceived that "mechanisms of culture and state" can have a profound impact on the formation of religious identity. Nancy T. Ammerman, *Religious Identities and Religious Institutions*, *in* Handbook of the Sociology of Religion 207, 223 (2003). And history similarly shows that government coercion, or even just pressure, can *reshape* religious identity. For example, in the late 1700s and early 1800s, state laws "contributed substantially to the trend toward congregationalism," as well as "more subtly" to "less rigorous standards of admission to church membership." Douglas Laycock, *Towards a General Theory of the Religion Clauses*, 81 Colum. L. Rev. 1373, 1391 (1981) (citing Howe, *supra* at 32-60).

With this documented risk that pressure—whether from government or culture—will distort religious identity, "there is increasing recognition that protection of religious life necessarily entails protection of religious communities, and this in turn requires protection of group rights and institutional autonomy." Durham & Dushku, *supra*, 1993 BYU L. Rev. at 423-24 n.10 (citations omitted). And as one scholar

has explained, "[w]ithout the ability to put ideas into practice within the community, it would be difficult for the group to maintain its commitments and convictions." Brady, *supra*, 2004 BYU L. Rev. at 1676.

5.     Understandably, then, a religious organization demonstrates its commitment to and influences the nature of its mission by the people it employs. This should come as no surprise. In the government context, it has long been known that "personnel is policy." Likewise, secular employers understand that choosing the right employees is vital to the success of a business. *See, e.g.*, Melvin Sorcher & James Brant, *Are You Picking the Right Leaders?*, Harv. Bus. Rev. (Feb. 2002), https://hbr.org/2002/02/are-you-picking-the-right-leaders.

Yet religious organizations have additional employment needs beyond those of secular organizations. Of course both need competent employees. But, while necessary, competence is not sufficient for religious organizations: If their employees, however professionally skilled, question the faith or fail to live its standards, such conduct can undermine the religious organization's message and mission, thus also harming the faith of the organization's individual members.

This is why authorizing courts to supersede the religious judgment of religious employers poses a significant threat to religious bodies—even, at times, an existential one. And this threat is magnified when an employer's religion is unpopular, as many religions are today out of step with majoritarian views on one issue or another. Thus, it is crucial that a religious organization be able to choose employees who will faithfully pursue its mission; and it is crucial that such an organizations be able to take steps, including termination, when an employee strays from that mission.

Preventing it from doing so, as the Maryland statute does, interferes with the religious organization's process of self-definition by overriding the organization's understanding of the very religious laws, principles, and doctrines that give it life and meaning. *See Amos*, 483 U.S. at 342 (Brennan, J., concurring). And that is just tragic, not just for the organization, and its adherents, but for religion and religious liberty more broadly. As discussed next, that is why, for over a century and a half, dating back to *Watson v. Jones*, 80 U.S. 679 (1872), the Supreme Court has consistently barred government from invading these sacred religious precincts.

II.    **It Is A Crucial Matter of Church Autonomy for A Religious Institution to be Able to Insist That Employees Truly Believe and Live the Faith.**

With this understanding of the importance of religious hiring, it has become clear in recent decades that the First Amendment's church autonomy doctrine not only protects religious organizations from any government interference in the selection of their ecclesiastical leaders ("ministers"), but also in those entities' general ability to staff their organizations with faithful adherents.

A.    **The constitutional principle of church autonomy applies generally to religious organizations' religious employment decisions.**

At its core, the church autonomy doctrine provides religious organizations the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). Because "[s]tate interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion," this doctrine stems independently from both the Establishment Clause

13

and the Free Exercise Clause. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020).

1.    One application of this doctrine in the employment context is the ministerial exception—a religious organization's right to determine "the selection of the individuals who play certain key roles." *Id*. Twice in recent years the Supreme Court has held this exception barred employment lawsuits by former teachers and counselors at religious schools because the suits intruded into "internal church decision[s] that affect[ed] the faith and mission of the church itself." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012); *see also Our Lady of Guadalupe*, 591 U.S. at 747 (noting that the "constitutional foundation" for the ministerial exception is "independence in matters of faith and doctrine" and "closely linked matters of internal government"); *Watson*, 80 U.S. at 728-29 (noting that the "right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members,

14

congregations, and officers within the general association, is unquestioned.").

Coursing through the ministerial exception is a religious organization's more general and constitutionally protected interest "in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Hosanna-Tabor*, 565 U.S. at 196. Hence, "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so," interferes "with the internal government of the church, depriving the church of control over the selection of those who will personify its beliefs." And the Court grounded the exception "in the general principle of church autonomy," which it described as "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe*, 591 U.S. at 747.

These decisions make clear that the constitutional interests served by the church autonomy doctrine are not limited to ministers and teachers. All or virtually all employees of a religious organization play a role in carrying out the institution's "mission." *Id.* at 751-52. And any

employee can aid or undermine the accomplishment of that mission by following—or departing from—the employer's religious standards.

Thus, as Justice Alito cogently noted in his *Hosanna-Tabor* concurrence (joined by Justice Kagan), "[a] religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses." 565 U.S. at 201 (Alito, J., concurring). And, as *Our Lady of Guadalupe* recognized, the observation is just as true for non-"ministers" as for employees with responsibility for teaching, proselytizing, and transmitting the faith. 591 U.S. at 752. Simply put, a religious organization's control over its employees "is an essential component of its freedom to speak its own voice, both to its own members and to the outside world." *Hosanna-Tabor,* 565 U.S. at 201 (Alito, J., concurring).

2.     Justice Brennan confirmed this same insight nearly four decades ago in his concurrence in *Amos*. 483 U.S. at 340-46. That case involved a "building engineer" working at a gym for The Church of Jesus Christ of Latter-day Saints who was "responsible for maintaining the facilities" with custodial and parking lot duties. Appellants' Br. at 8, *id.* (No. 86-179). He was fired and brought suit, challenging the

16

constitutionality of the very statute the MFEPA is based on: Title VII of the Civil Rights Act of 1964. *Amos,* 483 U.S. at 330-31 (majority opinion). And he "was discharged ... because he failed to qualify for a temple recommend," which would make him "eligible to attend [the Church's] temples," and which are "issued only to individuals who observe the Church's standards in such matters as regular church attendance, tithing, and abstinence from coffee, tea, alcohol, and tobacco," sexual morality, and other Church teachings, doctrines, commandments, and practices. *Id.* at 330 & n.4.

That the Church could fire the employee for not living the faith's standards was, in Justice Brennan's eyes, grounded in "religious organizations['] ... autonomy in ordering their internal affairs, so that they may be free to," among other things, "'resolve their own disputes, and run their own institutions.'" *Id.* at 341 (Brennan, J., concurring) (quoting Laycock, *supra*, 81 Colum. L. Rev. at 1389). In other words, the Church's right to select employees who lived consistently with the faith stemmed from the doctrine of church autonomy.

Justice Brennan then explained the relationship between religious employment and the exercise of religion within a religious community.

He noted that, "[f]or many individuals, religious activity derives meaning in large measure from participation in a larger religious community." *Id.* at 342. Such a community, he explained, is "an organic entity not reducible to a mere aggregation of individuals." *Id.* And he rightly perceived that employer-employee conflicts can be nearly existential in the religious workplace: "Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself." *Id.* Judicial respect for that need "reflects the idea that furtherance of the autonomy of religious organizations often furthers individual religious freedom as well." *Id.*

Justice Brennan characterized a religious organization's choice of religious mission and its decision that "only those committed to that mission should conduct" its activities as a "process of self-definition." *Id.* He conceded that allowing a religious organization the autonomy to fulfil that process "inevitably involves what we normally regard as infringement on free exercise rights," since a person's employment can be conditioned on compliance with "particular religious tenets." *Id.* And these same concerns could be voiced over other statutorily protected

18

characteristics or rights of employees. Yet, in Justice Brennan's view, "[w]e are willing to countenance the imposition of such a condition because we deem it vital that, if certain activities constitute part of a religious community's practice, then a religious organization should be able to require that only members of its community perform those activities." *Id.* at 342-43.

Further, to not protect church autonomy in the context of religious employment would be constitutionally troubling because it would lead to "ongoing government entanglement in religious affairs" and "raise[] concern that a religious organization may be chilled in its free exercise activity." *Id.* at 343 (Brennan, J., concurring). Also problematic, he observed, is that "the community's process of self-definition would be shaped in part by the prospects of litigation." *Id.* at 343-44. *Accord Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (expressing concern over the potential of litigation "inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.").

19

Thus, autonomy in religious organizations' employment decisions for all employees—not just ministers—is constitutionally grounded in the First Amendment. This does not mean religious employers have carte blanche to terminate non-ministerial employees for any reason at all, such as rank bigotry based on race. But it *does* mean they have a First Amendment right to employ only those who believe in and live the faith.

**B. The Maryland statute violates a religious organization's constitutionally recognized autonomy by interfering with religious employment decisions.**

Assessed against that constitutional doctrine, the MFEPA does not fare well. That conclusion is powerfully established by three comparisons with Justice Brennan's *Amos* concurrence.

First, the type of employee that Justice Brennan found subject to the protection of the church autonomy doctrine there—a "building engineer"[6]—is the very kind of employee who would *not* fall under the MFEPA's religious exemption, according to examples given by the Maryland Supreme Court. *See Doe v. Cath. Relief Servs.*, 300 A.3d 116, 136 (Md. 2023) (janitors would not trigger religious exemption).

---

[6] *See* Appellants' Br. (No. 86-179), *supra,* at 8.

Second, whereas the MFEPA requires an inquiry into whether an employee "directly further[s] the core mission(s) ... of the religious entity," *id.*, Justice Brennan viewed such an inquiry as constitutionally verboten. That is because "[d]etermining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is ... a means by which a religious community defines itself," *Amos*, 483 U.S. at 342 (Brennan, J., concurring).

Third, Justice Brennan would have objected to the MFEPA requirement (as construed by the Maryland courts) of a "fact-intensive inquiry" with numerous factors and ultimately depending on "consideration of the totality of the pertinent circumstances." *Doe*, 300 A.3d at 136. For Justice Brennan, "[c]oncern for the autonomy of religious organizations demands that we *avoid* the entanglement and the chill on religious expression that a case-by-case determination would produce," *Amos*, 483 U.S. at 345 (emphasis added).

Of course, "[t]his does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the

21

institution's central mission." *Our Lady of Guadalupe,* 591 U.S. at 746. And selecting and controlling who will carry out and model that mission as employees is about as "essential to the institution's central mission" as one can get.

In sum, the First Amendment's church autonomy doctrine demands the opposite of what the MFEPA has been held to require.

## C. The Maryland statute violates the Establishment Clause because it entangles courts in religious employment decisions.

Further, the entanglement concerns Justice Brennan noted—and that the Court has emphasized in recent years—are amply presented here. And even after the Supreme Court's recent invalidation of the "*Lemon* test," the entanglement doctrine—which predated *Lemon*—remains a sufficient basis for constitutional infirmity.

### 1. Non-entanglement remains an important Establishment Clause principle.

The Supreme Court has long recognized that laws creating "excessive government entanglement" can violate the Establishment Clause concerns. And that recognition finds ample support in our history and tradition.

1.     The non-entanglement principle was recognized, for example, in *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970), which rejected an Establishment Clause challenge to a state property tax exemption for churches. *Id.* at 672-80. The Court observed that "[e]ither course, taxation of churches or exemption, occasions some degree of involvement with religion," and that "[i]n analyzing either alternative the questions are whether the involvement is excessive, and whether it" leads "to an impermissible degree of entanglement," *id.* at 674-75. *Walz* concluded that exempting church property resulted in "far less" involvement between church and state, whereas eliminating the exemption "would tend to *expand* the involvement of government" in church affairs, including through "tax valuation of church property, tax liens, [and] tax foreclosures." *Id.* at 674, 676 (emphasis added). Thus, rather than calling into question the constitutionality of the exemption, the entanglement doctrine bolstered its constitutionality.

More recently, in *Our Lady of Guadalupe,* the Court expressly affirmed its commitment to non-entanglement. *See* 591 U.S. 732. There the Court faced an argument that the religious exception did not apply "unless the employee is a 'practicing' member of the religion with which

23

the employer is associated." *Id*. at 761. And with ease the Court rejected

that argument because inquiring into whether a person is a "practicing"

member of a particular faith "would risk judicial entanglement in

religious issues." *Id*. Such an inquiry, the Court recognized, would

"require courts to delve into the sensitive question of what it means to be

a 'practicing' member of a faith." *Id*. And the Court so held without

relying on *Lemon*, instead treating entanglement as an independent

doctrine under the Establishment Clause. *See also Hosanna-Tabor*, 565

U.S. at 196 (observing that "[b]oth Religion Clauses bar the government

from interfering with the decision of a religious group to fire one of its

ministers").

Granted, after *Walz,* the entanglement inquiry would ultimately

become part of the *Lemon* test, *see Lemon v. Kurtzman*, 403 U.S. 602,

612-13 (1971), which the Court later abandoned for a test grounded in

"historical practices and understandings," *Kennedy v. Bremerton Sch.

Dist.*, 597 U.S. 507, 535 (2022) (quoting *Town of Greece v. Galloway*, 572

U.S. 565, 576 (2014)). But this recent methodological shift leaves the

entanglement doctrine intact—especially given its historical pedigree.

24

2.     Moreover, the historical evidence shows that "entanglement linked to government control over religion and intermeddling with religious practices" had long been a concern of those who drafted and ratified our Constitution and Bill of Rights. *See* Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash. U. L. Rev. 1701, 1721 (2020). For example, John Adams, in a 1787 constitutional treatise, observed that the English practice of "entangl[ing]" its constitution with "spiritual lords" and "bishops" incentivized "the utmost artifices of bigotry" in society, along with "bribery and corruption at elections[.]" John Adams, *A Defence of the Constitutions of Government of the United States of America*, *in* 6 The Works of John Adams, Second President of the United States, with a Life of the Author, Notes and Illustrations 3, 119 (Charles Francis Adams ed., Boston 1851).

Likewise, after the American Revolution, religious leaders routinely opposed entangling government with religious matters. *See* Gunnarson, Phillips & Bates, *supra* note 2*, at 32 (describing Founding-era ministers' entanglement concerns). Nor were these opinions rare in the Founding-era generation, which generally feared government "control over doctrine, governance, and personnel" of churches. Michael

W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2131 (2003).

The Supreme Court also noted these historical roots of non-entanglement when it first recognized the ministerial exception. *See Hosanna-Tabor*, 565 U.S. at 184-85. The Court recounted how Madison, as Secretary of State, refused on behalf of the Executive Branch to give an opinion as to "who should be appointed to direct the affairs of the Catholic Church in the territory newly acquired by the Louisiana Purchase." *Id.* at 184. As Madison explained, the "'scrupulous policy of the Constitution in guarding against a political interference with religious affairs,' … prevented the Government from rendering an opinion on the 'selection of ecclesiastical individuals.'" *Id.* (quoting Letter from James Madison to Bishop Carroll (Nov. 20, 1806), reprinted in 20 Records of the American Catholic Historical Society 63-64 (1909)). And, of course, the modern name for "political interference with religious affairs" is entanglement.

In short, the historical record shows that the entanglement doctrine easily passes the Supreme Court's "history-and-tradition" test.

### 2. The MFEPA unconstitutionally requires significant entanglement by courts in religious determinations.

The MFEPA presents similar entanglement concerns—concerns that easily rise to an Establishment violation.

That is evident, first, from the test mandated by the Maryland Supreme Court for determining whether the religious organization exemption applies: A court must determine which employees "*directly* further the *core* mission(s)—religious or secular, or both—of the religious entity." *Doe*, 300 A.3d at 136 (emphasis added). To make that determination, there is arguably no fact, religious or otherwise, a court cannot inquire into—as the determination "entails a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances." *Id*.

So, while leaving the door open to anything pertinent, the Maryland Supreme Court noted that, "in determining what constitutes a core mission of a religious entity, a trial court may consider, *among other things*: the description of its mission(s) that the entity provides to the public and/or regulators; the services the entity provides; the people the

entity seeks to benefit; and how the entity's funds are allocated." *Id*. at 137 (emphasis added). This open-ended invitation to pry into a religious organization's mission and internal governance is deeply entangling. So too are the specific examples of mandated inquiries, such as how a religious organization allocates its funds. *See Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 798 (9th Cir. 2025) (en banc) (Bress, J., concurring) (noting that "[n]othing says 'entanglement with religion' more than" a lawsuit claiming a church had fraudulently misused funds requiring judicial inquiry into the claim).

Thus, the MFEPA inquiry "require[s] courts to delve into the sensitive question[s] of what" the religious organization's "core" religious mission is, and whether an employee "directly" furthers it. *Our Lady of Guadalupe*, 591 U.S. at 761. That is beyond the purview of civil courts. It violates religious autonomy and is the very type of "judicial entanglement" barred by the Establishment Clause.

## III. The Free Exercise Clause Requires Strict Scrutiny and Bars the MFEPA's Enforcement Against Plaintiffs.

The MFEPA also violates the Church's rights under the Free Exercise Clause.

### A. Forcing the Church to hire employees who do not adhere to its faith would burden the Church's religious free exercise.

As a threshold matter, such a law must burden a religious claimant's free exercise. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021). That is clearly demonstrated here: Maryland is interfering in the religious missions of religious organizations by telling them that they are not free to hire, fire, and discipline based on whether an employee is living the faith's standards. This forces upon religious organizations a Hobbesian choice of keeping employees who undermine the religious organization's mission, as well as the faith of its members who see this conduct, or paying tens of thousands of dollars in fines or damages. If this is not a burden under the Free Exercise Clause, nothing is. *See id.* (finding "the [government's] actions have burdened [Plaintiff's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs"); *see also Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding a loss of temporary unemployment

benefits a sufficient burden); *Wisconsin v. Yoder*, 406 U.S. 205, 208 (1972) (finding a $5 fine a sufficient burden).

### B. Under *Fulton*, strict scrutiny is triggered if there is government discretion in whether to provide an exemption.

Under the Free Exercise Clause, a law must satisfy strict scrutiny if it lacks neutrality or general applicability. *See Fulton*, 593 U.S. at 533. And "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id*. (cleaned up).

Thus, in *Sherbert*, the Court dealt with a state law under which a state actor could deny unemployment benefits if an applicant had "failed, without good cause … to accept available suitable work." 374 U.S. at 400-01. The Supreme Court characterized that unemployment law as lacking general applicability "because the 'good cause' standard permitted the government to grant exemptions based on the circumstances underlying each application." *Fulton*, 593 U.S. at 534 (citing *Emp. Div. v. Smith*, 494 U.S. 872, 884 (1990)).

Likewise in *Fulton*, the city contract required a Catholic services provider arranging foster care or adoption to "not reject a child or family

… based upon … their … sexual orientation … unless an exception is granted by the Commissioner[.]" *Id.* at 535 (internal citation omitted). The Court viewed the contract as similar to "the good cause provision in *Sherbert*, [because it] incorporates a system of individual exemptions[.]" *Id.* Thus, the regulation was not generally applicable and strict scrutiny applied. *See id.* at 540-41.

### C. The MFEPA's religious exemption is the very definition of government discretion.

Like the government discretion embedded in the state unemployment law in *Sherbert* and the government contract in *Fulton*, the MFEPA embeds government discretion in whether to grant a religious exemption—hence failing general applicability and triggering strict scrutiny.

That is because the MFEPA's religious organization exemption (as interpreted by the Maryland Supreme Court) applies only to employees who "directly further the core mission(s)—religious or secular, or both—of the religious entity." *Doe*, 300 A.3d at 136. Moreover, determining this—and thus determining whether the exemption applies—"entails a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances." *Id*. The statute, as interpreted, requires "a

31

trial court [to] consider, among other things," at least seven named factors, with the door open to unnamed others. *Id*. at 136-37. Such a multi-factor, totality-of-the-circumstances test is the very definition of discretion. *See, e.g., Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) ("District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances.").

That the statute vests this discretion in a court, as opposed to other government officials, does not matter. There is no reason why a judge should be treated any differently than any other official under the Free Exercise Clause. *See Herbert v. Lando*, 568 F.2d 974, 987 & n.13 (2d Cir. 1977) (Oakes, J., concurring) ("[T]he First Amendment binds the courts just as it binds the other branches of government.") (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976))), *rev'd on other grounds*, 441 U.S. 153 (1979). After all, *Smith* and *Fulton* articulated the standard as "government" discretion, not discretion of a certain *type* of government actor. *See Smith*, 494 U.S. at 884; *Fulton*, 593 U.S. at 534.

Because the MFEPA affords significant judicial discretion in granting a religious exemption, strict scrutiny applies.

**D.    Because the State lacks a compelling government interest in denying an exemption here, the State cannot satisfy strict scrutiny.**

With strict scrutiny triggered, a law can survive "only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (cleaned up). Moreover, "the First Amendment demands a more precise analysis" than stating a government interest "at a high level of generality." *Id*. "The question … is not whether the [State] has a compelling interest in enforcing its non-discrimination [law] generally, but whether it has such an interest in denying an exception to [Appellants]." *Id*. Thus, a general interest in prohibiting sexual orientation discrimination is insufficient. The State, then, must show a paramount reason for imposing that interest under the facts of *this* case, *i.e.*, that it has a compelling interest in forcing a church to employ someone who doesn't live its religion. *See id.* at 541 ("The question" is whether government "has such an interest in denying an exception to" the religious organization there.); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 431 (2006) (Courts must "look[] beyond broadly formulated interests justifying the general

33

applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants").

The Supreme Court has never recognized such an interest. On the contrary, as shown above, it has repeatedly recognized the Constitution's paramount interest in respecting the autonomy of religious organizations and avoiding government entanglement in their internal religious affairs.

The MFEPA, moreover, is riddled with exemptions that undermine any assertion of a compelling state interest in prohibiting all sexual orientation discrimination, much less by Appellants. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("[A] law cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited." (cleaned up)). First, the statute exempts all small businesses (14 or fewer employees). Md. Code Ann., State Gov't §20-601(d)(1)(i). Second, the statute exempts non-profit membership clubs. *Id*. §20-601(d)(3). Third, the MFEPA allows religious educational institutions to hire or employ only "employees of a particular religion," meaning the employer could discriminate on the basis of sexual

34

orientation if it has a religious reason to do so. *Id*. §20-605(a)(3). Finally, the statute exempts employers that are "observing the terms of a bona fide seniority system or any bona fide employee benefit plan … that is not a subterfuge to evade the purposes of this subtitle." *Id*. §20-605(a)(4).

These exemptions mean that over 80% of Maryland employers are free to discriminate based on any protected category.[7] This "leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (citation omitted). And it makes it hard to justify "the marginal interest in enforcing the [MFEPA]" against religious claimants when so many other employers are off the hook. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726-27 (2014).

Lacking a compelling interest, strict scrutiny cannot be satisfied. The Free Exercise Clause therefore requires that the Appellants be exempt from the MFEPA's prohibition.

---

[7] U.S. Census Bureau, 2021 SUSB Annual Data Tables by Establishment Industry: U.S. and States, NAICS, detailed employment (Dec. 21 2023), https://perma.cc/PQ57-M474 (dividing Maryland total firms by the sum enterprises with <5, 5-9, and 10-14 employees).

## CONCLUSION

Once would be sufficient and serious enough, but at least thrice the MFEPA violates the First Amendment. Accordingly, the district court's ruling should be reversed.

September 15, 2025                    Respectfully submitted,

                                     */s/ Gene C. Schaerr*
                                     Gene C. Schaerr
                                     James C. Phillips
                                     SCHAERR | JAFFE LLP
                                     1717 K Street NW, Suite 900
                                     Washington, DC 20006
                                     Telephone: (202) 787-1060
                                     gschaerr@schaerr-jaffe.com

                                     *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limit of Fed. R. App. P. 29(b)(4), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,491 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

Dated: September 15, 2025

# ADDENDUM

## List of *Amici Curiae*

- The Church of Jesus Christ of Latter-day Saints (https://www.churchofjesuschrist.org/)

- The First Church of Christ, Scientist (https://www.christianscience.com/)

- BAPS Swaminarayan Sanstha (https://www.baps.org/)

- International Society for Krishna Consciousness (https://www.iskcon.org/)

- Orthodox Union (https://www.ou.org/)

- American Islamic Congress (https://aicongress.org/)

- Coalition for Jewish Values (https://coalitionforjewishvalues.org/)

- The Anglican Office for Government and International Affairs (https://aogia.org/home)

- The Jurisdiction of the Armed Forces and Chaplaincy (Anglican Church in North America) (https://www.anglicanchaplains.org/)

- American Association of Jewish Lawyers and Jurists (https://www.aajlj.org/)

- Jewish Coalition for Religious Liberty (https://www.jcrl.org/)