No. 25-1735

———————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————————

**GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS,** *et al.*,

*Plaintiffs-Appellants*,

**v.**

**CLEVELAND L. HORTON, II,** *et al.*,

*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court for the District of Maryland
(Theodore D. Chuang, District Judge)

———————————————

**BRIEF OF APPELLEES**

———————————————


ANTHONY G. BROWN
Attorney General of Maryland

JOSHUA M. SEGAL
Principal Deputy Solicitor General
200 Saint Paul Place
Baltimore, Maryland  21202
jsegal@oag.state.md.us
(410) 576-6446
(410) 576-6955 (facsimile)

November 4, 2025                    Attorneys for Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>25-1735</u>    Caption: <u>General Conference of Seventh-day Adventists v. Cleveland Horton</u>, II

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Please see attached list of parties.</u>
(name of party/amicus)

_____

who is <u>appellee</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Joshua M. Segal _____      Date: ___November 4, 2025___

Counsel for: _Please see attached list of parties._

- 2 -

[Print to PDF for Filing]

*List of parties:*

Cleveland L. Horton, II

Glendora C. Hughes

Stephanie Suerth

Janssen E. Evelyn

Eileen M. Levitt

Angela Scott

Magdalena S. Navarro

Jeff Rosen

Gina McKnight-Smith

Noah Thomas Metheny

Anthony G. Brown

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 3

ISSUES PRESENTED FOR REVIEW ................................................ 3

STATEMENT OF THE CASE ............................................................. 4

    The Maryland Fair Employment Practices Act ............................ 4

    The Supreme Court of Maryland's Decision in *Doe* .................. 5

    The Complaint ............................................................................. 7

    The Preliminary Injunction Motion and the State's Motion to Dismiss ...... 11

    The District Court's Decision ................................................... 12

SUMMARY OF ARGUMENT ............................................................ 15

ARGUMENT ...................................................................................... 17

I.    THE DISTRICT COURT'S DENIAL OF THE PRELIMINARY INJUNCTION IS REVIEWED FOR ABUSE OF DISCRETION. ............ 17

II.   THE DISTRICT COURT WAS CORRECT TO DETERMINE THAT THE PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ............ 18

    A.   The Maryland Fair Employment Practices Act Does Not Violate the Church Autonomy Doctrine. ............ 19

        1.   The Church Autonomy Doctrine Shields Employment Decisions as to Ministers, Not an Organization's Entire Workforce. ............ 19

        2.   The Cases the Plaintiffs Cite Do Not Support the Broad Rule They Seek. ............ 25

3.  The Rule the Plaintiffs Seek Would Have Far-Reaching Consequences. ...................................................................28

B.  The Maryland Fair Employment Practices Act Does Not Entail Impermissible Church-State Entanglement. .........................................30

C.  The Maryland Fair Employment Practices Act Does Not Violate the Plaintiffs' Free Exercise Rights. .....................................................38

1.  The Maryland Fair Employment Practices Act's Exceptions Do Not Trigger Strict Scrutiny. ...............................39

2.  The Maryland Fair Employment Practices Act's "Bona Fide Occupational Qualification" Exception Is Not a "Mechanism for Individualized Exemptions." .........................44

3.  The Maryland Fair Employment Practices Act's Differential Impact on Different Denominations Does Not Undermine Its Neutrality. .........................................................48

4.  The Maryland Fair Employment Practices Act Survives Any Level of Scrutiny. ...............................................................50

III. THE DISTRICT COURT WAS CORRECT TO DETERMINE THAT THE PLAINTIFFS HAD NOT SATISFIED THE REMAINING PRELIMINARY INJUNCTION REQUIREMENTS. ...........................................................................51

A.  The District Court Did Not Abuse Its Discretion in Determining That the Plaintiffs Had Not Demonstrated Irreparable Harm. ............52

B.  The District Court Did Not Abuse Its Discretion in Determining That the Balance of Equities and Public Interest Weighed Against Injunctive Relief. ...................................................................55

IV. THIS COURT SHOULD REJECT THE PLAINTIFFS' CHALLENGE TO THE PARTIAL GRANT OF THE MOTION TO DISMISS. .............................................56

CONCLUSION ...................................................................................................57

REQUEST FOR ORAL ARGUMENT ...................................................................59

CERTIFICATE OF COMPLIANCE .......................................................................59

ii

PERTINENT PROVISIONS ......................................................................60

## TABLE OF AUTHORITIES

Page

### Cases

*American Fed'n of Teachers v. Bessent*,
    152 F.4th 162 (4th Cir. 2025) ...................................................................18

*Aparicio v. Christian Union, Inc.*,
    No. 18-CV-0592, 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019)......................27

*Axson-Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) ...........................................................46

*Bear Creek Bible Church v. EEOC*,
    571 F. Supp. 3d 571 (N.D. Tex. 2021) .............................................43

*Behrend v. San Francisco Zen Ctr., Inc.*,
    108 F.4th 765 (9th Cir. 2024) ...............................................................32

*Bell v. Presbyterian Church*,
    126 F.3d 328 (4th Cir. 1997) ...............................................................19

*Billard v. Charlotte Cath. High Sch.*,
    101 F.4th 316 (4th Cir. 2024) ...............................................................29

*Bloodgood v. Garraghty*,
    783 F.2d 470 (4th Cir. 1986) ...............................................................52

*Bouldin v. Alexander*,
    82 U.S. 131 (1872)...........................................................................22

*Braidwood Mgmt., Inc. v. EEOC*,
    70 F.4th 914 (5th Cir. 2023) ...............................................................43

*Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*,
    796 N.E.2d 286 (Ind. 2003) ...............................................................27

*Bryce v. Episcopal Church in the Diocese of Colo.*,
    289 F.3d 648 (10th Cir. 2002) ....................................................... 25, 28

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)...................................................................51

*Butler v. St. Stanislaus Kostka Cath. Acad.*,
609 F. Supp. 3d 184 (E.D.N.Y. 2022) ..............................................27

*Canaan Church v. Montgomery County*,
29 F.4th 182 (4th Cir. 2022) .........................................................47

*Carson v. Makin*,
596 U.S. 767 (2022)...................................................................31

*Catholic Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Review Comm'n*,
605 U.S. 238 (2025),..................................................................50

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ........................................................23

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985) .........................................................55

*Clem v. Corbeau,* |
284 F.3d 543 (4th Cir. 2006) ........................................................57

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) ...................................................... 23-24

*Coreas v. Bounds*,
451 F. Supp. 3d 407 (D. Md. 2020)..................................................55

*Corporation of Presiding Bishop of Church
of Jesus Christ of Latter-Day Saints v. Amos*,
483 U.S. 327 (1987)........................................................... 28, 32-33

*Darren Patterson Christian Acad. v. Roy*,
699 F. Supp. 3d 1163 (D. Colo. 2023)...............................................26

*Demkovich v. St. Andrew the Apostle Parish, Calumet City*,
3 F.4th 968 (7th Cir. 2021) ..........................................................32

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ............................................... 17, 18, 54

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
   952 F.2d 802 (4th Cir. 1991) ....................................................... 52, 54

*Doe v. Catholic Relief Servs.*,
   484 Md. 640 (2023) ......................................................... passim

*Doe v. Catholic Relief Servs.*,
   779 F. Supp. 3d 545 (D. Md. 2025),.................................................43

*Does 1-11 v. Board of Regents of Univ. of Colo.*,
   100 F.4th 1251 (10th Cir. 2024) ........................................................33

*Dothard v. Rawlinson*,
   433 U.S. 321 (1977).........................................................................48

*Duquesne Univ. of the Holy Spirit v. NLRB*,
   947 F.3d 824 (D.C. Cir. 2020)..........................................................37

*EEOC v. Roman Cath. Diocese of Raleigh*,
   213 F.3d 795 (4th Cir. 2000) ......................................... 12, 25, 26, 33

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................54

*Employment Div., Dep't of Human Res. of Or. v. Smith*,
   494 U.S. 872 (1990)......................................................... 38, 44, 46, 49

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) ...................................................... 46, 47

*Firewalker-Fields v. Lee*,
   58 F.4th 104 (4th Cir. 2023) ............................................................30

*Fulton v. City of Phila.*,
   593 U.S. 522 (2021)......................................................... 38, 44, 45, 47

*Garrick v. Moody Bible Inst.*,
   412 F. Supp. 3d 859 (N.D. Ill. 2019),...............................................27

*Hernandez v. Commissioner of Internal Revenue*,
   490 U.S. 680 (1989)................................................................... 29, 48

*Holt v. Hobbs*,
   574 U.S. 352  (2015)........................................................................29

*Hosanna-Tabor Evangelical Lutheran Church. & Sch. v. EEOC*,
  565 U.S. 171 (2012)........................................................ 5, 19, 20, 21

*International Union, United Auto., Aerospace & Agric.*
  *Implement Workers of Am. v. Johnson Controls, Inc.*,
  499 U.S. 187 (1991)........................................................47

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
  344 U.S. 94 (1952)........................................................19

*Kennedy v. Bremerton School Dist.*,
  597 U.S. 504 (2022)........................................................ 30, 38

*Kim v. Board of Ed. of Howard County*,
  93 F.4th 733 (4th Cir. 2024) ........................................................41

*Larson v. Valente*,
  456 U.S. 228 (1982)........................................................ 48-49

*Lemon v. Kurtzman*,
  403 U.S. 601 (1971)........................................................ 12, 30

*Loe v. Jett*,
  No. 23-CV-1527, 2025 WL 2430572 (D. Minn. Aug. 22, 2025)........................42

*Markel v. Union of Orthodox Jewish Congregations of Am.*,
  124 F.4th 796 (9th Cir. 2024) ........................................................32

*McMahon v. World Vision, Inc.*,
  704 F. Supp. 3d 1121 (W.D. Wash. 2023) ........................................................43

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F. 3d 197 (4th Cir. 2019) ........................................................52

*NLRB v. Catholic Bishop of Chi.*,
  440 U.S. 490 (1979)........................................................ 35, 37

*Norfolk & W. Ry. Co. v. Brotherhood of R.R. Signalmen*,
  164 F.3d 847 (4th Cir. 1998) ........................................................52

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020)........................................................ passim

*Palmer v. Liberty Univ., Inc.*,
    72 F.4th 52 (4th Cir. 2023) ...............................................................31

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ..............................................................55

*R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018) ....................................................... 50-51

*Rayburn v. General Conf. of Seventh-day Adventists*,
    772 F.2d 1164 (4th Cir. 1985) ................................................. passim

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984)...........................................................................23

*Scott v. Family Dollar Stores, Inc.*,
    733 F.3d 105 (4th Cir. 2013) ........................................................ 56, 57

*Serbian Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976)..................................................................... 22, 32

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023) ..............................................................23

*Tandon v. Newsom*,
    992 F.3d 916 (9th Cir. 2021) .............................................................41

*Tandon v. Newsom*,
    593 U.S. 61 (2021)......................................................................passim

*Teamsters Local Union No. 117 v. Washington Dep't of Corrs.*,
    789 F.3d 979 (9th Cir. 2015) .............................................................47

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014)...........................................................................30

*Union Gospel Mission of Yakima v. Ferguson*,
    No. 1:23-CV-3027-MKD, 2024 WL 4660918 (E.D. Wash. Nov. 1, 2024).......43

*Walz v. Tax Comm'n of City of N.Y.*,
    |397 U.S. 664 (1970).........................................................................31

*We the Patriots USA, Inc. v. Hochul*,
  17 F.4th 266 (2d Cir. 2021) ................................................................46

*White v. Department of Corr. Servs.*,
  814 F. Supp. 2d 374 (S.D.N.Y. 2011) ...............................................45

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)................................................................................45

### Constitutional Provisions

U.S. Const. amend I ........................................................................ passim

### Statutes

26 U.S.C. § 501(i)(2) ...........................................................................39

28 U.S.C. § 1292(a)(1) ...........................................................................3

28 U.S.C. § 1331 ....................................................................................3

42 U.S.C. § 2000e-1(a) .........................................................................29

Md. Code Ann., State Gov't § 20-601(d)(1)(i)(2) (LexisNexis Supp. 2024)..........39

Md. Code Ann., State Gov't § 20-601(d)(3) (LexisNexis Supp. 2024) .................39

Md. Code Ann., State Gov't § 20-604(2) (LexisNexis Supp. 2024)...................4, 34

Md. Code Ann., State Gov't § 20-605(a)(1) (LexisNexis Supp. 2024) ........... 45, 46

Md. Code Ann., State Gov't § 20-605(a)(3) (LexisNexis Supp. 2024) ..... 25, 37, 40

Md. Code Ann., State Gov't § 20-605(a)(3)(i) (LexisNexis Supp. 2024)................4

Md. Code Ann., State Gov't § 20-605(a)(4) (LexisNexis Supp. 2024) .................39

Md. Code Ann., State Gov't § 20-606(a) (LexisNexis Supp. 2024) ......................38

Md. Code Ann., State Gov't § 20-606(a)(1)(i) (LexisNexis Supp. 2024)................4

Md. Code Ann., State Gov't § 20-1008 (LexisNexis 2021)....................................5

Md. Code Ann., State Gov't § 20-1013(a) (LexisNexis Supp. 2024) .....................5

ix

Md. Code Ann., State Gov't § 20-1041 (LexisNexis Supp. 2024)...........................5

Md. Code Ann., State Gov't § 20-1042 (LexisNexis Supp. 2024)...........................5

**Regulations**

COMAR 14.03.02.08 ...............................................................................46

No. 25-1735

―――――――――――

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

―――――――――――

**GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS,** *et al.,*

*Plaintiffs-Appellants,*

v.

**CLEVELAND L. HORTON, II,** *et al.,*

*Defendants-Appellees.*

―――――――――――

On Appeal from the United States District Court for the District of Maryland
(Theodore D. Chuang, District Judge)

―――――――――――

## BRIEF OF APPELLEES

―――――――――――

## INTRODUCTION

Just five years ago, the Supreme Court addressed the circumstances in which a religious organization's First Amendment rights shield it from employment discrimination laws. The Court gave careful consideration to the so-called "ministerial exception" to such laws, then upheld its application to teachers who, by "[e]ducating and forming students in the Catholic faith," performed "vital religious

duties." *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 754, 756 (2020).

Three years later, in *Doe v. Catholic Relief Services*, 484 Md. 640 (2023), the Supreme Court of Maryland construed the scope of the religious exemption to the Maryland Fair Employment Practices Act. *Doe* rejected the argument that this statutory exemption was no broader than the First Amendment's constitutionally required ministerial exception. Instead, *Doe* held that the exemption applied with respect to all employees whose duties "directly further" the institutions' core missions, without regard for whether those missions are secular or religious, and without regard for whether the employees' duties would bring them within the ministerial exception.

The plaintiffs, though, maintain that *Doe* did not go far enough. They claim that the Constitution shields their employment-related decisions as to *all* of their employees, as long as those decisions are made for religious reasons. And they claim that the district court abused its discretion in denying a preliminary injunction protecting their employment practices—even though *Doe* was decided more than a year before they sued, the decision has not chilled their persistence in the employment practices that they claim are protected, and they have pointed to no threat of enforcement.

Regardless of the plaintiffs' religious beliefs, the Constitution does not categorically exempt them from laws prohibiting discrimination on the basis of religion and other protected characteristics, nor does it require the courts to provide employers with a broad path towards officially sanctioned discrimination. The district court's decision should be affirmed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. Insofar as this appeal challenges the district court's denial of the preliminary injunction, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1). As for the plaintiffs' challenge to the district court's partial grant of the motion to dismiss, this Court has pendent appellate jurisdiction as to Count 2 (entanglement) but not Count 4 (denominational discrimination), as discussed at pages 56-57 below.

## ISSUES PRESENTED FOR REVIEW

1.      Did the district court correctly conclude that the plaintiffs were unlikely to succeed on the merits of their claims of broad immunity from state anti-discrimination laws?

2.      Alternatively, should the denial of injunctive relief be upheld because the plaintiffs, who alleged no chill of their conduct or threat of enforcement, failed

to satisfy the remaining preliminary injunction factors, including the requirement of imminent irreparable harm?

3.    Should this Court affirm or decline to review the district court's dismissal of two claims, only one of which the plaintiffs raised as a basis for injunctive relief?

## STATEMENT OF THE CASE

### The Maryland Fair Employment Practices Act

The Maryland Fair Employment Practices Act ("MFEPA") prohibits discrimination based on a series of protected characteristics.  The statute bars employers from discriminating based upon "race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, military status, or disability."  Md. Code Ann., State Gov't § 20-606(a)(1)(i) (LexisNexis Supp. 2024).  It does not apply, however, to "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity."  *Id.* § 20-604(2) (LexisNexis Supp. 2024).  It also has other exceptions.  For instance, it does not prohibit a religiously affiliated educational institution "from hiring and employing employees of a particular religion."  *Id.* § 20-605(a)(3)(i).

4

MFEPA provides for both public and private enforcement. First, the Maryland Civil Rights Commission ("the Commission") may investigate violations and seek relief in state court or before an administrative law judge. *Id.* § 20-1008(a) (LexisNexis 2021). Second, the Attorney General may investigate violations and sue violators in state courts. *Id.* §§ 20-1041, 20-1042 (LexisNexis Supp. 2024). Third, subject to timing and exhaustion requirements, an individual may bring a civil action against an employer. *See id.* § 20-1013(a) (LexisNexis Supp. 2024).

### The Supreme Court of Maryland's Decision in *Doe*

In *Doe v. Catholic Relief Services*, the Supreme Court of Maryland addressed the scope of MFEPA's exemption for a religious entity's "employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity." The plaintiff argued that the phrase "work connected with the activities of a religious entity" should be interpreted as coextensive with the First Amendment's "ministerial exception." 484 Md. at 665-66; *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012) (recognizing ministerial exception); *Our Lady of Guadalupe*, 591 U.S. at 756 (extending ministerial exception to employees who perform "vital religious duties"). The employer, by contrast, argued that the exemption applies to all activities, not just those that are religious, and therefore prevents claims by any employee. *Doe*, 484 Md. at 666-67, 670.

5

The court struck a middle ground. It explained that exceptions to remedial statutes, such as MFEPA, must be interpreted narrowly. *Id.* at 668. Applying that principle, the court held that, for the religious exemption to apply, "the employee's duties must directly further the core mission(s)—religious or secular, or both—of the religious entity." *Id.* at 673. Making that determination, it explained, "should not require analysis of religious doctrine or otherwise result in courts being caught in a theological thicket." *Id.* (quotation marks and citation omitted).

Rather than leave the determination open-ended, the court offered guidelines. First, it explained that the determination "entails a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances." *Id.* at 673. Second, duties that "directly" further a religious entity's core mission are "duties that are not one or more steps removed from taking the actions that effect the goals of the entity." *Id.*; *see id.* at 673-74 (contrasting the work of a janitor at an organization whose core mission is to provide low-cost housing with the executive director of a charity whose core mission is to raise funds to build schools). Third, the religious entity's size "may be relevant." *Id.* at 674. Fourth, "a religious entity may have both religious and secular core missions, and more than one of each." *Id.* Finally, a trial court determining what constitutes a religious entity's core mission may consider factors such as "the description of its mission(s) that the entity provides to the public and/or

regulators; the services the entity provides; the people the entity seeks to benefit; and how the entity's funds are allocated." *Id.*

**The Complaint**

The plaintiffs are (1) the General Conference of Seventh-day Adventists, "the highest ecclesiastical and administrative body of the Seventh-day Adventist church"; and (2) Adventist Risk Management, Inc., "the insurance and risk management arm of the Church, serving Adventist ministries around the world." (JA13.) They filed this lawsuit more than a year after *Doe* was decided, and in the absence of any specific employment dispute. Its gravamen is that MFEPA (as interpreted by *Doe*) is unconstitutional either on its face or as applied to the plaintiffs' employment practices.

According to the complaint, "[t]he goal of all Adventist institutions is to make good on the Adventist promise to help everyone understand the Bible and find freedom, healing and hope in Jesus." (JA17 (quotation marks and citation omitted).) The plaintiffs allege that they "believe that all employees of the Church—including those of the General Conference and [Adventist Risk Management]—are critical to reaching these goals and engaging in the Church's divinely appointed ministry," including "employees whose day-to-day responsibilities may not, on the surface, appear to include direct religious instruction or leadership." (JA17.)

7

The complaint then describes the plaintiffs' employment practices. The plaintiffs allege that their "employment policies require that all employees are baptized, tithe-paying member[s] in regular standing" of the Church. (JA20 (quotation marks omitted; brackets in original).) The plaintiffs also expect all employees to adhere to certain "standards of personal conduct," which include refraining from, among other things, "homosexual practices" and "remarriage without Biblical grounds." (JA20.) The plaintiffs allege that they "will not hire individuals who do not meet these requirements." (JA20.) Finally, the plaintiffs allege that they consider "'[f]ailure to practice the fundamental teachings and standards' of the Church, '[r]emarriage without Biblical grounds,' and '[s]upporting or being involved with activities that are in conflict with the teachings and objectives' of the Church as grounds for termination of employment." (JA20 (quoting JA336; brackets in original).)

The complaint alleges that the plaintiffs' employment practices conflict with MFEPA, as interpreted by *Doe*, because the plaintiffs "require all employees to be members in regular standing of the Church—regardless of their job title and responsibilities." (JA26.) This requirement, the complaint explains, extends to "those whose roles may not typically deemed religious (such as information technology personnel and maintenance workers)." (JA26.) Despite the conflict that the complaint asserts, however, it alleges that the plaintiffs "are currently soliciting

8

applicants for positions that are available only to those who share their religious beliefs" and "plan to continue hiring employees with a qualification based on their sincere religious beliefs."  (JA26; *see* JA478.)

The complaint names as defendants the Attorney General of Maryland and various officials of the Commission, all in their official capacities.  (JA15-16.)  It concedes that, given *Doe*'s recency, "there has not yet been time for a clear history of enforcement to develop" with respect to MFEPA's application to religious entities.  (JA27.)  Still, the complaint highlights a series of statements and actions that purportedly "confirm[]" that the Commission and the Attorney General "are likely to attempt to enforce" MFEPA, as interpreted by *Doe*, against the plaintiffs.  (JA27.)  Specifically, the complaint cites (1) an April 2023 amicus brief filed by the Attorney General in *Doe*, arguing for a position that the Supreme Court of Maryland rejected; (2) a May 2023 statement by the Attorney General, after receiving statutory enforcement authority over MFEPA, that "[w]e will actively defend employees' rights" and "[n]o one should suffer discrimination in Maryland"; (3) an August 2023 statement, following *Doe*, decrying "gaps in our laws that could leave Marylanders vulnerable to discriminatory practices in the workplace"; (4) the Commission's receipt, in 2023, of "46 complaints related to religious discrimination in the employment context" and its recovery, the same year, of "over $1,000,000 in monetary relief across all cases"; and (5) the Commission's "frequent[]

investigat[ion]" of "job postings it believes violate MFEPA's restrictions on indicating preference for applicants . . . with particular protected characteristics." (JA27-28.)

The complaint asserts that MFEPA, as interpreted by *Doe*, is unconstitutional, at least as applied to the plaintiffs' own hiring practices. It raises seven claims, the first three of which are relevant to this appeal. Count 1 asserts that MFEPA violates the First Amendment's "church autonomy" doctrine because it "interfere[s] with the Church's autonomy to make decisions, and act in accordance with those decisions, on matters of faith and doctrine." (JA30 (quotation marks omitted; brackets in original).) Count 2 alleges that applying MFEPA to the plaintiffs' hiring practices would violate the Establishment Clause by allowing "excessive government entanglement with the Church's internal religious decision-making." (JA31.) Count 3 claims that MFEPA's application to the plaintiffs violates their free exercise rights because the statute is not neutral and generally applicable and does not survive strict scrutiny. (JA33-34.)[1]

---

[1] Count 4, which the plaintiffs contend is also at issue here, *see* Appellants' Br. 56-57, asserts that MFEPA unconstitutionally favors certain religious denominations over others. (JA35-37.) Counts 5, 6, and 7, respectively, assert that MFEPA violates the plaintiffs' right to expressive association, violates their right to assembly, and is unconstitutionally vague. (JA37-40.)

10

**The Preliminary Injunction Motion and the State's Motion to Dismiss**

Shortly after filing their complaint—but more than a year after the decision in *Doe*—the plaintiffs sought a preliminary injunction. They argued that they were likely to succeed on the merits of their first three claims, i.e., that MFEPA violates the church autonomy doctrine, impermissibly entangles the government in their religious decision-making, and burdens their religious exercise in a manner that is not neutral and generally applicable.

As for irreparable harm, the plaintiffs submitted no affidavits. Instead, they relied solely on the complaint, verified by an officer of each plaintiff. (JA42-43.) The plaintiffs did not claim that MFEPA had deterred them from exercising any religious rights; to the contrary, they asserted that they were continuing the same employment practices they claimed were constitutionally protected. (JA26.) Nor did the plaintiffs point to any threat of enforcement, or even to any way in which the possibility of enforcement had caused them to change their behavior. (JA26-27.) Instead, the plaintiffs stated, without further explanation, that they "fear that continuing their current hiring practices could lead to liability" under MFEPA. (JA27.)

In addition to opposing the motion for preliminary injunction, the State moved to dismiss all counts for failure to state a claim.

11

**The District Court's Decision**

The district court denied the preliminary injunction. First, the court held that the plaintiffs were not likely to succeed on the merits of their church autonomy claim. It noted that the Supreme Court had addressed "whether [the church autonomy] principle can be applied to exempt religious institutions from having to comply with employment discrimination laws" via the ministerial exception (JA614). The district court declined to extend the church autonomy doctrine beyond that exception to allow the plaintiffs "to hire only members of their own faith for all employment positions." (JA615.) Not only had this Court and the Supreme Court provided no "basis to conclude that the church autonomy principle protects such a practice" (JA615-616), the district court observed, but this Court had stressed that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides" (JA615-616 (quoting *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000); brackets in original)). The plaintiffs' position, the court continued, "effectively amounts to an extension of the ministerial exception to cover all employees." (JA619.)

Second, the district court rejected the plaintiffs' entanglement claim. That claim, the court reasoned, rested on an Establishment Clause test derived from *Lemon v. Kurtzman*, 403 U.S. 601 (1971); explicated in *Rayburn v. General*

12

*Conference of Seventh-day Adventists*, 772 F.2d 1164 (4th Cir. 1985); but since rendered "outdated and thus inapplicable." (JA623.) Even *Rayburn*, moreover, had stressed that a church's "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." (JA622 (quoting *Rayburn*, 772 F.2d at 1171).) Noting that the plaintiffs had cited no case "find[ing] an Establishment Clause violation based only on excessive entanglement" (JA623), the court observed that an entanglement-only argument "overlap[ped] almost entirely" with the plaintiffs' church autonomy argument and was unlikely to succeed for the same reasons (JA624).

Third, the district court rejected the plaintiffs' free exercise claim. Applying the Supreme Court's decision in *Tandon v. Newsom*, 593 U.S. 61 (2021), the court held that MFEPA's exemptions did not trigger strict scrutiny because three of those exemptions treated secular and religious activities equally, while the fourth treated religious activities *more* favorably than secular ones. (JA626-632); *see Tandon*, 593 U.S. at 62 (holding that a law is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise"). Further, according to the district court, MFEPA's exception for bona fide occupational qualifications was not the sort of individualized exemption mechanism that can trigger strict scrutiny because that exception "establishes an affirmative defense . . . subject to defined

13

criteria," rather than vesting a decisionmaker with discretion. (JA633.) MFEPA thus was subject only to rational-basis review, which it satisfied. (JA634.)

Fourth, the court held that the remaining factors "collectively weigh against a preliminary injunction." (JA634.) It explained that the plaintiffs had failed to demonstrate a likelihood of irreparable harm because they were unlikely to succeed on the merits and because "they continue to engage in their same hiring practices and have not been subjected to any enforcement actions or other adverse consequences." (JA635.) Further, the public interest and the balance of equities weighed against a preliminary injunction. An injunction, the court observed, would impair the State's interest in ensuring equal opportunity; meanwhile, the plaintiffs "have been operating under their same hiring practices for nearly two years since the Maryland Supreme Court decided *Doe* and have faced no enforcement consequences . . . or a chilling effect." (JA635.)

Finally, the court addressed the State's motion to dismiss. It dismissed Counts 2 (entanglement), 4 (denominational discrimination), 6 (right of assembly), and 7 (vagueness) for failure to state a claim. (JA637-641, JA646-648.) The court denied the motion, however, as to the church autonomy, free exercise, and expressive-association claims. It did so on the ground that, as to these claims, the plaintiffs were raising novel legal theories that arguably could be better assessed after factual development. (JA637, JA646.)

This appeal followed.  (JA650.)

## SUMMARY OF ARGUMENT

The district court correctly determined that the plaintiffs were unlikely to succeed on the merits of any of the three claims they advanced as bases for injunctive relief.  First, although the church autonomy doctrine shields a religious organization's ecclesiastical functions in a variety of respects, it does not shield employment decisions as to an organization's entire workforce.  Recognizing such immunity would be at odds with the Supreme Court's (and this Court's) recognition of only the ministerial exception, applicable only to those who perform vital religious duties, as church autonomy's manifestation in the employment setting.  That is true even though the plaintiffs' rule would extend immunity only to decisions made "for religious reasons": it is easy for a church to claim a decision was made for religious reasons, and hard for anyone else to question that claim's sincerity.

Second, MFEPA does not unconstitutionally entangle the government in religion.  It is highly doubtful that "entanglement" survives as a standalone Establishment Clause cause of action, but even if it did, the inquiry that *Doe* contemplates is not problematic.  It does not invite courts to take sides on religious doctrine or second-guess religious decisions; it requires courts to make factual determinations about an organization and its employees.  And if a religious entity is concerned that the inquiry may be too intrusive, it can opt not to invoke MFEPA's

15

statutory exemption (which is not constitutionally required) and, instead, to rely solely on the ministerial exception.

Third, MFEPA does not violate the Free Exercise Clause. Rather than favor secular activity over religious exercise, its exceptions apply to secular and religious activity alike or even favor religious activity. Contrary to the plaintiffs' assertions, the statute's "bona fide occupational qualification" exception is not an exemption-granting mechanism at all, much less a discretion-laden one of the sort that can trigger strict scrutiny. MFEPA therefore is neutral and generally applicable, and it is constitutional under rational-basis review—yet it would also survive strict scrutiny, as it is narrowly tailored to the compelling interest in combating employment discrimination.

The denial of preliminary injunctive relief can also be affirmed on the ground that, as the district court determined, the plaintiffs failed to satisfy any of the remaining requirements for securing the extraordinary remedy of a preliminary injunction. The plaintiffs, who brought this lawsuit in the absence of any employment dispute, did not demonstrate actual and imminent irreparable harm: Far from establishing that MFEPA is chilling the practices they claim are constitutionally protected, the plaintiffs asserted that they are continuing those practices. At the same time, they pointed to no threat of enforcement. And, confirming that irreparable harm is not imminent, the plaintiffs waited more than a

16

year after *Doe* before filing this lawsuit and seeking injunctive relief. These considerations, especially when combined with the State's interest in preventing employment discrimination, also support the district court's conclusion that the plaintiffs had not established that the balance of equities or public interest favored injunctive relief.

Finally, as to the district court's dismissal of the plaintiffs' entanglement and denominational-discrimination claims, this Court should decline to reach the plaintiffs' arguments or should affirm. The plaintiffs did not raise denominational discrimination in seeking a preliminary injunction, so the district court's dismissal of that claim does not implicate the same question as its denial of injunctive relief. And if this Court affirms the denial of the preliminary injunction on non-merits grounds, it need not address the entanglement arguments, either. Regardless, the district court's dismissal of these two claims was correct: MFEPA does not facially prefer any denomination over others, and the factual inquiry that *Doe* requires does not result in impermissible entanglement.

## ARGUMENT

### I.    THE DISTRICT COURT'S DENIAL OF THE PRELIMINARY INJUNCTION IS REVIEWED FOR ABUSE OF DISCRETION.

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase*

*v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  To obtain a preliminary injunction, plaintiffs must establish that (1) "they are likely to succeed on the merits"; (2) "they are likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in their favor"; and (4) "the injunction is in the public interest."  *American Fed'n of Teachers v. Bessent*, 152 F.4th 162, 168-69 (4th Cir. 2025) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  That test "is supposed to set a high bar" and requires the plaintiff to satisfy all four of the factors.  *American Fed'n of Teachers*, 152 F.4th at 169.  This Court, in turn, reviews the decision to deny a preliminary injunction for abuse of discretion.  *E.g.*, *Di Biase*, 872 F.3d at 229.

## II.    THE DISTRICT COURT WAS CORRECT TO DETERMINE THAT THE PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

The district court correctly concluded that, as to each of the three counts asserted as a basis for injunctive relief, the plaintiffs are unlikely to succeed on the merits.  In each instance, the plaintiffs' contentions stretch the First Amendment well beyond the bounds that this Court and the Supreme Court have established.  And their claims, if accepted, would vastly expand the scope of religious organizations' heretofore limited constitutional immunity from anti-discrimination laws.

### A.  The Maryland Fair Employment Practices Act Does Not Violate the Church Autonomy Doctrine.

The plaintiffs claim that MFEPA is unconstitutional because, they say, the church autonomy doctrine shields their employment decisions as to all employees, as long as those decisions are made for religious reasons.  But in the employment context, the church autonomy doctrine protects employment decisions as to ministers or their equivalent, not all of an organization's employees, and the case law does not support the plaintiffs' sweeping claim of immunity.

### 1.  The Church Autonomy Doctrine Shields Employment Decisions as to Ministers, Not an Organization's Entire Workforce.

The First Amendment protects religious organizations' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."  *Hosanna-Tabor*, 565 U.S. at 186 (*quoting Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).  This "church autonomy" doctrine, however, is limited.  At its core, it requires civil courts "not to intermeddle in internal ecclesiastical disputes."  *Bell v. Presbyterian Church*, 126 F.3d 328, 330 (4th Cir. 1997).  More recently, the Supreme Court has explained that the doctrine "protect[s] [a religious institution's] autonomy with respect to internal management decisions that are essential to the institution's central mission."  *Our Lady of Guadalupe*, 591 U.S. at 746.  It does not, however, grant religious organizations "general immunity from secular laws."  *Id.*

19

In the employment context, the church autonomy doctrine takes the form of the ministerial exception, which requires courts to "stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Id.* at 746; *see Hosanna-Tabor*, 565 U.S. at 191-92 (holding that employee came within the ministerial exception because she "held herself out as a minister of the Church" and her "duties reflected a role in conveying the Church's message and carrying out its mission"). As *Hosanna-Tabor* explained, "[t]he members of a religious group put their faith in the hands of their ministers," and "requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, . . . intrudes upon more than a mere employment decision." *Id.* The Court has since clarified that the ministerial exception applies to employees performing "vital religious duties" at the core of a religious organization's mission, regardless of title. *Our Lady of Guadalupe*, 591 U.S. at 756.

MFEPA's exemption for religious organizations, as interpreted by *Doe*, extends to more employees than does the ministerial exception. The exemption applies not just to employees who directly further an organization's religious missions, but also to those who directly further its secular missions. 484 Md. at 673. Still, the plaintiffs assert that the church autonomy doctrine entitles them to insist that *all* of their employees be members of the Church and to terminate them for straying from Church-prescribed practices regarding, for instance, sexuality and

remarriage. According to the plaintiffs, the church autonomy doctrine serves as an absolute bar to employment discrimination claims by any employee of a religious organization, so long as the employing organization offers a "religious reason[]" for its actions. Appellants' Br. 20.

This argument cannot be squared with the Supreme Court's careful articulation of the ministerial exception. *Our Lady of Guadalupe* made clear that the exception is an application of the church autonomy doctrine to the employment setting. *See* 591 U.S. at 746 (identifying "selection of the individuals who play certain key roles" as "a component of [church] autonomy"). That makes sense, for ministers' duties "lie at the very core of the mission" of a religious organization. *Our Lady of Guadalupe*, 591 U.S. at 754; *see id.* at 757 (holding that Catholic school's teachers fell within the exception because "they were the members of the school staff who were entrusted most directly with the responsibility of educating their students in the faith"). In neither *Hosanna-Tabor* nor *Our Lady of Guadalupe* did the Court suggest that, for all of its efforts to define the contours of the ministerial exception, the church autonomy doctrine might actually shield an organization's hiring and firing of *all* employees, as long as it is rooted in religious belief. *See Hosanna-Tabor*, 591 U.S. at 191-92 (contrasting decision "to accept or retain an unwanted minister" with "a mere employment decision"). The Court's characterization of the ministerial exception as a "component" of church autonomy, *see* Appellants' Br. 21,

reflects not that the doctrine sweeps far more broadly within the employment setting, but that it has multiple applications outside that setting altogether.

Nor has this Court suggested that the church autonomy doctrine broadly shields employment decisions with respect to non-ministerial employees. To the contrary, this Court has confirmed, in a case where it accepted the employer's invocation of the ministerial exception and a separate claim of entanglement, that "churches are not—and should not be—above the law"; thus, "[t]heir employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." *Rayburn*, 772 F.2d at 1172. The plaintiffs' claim to a broad church-autonomy-based exemption contravenes that pronouncement.

The plaintiffs cannot circumvent this problem by conflating employment with membership. *See* Appellants' Br. 25-27. They are correct that courts may not intercede in a church's decisions regarding who may be a member. *See, e.g.*, *Bouldin v. Alexander*, 82 U.S. 131, 139-40 (1872). But MFEPA places no limits on who a religious organization may exclude as a member, or on the grounds upon which a religious organization may exclude someone as a member. It also does not deem any form of member discipline ecclesiastically valid or invalid.[2] Instead, it regulates

---

[2] The statement in *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), that "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law," *id.* at 713, does not mean that a religious organization can immunize any decision by couching it as

employment, and decisions regarding whom to employ are *different* from decisions regarding membership. Cases such as *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), which involved compulsory admission of women to certain membership roles in a civic organization, *see id.* at 614-15, therefore are inapposite.

The right of expressive association does not bolster the plaintiffs' church autonomy argument, either. *See* Appellants' Br. 27-28 (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006), and *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023)). The plaintiffs' expressive-association claim is not even before this Court, because they did not raise it as a basis for preliminary injunctive relief. And with good reason: They cite no case in which this Court or the Supreme Court has upheld an expressive-association claim based on the employer-employee relationship. Even in the Second Circuit, which contemplated that an anti-abortion group could have an expressive-association right to take adverse action against employees who seek abortions, *see Slattery*, 61 F.4th at 289-91, the right of expressive association does not apply in bulk. Instead, an employer must make an expressive-association showing "in the context of a specific employment decision," with specific reference to "the responsibilities of the position at issue," as well as "the particular conduct or

---

"discipline." It means, instead, that civil courts cannot question whether an act of discipline is *religiously* correct. *See id.* (decrying "inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow").

attribute of the employee that renders the employment of that person, in that position, a threat to the employer's mission." *CompassCare v. Hochul*, 125 F.4th 49, 61 (2d Cir. 2025). None of this provides support for categorically protecting all religiously rooted employment decisions.

Finally, the plaintiffs' speculation about the need to make religious accommodations for employees, *see* Appellants' Br. 30-31, provides no basis for their church autonomy claim. This case, as the plaintiffs have framed it, concerns their desire to preserve their own employment practices, but they do not describe *any* practices with respect to religious accommodations for non-Adventist employees—nor could they, because the complaint alleges that the plaintiffs do not hire such employees. (JA20.) At the same time, it is not clear what religious accommodation (if any) a hypothetical non-Adventist employee might seek. Even if some conjectured accommodation might be constitutionally problematic, that possibility is far too remote and speculative to support the plaintiffs' broad claim of immunity for the practices in which they currently engage.[3]

---

[3] The church autonomy arguments in the amicus brief of religious colleges and universities are largely beside the point, for MFEPA includes a separate exemption—which the amicus brief nowhere mentions—shielding religious educational institutions from liability for "hiring and employing employees of a particular religion." State Gov't § 20-605(a)(3).

### 2.  The Cases the Plaintiffs Cite Do Not Support the Broad Rule They Seek.

Although the plaintiffs cite a host of cases in support of their church autonomy argument, those cases do not support their position that all religiously rooted employment decisions are immune from scrutiny.  The Tenth Circuit's decision in *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), from which the plaintiffs derive their proposed "rooted in religious belief" test, *see* Appellants' Br. 21, is illustrative.  Contrary to the plaintiffs' assertion, *see* Appellants' Br. 23, *Bryce* was not a challenge to a personnel decision; it was a sexual harassment suit "for remarks made about homosexuals and the plaintiffs' homosexual activities." 289 F.3d at 651.  Framing the question as whether these remarks themselves "were ecclesiastical statements protected by church autonomy," the Tenth Circuit declined "to insert itself into a theological discussion about the church's doctrine and policy towards homosexuals" and held that church autonomy barred the claims.  *Id.* at 651, 657-59; *see id.* at 658 (stressing "the First Amendment rights of the church *to discuss church doctrine and policy freely*" and the right of the church *to engage freely in ecclesiastical discussions* with members and non-members (emphasis added)).  The court did not suggest that, in circumstances not involving ecclesiastical dialogue in this fashion, church autonomy offers the broad immunity that the plaintiffs seek here.

25

This Court's decision in *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795 (4fh Cir. 2000), is no more availing to the plaintiffs. Their brief quotes the case for the proposition that "church autonomy 'shelters' any religious employment decisions necessary 'to preserve the independence of religious institutions in performing their spiritual functions.'" Appellants' Br. 21 (quoting *Roman Cath. Diocese of Raleigh*, 213 F.3d at 801). But the decision does not say that "church autonomy" shelters employment decisions in this manner; it says that "*the exception*"—i.e., the ministerial exception—"shelters *certain* employment decisions from the scrutiny of civil authorities so as to preserve the independence of religious institutions in performing their spiritual functions." *Roman Cath. Diocese of Raleigh*, 213 F.3d at 801 (emphasis added). And in the same paragraph, the decision confirms that the exception "does not insulate wholesale the religious employer from the operation of federal anti-discrimination statutes," so that, "[f]or instance, the exception would not apply to employment decisions concerning purely custodial or administrative personnel." *Id.* Selective quotations cannot transform the limited ministerial exception that the decision describes into a far broader church autonomy claim.

The other cases on which the plaintiffs rely do not support their broad claim, either. In *Darren Patterson Christian Academy v. Roy*, 699 F. Supp. 3d 1163 (D. Colo. 2023), for instance, the court found that the defendants "effectively

26

stipulated to Plaintiff's characterization of the law" by "ma[king] *no* argument on the substance of *any* of Plaintiff's First Amendment claims," *id.* at 1183; further, the decision's sole basis for endorsing a constitutional "coreligionist exemption" was a series of Supreme Court cases addressing whether States can deny organizations funding solely on the basis of their religious status, *id.* at 1185. In *Butler v. St. Stanislaus Kostka Catholic Academy*, 609 F. Supp. 3d 184 (E.D.N.Y. 2022), the court discussed the doctrine only by way of "foreclos[ing] judicial inquiry into the plausibility" of religious beliefs asserted by an employer as its reason for an employment action. *Id.* at 204. In *Garrick v. Moody Bible Institute*, 412 F. Supp. 3d 859, 872 (N.D. Ill. 2019), the court refused to weigh in on a doctrinal dispute about the role of women in the ministry. In *Aparicio v. Christian Union, Inc.*, No. 18-CV-0592, 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019), the court invoked church autonomy in recognizing the employer's right to select its leaders, not its employees writ large; the plaintiff's retaliation claim, moreover, arose out of his opposition to the church's policy regarding who could serve as a minister. *Id.* at *1, *9. Finally, *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286 (Ind. 2003), was not a challenge to an employment decision but, rather, concerned the plaintiff's claim that her former employer blacklisted her to a prospective one, with the court stressing that she sought to "penalize communication and coordination

among church officials . . . on a matter of internal church policy and administration that did not culminate in any illegal act." *Id.* at 288, 294.

### 3. The Rule the Plaintiffs Seek Would Have Far-Reaching Consequences.

The implications of the plaintiffs' view of the church autonomy doctrine are sweeping. Under their theory, an employer could escape liability for discrimination merely by asserting that a challenged employment action was motivated by religion—or, put differently, that it was "rooted in religious belief." Appellants' Br. 21 (quoting *Bryce*, 289 F.3d at 657. As long as an employer asserts a "religious reason[]," Appellants' Br. 20, a groundskeeper could be fired because of religion, a billing specialist could be fired because of sex, or a mailroom clerk could be fired because of race. Whatever policies some other States have chosen as a statutory matter, *see* Appellants' Br. 51-52, the First Amendment does not require States to authorize discrimination in this manner.

Indeed, the plaintiffs' position here would mean that even Title VII's co-religionist exemption is constitutionally insufficient. Title VII does not apply "to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a). In *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987),

28

the Supreme Court did not say the exemption was constitutionally required; it said that it was not *un*constitutional because "there is ample room for accommodation of religion under the Establishment Clause."  *Id.* at 338; *see Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024) (deeming the exemption "constitutionally inspired" and likening it to the Religious Freedom Restoration Act ("RFRA")); *see also Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (explaining that "Congress enacted RFRA in order to provide *greater* protection for religious exercise than is available under the First Amendment" (emphasis added)).  Under the plaintiffs' view, though, the exemption not only is constitutionally mandatory, but does not go far enough:  While the exemption shields "the employment of individuals of a particular religion," 42 U.S.C. § 2000e-1(a), the plaintiffs' proposed constitutional rule requires immunity for *all* employment decisions rooted in religious belief.

Further, the rule that the plaintiffs seek could not readily be cabined to circumstances such as these and would invite opportunistic claims of immunity.  It is no answer that plaintiffs may be able to contest such claims on their facts.  Any such ability could not constitutionally extend to questioning whether a particular religion indeed requires a certain practice or dictates a certain belief.  *See, e.g.*, *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989).  Instead, it would be limited to challenging the sincerity of the employer's belief, as well as

whether that belief in fact motivated the employer's decision. But it is both easy to claim that a decision is "rooted in religious belief" and difficult to question that claim, particularly when the employer is, by definition, a religious institution. In practice, therefore, there is little difference between the plaintiffs' position and the extension of the ministerial exception to cover all employees. This Court should not enable the weakening of civil rights protections in this manner.

### B. The Maryland Fair Employment Practices Act Does Not Entail Impermissible Church-State Entanglement.

The district court was correct to determine that the plaintiffs were unlikely to succeed on the merits of their entanglement claim. To begin, it is, at a minimum, doubtful that entanglement remains an independent basis for finding an Establishment Clause violation. As the district court observed, "entanglement" was one component of the three-part Establishment Clause test articulated by *Lemon v. Kurtzman*, 403 U.S. 602 (1971). But the Supreme Court stated in 2022 that it had "long ago abandoned *Lemon*" and had chosen, instead, to interpret the Establishment Clause with "reference to historical practices and understandings." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022); *see Firewalker-Fields v. Lee*, 58 F.4th 104, 122-23 (4th Cir. 2023) (remanding for district court to consider Establishment Clause challenge in this manner). The historical practices and understandings in question relate to the prevalence or permissibility of specific practices, not abstract concepts like "entanglement." *See, e.g., Town of Greece v.*

*Galloway*, 572 U.S. 565, 577-86 (2014) (legislative prayer); *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 680 (1970) (church tax exemptions)

Although entanglement concerns do remain salient, in recent years the Supreme Court generally has highlighted them not as giving rise to a claim in their own right, but as support for a claim reached on broader or different primary grounds. For instance, in *Carson v. Makin*, 596 U.S. 767 (2022), the Court concluded that Maine had violated the Free Exercise Clause (not the Establishment Clause) by categorically excluding sectarian schools from a program of tuition assistance. *Id.* at 779-81. In responding to an argument that the Free Exercise Clause prohibits discrimination based only on religious status, not religious use, the Court reasoned that giving effect to that distinction "would . . . raise serious concerns about entanglement and denominational favoritism." *Id.* at 787. And in *Our Lady of Guadalupe*, the Court declined to limit the ministerial exception to "'practicing' member[s] of the religion with which the employer is associated" because "determining whether a person is a 'co-religionist' . . . would risk judicial entanglement in religious issues." 591 U.S. at 761; *see also Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 78 (4th Cir. 2023) (Richardson, J., concurring in the judgment) ("I need not say that a court's inquiry into a minister's employment is *unconstitutional* in order to say that it is—as a prudential matter—a bad idea for us to become so entangled.").

31

It is in that sense that anti-entanglement principles come into play here. Concerns about entanglement find expression in the church autonomy doctrine and, in the specific context of employment, the ministerial exception. *See, e.g.*, *Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 808 (9th Cir. 2024) (holding that a religious entity "need not provide any religious justification to invoke the ministerial exception" because "[d]elineating a religious organization's decisions between religious and secular would create excessive entanglement between the church and state"); *Behrend v. San Francisco Zen Ctr., Inc.* 108 F.4th 765, 770 n.3 (9th Cir. 2024) (noting "the entanglement concerns that undergird the ministerial exception"); *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 976 (7th Cir. 2021) (ministerial exception prevents "excessive entanglement").  But the church autonomy doctrine does not generally protect employment decisions as to non-ministers, as explained at pages 18-30 above, and a freestanding "entanglement" claim would amount to an end-run around the ministerial exception's limits.

Even if "entanglement" remains a freestanding basis for an Establishment Clause claim, though, the plaintiffs' entanglement claim fails.  First, *Doe* does not call on courts to determine the religious validity, legitimacy, or centrality of any belief or practice; decide whether particular acts are secular or religious; or otherwise insert themselves into matters of religious doctrine.  *See, e.g.*, *Serbian Orthodox*

32

*Diocese*, 426 U.S. at 717-20 (reversing the lower court's decision to order a bishop reinstated because of the court's view of what ecclesiastical law required); *Amos*, 483 U.S. at 336 (warning of the "significant burden" associated with requiring a religious organization "to predict which of its activities a secular court will consider religious"); *Does 1-11 v. Board of Regents of Univ. of Colo.*, 100 F.4th 1251, 1257, 1271 (10th Cir. 2024) (invalidating vaccination policy that permitted religious exemption only if employees could cite to official doctrine of an organized religion, on the ground that it created an "intrusive inquiry" into the "perceived validity" of individuals' religious beliefs).

Instead, the exemption for religious organizations requires courts to determine whether an employee's duties directly further a religious organization's core missions, regardless of whether those missions are religious or secular. *Doe*, 484 Md. at 673. That inquiry is no more problematic than assessing whether a particular employee comes within the ministerial exception because she performs "vital religious duties" or because her duties lie within the "core" of the organization's religious mission. *Our Lady of Guadalupe*, 591 U.S. at 754, 756; *see Rayburn*, 772 F.2d at 1169 (court must "determine whether a position is important to the spiritual and pastoral mission of the church" to determine whether the ministerial exception applies; *Roman Catholic Diocese of Raleigh*, 213 F.3d at 801 (same); *see also Our Lady of Guadalupe*, 591 U.S. at 757 (characterizing "a religious institution's

explanation of the role of . . . employees in the life of the religion in question" as "important," not dispositive). If anything, the inquiry under *Doe* is less problematic, because an organization's "core missions" can be religious or secular. 484 Md. at 673.

The plaintiffs are incorrect to claim that the inquiry under *Doe* requires "weighing an organization's religious beliefs." Appellants' Br. 34. They assert that, with respect to a tenet to which a church genuinely subscribes, *Doe* requires a court to analyze the church's activities "to see if *the court* believes the tenet is sufficiently 'core . . . for the purpose of applying the exemption.'" Appellants' Br. 34 (quoting *Doe*, 484 Md. at 674 n.20; emphasis and ellipsis in original). But *Doe* says just the opposite: "[F]or purposes of MFEPA's exemption, a religious entity's core mission is *not* synonymous with the entity's religious doctrine." 484 Md. at 674 n.20 (emphasis added). The court's role is not to assess whether a "tenet" is core to a religion; it is to assess, based on "the activities of a religious entity," what the entity's core missions are. *Id.* Consistent with the statute's reference to "work connected with *the activities* of the religious entity," State Gov't § 20-604(2) (emphasis added), "mission" refers to what the entity principally seeks to *do*, not what it principally *believes*. *See Doe*, 484 Md. at 673-74 (describing one entity's core mission as "supplying housing to low-income communities" and another entity's core mission as "the raising of funds to build new schools in underserved communities"); *id.* at

34

673 (disagreeing that General Assembly intended to allow discrimination "against employees whose duties are materially indistinguishable from those performed by individuals at secular organizations, irrespective of the religious entity's *core activities*" (emphasis added)). That is why *Doe* observed that the inquiry it prescribed "should not require analysis of religious doctrine or otherwise result in courts being caught in a theological thicket." *Id.* at 673 (quotation marks and citation omitted).

Second, the "process of inquiry" that *Doe* entails is not problematic. Appellants' Br. 34 (quoting *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979)). MFEPA, under *Doe*, does not have courts "second-guess[]" or "approv[e]" religious organizations. Appellants' Br. 36. It asks courts to make determinations of fact, which are no more intrusive than the determinations necessary to ascertain whether a given employee comes within the ministerial exception. *See Our Lady of Guadalupe*, 591 U.S. at 757 (explaining that "[e]ducating and forming students in the Catholic faith lay at the *core of the mission* of" schools where the plaintiffs taught and "they were the members of the school staff who were *entrusted most directly* with the responsibility of educating their students in the faith" (emphases added)); *Rayburn*, 772 F.2d at 1169 (courts must examine whether a position is "important to the spiritual mission" of the church to determine whether the ministerial exception applies). Indeed, although the plaintiffs complain that *Doe*'s inquiry is "fact-

35

intensive" and requires consideration of "the totality of the pertinent circumstances," Appellants' Br. 33, *Our Lady of Guadalupe* similarly explains that "a variety of factors may be important," 591 U.S. at 751, and requires consideration of "all relevant circumstances," *id.* at 758.[4]  And any concern about the "process of inquiry" prospectively distorting religious organizations' choices, *see* Appellants' Br. 34-35, is especially inapt here, where the plaintiffs do not claim to be doing anything differently as a result of *Doe*.  More generally, determining which employees fall within any exemption necessarily will require drawing lines based on some amount of factual inquiry.  The only way to avoid line-drawing would be to categorically exempt religious organizations from all anti-discrimination laws.

The "process of inquiry," moreover, is one that the plaintiffs (or any defendant) can avoid.  As explained at pages 18-30 above, the Constitution shields a religious organization's employment decisions as to ministers or their equivalent, but not as to other employees; thus, the exemption that MFEPA provides, which goes beyond the ministerial exception, is a matter of legislative grace, not constitutional mandate.  If a religious employer believes the *Doe* inquiry is overly intrusive, it can decline to invoke the statutory religious exemption—in which case

---

[4] That the Supreme Court of Maryland chose to articulate a series of guidelines that further define the contours of the inquiry, rather than leave it open-ended, does not make the inquiry more problematic.

the inquiry will never take place—and rely solely on the ministerial exception, which is all that the Constitution requires.

For that reason, among others, the Supreme Court's decision in *Catholic Bishop of Chicago* is inapposite. There, the NLRB's exercise of jurisdiction over the employment of teachers in religious schools would have subjected schools, as an involuntary matter, to a "process of inquiry" that included whether schools' "challenged actions were mandated by their religious creeds." 440 U.S. at 502. It would have subjected them to that process, moreover, despite "the critical and unique role of the teacher in fulfilling the mission of a church-operated school." *Id.* at 501; *see Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 829 (D.C. Cir. 2020) (observing that *Catholic Bishop of Chicago* rested on the "vital role played by teachers" at church-operated schools). The Court did not suggest it would reach a similar result in a setting other than religious schools (which benefit from a co-religionist exception under Maryland law, *see* State Gov't § 20-605(a)(3)), or in circumstances where the religious entity need not submit to the "process of inquiry" in the first place. And the Court did not even resolve the question of constitutionality, choosing instead to interpret the applicable statute narrowly to avoid "difficult and sensitive" constitutional questions. 440 U.S. at 507. *Rayburn*, for its part, expressed concern about the process of inquiry not in the abstract, but in the specific context of a church's "selection of its spiritual leaders." 772 F.2d at

1170; *see id.* at 1171 (expressing concern about "legal process designed to probe the mind of the church *in the selection of its ministers*" (emphasis added)). That concern provides no basis for reversal here.

### C.    The Maryland Fair Employment Practices Act Does Not Violate the Plaintiffs' Free Exercise Rights.

MFEPA prohibits employers from discriminating based on a series of characteristics, including race, religion, sex, age, sexual orientation, gender identity, and disability. State Gov't § 20-606(a). It applies to religious and secular entities alike, and it therefore is neutral and generally applicable. *See Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021) (explaining that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are both neutral and generally applicable" (citing *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878-82 (1990))); *Kennedy*, 597 U.S. at 526 (explaining that a law is not neutral and generally applicable if it is specifically directed at religious practice, prohibits religious conduct while allowing secular conduct that undermines the government's interest in a similar way, or contains a mechanism for individualized exemptions). MFEPA thus is subject only to rational-basis review, which it easily survives.

Still, the plaintiffs argue that MFEPA is *not* neutral and generally applicable because of its exceptions and because it purportedly favors certain denominations over others. These arguments distort both the statute and the case law.

38

### 1.    The Maryland Fair Employment Practices Act's Exceptions Do Not Trigger Strict Scrutiny.

Under *Tandon v. Newsom*, 593 U.S. 61 (2021), exceptions to government regulations trigger strict scrutiny only where they "treat *any* comparable secular activity more favorably than religious exercise." *Id.* at 62. MFEPA's exceptions treat no secular activity more favorably than religious exercise and therefore do not make the statute constitutionally suspect.

First, three of MFEPA's exceptions place secular and religious entities on the same footing. MFEPA generally excepts (1) employers with fewer than 15 employees, State Gov't § 20-601(d)(1)(i)(2) (LexisNexis Supp. 2024); and (2) "bona fide private membership club[s] that [are] exempt from taxation under § 501(c) of the Internal Revenue Code," *id.* § 20-601(d)(3). It also generally does not prohibit employers "from observing the terms of a bona fide seniority system or any bona fide employee benefit plan." *Id.* § 20-605(a)(4). Each of these exceptions applies to secular and religious employers alike: *Both* are exempt if they have fewer than 15 employees, if they are tax-exempt bona fide private membership clubs,[5] or if they are observing the terms of a bona fide seniority system or employee benefit plan. These exemptions thus do not treat secular activity "more favorably," *Tandon*¸ 593

---

[5] The Internal Revenue Code expressly contemplates that such clubs may "limit[] [their] membership to the members of a particular religion in order to further the teachings or principles of that religion." 26 U.S.C. § 501(i)(2).

U.S. at 62; they treat the same activity the same, regardless of whether it is religious or secular.[6]

Second, MFEPA's exception for religious educational institutions hiring employees of a particular religion, State Gov't § 20-605(a)(3), is even less helpful to the plaintiffs. That exception treats religious entities *more* favorably than comparable secular ones, the opposite of what *Tandon* deems constitutionally suspect. And it would make little sense to conclude that an exception protecting religion subjects a regulation to strict scrutiny. If anything, such a conclusion would create a disincentive for legislatures to create the very sorts of exceptions that the plaintiffs seek here, lest courts find that they did not go far enough.

The plaintiffs are incorrect to assert that, under *Tandon,* the question is "whether secular *interests* are favored over religious ones." Appellants' Br. 43. *Tandon* directs inquiry into whether any "comparable secular activity" is treated "more favorably than religious exercise." Employment (or even discrimination) by a small organization, by a bona fide membership club, or by an employer administering a seniority system or benefit plan is not "secular activity"; it is activity that can be either secular or religious. And the Supreme Court in *Tandon* did not

---

[6] The same is true of MFEPA's exception for bona fide occupational requirements, although the plaintiffs challenge this as a supposed mechanism for individualized exemptions rather than an exception for comparable secular activity.

say it was summarily rejecting "a similar argument," Appellants' Br. 43; it said it was summarily rejecting "the Ninth Circuit's analysis," 593 U.S. at 64. That analysis turned on the Ninth Circuit's assessment that commercial activity in public buildings was not comparable to in-home religious gatherings, not that the plaintiffs' proposed comparators to religious exercise, such as hair salons, movie theaters, and retail stores, were not "secular activities." *Tandon v. Newsom*, 992 F.3d 916, 920 (9th Cir. 2021).

Even if viewed through the lens of comparability, though, MFEPA's exceptions do not subject the statute to strict scrutiny. As the district court explained, "[f]or a large religious organization, one without a seniority policy, or one that does not constitute a private membership club, the comparable secular activity would be that of a large secular organization without a seniority policy that does not constitute a private membership club, and under . . . MFEPA, such organizations are exempt." (JA630.) That is the relevance of this Court's decision in *Kim v. Board of Education of Howard County*, 93 F.4th 733 (4th Cir. 2024), on which the district court relied: Just as the law challenged there barred students from all private schools, whether religious or secular, from serving on the county's board of education, *see id.* at 747-49, here MFEPA's exceptions are (1) available to any organization, religious or secular, that satisfies them; and (2) unavailable to any organization, religious or secular, that does not.

41

Still less persuasive is the plaintiffs' argument that strict scrutiny applies because "secular organizations in Maryland can and do require employee alignment with their missions," while "religious organizations risk liability if they require religious alignment from their employees." Appellants' Br. 42-43. That statement paints with far too broad a brush, for ensuring alignment with a religious mission may not always entail prohibited discrimination (as with, for instance, an organization's requirement that its employees share a commitment to charitable works). But even if the assertion is accurate, it is irrelevant: If a secular organization's efforts to "require employee alignment" are permissible, then by definition it is not engaging in prohibited discrimination, so its activities cannot be comparable to the religious organization's prohibited acts. *See Tandon*, 593 U.S. at 62 (explaining that comparability "is concerned with the risks various activities pose").[7] More generally, the plaintiffs' approach could deprive virtually any regulation of its status as "generally applicable," as long as the activities are redefined at a sufficiently high level of abstraction.

---

[7] The District of Minnesota's recent decision in *Loe v. Jett*, No. 23-CV-1527, 2025 WL 2430572 (D. Minn. Aug. 22, 2025), is inapposite. *See* Appellants' Br. 43. There, the regulation singled out religious conduct by prohibiting schools from requiring applicants to submit faith statements while allowing them to require applicants to submit other statements. *Loe*, 2025 WL 2430572, at *16-17. Here, by contrast, the discrimination that MFEPA prohibits may or may not be religiously motivated.

The Eastern District of Washington's unpublished decision in *Union Gospel Mission of Yakima v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918 (E.D. Wash. Nov. 1, 2024) is unpersuasive. *Union Gospel*, which held that Washington's anti-discrimination law was not generally applicable because it "exempt[ed] employers with fewer than eight employees," *id.* at *3, effectively ignored that, for strict scrutiny to apply, a law must treat a "*secular* activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62 (emphasis added). The same is true of *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 613 (N.D. Tex. 2021), *rev'd in part on other grounds sub nom. Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023), which subjected Title VII to strict scrutiny because of, among other things, its small-employer exemption. Far more persuasive is *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121 (W.D. Wash. 2023), *rev'd on other grounds*, 147 F.4th 959 (9th Cir. 2025), which held that the Washington exception and the Title VII exemption did not trigger strict scrutiny because they applied to both religious and secular employers. *Id.* at 1142-43. And another court in the District of Maryland has reached the same conclusion as to MFEPA. *See Doe v. Catholic Relief Servs.*, 779 F. Supp. 3d 545, 564-65 (D. Md. 2025), *appeal pending*, No. 25-1569 (4th Cir.). This Court should not hold otherwise.

43

### 2. The Maryland Fair Employment Practices Act's "Bona Fide Occupational Qualification" Exception Is Not a "Mechanism for Individualized Exemptions."

Alternatively, the plaintiffs claim that MFEPA is not generally applicable because it purportedly includes a mechanism for individualized exemptions—namely, the exception for employment decisions based on a "bona fide occupational qualification reasonably necessary to the normal operation of the business." Appellants' Br. 45-47; *see* State Gov't § 20-605(a)(1). *Fulton* and other decisions make clear, however, that this exception is not the sort of mechanism that renders a law constitutionally suspect.

In *Fulton*, a religious foster care agency's challenge to a city requirement that agencies not discriminate based on sexual orientation, the Supreme Court applied strict scrutiny because of a provision that allowed a city official to grant an exemption from the requirement "at his/her sole discretion." *Id.* at 535. The Court reasoned that "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Id.* at 533 (quoting *Smith*, 494 U.S. at 884). Applying that principle, the Court determined that the "at his/her sole discretion" clause created a "formal mechanism for granting exceptions" that made the law not generally applicable and therefore triggered strict scrutiny. *Fulton*, 593 U.S. at 537.

Deciding whether a characteristic is a "bona fide occupational qualification" is not, as the plaintiffs claim, a "mechanism for individualized exemptions." The exception for a "bona fide occupational qualification" is not one (as in *Fulton*) that any government official has the power to grant or deny; it is a self-executing statutory exception to the statute's definition of unlawful employment practices. State Gov't § 20-605(a)(1); *see Fulton*, 593 U.S. at 533 (question is whether the exemption-granting mechanism allows "*the government* to consider the particular reasons for a person's conduct" (emphasis added)).[8]  As with its analogues in Title VII and other federal statutes, the exception is a defense that a finder of fact may accept or reject on the basis of evidence. *See, e.g.*, *White v. Department of Corr. Servs.*, 814 F. Supp. 2d 374, 387 (S.D.N.Y. 2011).  The plaintiffs' bald assertion that "the Commission . . . has discretion to grant case-by-case exceptions from MFEPA's nondiscrimination requirement," Appellants' Br. 45, has no basis in law.[9]

---

[8] The argument that a court's application of *Doe* could itself constitute a discretionary exemption-granting mechanism and thereby trigger strict scrutiny, *see* Br. of Major Religious Orgs. 31-32, stretches *Fulton* beyond recognition.  A court does not "grant" exceptions, much less in a discretionary manner, when it applies a predetermined legal framework to a particular case.

[9] Although the Commission does have general discretion to determine whether to *pursue* particular cases—either in court or before an administrative body—that is the same discretion vested in any comparable enforcement agency and does not flow from the existence of the "bona fide occupational qualification" exception.

45

Further, "[i]ndividualized exemptions" within the meaning of *Fulton* are only those made on an "ad hoc" basis, or with "less than clear considerations." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 687-88 (9th Cir. 2023) (en banc); *see Smith*, 494 U.S. at 884 (distinguishing a generally applicable statute from one allowing exemptions for "good cause"). Decisions under well-defined criteria are not the kind of "individualized exemptions" at issue in *Fulton*, even if they are made on a case-by-case basis. *See We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288 (2d Cir. 2021) (explaining that "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons" (quotation marks and citation omitted)); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004) ("While of course it takes some degree of individualized inquiry to determine whether a person is eligible for even a strictly defined exemption, that kind of limited yes-or-no inquiry is qualitatively different from the kind of case-by-case system envisioned by the *Smith* Court . . . .").

Here, the substantive criteria for the "bona fide occupational qualification" exception set it apart from *Fulton*. Maryland's statute does not require only "reasonableness" or even "reasonable necessity"; rather, the otherwise-prohibited criterion must be a "bona fide occupational qualification," and that qualification must be "reasonably necessary to the normal operation of [the] business or

enterprise." State Gov't § 20-605(a)(1); *cf.* COMAR 14.03.02.08 (regulations relating to discrimination based on disability). Those criteria contrast sharply with the ad hoc, "at his/or sole discretion" exemption mechanism in *Fulton* and therefore create no constitutional infirmity.[10] And even if discretion need not be unfettered to trigger strict scrutiny, *see Fellowship of Christian Athletes*, 82 F.4th at 687-88, the "bona fide occupational qualification" exception does not allow any decisionmaker, let alone the government, "to decide which reasons for not complying . . . are worthy of solicitude," *Fulton*, 593 U.S. at 537. Explications of the term "bona fide occupational qualification" in federal law confirm as much. *See, e.g.*, *Teamsters Local Union No. 117 v. Washington Dep't of Corrs.*, 789 F.3d 979, 987 (9th Cir. 2015) (employer must show that "the job qualification justifying the discrimination is reasonably necessary to the essence of its business" and that the otherwise prohibited classification "is a legitimate proxy for" the qualification (quotation marks and citation omitted)); *International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991)

---

[10] Contrary to the plaintiffs' suggestion, *see* Appellants' Br. 45-46, the concurrence in *Canaan Church v. Montgomery County*, 29 F.4th 182 (4th Cir. 2022), only underscores that the "bona fide occupational qualification" exception does not deprive MFEPA of its status as "generally applicable." According to the concurrence, "[w]hat we're looking for is unconstrained discretion to make essentially ad-hoc decisions about what circumstances warrant an exception." *Id.* at 203 (Richardson, J., concurring).

(stressing that the bona fide occupational qualification defense is "narrow[]" and has a "restrictive scope"); *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977) (exception is "extremely narrow").

### 3. The Maryland Fair Employment Practices Act's Differential Impact on Different Denominations Does Not Undermine Its Neutrality.

Finally, the plaintiffs assert that MFEPA is not neutral because it "favors certain religious groups over others." Appellants' Br. 48. They did not seek injunctive relief on this basis, even as part of their Establishment Clause argument (*see* ECF 15-1, at 22-23), so it is not before this Court in this interlocutory appeal.

The argument lacks merit in any event. MFEPA's religious exemption allows *all* religious organizations to make employment decisions based on religion, sexual orientation, or gender identity for employees who "perform work connected with the activities of the religious entity"; *Doe*'s interpretation of that language, in turn, allows *all* religious entities to avail themselves of that exemption with respect to employees whose duties "directly further the[ir] core mission(s)—religious or secular, or both." 484 Md. at 673. The statute thus does not draw lines distinguishing between different denominations and, for this reason, is constitutionally sound. *Compare Hernandez*, 490 U.S. at 695-96 (upholding tax statute that disfavored contributions made for consideration, and rejecting claim of unconstitutional discrimination against denominations that raise funds by collecting

fees in exchange for religious services), *with Larson v. Valente*, 456 U.S. 228, 246-47 & n.23, 255 (1982) (invalidating rule that imposed reporting requirements only on those religious organizations that received less than fifty percent of their contributions from members or affiliated organizations, because the rule "effectively distinguishes between well-established churches that have achieved strong but not total financial support from their members . . . and churches which are new and lacking in a constituency, or which . . . may favor public solicitation over general reliance on financial support from members" (quotation marks omitted)).

In challenging the denial of injunctive relief, the plaintiffs do not even say what kinds of denominations they think the statute favors. Elsewhere, however, they make clear that their claim is that MFEPA is not "neutral between faith groups whose beliefs require employees to share their faith and those who do not." Appellants' Br. 57. In other words, the supposed problem is that required nondiscrimination against atheists (for example) offends the beliefs of one group but not another. But this is a claim that the statute imposes disparate religious burdens, not different practical obligations, on different denominations. That is not a denominational preference; it is the sort of differential impact that has long been held constitutional. *See, e.g., Larson*, 490 U.S. at 247 n.23 (distinguishing fifty-percent rule from "facially neutral statute[s], the provisions of which happen to have a 'disparate impact' upon different religious organizations"); *Smith*, 494 U.S. at 879.

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Indus. Review Comm'n*, 605 U.S. 238 (2025), does not suggest otherwise. The statute there, as interpreted by the state court, gave favorable treatment to a religious activity—provision of charitable services—only if the service-providing organization limited those services to co-religionists or proselytized in the course of its charitable work. *See id.* at 241, 245. The Supreme Court held that the statute thus "facially differentiate[d] among religions based on inherently theological choices." *Id.* at 250. Here, the plaintiffs have identified no theological choice—much less one evident on the face of *Doe*'s interpretation of MFEPA— that would make discrimination lawful for one religion but unlawful for another.

### 4.      The Maryland Fair Employment Practices Act Survives Any Level of Scrutiny.

As explained above, because MFEPA is neutral and generally applicable, it does not trigger strict scrutiny. Instead, MFEPA is subject only to rational-basis review, and as the district court explained (JA634), the statute is rationally related to the interest in combating employment discrimination.

But MFEPA would satisfy strict scrutiny in any event. First, Maryland has a compelling interest in eliminating discrimination in employment. *See Rayburn*, 772 F.2d at 1168 ("It would, of course, be difficult to exaggerate the magnitude of the state's interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin."); *R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560,

50

591 & n.12 (6th Cir. 2018) (noting "EEOC's compelling interest in combating discrimination in the workforce").

Second, MFEPA, including its religious exemption, is narrowly tailored to that interest. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) (dismissing fear that "discrimination in hiring, for example on the basis of race, might be cloaked as religious practice to escape legal sanction," because "[t]he Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal"). Far from sweeping too broadly, MFEPA gives religious organizations additional leeway beyond what this Court and the Supreme Court have determined the First Amendment requires. Conversely, even at the level of a single organization, there is, by definition, no less restrictive approach that would equally serve the compelling interest in eliminating discrimination. MFEPA therefore is constitutional regardless of the level of scrutiny that applies.

III.  **THE DISTRICT COURT WAS CORRECT TO DETERMINE THAT THE PLAINTIFFS HAD NOT SATISFIED THE REMAINING PRELIMINARY INJUNCTION REQUIREMENTS.**

As explained above, the district court properly determined that the plaintiffs were unlikely to succeed on the merits. Its denial of injunctive relief can also be affirmed, however, based on its conclusion that the plaintiffs—who alleged no

51

chilling effect or threat of enforcement, and who brought this suit in the absence of any employment dispute—had not established the other prerequisites for injunctive relief.

### A.    The District Court Did Not Abuse Its Discretion in Determining That the Plaintiffs Had Not Demonstrated Irreparable Harm.

As the plaintiffs acknowledge, *see* Appellants' Br. 53, any showing of irreparable harm must derive from their likelihood of success on the merits. And the plaintiffs are unlikely to succeed on the merits, as explained above.

Even if they were likely to succeed, though, the plaintiffs still could not satisfy the irreparable harm requirement.  That requirement is demanding: a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original).  This Court has repeatedly required a "clear showing" that irreparable harm is "actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). By contrast, "[a]n injunction 'will not be granted against something merely feared as liable to occur at some indefinite time in the future.'" *Norfolk & W. Ry. Co. v. Brotherhood of R.R. Signalmen*, 164 F.3d 847, 856 (4th Cir. 1998) (quoting *Bloodgood v. Garraghty*, 783 F.2d 470, 475 (4th Cir. 1986)).

The plaintiffs' own allegations foreclose any finding of irreparable harm. In this Court, the plaintiffs state that they sought a preliminary injunction "to allow them to continue to operate normally while the litigation proceeds," Appellants' Br. 16, implying that the absence of such an injunction has chilled their conduct. But the plaintiffs never asserted below that Maryland law had caused them (or would cause them) to refrain from undertaking activities that they view as protected religious exercise. Instead, they alleged just the opposite: that, even though their employment practices purportedly violate MFEPA as interpreted by *Doe*, they are *continuing* those practices. (JA26 ("Plaintiffs are currently soliciting applicants for positions that are available only to those who share their religious beliefs and Plaintiffs plan to continue hiring employees with a qualification based on their sincere religious beliefs."); *see also* ECF 15-1, at 29 ("Plaintiffs do not intend to change their hiring policies and plan to continue to apply their terms of employment to all employees.").)[11]

At the same time, the plaintiffs provided no basis to conclude that irreparable harm might be likely or imminent because of enforcement. They did not report, for

---

[11] Although the plaintiffs asserted that they "fear that continuing with their current hiring practices could lead to liability" (JA27), it is not clear how a corporate entity can "fear" anything. Nor did the plaintiffs attempt to explain as much: the sole support for this corporate "fear" was the verification of that single statement in the complaint, unaccompanied by any individual's affidavit.

instance, that any defendant had threatened them with enforcement, or even that anyone had complained about their hiring practices. Although they asserted that defendants "are likely to attempt to enforce this new understanding of MFEPA's religious exemption against Plaintiffs" (JA27), that claim rested on a series of general statements or actions by the Commission or the Attorney General, the most recent of which predated the complaint by nine months. (JA27-28.)

The plaintiffs' acknowledged continuation of the conduct they claimed was protected, coupled with the absence of any threat of enforcement, defeats their claim of irreparable harm.[12] (JA635 (noting the plaintiffs' "acknowledg[ment]" that "they continue to engage in their same hiring practices and have not been subjected to any enforcement actions or other adverse consequences")); *see Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (irreparable injury present because "First Amendment interests were either *threatened* or *in fact being impaired* at the time relief was sought" (emphasis added)). Their long delay in bringing this action only underscores that conclusion. The foundation for all of the plaintiffs' claims, including the ones on which they based their request for injunctive relief, was that

---

[12] It is immaterial that the defendants, who are charged with enforcing Maryland's civil rights laws, have declined to promise *not* to enforce MFEPA against plaintiffs. (JA575.) A preliminary injunction is an "extraordinary remedy," *Di Biase*, 872 F.3d at 230; it is a plaintiff's burden to demonstrate that irreparable harm is likely and imminent, *see Direx Israel*, 952 F.2d at 812, not a defendant's burden to show that it is impossible.

*Doe* (in their view) worked a sea change in Maryland anti-discrimination law. But that decision was issued on September 14, 2023—more than a year before the plaintiffs filed this lawsuit. That lengthy delay belies the notion that irreparable harm is likely or imminent. *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75 (4th Cir. 1989) (explaining that the plaintiff's delay "may . . . indicate an absence of the kind of irreparable harm required to support a preliminary injunction" (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)). The complaint does not allege *any* harm that befell the plaintiffs in the year following *Doe*. The absence of imminent irreparable harm thus provides an independent basis for upholding the denial of injunctive relief.

## B. The District Court Did Not Abuse Its Discretion in Determining That the Balance of Equities and Public Interest Weighed Against Injunctive Relief.

Especially given the lack of irreparable harm, the district court did not abuse its discretion in concluding that the balance of equities and public interest likewise weighed against granting injunctive relief. (JA635-636.) "When a plaintiff seeks preliminary injunctive relief against the Government, the balance of the equities and the public interest factors merge." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 429 (D. Md. 2020) (citation omitted). Here, the State has a strong interest in ensuring equal employment opportunity for all, including freedom from discrimination on the basis of religion, sexual orientation, and gender identity. *See Rayburn*, 772 F.2d at 1168.

An injunction would impair the State's ability to protect that interest—not only by directly restraining it from enforcing its anti-discrimination laws, but also by inviting other employers to invoke religious beliefs as an unwarranted shield against those laws.

## IV.  THIS COURT SHOULD REJECT THE PLAINTIFFS' CHALLENGE TO THE PARTIAL GRANT OF THE MOTION TO DISMISS.

Besides challenging the denial of the preliminary injunction, the plaintiffs ask this court to reverse the dismissal of their entanglement claim and their denominational discrimination claim.  Their arguments provide no basis for reversal.

First, this Court lacks pendent appellate jurisdiction over the dismissal of the plaintiffs' denominational discrimination claim because that issue is not "inextricably intertwined" with the denial of injunctive relief.  *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013).   The plaintiffs' motion for preliminary injunction claimed a likelihood of success on the merits of their church autonomy, entanglement, and free exercise claims—not their denominational discrimination claim—and did not even assert denominational discrimination as a basis for their claim of entanglement.   Thus, contrary to the plaintiffs' present contention, *see* Appellants' Br. 56-57, this Court need not address denominational discrimination in reviewing the denial of the preliminary injunction, so it lacks pendent appellate jurisdiction over the dismissal of that claim.  *See Scott*, 733 F.3d at 111 (pendent appellate jurisdiction turns on whether multiple rulings require the

court to address the "same specific question"). In the event this Court does reach the issue, however, it should affirm the dismissal for the reasons stated at pages 48-50 above.

Second, although this Court does have pendent appellate jurisdiction over the district court's dismissal of the entanglement claim, it still may exercise discretion not to exercise that jurisdiction, should it uphold the denial of the preliminary injunction because of the plaintiffs' failure to satisfy the non-merits requirements for such relief. *See Clem v. Corbeau*, 284 F.3d 543, 549 n.2 (4th Cir. 2006) (decision to exercise pendent appellate jurisdiction is discretionary). If the Court does address the dismissal of the entanglement claim, it should find the dismissal proper for the reasons (set forth at pages 30-38 above) supporting the conclusion that the plaintiffs were unlikely to succeed on the claim's merits.

## CONCLUSION

The order denying the preliminary injunction should be affirmed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Joshua M. Segal

_____

JOSHUA M. SEGAL
Principal Deputy Solicitor General
200 Saint Paul Place
Baltimore, Maryland  21202
jsegal@oag.state.md.us
(410) 576-6446
(410) 576-6955 (facsimile)

Attorneys for Appellees

## REQUEST FOR ORAL ARGUMENT

Appellees respectfully request that the Court hear oral argument in this appeal, which has been tentatively calendared for the January 27-30, 2026 argument session, as it challenges an important state statute on multiple constitutional grounds.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,985 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

/s/ Joshua M. Segal

_____

Joshua M. Segal

# PERTINENT PROVISIONS

**Maryland Code Annotated, State Government Article**

## § 20-601. Definitions.

**(a)** In this subtitle the following words have the meanings indicated.

**(b)**

    **(1)** "Disability" means:

        **(i)**

            **1.** a physical disability, infirmity, malformation, or disfigurement that is caused by bodily injury, birth defect, or illness, including epilepsy; or

            **2.** a mental impairment or deficiency;

        **(ii)** a record of having a physical or mental impairment as otherwise defined under this subsection; or

        **(iii)** being regarded as having a physical or mental impairment as otherwise defined under this subsection.

    **(2)** "Disability" includes:

        **(i)**

            **1.** any degree of paralysis, amputation, or lack of physical coordination;

            **2.** blindness or visual impairment;

            **3.** deafness or hearing impairment;

            **4.** muteness or speech impediment; and

            **5.** physical reliance on a service animal, wheelchair, or other remedial appliance or device; and

        **(ii)** retardation and any other mental impairment or deficiency that may have necessitated remedial or special education and related services.

**(c)**

    **(1)** "Employee" means:

        **(i)** an individual employed by an employer; or

        **(ii)** an individual working as an independent contractor for an employer.

    **(2)** Unless the individual is subject to the State or local civil service laws, "employee" does not include:

        **(i)** an individual elected to public office;

        **(ii)** an appointee on the policy making level; or

        **(iii)** an immediate adviser with respect to the exercise of the constitutional or legal powers of an elected office.

**(d)**

    **(1)** "Employer" means:

        **(i)** a person that:

**1.** is engaged in an industry or business; and

**2.**

    **A.** has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year; or

    **B.** if an employee has filed a complaint alleging harassment, has one or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year; and

**(ii)** an agent of a person described in item (i) of this paragraph.

**(2)** "Employer" includes the State to the extent provided in this title.

**(3)** Except for a labor organization, "employer" does not include a bona fide private membership club that is exempt from taxation under § 501(c) of the Internal Revenue Code.

**(e)**

**(1)** "Employment agency" means:

    **(i)** a person that regularly undertakes with or without compensation to procure:

        **1.** employees for an employer; or

        **2.** opportunities for employees to work for an employer; and

    **(ii)** an agent of a person described in item (i) of this paragraph.

**(2)** Except for the United States Employment Service and the system of State and local employment services receiving federal assistance, "employment agency" does not include a unit of the United States, the State, or a political subdivision of the State.

**(f)** "Genetic information" has the meaning stated in § 27-909(a)(3) of the Insurance Article.

**(g)** "Genetic test" has the meaning stated in § 27-909(a)(5) of the Insurance Article.

**(h)** "Harassment" includes:

**(1)** unwelcome and offensive conduct, which need not be severe or pervasive, when:

    **(i)** the conduct is based on race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability; and

    **(ii)**

        **1.** submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;

        **2.** submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or

        **3.** based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile; and

**(2)** sexual harassment.

61

**(i)**
  **(1)** "Labor organization" means:
    **(i)** a labor organization engaged in an industry; and
    **(ii)** an agent of an organization described in item (i) of this paragraph.
  **(2)** "Labor organization" includes:
    **(i)** an organization of any kind, an agency, or an employee representation committee, group, association, or plan:
      **1.** in which employees participate; and
      **2.** that exists, wholly or partly, for the purpose of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment; and
    **(ii)** a conference, general committee, joint or system board, or joint council that is subordinate to a national or international labor organization.
**(j)** "Religion" includes all aspects of religious observances, practice, and belief.
**(k)** "Sexual harassment" includes conduct, which need not be severe or pervasive, that consists of unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature when:
  **(1)** submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;
  **(2)** submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or
  **(3)** based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile.

## § 20-604. Scope of subtitle.

This subtitle does not apply to:
  **(1)** an employer with respect to the employment of aliens outside of the State; or
  **(2)** a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity.

## § 20-605. Exceptions.

**(a)** Notwithstanding any other provision of this subtitle, this subtitle does not prohibit:

**(1)** an employer from hiring and employing employees, an employment agency from classifying or referring for employment any individual, a labor organization from classifying its membership or classifying or referring for employment any individual, or an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs from admitting or employing any individual in a program, on the basis of the individual's sex, age, religion, national origin, or disability, if sex, age, religion, national origin, or disability is a bona fide occupational qualification reasonably necessary to the normal operation of that business or enterprise;

**(2)** an employer from establishing and requiring an employee to adhere to reasonable workplace appearance, grooming, and dress standards that are directly related to the nature of the employment of the employee and that are not precluded by any provision of State or federal law, as long as the employer allows any employee to appear, groom, and dress consistent with the employee's gender identity;

**(3)** a school, college, university, or other educational institution from hiring and employing employees of a particular religion, if:

**(i)** the institution is wholly or substantially owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society; or

**(ii)** the curriculum of the institution is directed toward the propagation of a particular religion; or

**(4)** except as provided in subsection (b) of this section, an employer, employment agency, or labor organization from observing the terms of a bona fide seniority system or any bona fide employee benefit plan, such as a retirement, pension, or insurance plan, that is not a subterfuge to evade the purposes of this subtitle.

**(b)** An employee benefit plan may not excuse the failure to hire any individual.


### § 20-606. Unlawful employment practices.

**(a)** An employer may not:

**(1)** fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of:

**(i)** the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

**(ii)** the individual's refusal to submit to a genetic test or make available the results of a genetic test;

**(2)** limit, segregate, or classify its employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee because of:

**(i)** the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

**(ii)** the individual's refusal to submit to a genetic test or make available the results of a genetic test;

**(3)** request or require genetic tests or genetic information as a condition of hiring or determining benefits;

**(4)** fail or refuse to make a reasonable accommodation for the known disability of an otherwise qualified employee or an applicant for employment; or

**(5)** engage in harassment of an employee.

**(b)** An employment agency may not:

**(1)** fail or refuse to refer for employment or otherwise discriminate against any individual because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

**(2)** classify or refer for employment any individual on the basis of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

**(c)** A labor organization may not:

**(1)** exclude or expel from its membership, or otherwise discriminate against, any individual because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment;

**(2)** limit, segregate, or classify its membership, or classify or fail or refuse to refer for employment any individual, in any way that would deprive or tend to deprive the individual of employment opportunities, limit the individual's employment opportunities, or otherwise adversely affect the individual's status as an employee or as an applicant for employment because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender

identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

**(3)** cause or attempt to cause an employer to discriminate against an individual in violation of this section.

**(d)** An employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs, including on-the-job training programs, may not discriminate against any individual in admission to, or employment in, any program established to provide apprenticeship or other training or retraining because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

**(e)**

**(1)** Except as provided in paragraph (2) of this subsection, an employer, labor organization, or employment agency may not print or cause to be printed or published any notice or advertisement relating to employment by the employer, membership in or any classification or referral for employment by the labor organization, or any classification or referral for employment by the employment agency that indicates any preference, limitation, specification, or discrimination based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability.

**(2)** A notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, age, national origin, marital status, or disability if religion, sex, age, national origin, marital status, or disability is a bona fide occupational qualification for employment.

**(f)** An employer may not discriminate or retaliate against any of its employees or applicants for employment, an employment agency may not discriminate against any individual, and a labor organization may not discriminate or retaliate against any member or applicant for membership because the individual has:

**(1)** opposed any practice prohibited by this subtitle; or

**(2)** made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle.

65

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

|   |   |
|---|---|
| GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, *et al.*, | * |
| | * |
| *Plaintiffs-Appellants*, | * |
| v. | *   No. 25-1735 |
| CLEVELAND L. HORTON, II, *et al.*, | * |
| | * |
| *Defendants-Appellees*. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**CERTIFICATE OF SERVICE**

I certify that, on this 4th day of November, 2025, the Brief of Appellees was filed and served electronically on counsel of record who are registered CM/ECF users.

/s/ Joshua M. Segal
_____
Joshua M. Segal

66