No. 25-1735

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

General Conference of Seventh-Day Adventists, *et al.*,

Plaintiffs-Appellants,

v.

Cleveland L. Horton, II, *et al.*,

Defendants-Appellees.

---

On Appeal from a Final Judgment of the
United States District Court for the District of Maryland
Case No. 8:24-cv-02866, Hon. Theodore D. Chuang

---

# *AMICUS CURIAE* BRIEF FOR METROPOLITAN WASHINGTON
# EMPLOYMENT LAWYERS ASSOCIATION
# IN SUPPORT OF APPELLEES

---

Carolyn L. Wheeler
Jessica Westerman
Susanna Barron
Katz Banks Kumin LLP
11 Dupont Circle, N.W.
Suite 600
Washington, D.C. 20036
(202) 299-1140
wheeler@katzbanks.com
westerman@katzbanks.com
barron@katzbanks.com

*Counsel for Amicus Curiae*
November 12, 2025

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A)  *Parties and Amicus Curiae.*  All parties appearing before the District Court and in this Court are listed in the Appellants' Brief.

(B)  *Rulings Under Review.*  References to the rulings at issue appear in the Appellants' Brief.

(C)  *Related Cases.*  There are no related cases.

## RULE 29(a)(4)(A) STATEMENT OF *AMICUS*

The Metropolitan Washington Employment Lawyers Association ("MWELA") is an association.  It does not have any corporate parent.  It does not have any stock, and therefore no publicly held company owns 10% or more of the stock of this *Amicus Curiae*.[1]

## RULE 29(a)(4)(D) STATEMENT OF INTEREST OF *AMICUS*

MWELA, founded in 1991, is a professional association and is the local chapter of the National Employment Lawyers Association, a national organization of attorneys who specialize in employment law.  MWELA conducts continuing legal education programs for its more than 400 members, including an annual day-long conference which usually features one or more

---

[1] In accordance with Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1, *Amicus* states that no party's counsel authored this brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *Amicus* or its members—contributed money that was intended to fund preparing or submitting the brief.

judges as speakers. MWELA also participates as *amicus curiae* in important cases in the District of Columbia, Maryland, and Virginia, the three jurisdictions in which its members primarily practice.

MWELA's members and their clients have an important interest in the proper interpretation of the meaning and scope of the exemptions from the Maryland Fair Employment Practices Act afforded to religious entities. MWELA members represent employees of all religions, races, colors, sexes, and national origins and believe that Maryland's statutory exemption from the protections against discrimination must be construed narrowly, in accordance with the legislature's intent to preserve the intended balance between the rights of religious employers to free expression of their religious beliefs and the rights of employees whose jobs do not further the religious or secular missions of their employers to be free from all forms of invidious discrimination.

*Amicus Curiae* files this brief with the consent of all parties.

# TABLE OF CONTENTS

BACKGROUND AND SUMMARY OF THE ARGUMENT ................................1

ARGUMENT ..........................................................................................3

I.  The district court properly held that the Maryland Supreme Court's interpretation of MFEPA does not violate the doctrine of church autonomy........3

II.  The district court properly held that the Maryland Supreme Court's interpretation of MFEPA would not create excessive entanglement. ..................10

   a.  The cases cited by the Adventists are distinguishable from this case. ......11

   b.  The Doe decision is consistent with employment jurisprudence, including as applied to religious employers.....................................................................14

III.  The district court properly held that the Maryland Supreme Court's interpretation of MFEPA does not violate the Adventists' free exercise rights. .17

   a.  MFEPA is a neutral law. ..........................................................................18

   b.  MFEPA is generally applicable. ..............................................................20

      i.  MFEPA's categorical exemptions treat comparable religious and secular activities the same way. ...................................................................21

      ii.  MFEPA does not permit individualized discretion. ..............................24

   c.  MFEPA satisfies rational basis review and would satisfy strict scrutiny, if it applied..................................................................................................26

CONCLUSION ....................................................................................28

CERTIFICATE OF COMPLIANCE.......................................................29

CERTIFICATE OF SERVICE ..............................................................29

# TABLE OF AUTHORITIES

## Cases

*Bear Creek Bible Church v. EEOC*, 571 F.Supp. 3d 571 (N.D. Tex. 2021) ..........23

*Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ..........4

*Bodkin v. Town of Strasburg, Virginia*, 386 F. App'x 411 (4th Cir. 2010)............15

*Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410 (6th Cir. 1996) ................19

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015) ....................15

*Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002) ...................5

*Butler v. Stanislaus Kostka Catholic Academy*, 609 F. Supp. 3d 184 (E.D.N.Y. 2022)...................5

*Carson v. Makin*, 596 U.S. 767 (2022) .................12

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520 (1993) .......18

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) ..........9

*Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163 (D. Colo. 2023)...5

*Doe v. Cath. Relief Serv.*, 300 A.3d 116 (Md. 2023)..................... passim

*EEOC v. Cath. Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996)....................7

*EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir. 1982) ...........19

*EEOC v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795 (4th Cir. 2000)...., 9

*EEOC v. Sw. Baptist Theological Seminary*, 651 F.2d 277 (5th Cir. 1981).............7

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ....... 17, 26

*Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522 (2021) ............. 22, , 26

*Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 865 (N.D. Ill. 2019)................5

*Goodman v. Archbishop Curley High Sch., Inc.*, 149 F. Supp. 3d 577 (D. Md. 2016)..................16

*Groff v. DeJoy*, 600 U.S. 447 (2023) ....................14

*Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018) .........8

*Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136 (1987) .................

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171 (2012) .................. 6, 7, 17

*Kane v. de Blasio*, 623 F. Supp. 3d 339 (S.D.N.Y. 2022) .....................23

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) .........................20

*McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) ....................19

*McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235 (4th Cir. 2016).........................15

Md. Code, State Gov't § 20-606(a) ...........................................................20

*Molesworth v. Brandon*, 672 A.2d 608 (Md. 1996) ...............................22

*NLRB v. Cath. Bishop*, 440 U.S. 490 (1979) .........................................11

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020).............7, 16

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) .................................. 13, 19, 26

*Rehfield v. Diocese of Joliet*, 182 N.E.3d 123 (Ill. 2021)..........................8

*Serbian E. Orthodox Diocese for U.S. of Am. and Canada v. Milivojevich*,
   426 U.S. 696 (1976) ...........................................................................3

*Simon v. Saint Dominic Acad.*, No. 19-CV-21271,
   2021 WL 1660851 (D.N.J. Apr. 28, 2021)........................................8

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th
   Cir. 2022)...........................................................................................8

*Stephenson v. Pfizer, Inc.*, 641 F. App'x 214 (4th Cir. 2016) ...............15

*Tandon v. Newsom*, 593 U.S. 61 (2021) ..........................................., 25

## Statutes

42 U.S.C. § 2000e-1(a) .........................................................................19

Md. Code, State Gov't § 20-601(d)(1)(i).................................................21

Md. Code, State Gov't § 20-604(2) .....................................................1, 20

Md. Code, State Gov't § 20-605(a)(1)....................................................

Md. Code, State Gov't § 20-606 ...........................................................1

Md. Code, State Gov't § 20-601(d)(3) .....................................................21

Md. Code, State Gov't § 20-605(a)(4) ......................................................21

## Other Authorities

Carl H. Esbeck, An Extended Essay on Church Autonomy,
   22 Federalist Soc'y Rev. 244 (2021)........................................................4

H.B. 307/S.B. 205, 2001 Leg., 415th Sess. (Md. 2001) .........................18

## Regulations

**BACKGROUND AND SUMMARY OF THE ARGUMENT**

The Maryland Fair Employment Practices Act ("MFEPA"), Md. Code, State Gov't §§ 20-601 *et seq.*, prohibits employment discrimination based on protected characteristics including religion, sexual orientation, and gender identity. Md. Code, State Gov't § 20-606(a)(1)(i). MFEPA does not apply to a "religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity." Md. Code, State Gov't § 20-604(2).

The Maryland Supreme Court accepted for review a question certified by the United States District Court for the District of Maryland: whether the exemption in § 20-604(2) applies with respect to the employment of individuals of a particular sexual orientation or gender identity "to perform work connected with all activities of the religious entity or only those that are religious in nature." *Doe v. Cath. Relief Serv.,* 300 A.3d 116, 121 (Md. 2023). The court held that the exemption applies to employees whose duties "directly further the core mission(s)—religious or secular, or both—of the religious entity." *Id.* at 136.

The General Conference of Seventh-Day Adventists and Adventist Risk Management, Inc. (together, "Adventists") sued the Maryland Commission on Civil Rights and the Attorney General of Maryland (together, "Maryland")

1

challenging the Maryland Supreme Court's interpretation of the MFEPA religious exemption as applying only to employees whose roles directly further a religious entity's core religious or secular missions.  The Adventists sought a preliminary injunction to enjoin enforcement of MFEPA against their practice of hiring only members of their own religion and Maryland moved to dismiss for failure to state a claim.  JA 612.

The district court held that the Adventists were not entitled to the preliminary relief they sought because they were unlikely to succeed on the merits of any of their constitutional challenges to the *Doe* court's interpretation of the MFEPA religious exemption.  *See* JA 613-20 (no violation of church autonomy); *id.* at 620-24 (no excessive entanglement); *id.* at 624-34 (no violation of free exercise rights).  The district court then stated in dicta that the Adventists were unable to establish the likelihood of irreparable harm absent the injunctive relief they sought, and the balance of equities favored denial of the preliminary injunction.  JA 634-36.  The court thus granted Maryland's motion to dismiss in part.  *Id.* at 637-47 (dismissing Counts 2, 4, 6, and 7).

On appeal, the Adventists focus on their arguments that the Maryland Supreme Court's construction of MFEPA's religious exemption violates their constitutional rights under the First Amendment.  They are wrong on all counts.  The Maryland Supreme Court's reading of the MFEPA exemption does not offend

the principle of religious autonomy, which is fully realized through application of the ministerial exception, an exception that is not implicated at all in this pre-enforcement action that asserts no claim on behalf of any purported Adventist minister. The Maryland Supreme Court's reading of the MFEPA exemption also does not run afoul of the prohibition on government entanglement in religious affairs because the test the Maryland Supreme Court adopted for application of the religious exemption does not require excessive entanglement in religious affairs. Rather, the test is a straightforward application of factors identifying the secular and religious missions of a religious entity without any assessment of the value, merit, or doctrinal basis of those asserted missions. Finally, the Maryland Supreme Court's reading of the exemption does not interfere with the Adventists' free exercise rights because MFEPA is a neutral and generally applicable law subject only to rational basis review, which is fully satisfied in this case.

## ARGUMENT

### I. The district court properly held that the Maryland Supreme Court's interpretation of MFEPA does not violate the doctrine of church autonomy.

The church autonomy doctrine arose in a line of cases prohibiting secular courts from deciding issues involving church disputes over property, polity, and church administration. *See Serbian E. Orthodox Diocese for U.S. of Am. and Canada v. Milivojevich*, 426 U.S. 696, 710 (1976). This principle of abstention

from deciding church disputes requires that courts avoid controversies over religious doctrine.  In the arena of employment law, the church autonomy doctrine is encapsulated in the ministerial exception, as the district court properly concluded.  JA 613-20.  Accepting the Adventists' argument would effectively extend the ministerial exception to cover all employees, contrary to settled law and the doctrinal underpinnings of the church autonomy principle.

Commentators and courts agree that the church autonomy doctrine is applied in employment cases only through the ministerial exception, which shields from judicial scrutiny all decisions about "the hiring, training, supervising, promoting, and removing of clergy, worship leaders, and other employees with explicitly religious functions as well as policy leaders."  Carl H. Esbeck, <u>An Extended Essay on Church Autonomy</u>, 22 Federalist Soc'y Rev. 244, 248 (2021); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, *14 (W.D.N.C. Sept. 3, 2021) ("In the context of employment, the church autonomy doctrine is limited only to employees who perform spiritual functions that qualify for the ministerial exception."), *rev'd and remanded on other grounds*, 101 F.4th 316 (4th Cir. 2024) (reversing determination that Billard was not a minister for purposes of ministerial exception, but citing with approval the district court's statement about the scope of the church autonomy doctrine).

The Adventists have cited no case that supports their argument for an expanded scope of the church autonomy doctrine. As the district court succinctly noted, the cases relied on by the Adventists do not apply the church autonomy principle "as a basis upon which to conclude that the First Amendment requires that a religious institution be allowed to hire only members of its own religion for all positions." JA 617.[2] The reason is straightforward: the ministerial exception fully implements the core principle of church autonomy by shielding religious employers' decisions about their ministerial staff from judicial scrutiny.

---

[2] Cases cited in the Adventists' brief on appeal likewise do not support their argument for a new iteration of the church autonomy doctrine that would make it applicable to all employment decisions. ECF 20, at 23-24. In *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 656 (10th Cir. 2002), the court merely held that it could not review internal letters, handouts, and church meetings discussing a church's position on homosexuality under the principle of church autonomy. That conclusion is far removed from a rule that churches are free to discriminate in the selection of all employees. In *Butler v. Stanislaus Kostka Catholic Academy,* 609 F. Supp. 3d 184, 198 (E.D.N.Y. 2022), the court found the plaintiff's claim barred by the ministerial exception, then opined in dicta that the religious autonomy principle would constrain application of the *McDonnell Douglas* framework to the pretext issue when the employer asserts a religious reason for its decision. The court's discussion did not suggest there would be a constitutional barrier to consideration of such a claim. *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163 (D. Colo. 2023), was not an employment case and thus has no relevance to the questions before this Court. In *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 865, 872 (N.D. Ill. 2019), the court held it could not evaluate the religious reasons offered for a religious institution instructor's termination, but allowed her to assert and proceed with claims of sex discrimination. The church autonomy doctrine thus did not have the scope the Adventists advocate here.

The Adventists largely ignore the ministerial exception because they contend that Maryland's statutory exemptions are unconstitutional under their conception of church autonomy. This argument makes little sense because even if MFEPA contained no statutory exemptions, the Adventists would be entitled to assert the ministerial exception in appropriate cases because the First Amendment requires it. The exemptions the legislature codified thus do not conflict with, undermine, or fail to preserve the substance of the church autonomy doctrine.

The ministerial exception assures certain religious employers of the freedom to select ministers without regard to the anti-discrimination mandates of federal and state statutes and, where applicable, it operates to shield certain employment decisions regardless of the breadth or scope of any statutory exemption. This judicially-created exception is drawn from the two clauses of the First Amendment, which direct that Congress shall make no laws establishing religion or prohibiting its free exercise. *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 181 (2012). The Supreme Court concluded in *Hosanna-Tabor* that both clauses "bar the government from interfering with the decision of a religious group to fire one of its ministers." *Id.* To delineate the scope of employees thus denied the protections of the anti-discrimination laws, the Court identified a number of factors related to an elementary school teacher's role and concluded that because she had significant religious training, was called a

minister, held herself out as a minister, and taught her students religion and led them in prayer, she was "a minister covered by the ministerial exception." *Id.* at 192.

More recently, the Supreme Court determined that two teachers in Catholic schools who shared few of these characteristics identified in *Hosanna-Tabor* were nonetheless "ministers" because "[w]hat matters, at bottom, is what an employee does," and educating young people in their faith lies at "the very core of the mission of a private religious school." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753-54 (2020).

The purpose of the church autonomy protection is to shield a discrete field of internal church operations, described in *Hosanna-Tabor* as matters pertaining to "the internal governance of the church." 565 U.S. at 188. As applied in ministerial exception cases, this field of operations is relatively small, but the functions protected go to the heart of a religious entity's ability to control its organization and its destiny. Courts have concluded that a variety of positions come within the ministerial exception before and since the Supreme Court decisions in *Hosanna-Tabor* and *Our Lady of Guadalupe*. *See*, *e.g.*, *EEOC v. Sw. Baptist Theological Seminary*, 651 F.2d 277 (5th Cir. 1981) (faculty and administrators at a seminary are ministers); *EEOC v. Cath. Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996) (Catholic University faculty member in canon law department is a minister); *EEOC v.*

*Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795 (4th Cir. 2000) (cathedral director of music ministry and part-time music teacher is a minister); *Alicea-Hernandez v. Archdiocese of Chicago*, 320 F.3d 698 (7th Cir. 2003) (archdiocese's communications manager is a minister); *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018) (holding that Jewish day school was religious institution and ministerial exception applied to Hebrew teacher because she taught her students about prayer, Torah portions, and Jewish holidays and symbolism); *Rehfield v. Diocese of Joliet*, 182 N.E.3d 123 (Ill. 2021) (religious school principal a minister); *Simon v. Saint Dominic Acad.*, No. 19-CV-21271, 2021 WL 1660851 (D.N.J. Apr. 28, 2021) (chair of the religion department and campus chaplain at a Catholic college a minister); *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022) (guidance counselor and member of faculty administrative team at Catholic high school a minister).

To the extent the Adventists want to shield their employment decisions about key religious leaders who can be considered ministers from the reach of all prohibitions on discrimination, including discrimination on the bases of national origin, race, sex, age, and disability, they will be able to avail themselves of the ministerial exception. Maryland was not required to codify this exception in its religious exemption provision and, since the First Amendment requires it, it would have been superfluous to do so. Instead, Maryland's religious exemptions shield

8

employment decisions by religious entities on the bases of religion, sexual orientation, gender identity, and military status as to individuals performing work "directly connected to the core mission(s)" both secular and religious of the entity. Nothing more is constitutionally required.

Employment decisions about positions that do not connect at all with the performance of spiritual functions are not shielded by the ministerial exception, and the church autonomy doctrine should not be distorted to exempt such decisions from scrutiny. Such an interpretation would not serve the constitutional purpose of keeping government out of the core business of churches. As this Court has held, "Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer." *Diocese of Raleigh,* 213 F.3d at 801. If this Court were to expand the church autonomy doctrine as the Adventists advocate, it would risk creating an impermissible establishment of religion, prohibited by the First Amendment.

As the Supreme Court observed in *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, the Establishment Clause requires "benevolent neutrality" that will permit free religious exercise, but "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334-35 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n*

*of Fla.*, 480 U.S. 136, 145 (1987)).  That point would be reached under the
Adventists' view of the unparalleled freedom to discriminate it seeks in this case.

The Adventists seek to turn a constitutional barrier erected to prevent
government intrusion into the internal governance of religious entities into a
weapon that would destroy the rights of all employees of religious institutions to be
free from discrimination that lacks any connection to religious principles or
doctrines.  This Court should not permit it to do so.

## II. The district court properly held that the Maryland Supreme Court's interpretation of MFEPA would not create excessive entanglement.

The Adventists claim that the *Doe* court's interpretation of MFEPA's
religious exemption created a test that would violate the First Amendment doctrine
against excessive entanglement between the government and religious institutions.[3]
The inquiry required by the multi-factor test established in *Doe* creates no such
entanglement.

As the Supreme Court noted in *Walz v. Tax Comm'n of City of New York,*
"no perfect or absolute separation is really possible" between government and
religion, as "the very existence of the Religion Clauses is an involvement of
sorts—one that seeks to mark boundaries to avoid excessive entanglement." *Walz*

---

[3] As Maryland notes in its brief, it is not clear that excessive entanglement provides
an independent basis for an Establishment clause violation.  ECF 45, at 30.  Our
brief does not address this question but assumes, *arguendo,* that excessive
entanglement may create a standalone claim.

*v. Tax Comm'n of City of New York*, 397 U.S. 664, 670 (1970). The test for whether a law creates excessive entanglement is "inescapably one of degree," because any exemption for religious entities "occasions some degree of involvement with religion." *Id.* at 674. The relevant questions are "whether involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement." *Id* at 675.

> ### a. The cases cited by the Adventists are distinguishable from this case.

In asserting that the *Doe* test creates an impermissible degree of entanglement, the Adventists cite several cases striking down laws that required courts to evaluate the degree to which certain activities of a religious organization were religious, rather than secular. These cases are easily distinguishable from the inquiry required by *Doe*.

The Adventists cite the Supreme Court's holding in *NLRB v. Catholic Bishop* that the NLRB's exercise of jurisdiction over lay teachers at Catholic schools would "necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." ECF 20, at 33 (quoting *NLRB v. Cath. Bishop*, 440 U.S. 490, 502 (1979) (internal citation marks omitted)). The inquiry in *Catholic Bishop* sought to

distinguish between entities that were "completely religious" and those that were "just religiously associated." *Id.* at 493. The Adventists also cite *Carson v. Makin* for the proposition that "any attempt to 'scrutiniz[e] whether and how a religious [entity] pursues its . . . mission . . . raise[s] serious concerns about state' entanglement with religion." ECF 20, at 32 (quoting *Carson v. Makin*, 596 U.S. 767, 787 (2022)). The inquiry in *Carson* required courts to evaluate whether a school "promotes a particular faith and presents academic material through the lens of that faith" and the Court found this kind of scrutiny to be unconstitutional "status-based discrimination" disguised as "use-based discrimination." 596 U.S. at 787.

Unlike the inquiries in *Catholic Bishop* and *Carson*, the test established in *Doe* does not require a court to inquire into the legitimacy of any organization's religious mission or the degree to which an organization's mission or an employee's work for that organization is religious in nature. Rather, the Maryland Supreme Court's interpretation of the MFEPA exemption merely requires a determination as to whether an employee's work directly furthers the core mission of a religious organization, with the express acknowledgement that "a religious entity may have both religious and secular core missions." *Doe,* 300 A.3d at 136. Distinguishing between a religious entity's missions which are religious and those

which are secular therefore is not necessary for a court to evaluate the applicability of MFEPA's exemption to a particular employee.

The Adventists also rely on *Rayburn v. Gen. Conf. of Seventh-Day Adventists* for the proposition that application of the *Doe* test to its employment decisions "would alter the character of the Church by encouraging it to make . . . decisions with an eye toward the government's '[b]ureacratic suggestion' rather than its own perception of its needs and purposes." ECF 20, at 34 (quoting *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985)). This reliance is misplaced. In *Rayburn*, the court analyzed application of the ministerial exception to Title VII, which is not at issue here, and stated more specifically that "[b]ureaucratic suggestion in employment decisions *of a pastoral character*, in contravention of a church's own perception of its needs and purposes, would constitute unprecedented entanglement with religious authority." *Id.* (emphasis added). The Adventists' argument, which is limited to non-ministerial employees, elides *Rayburn*'s crucial distinction between "pastoral" and "non-pastoral" employment decisions, regulation of the latter of which creates no entanglement concerns. Furthermore, the *Rayburn* court stated that the ministerial exception "necessarily requires" courts to "inquire into whether a position is important to the spiritual and pastoral mission of the church." *Id.* at 1169. That is precisely the kind of inquiry that *Doe* prescribes.

The Adventists' assertion that application of the *Doe* test to a religious organization requires "weighing an organization's religious beliefs to understand which employment tasks are sufficiently important" and "second-guessing . . . a church's stated religious mission," ECF 20, at 34, misrepresents the *Doe* court's interpretation of MFEPA's religious exemption.  In *Doe*, the Maryland Supreme Court identified several factors as relevant to "determining what constitutes a core mission of a religious entity," including "the description of its mission(s) that the entity provides to the public and/or regulators; the services the entity provides; the people the entity seeks to benefit; and how the entity's funds are allocated."  *Doe,* 300 A.3d at 137.  None of these factors require a court to inquire into the sincerity of a particular religious tenet or the relationship between a core mission and the religious entity's beliefs, and in fact, this part of the test accords significant deference to the religious entity's own description of its mission(s), whether they are religious or secular in nature.

> **b.  The *Doe* decision is consistent with employment jurisprudence, including as applied to religious employers.**

The *Doe* test is "a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances."  *Doe,* 300 A.3d at 136.  This kind of inquiry is common in employment jurisprudence under both federal and Maryland law.  *See, e.g.*, *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (test of whether religious

accommodation creates undue burden under Title VII is "fact-specific inquiry" taking into account "all relevant factors in the case at hand"); *Stephenson v. Pfizer, Inc.*, 641 F. App'x 214, 220 (4th Cir. 2016) ("identifying the essential functions of a job" for purposes of ADA claim "requires a factual inquiry that is guided by several statutory and regulatory factors"); *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016) ("economic realities" test to determine whether employee is covered by FLSA "turns on six factors," none of which is "dispositive" and all of which are "part of the totality of circumstances presented"); *Boyer-Liberto v. Fontainebleau Corp.,* 786 F.3d 264, 272 (4th Cir. 2015) (courts determine whether working environment is "sufficiently hostile or abusive" for purposes of Title VII harassment claim "by looking at all the circumstances"); *Bodkin v. Town of Strasburg, Virginia*, 386 F. App'x 411, 413 (4th Cir. 2010) (noting that constructive discharge claim must be evaluated "based on the totality of the circumstances" and enumerating four "[c]ircumstances to be considered").  The *Doe* test is therefore one that courts are well-equipped to undertake with respect to a broad range of employees and employers, regardless of their religious or secular identity.

To claim that any inquiry which requires a court to in any way scrutinize or evaluate the priorities and practices of a religious employer or the nature of its employee's work creates "excessive entanglement" would undermine the entire

statutory framework of employment law and effectively grant those entities a

blanket exemption, completely denying their employees protection from

discrimination and retaliation. This would clearly go well beyond the requirements

of the First Amendment. *Goodman v. Archbishop Curley High Sch., Inc.*, 149 F.

Supp. 3d 577, 587 (D. Md. 2016) ("[C]ourts have long recognized that First

Amendment protections do not unquestionably foreclose antidiscrimination

actions, especially where a Plaintiff's job duties are not religious in nature.")

The *Doe* test is the kind of inquiry that courts have consistently found not to

create excessive entanglement when applied to religious employers, creating only

"the sort of 'routine regulatory interaction which involves no inquiries into

religious doctrine, no delegation of state power to a religious body, and no

"detailed monitoring and close administrative contact" between secular and

religious bodies.'" *Goodman*, 149 F. Supp. 3d at 585 (finding application of

*McDonnell Douglas* test to discrimination claim brought by lay employee against

religious employer, "without more . . . does not run the risk of excessive

entanglement") (internal citations omitted).

In fact, this multi-factor, flexible test, focused on the duties of employees

and their connection to certain missions of a religious entity, is similar to the

inquiry required by the "ministerial exception" to federal discrimination law

developed by the Supreme Court. *Our Lady of Guadalupe*, 591 U.S. at 751

("variety of factors may be important" in determining whether particular position falls within ministerial exception). A court's determination of who is a "minister" for purposes of that exception considers whether the duties of the employee in question "reflected a role in conveying the [religious entity's] message and carrying out its mission." *Hosanna-Tabor*, 565 U.S. at 192. This analysis, which repeatedly has been found to be constitutional, involves at least as much inquiry into the religious activities and beliefs of a religious employer as the Maryland Supreme Court's interpretation of MFEPA, if not more. The Adventists, a religious institution that benefits from the ministerial exemption, cannot now argue that the same inquiry, when applied to determine the relationship between an employee's job responsibilities and the organization's mission(s), whether religious or secular, creates more entanglement than one which focuses only on its religious mission.

### III. The district court properly held that the Maryland Supreme Court's interpretation of MFEPA does not violate the Adventists' free exercise rights.

MFEPA does not impermissibly burden the Adventists' free exercise of religion. MFEPA is a neutral law of general applicability and, as such, is subject only to rational basis review. *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990). Even assuming MFEPA triggers strict scrutiny, which it does not, it is narrowly tailored to satisfy Maryland's compelling interest in

eliminating discrimination in employment, including employment by religious entities.

### a. MFEPA is a neutral law.

MFEPA is neutral with respect to religious belief. A law is not neutral if the object of the law is to "infringe upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.,* 508 U.S. 520, 533 (1993). There is no evidence here that the Maryland General Assembly intended to restrict the Adventists'—or any other religious organizations'— religious practices when it enacted the exemption at issue.

To the contrary: when the Maryland General Assembly amended MFEPA in 2001 to add sexual orientation to the religious exemption, the Maryland Commission on Human Relations ("MCHR")[4] testified that the proposed legislation would not "force faith-based organizations to extend jobs to those who do not live in accordance with their religious beliefs"—by, for example, requiring them to not discriminate against gay job applicants. H.B. 307/S.B. 205, 2001 Leg., 415th Sess. (Md. 2001) (testimony of MCHR); *Doe*, 300 A.3d at 134 (citing MCHR testimony). Although the legislative history of the 2001 amendment is

---

[4] MCHR was subsequently renamed the Maryland Commission on Civil Rights.

"sparse," it tends to suggest the amendment's goal was to *protect* the Adventists' and others' religious practices, not restrict them. *Doe*, 300 A.3d at 134.

Moreover, MFEPA's religious exemption is *more* permissive than is Title VII's religious exemption in a crucial respect: under Title VII, religious entities are categorically exempt only "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a) ("Section 702"). That is, Section 702 permits religious entities to prefer their co-religionists, but not to make employment decisions based on any other traits protected by Title VII. *Rayburn*, 772 F.2d at 1116 (holding Section 702 "applies to one particular reason for employment decision—that based upon religious preference"); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (permitting sex discrimination claim to proceed against religious school and holding Section 702 "merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination. Title VII still applies, however, to a religious institution charged with sex discrimination."); *EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982) (holding Section 702 did not preclude sex discrimination claim against religious entity); *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972) (holding "[t]he language and the legislative history of § 702 compel the conclusion that Congress did not intend that a religious organization be exempted from liability for

discriminating against its employees on the basis of race, color, sex or national origin").

Under MFEPA, however, religious entities are expressly permitted to make certain employment decisions *not only* on the basis of religion, *but also* on the basis of sexual orientation, gender identity, and military status. Md. Code, State Gov't § 20-604(2) (exempting religious entities "with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status"). All three of these traits are otherwise protected by MFEPA. Md. Code, State Gov't § 20-606(a) (identifying, among other traits, sexual orientation, gender identity, and military status as prohibited bases for discrimination). Religious employers in Maryland therefore have wider latitude under MFEPA to make certain employment decisions on the basis of statutorily protected traits than they do under Title VII.

### b. MFEPA is generally applicable.

MFEPA, like Title VII, is also generally applicable. A law is not generally applicable if it "'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022). MFEPA does neither of these things.

### i. MFEPA's categorical exemptions treat comparable religious and secular activities the same way.

MFEPA's categorical exemptions do not undermine the law's general applicability because MFEPA still treats comparable secular and religious activities the same way. MFEPA's exemptions for (1) employers with fewer than 15 employees, (2) bona fide private membership clubs under § 501(c) of the Internal Revenue Code, and (3) employers when observing the terms of a bona fide seniority system or employee benefit plan apply equally to both secular and religious entities. Md. Code, State Gov't §§ 20-601(d)(1)(i) (employers with fewer than 15 employees); 20-601(d)(3) (bona fide private membership clubs); 20-605(a)(4) (employers observing terms of bona fide seniority system or employee benefit plan). They therefore treat comparable religious and secular activities the same way.

The Adventists contend these exemptions undermine MFEPA's general applicability because they permit covered employers (which include religious employers) to "make employment decisions . . . that are comparable to the Church's religious hiring practices now prohibited" by MFEPA. ECF 20, at 40. This is a false comparison. Employment decisions made by employers with fewer than 15 employees, bona fide private membership clubs, or employers observing the terms of a bona fide seniority system or employee benefit plan are not

comparable to employment decisions made by Adventists. MFEPA therefore can treat them differently.

Whether religious and secular activities are comparable "must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). For example, MFEPA's exemption for employers with fewer than 15 employees was intended in part to avoid overburdening administrative agencies, which would have experienced a massive workload increase if coverage were expanded to those employers. *Molesworth v. Brandon*, 672 A.2d 608, 614 (Md. 1996) (relying on legislative history of Title VII to interpret MFEPA employer size exemption). As the Adventists point out in their brief, a huge number of Maryland employers fall within MFEPA's small employer exemption. ECF 20, at 41. Assuming religious entities with 15 or more employees, like the Adventists, are fewer in number than employers with fewer than 15 employees, categorically exempting them from coverage would not serve the government interest of avoiding overburdening administrative agencies. MFEPA therefore does not "prohibit religious conduct while permitting secular conduct that undermines the government's asserted interests [in avoiding overburdening administrative agencies] in a similar way." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 534 (2021).

As the district court correctly concluded, the secular activities that are comparable to the Adventists' employment decisions are employment decisions made by secular employers with more than 15 employees that are not bona fide private membership clubs and that do not observe seniority systems or employee benefit plans. JA 630. Indeed, MFEPA treats these employment decisions the same way that it treats employment decisions by analogous religious employers: none of them are exempt. MFEPA's categorical exemptions therefore do not undermine the law's general applicability.

The Adventists rely on a district court case from the Northern District of Texas, *Bear Creek Bible Church v. EEOC*, 571 F.Supp. 3d 571 (N.D. Tex. 2021), for the proposition that Title VII's small employer exemption "rendered the law not-generally-applicable." ECF 20, at 42. *Bear Creek* is "an outlier case." *Kane v. de Blasio*, 623 F. Supp. 3d 339, 357 (S.D.N.Y. 2022). Title VII "has been routinely analyzed and applied by courts for over half a century," and courts do not apply strict scrutiny when analyzing Title VII claims. *Id.* This Court should not entertain the Adventists' notion that the statute's categorical exemptions render it—and would render Title VII—constitutionally suspect.

The Adventists' reliance on *Union Gospel Mission of Yakima, Wash. v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918 (E.D. Wash. Nov. 1, 2024), likewise is misplaced. *Union Gospel Mission* involved the Supreme Court

of Washington's interpretation of the Washington Law Against Discrimination ("WLAD") religious exemption to apply "concerning the claims of a 'minister' as defined by *Our Lady of Guadalupe* and *Hosanna-Tabor*"—that is, coextensively with the ministerial exception. *Woods v. Seattle's Union Gospel Mission*, 481 P.3d 1060, 1069 (Wash. 2021); *Union Gospel Mission*, 2024 WL 4660918, at *1 (characterizing *Woods* as holding that "the religious exemption should parallel the ministerial exception set forth by the United States Supreme Court" in *Our Lady of Guadalupe* and *Hosanna-Tabor*).

The Maryland Supreme Court expressly rejected the plaintiff's argument in *Doe* that MFEPA's religious exemption is coextensive with the ministerial exception. *Doe*, 300 A.3d at 132 ("[W]e do not agree with [Doe] that the exemption is coextensive with the First Amendment's ministerial exception."). MFEPA provides religious entities more latitude than does WLAD because it shields them from claims of sexual orientation, gender identity, and miliary status discrimination brought not just by ministers, but by all employees whose job duties "directly further the [religious entity's] core mission(s)—religious or secular, or both." *Id.* at 136. *Union Gospel Mission* therefore is not applicable here.

### ii. MFEPA does not permit individualized discretion.

MFEPA also does not provide a mechanism for individualized exemptions that would undermine its general applicability. In *Fulton*, the City of

Philadelphia's foster care contract included "a formal system of entirely discretionary exceptions" that rendered it not generally applicable. *Fulton*, 593 U.S. at 535-36. Specifically, the contract prohibited foster care agencies from rejecting prospective foster parents based upon their sexual orientation "unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." *Id.* at 535. This schema permitted the City to grant *ad hoc* exceptions to its non-discrimination requirement based upon an agency's motivation for rejecting prospective foster parents based upon their sexual orientation.

For example, under the City's contract, the Commissioner could grant an exception to an agency that rejected gay prospective foster parents for secular reasons but refuse to grant the same exception to an agency that rejected gay prospective foster parents for religious reasons *because the agency rejected them for religious reasons*. This would result in the City's treating comparable and secular and religious activities differently, in violation of the Free Exercise clause. *Tandon*, 593 U.S. at 62. But MFEPA contains no such exception.

MFEPA's bona fide occupational qualification ("BFOQ") affirmative defense does not constitute the type of discretionary exception that undermined general applicability in *Fulton*. Like Title VII, MFEPA permits employers to make employment decisions based on a statutorily protected trait when the trait is a

25

"bona fide occupational qualification reasonably necessary to the normal operation of" the employer.  Md. Code, State Gov't § 20-605(a)(1) (MFEPA); 42 U.S.C. § 2000e-2(e) (Title VII).  The fact that MFEPA's implementing regulations require employers to engage in reasonableness determinations does not render the BFOQ affirmative defense "discretionary," or even subjective.  Md. Code Regs. 14.03.02.08(A).  MFEPA's BFOQ affirmative defense thus does not "'invite[]' the government to consider the particular reasons for a person's conduct[.]" *Fulton*, 593 U.S. at 533 (citing *Smith*, 494 U.S. at 884).

### c.  MFEPA satisfies rational basis review and would satisfy strict scrutiny, if it applied.

Since MFEPA is a neutral law of general applicability, it is subject only to rational basis review.  *Smith*, 494 U.S. at 879.  The district court correctly concluded that MFEPA is rationally related to Maryland's stated purpose of preventing discrimination in employment.  JA 634.

Even if this Court finds MFEPA is not neutral or is not generally applicable, which it should not, the statute satisfies strict scrutiny review.  Maryland has articulated a compelling interest in eliminating discrimination in employment— including employment by religious entities.  *Rayburn*, 772 F.2d at 1168 (stating, in another case against the Adventists, "it would . . . be difficult to exaggerate the

magnitude of [Maryland's] interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin").

MFEPA is also narrowly tailored to achieve that compelling interest. The Maryland General Assembly adopted the language of the religious exemption only in connection with its addition of sexual orientation and gender identity to MFEPA's list of protected traits in 2001 and 2014, respectively. The Maryland Supreme Court gave the religious exemption its "narrowest reasonable reading" when taking into consideration Americans' changing views toward homosexuality between 1973, when MFEPA was first adopted, and the addition of these protected traits in 2001 and 2014. *Doe*, 300 A.3d at 136. It cannot be tailored more narrowly while still achieving the state's compelling interest in eliminating discrimination in employment. Moreover, MFEPA's religious exemption is actually *more* permissive than Title VII's religious exemption in that it permits religious entities to make non-ministerial employment decisions based on sexual orientation and gender identity *in addition to* religion, which Title VII does not. *Supra* III.a.

MFEPA's categorical exceptions (which apply equally to secular and religious entities) do not render the statute fatally "underinclusive." ECF 20, at 50. As explained *supra* II.b.i, MFEPA's categorical exemptions serve government interests that are different from those served by the religious exemption. The

Adventists' apples-to-oranges comparison between employment decisions made by small secular employers and large religious employers reveals nothing about the relative inclusiveness of MFEPA's religious exemption. Nor does the fact that other states permit the forms of discrimination that Maryland prohibits change the fact that MFEPA's religious exemption is narrowly tailored to *Maryland's* compelling interest in eliminating discrimination in employment, including employment by religious entities.

## CONCLUSION

The Adventists' arguments for expansion of settled constitutional protections grounded in the First Amendment are all unavailing. We respectfully urge the Court to affirm the well-reasoned decision of the district court denying the injunctive relief the Adventists seek.

Respectfully submitted,

/s/ *Jessica Westerman*

Carolyn L. Wheeler
Jessica Westerman
Susanna Barron
Katz Banks Kumin LLP
11 Dupont Circle, N.W.
Suite 600
Washington, D.C. 20036
(202) 299-1140
wheeler@katzbanks.com
westerman@katzbanks.com
barron@katzbanks.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) in that, according to the word-count function of the word-processing system used to generate the brief (Microsoft Word), the brief contains 6,214 words, exclusive of the portions exempted by Rule 32(f).

*/s/ Jessica Westerman*
Jessica Westerman

**CERTIFICATE OF SERVICE**

I certify that on this date, November 12, 2025, the foregoing Amicus Curiae Brief has been served upon counsel of record via the Court's CM/ECF system.

*/s/ Jessica Westerman*
Jessica Westerman