# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, *et al.*,

*Plaintiffs-Appellants*,

v.

CLEVELAND L. HORTON, II, *et al.*,

*Defendants-Appellees.*

On Appeal from the
United States District Court for the District of Maryland
Case No. 8:24-cv-02866, Hon. Theodore D. Chuang

## BRIEF OF RELIGIOUS AND CIVIL-RIGHTS ORGANIZATIONS AS *AMICI CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE

DANIEL MACH
ARIJEET SENSHARMA
American Civil Liberties Union
   Foundation

DEBORAH A. JEON
American Civil Liberties Union
   of Maryland

AMY TAI
JENNY SAMUELS
Americans United for Separation
   of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 988-7682
*tai@au.org*
*samuels@au.org*

*Counsel for* Amici Curiae; full contact information is on signature page.

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1735</u>     Caption: <u>General Conference of Seventh-day Adventists v. Cleveland L. Horton</u>, II

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Americans United for Separation of Church & State; American Civil Liberties Union; American Civil Liberties Union of Maryland;</u>

(name of party/amicus)

<u>Bend the Arc: A Jewish Partnership for Justice; DignityUSA; Hindu American Foundation; Interfaith Alliance; Methodist Federation for Social Action; Sadhana: Coalition of Progressive Hindus; Society for Humanistic Judaism</u>

who is <u>Amici Curiae</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                                  ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                                   ☐ YES ☑ NO
      If yes, identify all such owners:

4.	Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?	☐YES ☑NO
If yes, identify entity and nature of interest:

5.	Is party a trade association? (amici curiae do not complete this question)	☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.	Does this case arise out of a bankruptcy proceeding?	☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.	Is this a criminal case in which there was an organizational victim?	☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Amy Tai	Date: 11/12/25

Counsel for: Amici Curiae

Print to PDF for Filing

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ....................................................................... i

Table of Authorities ...................................................................................... iv

Interests of the *Amici Curiae* .......................................................................1

Introduction................................................................................................2

Argument....................................................................................................4

I.  The MFEPA's religious exemption does not violate the church-autonomy doctrine.......................................................................4

II. The MFEPA does not violate the Free Exercise Clause. ......................... 13

    A.  The MFEPA is neutral. .................................................................. 14

    B.  The MFEPA is generally applicable. .............................................. 17

        1.  The MFEPA does not contain exemptions that favor secular conduct. .......................................................... 18

        2.  The MFEPA does not contain individualized, discretionary exemptions. ......................................... 20

Conclusion ................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alive Church of the Nazarene, Inc. v. Prince William Cnty.*,
    59 F.4th 92 (4th Cir. 2023)........................................................14

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*,
    605 U.S. 238 (2025) ..............................................................15–17

*Bell v. Presbyterian Church (U.S.A.)*,
    126 F.3d 238 (4th Cir. 1997) ...................................................5

*Billard v. Charlotte Cath. High Sch.*,
    101 F.4th 316 (4th Cir. 2024).....................................5, 7–9, 11

*Billard v. Charlotte Cath. High Sch.*,
    No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ..............6

*Bryce v. Episcopal Church*,
    289 F.3d 648 (10th Cir. 2002) ..............................................5, 8

*Butler v. St. Stanislaus Kostka Cath. Acad.*,
    609 F. Supp. 3d 184 (E.D.N.Y. 2022) ......................................8

*Canaan Christian Church v. Montgomery Cnty.*,
    29 F.4th 182 (4th Cir. 2022)..............................................22, 24

*Carson ex rel O.C. v. Makin*,
    596 U.S. 767 (2022) ...............................................................10

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) .............................................. 13, 14, 17, 18

*Corp. of Presiding Bishop v. Amos*,
    483 U.S. 327 (1987). ..............................................................7

*Demkovich v. St. Andrew the Apostle Par.*,
    3 F.4th 968 (7th Cir. 2021).....................................................12

*Doe v. Cath. Relief Servs.*,
    300 A.3d 116 (Md. 2023) ..................................................7, 9, 16

*EEOC v. Roman Cath. Diocese of Raleigh*,
    213 F.3d 795 (4th Cir. 2000) ..........................................5, 6, 9

*El Bey v. Moorish Sci. Temple of Am., Inc.,*
765 A.3d 132 (Md. 2001) ...........................................................9

*Emp. Div. v. Smith,*
494 U.S. 872 (1990) ....................................................3, 13, 21

*Everson v. Mich. Dep't of Corr.,*
391 F.3d 737 (6th Cir. 2004) ..................................................23

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*
*Bd. of Educ.,*
82 F.4th 664 (9th Cir. 2023)................................................23, 24

*Fulton v. Philadelphia,*
593 U.S. 522 (2021), .............................. 17, 20, 22–24

*Garrick v. Moody Bible Inst.,*
95 F.4th 1104 (7th Cir. 2024)............................................5, 10

*Garrick v. Moody Bible Inst.,*
412 F. Supp. 3d 859 (N.D. Ill. 2019) ....................................8

*Hines v. S.C. Dep't of Corr.,*
148 F.3d 353 (4th Cir. 1998) ..................................................14

*Hishon v. King & Spalding,*
467 U.S. 69 (1984) .....................................................................6

*Holt v. Hobbs,*
574 U.S. 352 (2015) ..................................................................8

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
565 U.S. 171 (2012) ...........................................................10, 12

*Kane v. De Blasio,*
19 F.4th 152 (2d Cir. 2021) ....................................................19

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church,*
344 U.S. 94 (1952) .....................................................................4

*Kim v. Bd. of Educ.,*
93 F.4th 733 (4th Cir. 2024)...................................................20

*Larson v. Valente,*
456 U.S. 228 (1982) ..................................................16

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
591 U.S. 657 (2020) ....................................................5

*Mahmoud v. Taylor,*
606 U.S. 522 (2025) ..................................................13

*NLRB v. Cath. Bishop,*
440 U.S. 490 (1979) ..................................................11

*O'Connell v. U.S. Conf. of Cath. Bishops,*
134 F.4th 1243 (D.C. Cir. 2025)..............................10

*Ogle v. Hocker,*
279 F. App'x 391 (6th Cir. 2008)...............................2

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
591 U.S. 732 (2020) ...........................................2, 4, 12

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,*
393 U.S. 440 (1969) ....................................................4

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
772 F.2d 1164 (4th Cir. 1985) .....................3, 5, 9, 24

*Reynolds v. U.S.,*
98 U.S. 145 (1878) ...................................................13

*Seattle Pac. Univ. v. Ferguson,*
104 F.4th 50 (9th Cir. 2024)......................................11

*Serbian E. Orthodox Diocese v. Milivojevich,*
426 U.S. 696 (1976) ...............................................4, 10

*Sherbert v. Verner,*
374 U.S. 398 (1963) ...............................................21, 22

*Smith v. Atlantic City,*
138 F.4th 759 (3d Cir. 2025) ...................................23

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
   496 F. Supp. 3d 1195 (S.D. Ind. 2020)......................................6

*Tandon v. Newsom*,
   593 U.S. 61 (2021) .............................................................17–20

*Tucker v. Faith Bible Chapel Int'l*,
   36 F.4th 1021 (10th Cir. 2022)..............................................11

*UAW v. Johnson Controls, Inc.*,
   499 U.S. 187 (1991) ...................................................21, 22, 24

*Walz v. Tax Comm'n*,
   397 U.S. 664 (1970) ................................................................7

**Statutes, Rules, and Regulations**

42 U.S.C. § 2000e-1(a)...............................................................6

42 U.S.C. § 2000e-2(e)..............................................................22

Md. Code, State Gov't § 20-601(d) .......................................18, 20

Md. Code, State Gov't § 20-604(2) ............................................2

Md. Code, State Gov't § 20-605(a) .......................................18, 21

**Other Authorities**

Andrew Koppelman, *The Increasingly Dangerous Variants of
   the "Most-Favored-Nation" Theory of Religious Liberty*,
   108 Iowa L. Rev. 2237 (2023) ...............................................19

## INTERESTS OF THE *AMICI CURIAE*[1]

*Amici* are religious and civil-rights organizations committed both to ensuring the effective enforcement of our nation's antidiscrimination laws and protecting religious freedom under the First Amendment. *Amici* believe that the Constitution does not require that religious employers' right to select their ministers be extended to exempt religious employers from complying with all workplace laws that protect employees against discrimination based on religion or any other protected category.

The *amici* are:

- Americans United for Separation of Church and State
- American Civil Liberties Union
- American Civil Liberties Union of Maryland
- Bend the Arc: A Jewish Partnership for Justice
- DignityUSA
- Hindu American Foundation
- Interfaith Alliance
- Methodist Federation for Social Action
- Sadhana: Coalition of Progressive Hindus
- Society for Humanistic Judaism

[1] *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

**INTRODUCTION**

In this case, Appellants General Conference of Seventh-day Adventists and Adventist Risk Management argue that they are constitutionally entitled to make employment decisions without regard to the Maryland Fair Employment Practices Act (MFEPA). The MFEPA already gives wide latitude to religious employers like Appellants to discriminate "with respect to the employment of individuals of a particular religion, sexual orientation, [or] gender identity . . . to perform work connected with the activities of the religious entity." Md. Code, State Gov't § 20-604(2). But Appellants seek something much broader. They contend that, under the church-autonomy doctrine[2] and the Free Exercise Clause of the First Amendment, they have a right to discriminate against *all* employees, including "information technology personnel and maintenance workers," so long as the discrimination is justified by religious belief. Appellants' Br. 16.

But the First Amendment does not make such promises. "[R]eligious institutions [do not] enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Although afforded dominion over religious doctrinal disputes, religiously affiliated

---

[2] Courts also refer to the church-autonomy doctrine as the ecclesiastical-abstention doctrine. *See Ogle v. Hocker*, 279 F. App'x 391, 395 (6th Cir. 2008). This brief follows the parties' convention of using the term "church autonomy."

organizations are not, and have never been, above the laws that govern everyone else. *See Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985). Indeed, "[a]ny society adopting such a system would be courting anarchy." *Emp. Div. v. Smith*, 494 U.S. 872, 888 (1990).

Neither the church-autonomy doctrine nor the Free Exercise Clause supports Appellants' bid to opt out of the MFEPA entirely. Church autonomy is a narrow doctrine that prevents courts from intervening in disputes that concern purely ecclesiastical matters, including those concerning a religious entity's choice of ministerial employees. It is not, as Appellants claim, a free pass to discriminate against non-ministerial employees or to violate secular laws whenever there is a religious justification for doing so. Likewise, the Free Exercise Clause does not allow employers to discriminate in violation of a neutral, generally applicable law like the MFEPA. And none of the MFEPA's exemptions cited by Appellants supports their argument that the law should be subject to heightened scrutiny. Accordingly, the district court correctly found that the MFEPA does not violate the First Amendment's Religion Clauses, and this Court should do the same.

# ARGUMENT

## I. The MFEPA's religious exemption does not violate the church-autonomy doctrine.

The church-autonomy doctrine protects religious entities' ability to make religious decisions by forbidding courts from taking sides in "matters of church government" and "those of faith and doctrine." *Our Lady of Guadalupe*, 591 U.S. at 737 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952)). Simply put, civil courts may not "resolv[e] underlying controversies over religious doctrine." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969). "It is obvious, however," that not every dispute touching on a church "jeopardizes values protected by the First Amendment." *Id.* While the church-autonomy doctrine requires deference to religious authorities on "matters of ecclesiastical cognizance and polity," *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 698 (1976), it does not extend to all employment decisions. Rather, the doctrine insulates only "internal management decisions that are essential to the institution's central mission," such as the selection of its ministers. *Our Lady of Guadalupe*, 591 U.S. at 746.

The ministerial exception accordingly "exempt[s] from legal process 'decisions of religious entities about the appointment and removal of

4

ministers and persons in other positions of similar theological significance.'" *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024) (quoting *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 238, 331 (4th Cir. 1997)). Beyond the ministerial exception, the church-autonomy doctrine only bars claims that would require courts to weigh in on "ecclesiastical discussions" about "church doctrine and policy," *Bryce v. Episcopal Church*, 289 F.3d 648, 658 (10th Cir. 2002), or otherwise "subject [the religious entity's] doctrine to judicial second-guessing," *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1113 (7th Cir. 2024).

The Supreme Court and this Court have made clear that the church-autonomy doctrine does *not* insulate employment decisions regarding non-ministerial positions from neutral and generally applicable regulations, regardless of whether or not those decisions are "made for religious reasons." Appellants' Br. 20. "[C]hurches are not—and should not be—above the law," *Rayburn*, 772 F.2d at 1171, and "there is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 706 n.1 (2020) (Kagan, J., concurring). Religious entities, "[l]ike any other person or organization, . . . may be subject to" employment antidiscrimination laws. *Rayburn*, 772 F.2d at 1171; *see also EEOC v. Roman Cath. Diocese of*

*Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) ("Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides.").[3]

Title VII's religious exemption, unlike the MFEPA's religious exemption, does permit religious employers to discriminate against non-ministerial employees on the basis of religion, *see* 42 U.S.C. § 2000e-1(a), but none of the cases cited by Appellants supports the argument that the

---

[3] Appellants' attempt to inject expressive association principles into the church-autonomy doctrine likewise fails. They assert that because church autonomy protects decisions about church membership, it must also protect religious entities' hiring decisions for every position because "employment is inextricable from membership." Appellants' Br. 25. But employment is not the same thing as membership, and the Supreme Court has never found an expressive association right to engage in employment discrimination. To the contrary, it has flatly rejected such a claim. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (finding that expressive association did not immunize a law firm from Title VII's mandate that it not exclude women from partnership). Lower courts have also routinely rejected such claims. *See, e.g.*, *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1209 (S.D. Ind. 2020) ("The freedom of association cases . . . reveal the doctrine's applicability to parade groups, political parties, and other non-employment contexts."); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *23 (W.D.N.C. Sept. 3, 2021) ("[H]iring paid employees is commercial activity, not expressive association. Freedom of association does not apply in the employment context."), *rev'd on other grounds*, 101 F.4th 316 (4th Cir. 2024). Appellants' theory of "associational protections," Appellants' Br. 24–28, extended to the employment context, would upend *Hishon*, 467 U.S. at 78, and expressive association doctrine more broadly, and threatens to clear the path for unchecked discrimination in employment.

church-autonomy doctrine *requires* such a rule. For example, in *Corporation of Presiding Bishop v. Amos*, the Supreme Court held that Title VII's religious exemption could apply to religious employers' secular activities because, in part, "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." 483 U.S. 327, 336 (1987). But the Court did not indicate that Title VII's exemption was constitutionally required—to the contrary, it emphasized that "'[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.'" *Id.* at 334 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 673 (1970)). And, in any event, the MFEPA's religious exemption does not distinguish between a religious employer's religious and secular missions, *see Doe v. Cath. Relief Servs.*, 300 A.3d 116, 135 (Md. 2023), and thus does not impose a "significant burden" on religious organizations of the sort contemplated in *Amos*, 483 U.S. at 336.

As Appellants note, *see* Appellants' Br. 22–23, this Court stated in a recent ministerial-exception case that "Title VII's religious exemptions, though statutory, are also constitutionally inspired," *Billard*, 101 F.4th at 329. But that language plainly does not dictate or even suggest that such exemptions are constitutionally *mandated*. Otherwise, this Court's subsequent statement that "[t]he same is true of [the Religious Freedom

Restoration Act]," *id.* at 329, would make no sense. RFRA is not constitutionally required; it was passed "to provide greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015).

The other cases cited by Appellants similarly fail to establish that the church-autonomy doctrine gives religious employers a right to discriminate in hiring non-ministerial employees. In *Bryce*, for example, the Tenth Circuit dismissed a sexual harassment suit under the church-autonomy doctrine. 289 F.3d at 658 n.2. But that was because the employee's suit argued that the church's internal discussions of its own religious doctrine were *themselves* unlawful harassment, and the court thus could not rule on the harassment claim without wading into internal debates over church doctrine and governance. *Id.* at 658 & n.2; *see also, e.g.*, *Butler v. St. Stanislaus Kostka Cath. Acad.*, 609 F. Supp. 3d 184, 203 (E.D.N.Y. 2022) (holding that church-autonomy doctrine barred claim where "the only way for the jury to find pretext would be to question the Church's explanation of religious doctrine, or to question how much that particular religious doctrine really mattered to the Church"); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871–73 (N.D. Ill. 2019) (dismissing employment discrimination claims that required court to intrude on doctrinal dispute about role of women in ministry).

The MFEPA's religious exemption does not run afoul of church-autonomy principles. For one thing, the MFEPA's exemption is broader than the ministerial exception and thus does not infringe on religious entities' ability to choose ministerial employees. *See Doe*, 300 A.3d at 135. While the ministerial exception applies only to employees whose duties are "central" to their employers' "religious missions," *Billard*, 101 F.4th at 332, the MFEPA's religious exemption applies to employees whose duties "directly further" their employers' missions, regardless of whether those missions are "religious or secular, or both," *Doe*, 300 A.3d at 136, 138. The MFEPA therefore does not infringe on Appellants' broad discretion in hiring employees who perform "spiritual functions" and does not implicate ministerial-exception concerns. *Rayburn*, 772 F.2d at 1171; *Roman Cath. Diocese of Raleigh*, 213 F.3d at 801.

Moreover, determining whether a particular employee is subject to the exemption "should not require analysis of religious doctrine or otherwise result in courts being caught in a 'theological thicket.'" *Doe*, 300 A.3d at 136 (quoting *El Bey v. Moorish Sci. Temple of Am., Inc.*, 765 A.3d 132, 141 (Md. 2001)). In evaluating application of the exemption, courts are directed to ask whether the employee's work "directly" furthers the employer's core mission, which may be religious or secular, or if the employee's duties are "one or more steps removed from taking the actions that effect the goals of

the entity." *Id.* Nothing about this analysis would require "extensive inquiry by civil courts into religious law and polity," *Milivojevich*, 426 U.S. at 709, or otherwise require courts to take sides in "quintessentially religious controversies," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 187 (2012) (quoting *Milivojevich*, 426 U.S. at 720).[4]

Appellants insist that "independently evaluating an employee's role and whether it directly furthers a core religious mission based on a review of all relevant factors" constitutes excessive entanglement. Appellants' Br. 17.[5] But the cases Appellants cite for their entanglement argument involved governmental scrutiny of the substance of a religious school's beliefs rather than a simple objective inquiry as to a religious entity's mission or the nature of a particular job. *See Carson ex rel O.C. v. Makin*, 596 U.S. 767, 775 (2022) (explaining that, in administering "'nonsectarian' requirement

---

[4] If a particular MFEPA suit *did* raise valid church-autonomy concerns, the reviewing court could deal with those issues as they arose by, for example, limiting discovery or dismissing certain claims. *See O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1256 (D.C. Cir. 2025) ("[D]istrict courts have ample tools at their disposal to limit discovery, tailor jury instructions, and dismiss claims as necessary to safeguard against infringements of the church autonomy doctrine.").

[5] Appellants portray entanglement as a standalone legal claim under the Establishment Clause. *See* Appellants' Br. 32. But entanglement is more properly understood in this context as a church-autonomy issue. *See, e.g.*, *Garrick*, 95 F.4th at 1112 (explaining that church-autonomy defense applies when resolution of claim would "require judicial entanglement in doctrinal matters").

for participation in Maine's tuition assistance program," state agency analyzed "what the school teaches through its curriculum and related activities, and how the material is presented" (citation omitted)); *NLRB v. Cath. Bishop*, 440 U.S. 490, 501–03 (1979) (holding that NLRB did not have jurisdiction over teachers in religious schools because the collective bargaining process "necessarily represents an encroachment upon the . . . position of management" and presents a "significant risk" of "governmental entanglement" with church-operated schools' religious decisions about curriculum and classroom instruction).

Moreover, determining the mission of a religious employer and examining how an employee's duties relate to that mission is something courts routinely do in the ministerial exception context. *See, e.g.*, *Billard*, 101 F.4th at 332 (explaining that application of the ministerial exception depends on whether employees "perform tasks" that are "central to their [employers'] religious missions"). And courts have roundly rejected the argument that evaluating a religious entity's eligibility for the ministerial-exception defense amounts to excessive entanglement. *See, e.g.*, *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 58 (9th Cir. 2024) ("[It cannot] be that *any* investigation into a religious organization's employment practices creates a First Amendment injury."); *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1045 (10th Cir. 2022) ("Requiring [a religious entity] to litigate to

resolution . . . the genuinely disputed predicate factual issue of whether or not [an employee] is a minister does not amount to an excessive entanglement of courts with religion." (emphasis omitted)); *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 983 (7th Cir. 2021) (en banc) ("The ministerial exception's status as an affirmative defense makes some threshold inquiry necessary."). Likewise, the straightforward factual determination required under the MFEPA does not create any First Amendment violation.

Overall, Appellants' proposed expansion of the church-autonomy doctrine would render the ministerial exception—which has been consistently reaffirmed by the Supreme Court, *see Our Lady of Guadalupe*, 591 U.S. at 746–47—entirely superfluous. If the church-autonomy doctrine allowed religious employers to disregard employment-nondiscrimination laws simply by citing a religious justification for their unlawful actions, regardless of whether the employees affected by the law carry out ministerial duties, there would be no need to have a ministerial exception at all. The Supreme Court has had ample opportunity to adopt the reasoning Appellants propose here but has consistently declined to do so. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 180, 190 (proceeding to apply fact-intensive ministerial-exception analysis even after employer argued that employee was "fired for a religious reason"). This Court should do the same

and reject Appellant's invitation to expand the church-autonomy doctrine well beyond what the First Amendment requires.

## II.  The MFEPA does not violate the Free Exercise Clause.

In a nation defined by religious pluralism, it is inevitable that government policies will at times conflict with some people's religious beliefs. But while religion may not be specially disfavored, religion-based disagreement with the law does not excuse noncompliance. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–33 (1993). "To make an individual's obligation to obey [the] law contingent upon the law's coincidence with his religious beliefs . . . —permitting him, by virtue of his beliefs, 'to become a law unto himself[]'—contradicts both constitutional tradition and common sense." *Smith*, 494 U.S. at 885 (quoting *Reynolds v. U.S.*, 98 U.S. 145, 167 (1878)). The Supreme Court has therefore held that laws that apply generally and are neutral with respect to religion do not trigger heightened scrutiny, even if they "ha[ve] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531; *accord Mahmoud v. Taylor*, 606 U.S. 522, 532 (2025) ("Under our precedents, the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable."). Here, the district court properly dismissed Appellants' free exercise claim because the MFEPA passes constitutional

muster: It is neutral, generally applicable, and rationally related to the state's goal of preventing discrimination in employment. *See* JA634.

## A. The MFEPA is neutral.

Neutrality means that a law must not "restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533; *accord Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998) ("A law is considered neutral if it proscribes conduct without regard to whether that conduct is religiously motivated or not."). To trigger strict scrutiny for lack of neutrality, the claimant must show that the government has targeted specific religious conduct or beliefs for maltreatment. *See Lukumi*, 508 U.S. at 533. Discriminatory intent may be apparent on the face of a law, or it may be revealed through the law's practical effects—for example, when legal requirements have been "gerrymandered with care to proscribe" religious conduct. *Id.* at 542; *Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92, 109 (4th Cir. 2023) (holding that a law is neutral if "it treats all similarly situated entities alike [and] it does not single religious institutions out for differential treatment"). But an "adverse impact" on religious practice is not enough to undermine neutrality. *Lukumi*, 508 U.S. at 535.

The MFEPA is neutral. There is no evidence in the record showing that the MFEPA religiously discriminates on its face or that it was enacted to

target religious practices. *See* JA626. Appellants do not even attempt to argue otherwise. *See* Appellants' Br. 47–48. Other than conclusory assertions that the statute is not neutral, Appellants do not argue that the MFEPA is facially discriminatory or that it has a practical effect of a religious gerrymander.

Instead, Appellants attempt to shoehorn their Establishment Clause denominational discrimination claim—a separate claim that the district court dismissed and is not on appeal—into their free exercise argument. Relying on *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), Appellants argue that the test for whether the MFEPA's religious exemption applies "favor[s] certain religious groups over others in the same way that the Wisconsin Supreme Court's unconstitutional religious-exemption test did in *Catholic Charities*." Appellants' Br. 48 (emphasis omitted).

Appellants' argument is unavailing. As an initial matter, *Catholic Charities* was based on the Establishment Clause. *See* 605 U.S. at 247. But even if *Catholic Charities* were relevant here, the MFEPA would still not trigger heightened scrutiny. In *Catholic Charities*, the Supreme Court held that Wisconsin's unemployment insurance regime violated the Establishment Clause because it "grant[ed] a denominational preference by explicitly differentiating between religions based on theological practices."

15

*Id.* at 250. To determine whether a religious entity was exempt from paying unemployment taxes, Wisconsin required that the entity be "operated primarily for religious purposes," *id.* at 242, which "ultimately turn[ed] on inherently religious choices (namely, whether to proselytize or serve only co-religionists), not 'secular criteria' that 'happen to have a disparate impact upon different religious organizations,'" *id.* at 250 (quoting *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982)).

In contrast, the MFEPA's religious exemption does not turn on whether an entity is "operated primarily for religious purposes." *Id.* In fact, the exemption does not even attempt to differentiate between a religious entity's religious and secular activities. If an employee's duties "directly further the core mission(s)—*religious or secular, or both*—of the religious entity," then the exemption applies. *Doe*, 300 A.3d at 136 (emphasis added). Moreover, the considerations relevant to the MFEPA analysis—the "services the entity provides," "the people the entity seeks to benefit," and "how the entity's funds are allocated"—help determine the "core mission of a religious entity," *id.* at 137, but unlike the denominational preferences in *Catholic Charities*, they do not mandate a specific type of services to be provided and they do not require that services be provided to only one specific population, *see Cath. Charities*, 605 U.S. at 250. To the extent such considerations "happen to have a disparate impact upon different religious

organizations," they are "secular criteria" that do not raise constitutional concerns. *Id.* at 250 (citation modified).

### B. The MFEPA is generally applicable.

General applicability is "[t]he principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. A law may not be generally applicable if it gives the government impermissible discretion to grant individualized exemptions, *Fulton v. Philadelphia*, 593 U.S. 522, 533 (2021), or if the law contains exemptions that treat "comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

Appellants argue that the MFEPA is not generally applicable because: (1) the statute contains four exemptions that purportedly favor secular activities over religious ones; and (2) the statute purportedly invites individualized discretion based on its "bona fide occupational qualifications" (BFOQ) exception. Appellants' Br. 40–47. They are wrong. As the district court correctly held, each of the four exemptions identified by Appellants either applies equally to both religious and secular employers or favors religious employers over secular ones, and the MFEPA does not have "a system of individual exemptions." JA627, 631–33.

## 1. The MFEPA does not contain exemptions that favor secular conduct.

The MFEPA does not contain exemptions that "treat any comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. Appellants point out, *see* Appellants' Br. 40, that the statute exempts the following employers from the anti-discrimination requirement: (1) employers with fewer than fifteen employees; (2) "bona fide private membership clubs" that meet certain criteria under the federal tax code; (3) employers that "observ[e] the terms of a bona fide seniority system or any bona fide employee benefit plan; and (4) religious educational institutions that meet certain criteria and are thus permitted to hire employees of a particular religion, Md. Code, State Gov't §§ 20-601(d), 20-605(a)(3)–(4).

Appellants argue that these exemptions undermine the MFEPA's general applicability because they "allow other organizations to make employment decisions under MFEPA that are comparable to the Church's religious hiring practices."[6] Appellants' Br. 40. But the mere existence of some exemptions does not and cannot trigger strict scrutiny. "All laws are selective to some extent." *Lukumi*, 508 U.S. at 542. "The fact that a state

---

[6] Appellants argue that the law is not generally applicable because it purportedly permits secular mission-driven organizations to hire employees who align with their missions while "religious organizations risk liability if they require religious alignment from their employees." Appellants' Br. 43. This argument fails because there is no such exemption in the MFEPA.

interest is not pursued to the limits of the possible" cannot be taken as evidence that the government is undermining its interests with respect to what the law leaves out. Andrew Koppelman, *The Increasingly Dangerous Variants of the "Most-Favored-Nation" Theory of Religious Liberty*, 108 Iowa L. Rev. 2237, 2248 (2023). Indeed, "a law [need not] apply to all people, everywhere, at all times, to be 'generally applicable.'" *Kane v. De Blasio*, 19 F.4th 152, 166 (2d Cir. 2021). If that were the case, any law that had any exemption would not be generally applicable.

But the relevant question under *Tandon* is not merely whether a statute has *any* exemptions. Instead, the question is whether the law contains exemptions that treat "comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* The Covid-related public-health law at issue in *Tandon*, for example, was not generally applicable because it severely restricted in-home religious gatherings while exempting nonreligious gatherings that posed greater or equal risks of transmission of Covid. *See id.* at 63.

Here, none of the exemptions highlighted by Appellants disfavors religious exercise. *See id.* at 62. The first three exceptions apply to both religious and secular employers alike and thus plainly do not disfavor

religious exercise. *See Kim v. Bd. of Educ.*, 93 F.4th 733, 748 (4th Cir. 2024) (holding that law that "makes no distinction between religious and secular" and that treats "religious and nonreligious [groups] alike" is generally applicable). A religious employer with fewer than fifteen employees is exempt from the anti-discrimination requirement just as a secular employer of the same size is exempt. *See* Md. Code, State Gov't § 20-601(d)(1)(i). Similarly, a religious employer that is a bona fide private membership club, as defined under the law, is exempt, just as a secular employer that meets the same criteria is. *See id.* § 20-601(d)(3). The statute's exemption for employers that "observ[e] the terms of a bona fide seniority system or bona fide employee benefit plan" is no different—both religious and secular employers are exempt. *See id.* § 20-605(a)(4). Finally, the fourth exemption, which pertains only to religious educational institutions, favors religious employers over secular employers, not the other way around as prohibited under *Tandon*. Because this exception treats religious employers *more* favorably than secular ones, this exception also does not trigger strict scrutiny. *Cf. Tandon*, 593 U.S. at 62.

### 2. The MFEPA does not contain individualized, discretionary exemptions.

The MFEPA does not contain any individualized, discretionary exemptions. *See Fulton*, 593 U.S. at 533. An individualized exemption is one

that gives the government "sole discretion" to decide whether to grant an exception on an individual basis based on "the particular reasons" for the conduct. *Id.* at 533, 535. In *Sherbert v. Verner*, for example, the unemployment benefits statute disqualified claimants who "failed, without good cause . . . to accept available suitable work." 374 U.S. 398, 401 (1963). Without any factors for determining whether a reason was "good cause," the statute invited the government to make a value judgment about whether a claimant's reason was worthy—specifically, whether the claimant's observance of the Sabbath on Saturdays, in accordance with her faith, was "good cause." *Id.* at 399, 401; *see also Smith*, 494 U.S. at 884.

Appellants assert that the MFEPA's BFOQ defense—which permits discrimination on an otherwise prohibited ground in furtherance of "a bona fide occupational qualification reasonably necessary to the normal operation of that business or enterprise," Md. Code, State Gov't § 20-605(a)(1)—is an individualized exemption because the terms "reasonably necessary" and "normal operation" are "inherently discretionary," Appellants' Br. 45. But the Supreme Court came to the opposite conclusion in *UAW v. Johnson Controls, Inc.*, a Title VII case, when it held that the BFOQ criteria "favor[] an objective, verifiable requirement."[7] 499 U.S. 187,

---

[7] Title VII contains a very similar BFOQ defense. It permits an employer to discriminate "in those certain instances where [an otherwise protected

21

201 (1991). Specifically, terms such as "reasonably necessary," "normal operation," and "occupational," prevent "the use of general subjective standards." *Id.* The BFOQ defense therefore does not give the government leeway to make a value judgment about the worthiness of any particular religious conduct, and bears no resemblance to the "entirely discretionary" exemptions at issue in *Fulton*, 593 U.S. at 536, or the "good cause" exemption at issue in *Sherbert*, 374 U.S. at 401.

Of course, concepts like "necessity" and "reasonableness" could create "discretionary standards" when, as a whole, the statute in question provides "unconstrained discretion to make essentially ad-hoc decisions about what circumstances warrant an exception." *Canaan Christian Church v. Montgomery County*, 29 F.4th 182, 203 (4th Cir. 2022) (Richardson, J., concurring). But those terms do not trigger strict scrutiny when the statute, as the MFEPA's BFOQ defense does, provides for an "objective, verifiable requirement." *UAW*, 499 U.S. at 201.

The out-of-circuit cases that Appellants cite, Appellants' Br. 45–46, do not support their argument that the BFOQ defense is an individualized, discretionary exemption that would trigger strict scrutiny under the Free

---

characteristic] is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e).

Exercise Clause. In *Everson v. Michigan Department of Corrections*, for example, the Sixth Circuit referred to the BFOQ analysis as "case-by-case," but it also noted that the BFOQ defense requires "basis in fact" that the discrimination is "'reasonably necessary'—not merely reasonable or convenient—to the normal operation of its business." 391 F.3d 737, 748, 760 (6th Cir. 2004) (citation omitted). The MFEPA's BFOQ defense is also nothing like the city fire department grooming policy that the Third Circuit found had "built-in discretion" because captains had authority to "deviate" from the policy and "permit any sort of conduct as long as they 'bear . . . full responsibility for the results of any deviation.'" *Smith v. Atlantic City*, 138 F.4th 759, 771 (3d Cir. 2025) (citation omitted). The BFOQ defense contains no such discretion—it only applies where employers can satisfy objective criteria.

*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*, 82 F.4th 664 (9th Cir. 2023), also does not help Appellants. There, the Ninth Circuit stated that *Fulton* should not be interpreted as only concerning "unfettered" discretion. *Id.* at 687. But, in that case, the school district admitted that it had "significant discretion" in determining when to apply an exception to the district's non-discrimination policies. *Id.* Unlike the BFOQ defense, the policy in *Fellowship of Christian Athletes* gave the school district authority "'to decide which reasons for not

complying with the policy are worthy of solicitude' on an ad hoc basis." *Id.* (quoting *Fulton*, 593 U.S. at 537). No such authority exists with respect to the BFOQ defense. *See UAW*, 499 U.S. at 201. Accordingly, there is no individualized, discretionary exception that undermines the MFEPA's general applicability.

*     *     *

Because the MFEPA is neutral and generally applicable, the district court properly applied rational basis review. *See Canaan Christian Church*, 29 F.4th at 199. And because the MFEPA is rationally related to the state's interest in preventing employment discrimination, the MFEPA does not violate the Free Exercise Clause. JA634; *see also Rayburn*, 772 F.2d at 1168 ("It would, of course, be difficult to exaggerate the magnitude of the state's interest in assuring equal employment opportunities for all.").[8]

## CONCLUSION

The judgment of the district court should be affirmed.

---

[8] Even if this Court were to find that strict scrutiny is proper here, the MFEPA would satisfy such scrutiny for the reasons provided by Appellees. Appellees' Br. 50–51.

Respectfully submitted,

 /s/ *Amy Tai*

DANIEL MACH
American Civil Liberties Union
  Foundation
915 15th Street NW
Washington, DC 20005
(202) 675-2330
*dmach@aclu.org*

ARIJEET SENSHARMA
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
*cl_asensharma@aclu.org*

DEBORAH A. JEON
American Civil Liberties Union of
  Maryland
3600 Clipper Mill Road, Suite 200
Baltimore, MD 21211
(410) 889-8550 x120
*jeon@aclu-md.org*

AMY TAI
JENNY SAMUELS
Americans United for Separation
  of Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(202) 988-7682
*tai@au.org*
*samuels@au.org*

*Counsel for* Amici Curiae

November 12, 2025

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rules 32(a)(7)(B) and 29(a)(5) because it contains 5,312 words including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.


/s/ *Amy Tai*