No. 25-1735

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

General Conference of Seventh-Day Adventists, an unincorporated association; and Adventist Risk Management, Inc.,

*Plaintiffs-Appellants,*

*v.*

Cleveland L. Horton, II; Glendora C. Hughes; Stephanie Suerth; Janssen E. Evelyn; Eileen M. Levitt; Angela Scott; Magdalena S. Navarro; Jeff Rosen; Gina McKnight-Smith; Noah Thomas Metheny; and Anthony G. Brown,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, CASE NO. 8:24-CV-02866

**BRIEF FOR *AMICI CURIAE* MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAI'I, ILLINOIS, MAINE, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
David C. Kravitz*
  *State Solicitor*
Adam M. Cambier
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
david.kravitz@mass.gov
(617) 963-2427
  *\*Counsel of Record*
*Additional counsel listed on signature page*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTERESTS OF AMICI ...........................................................................1

ARGUMENT ............................................................................................3

I.  In the context of employment, the church autonomy doctrine is coextensive with the ministerial exception. .........................................4

II.  The First Amendment right to expressive association does not justify the blanket exemption that Plaintiffs seek. ..............................11

A.  The right to expressive association applies to group membership, not employment..................................................11

B.  States have a compelling interest in enforcing employment discrimination laws because of the enormous harm that such discrimination causes. ....................16

CONCLUSION ......................................................................................20

CERTIFICATE OF COMPLIANCE ......................................................22

# TABLE OF AUTHORITIES

**Cases**

*Billard v. Charlotte Catholic H.S.*, 101 F.4th 316 (4th Cir. 2024) ........................ 4-5

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) .................................. 11, 14-15

*Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002) ........................................................................8

*Butler v. St. Stanislaus Kostka Catholic Academy*, 609 F. Supp. 3d 184 (E.D.N.Y. 2022) ................................................................. 9-10

*Catholic Charities Bureau, Inc. v. Wisc. Labor & Indus. Rev. Comm'n*, 605 U.S. 238 (2025)................................................... 6-7

*Christian Legal Soc. v. Martinez*, 561 U.S. 661 (2010) .........................................11

*CompassCare v. Hochul*, 125 F.4th 49 (2d Cir. 2025) .................................... 11-12

*DeWeese-Boyd v. Gordon College*, 163 N.E.3d 1000 (Mass. 2021), *cert. denied*, 142 S.Ct. 952 (2022)....................................................................5

*EEOC v. Mississippi Coll.*, 626 F.2d 477 (5th Cir. 1980) .......................................17

*EEOC v. Pacific Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir. 1982), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991) ............................................................................ 16-17

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), *aff'd*, *Bostock v. Clayton County*, 590 U.S. 644 (2020)............................................................................16

*EEOC v. Roman Cath. Diocese of Raleigh,* 213 F.3d 795 (4th Cir. 2000) ....................................................................10, 16

*Gordon College v. DeWeese-Boyd*, 142 S. Ct. 952 (2022)........................................6

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ....................................11

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)................................................................ 6-8

*Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952) .............................6

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ....................17

*McRaney v. N. Am. Mission Bd. of the Southern Baptist
Convention, Inc.*, __ F.4th __, 2025 WL 3012553
(5th Cir. Oct. 28, 2025)................................................................10

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ........................................14

*N.Y. State Club Ass'n, Inc. v. City of New York*, 505 N.E.2d 915
(N.Y. 1987), *aff'd*, 487 U.S. 1 (1988) ...........................................19

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 723 (2020)................................................................ 4-7

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164
(4th Cir. 1985) ............................................................................16

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ................................13, 19

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547
U.S. 47 (2006)................................................................ 14-15

*Schmidt v. Univ. of Northwestern-St. Paul*, No. 23-2199, 2024 WL
477166 (D. Minn. Feb. 7, 2024) .....................................................5

*Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) ............6

*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) ...................................12

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195 (S.D. Ind. 2020), *app. dism'd*, No. 20-3265, 2021 WL 9181051 (7th Cir. Jul. 22, 2021) .......................................7

*United States v. Burke*, 504 U.S. 229 (1992) ...........................................17

**Other Authorities**

Samuel R. Bagenstos, *Employment Law and Social Equality*, 112 Mich. L. Rev. 225 (2013) ...............................................................13

Jenny Bourne, *"A Stone of Hope": The Civil Rights Act of 1964 and Its Impact on the Economic Status of Black Americans*, 74 La. L. Rev. 1195 (2014)........................................................................ 1-2

EEOC, *American Experiences versus American Expectations* (2015), https://www.eeoc.gov/special-report/american-experiences-versus-american-expectations ....................................2

David Freeman Engstrom, *The Lost Origins of American Fair Employment Law: Regulatory Choice and the Making of Modern Civil Rights, 1943-1972*, 63 Stan. L. Rev. 1071 (2011).........................................................1

Desta Fekedulegn *et al.*, *Prevalence of workplace discrimination and mistreatment in a national sample of older U.S. workers: The REGARDS cohort study*, 8 SSM – Population Health 1 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6612926/pdf/main.pdf ........................................................................18

H. Rep. 102-40, 1991 U.S.C.C.A.N. 549 (Apr. 24, 1991)................................ 17-18

Institute for Women's Policy Research, *The 2023 Weekly Gender Wage Gap by Race, Ethnicity, and Occupation* (Mar. 2024), https://iwpr.org/wp-content/uploads/2024/03/Occupational-Wage-Gap-2024-Fact-Sheet-1.pdf ...............................................19

Amy Elisa Jackson, *New Study: 3 in 5 U.S. Employees Have Witnessed or Experienced Discrimination*, Glassdoor (Oct. 23, 2019), https://www.glassdoor.com/blog/new-study-discrimination/ ...................................................................18

Justia, "Employment Discrimination Laws: 50-State Survey" (Sept. 2022), https://www.justia.com/employment/employment-laws-50-state-surveys/employment-discrimination-laws-50-state-survey ......................................................................1

Michael Stokes Paulsen, *A Funny Thing Happened on the Way to the Limited Public Forum: Unconstitutional Conditions on "Equal Access" for Religious Speakers and Groups*, 29 U.C. Davis L. Rev. 653 (1996) ...........................................13

Brad Sears *et al.*, *LGBTQ People's Experiences of Workplace Discrimination and Harassment*, Williams Institute (Aug. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Aug-2024.pdf........................19

Elizabeth Sepper, *et al.*, *Expressive Association at Work*, 126 Mich. L. Rev. __ (forthcoming 2026), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5176842 .............. 12-13

U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2023*, at 1 (Aug. 2024), https://www.bls.gov/opub/reports/womens-earnings/2023/home.htm ...........................................19

Valerie Wilson & William Darity Jr., *Understanding Black-White Disparities in Labor Market Outcomes Requires Models That Account for Persistent Discrimination and Unequal Bargaining Power*, Econ. Pol'y Inst. (Mar. 25, 2022), https://files.epi.org/uploads/215219.pdf.......................................18

## INTERESTS OF AMICI

The *Amici* States—Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin—share sovereign and compelling interests in protecting workers within our jurisdictions from discrimination in employment. States have long been at the forefront of fighting employment discrimination. "[B]y the time Congress passed Title VII to the Civil Rights Act of 1964, nearly two dozen states had already enacted laws mandating equal treatment in employment and engaged in nearly two decades' worth of enforcement efforts." David Freeman Engstrom, *The Lost Origins of American Fair Employment Law: Regulatory Choice and the Making of Modern Civil Rights, 1943-1972*, 63 Stan. L. Rev. 1071, 1073 (2011). Today, nearly every State has some form of employment discrimination law in place.[1]

These efforts to level the playing field in the labor market have borne fruit. According to one researcher, "real wages among employed, black, male household heads aged 20 to 60 years old increased sharply during the 1960s across all ages

---

[1] *See* Justia, "Employment Discrimination Laws: 50-State Survey" (Sept. 2022), https://www.justia.com/employment/employment-laws-50-state-surveys/employment-discrimination-laws-50-state-survey/. All URLs cited in this brief were last visited on November 11, 2025.

and educational levels."  Jenny Bourne, *"A Stone of Hope": The Civil Rights Act of 1964 and Its Impact on the Economic Status of Black Americans*, 74 La. L. Rev. 1195, 1195-96 (2014).  Those gains have continued in more recent years among a wide variety of groups protected by employment discrimination laws.  *See, e.g.*, EEOC, *American Experiences versus American Expectations* (2015) (collecting data from 1965 through 2015 showing that African Americans, Hispanics, Asian Americans, American Indians/Alaskan Natives, and women gained in most, but not all, of nine different job categories), https://www.eeoc.gov/special-report/american-experiences-versus-american-expectations.

We also share interests in upholding the rights protected by the First Amendment.  We respect and do not seek to abridge the right of religious organizations to hold and express their views, and to operate free of interference from secular authorities within the existing confines of the church autonomy doctrine.  But Plaintiffs' theories of church autonomy and expressive association go well beyond existing precedent and threaten our ability to combat employment discrimination.  We urge this Court to reject them.[2]

---

[2] While this brief focuses on church autonomy and expressive association, we join Defendants in urging this Court to reject Plaintiffs' other arguments as well.

## **ARGUMENT**

Plaintiffs' case is founded upon the erroneous claim that the First Amendment guarantees them the across-the-board right to treat "the failure to practice the fundamental teachings and standards of the Church as potential grounds for termination of employment"—regardless of any particular employee's job responsibilities.  Pl. Br. 8 (alteration and internal quotation marks omitted). Thus, Plaintiffs asked the district court to issue an order holding that, under the First Amendment, they may require *all* employees to "share and agree to uphold Plaintiffs' sincere religious beliefs in both word and deed," and that they may "[e]nforc[e] Plaintiffs' terms of employment against *all* current and future employees, including requiring … that employees refrain from conduct inconsistent with the Church's religious beliefs."  JA 511-12 (emphasis added). Plaintiffs expressly claim this right with respect to employees "whose roles may not typically be deemed religious (such as information technology personnel and maintenance workers)."  Pl. Br. 15-16.

The district court correctly rejected this exceptionally broad request.  Neither the Supreme Court nor this Court has ever recognized a First Amendment right to discriminate in employment to the extent Plaintiffs claim.  To the contrary, the doctrines upon which Plaintiffs rely are limited, shielding some—but not all— employment decisions by religious employers from scrutiny by secular authorities.

To allow religious employers to ignore employment discrimination laws to the extent Plaintiffs claim would strip many thousands of workers of the most basic job protections.  The First Amendment does not require such a drastic result.

## I.    In the context of employment, the church autonomy doctrine is coextensive with the ministerial exception.

As Plaintiffs appear to recognize, the ministerial exception does not justify the result they seek because that exception requires inquiry into the particular employee's responsibilities.  It thus does not support a blanket exemption of religious employers from employment discrimination laws.  This conclusion flows from the fact that the ministerial exception exists to shield a religious institution's ability to select individuals to fill "certain key roles" from potential nondiscrimination liability.  *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 723, 746 (2020); *see also id.* (ministerial exception applies to "certain important positions").  Determining whether a religious institution may invoke the exception is a highly context-dependent inquiry that, "at bottom," hinges on "what an employee does."  *Id.* at 753.

Accordingly, the Supreme Court has expressly rejected the proposition that "religious institutions enjoy a general immunity from secular laws."  *Id.* at 746.  To the contrary, the touchstone of the ministerial exception analysis is "whether *each particular position* implicate[s] the fundamental purpose of the ministerial exception."  *Id.* at 758 (emphasis added).  And as this Court recently observed,

4

"[t]he ministerial exception remains just that—an exception—and each case must be judged on its own facts to determine whether a 'particular position' falls within the exception's scope." *Billard v. Charlotte Catholic H.S.*, 101 F.4th 316, 333 (4th Cir. 2024) (quoting *Our Lady*, 591 U.S. at 758); *see also DeWeese-Boyd v. Gordon College*, 163 N.E.3d 1000, 1017 (Mass. 2021) (rejecting religious college's effort to exempt "all its employees" from state antidiscrimination law as a "significant expansion of the ministerial exception well beyond" existing doctrine), *cert. denied*, 142 S.Ct. 952 (2022); *cf. Schmidt v. Univ. of Northwestern-St. Paul*, No. 23-2199, 2024 WL 477166, at *4-5 (D. Minn. Feb. 7, 2024) (denying motion to dismiss based on ministerial exception where defendant college pointed to doctrinal affirmation required of all applicants, students, and employees, pending further factual development about plaintiff's specific role).[3]

Plaintiffs erroneously argue that those limitations do not matter because the "church autonomy doctrine" goes much further, shielding *all* of their employment decisions from state and federal employment discrimination laws. Pl. Br. 20 ("[C]hurch autonomy does not end with this absolute freedom in 'the selection of the individuals who play certain key roles.'" (quoting *Our Lady*, 591 U.S. at 746)).

---

[3] Only two Justices have adopted the broader view that "civil courts" must unquestioningly defer to a religious organization's "good faith" view of who constitutes a minister. *See Our Lady*, 591 U.S. at 763 (Thomas, J., concurring).

That is incorrect.  As the Supreme Court has explained, the ministerial exception is one "component" of a broader doctrine relating to religious institutions' "autonomy."  *Our Lady*, 591 U.S. at 746.  Other such components include the control of church property, *see Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952), and internal matters of church discipline and governance, *see Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976).

In the employer-employee context, however, the Supreme Court has never extended religious institutions' "autonomy" beyond the ministerial exception.  To the contrary, Justice Alito has explained that "[r]eligious autonomy *means* that religious authorities must be free to determine who is qualified to serve in positions of *substantial* religious importance."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (concurring opinion) (emphasis added); *see also Gordon College v. DeWeese-Boyd*, 142 S. Ct. 952, 954 (2022) (statement of Alito, J. respecting denial of certiorari) ("In *Our Lady of Guadalupe School*, we explained that the 'ministerial exception' protects the 'autonomy' of 'churches and other religious institutions' in the selection of the employees who 'play *certain key roles*.'" (quoting *Our Lady*, 591 U.S. at 746) (emphasis added)); *cf. Hosanna-Tabor*, 565 U.S. at 204 (Alito, J., concurring) (noting that "a purely secular teacher would not qualify for the 'ministerial' exception" at a religious school).  Similarly, Justice Thomas recently explained that "the church autonomy

doctrine" provides, *inter alia*, that "'courts are bound to stay out of employment disputes involving those holding *certain important positions* with churches and other religious institutions.'" *Catholic Charities Bureau, Inc. v. Wisc. Labor & Indus. Rev. Comm'n*, 605 U.S. 238, 256 (2025) (Thomas, J., concurring) (quoting *Our Lady*, 591 U.S. at 746) (emphasis added).

Plaintiffs' contrary claim that even with respect to employment, the ministerial exception is only a "component" of the church autonomy doctrine, Pl. Br. 21, "would render the ministerial exception superfluous." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1206 (S.D. Ind. 2020) (rejecting position "that the overarching principle of religious autonomy bars employment discrimination claims arising from a religious employer's application of religious doctrine regardless of whether the employee qualifies as a minister"), *app. dism'd*, No. 20-3265, 2021 WL 9181051 (7th Cir. Jul. 22, 2021). Indeed, "[i]f … religious autonomy protects employment decisions regardless of whether the position was religious or secular, it is not clear why the Supreme Court reaffirmed the ministerial exception's narrow application to only those employees who have responsibilities 'that lie at the very core of the mission of a [religious employer].'" *Id.* at 1207 (quoting *Our Lady*, 591 U.S. at 754). In *Hosanna-Tabor*, for example, a teacher at a religious school had been discharged because "her threat to sue the Church violated the Synod's belief that Christians should resolve their disputes

7

internally." 565 U.S. at 180. That conduct fits squarely within Plaintiffs' claimed authority to fire (or refuse to hire) anyone—ministerial or not—who does not abide by the organization's beliefs. Pl. Br. 21-22; JA 511-12. Yet, rather than simply upholding the teacher's discharge based on "autonomy," *Hosanna-Tabor* carefully examined "all the circumstances of [the teacher's] employment," 565 U.S. at 190-94, ultimately concluding that she "was a minister within the meaning of the exception," *id.* at 194.

Plaintiffs' reliance on *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), *see* Pl. Br. 23, is misplaced. There, an employee and a non-employee claimed sexual harassment by the church, so the case focused not on the church's prerogatives as an employer, but rather on "the First Amendment rights of the church to discuss church doctrine and policy freely." 289 F.3d at 658.[4] *Bryce*'s holding that a church may not be held liable for sexual harassment based on statements—i.e., speech—made in the course of "an internal ecclesiastical dispute and dialogue" on homosexuality, *id.* at 659, has little relevance to the question whether these Plaintiffs may shield themselves from

---

[4] Moreover, *Bryce* predates *Hosanna-Tabor*, and therefore the *Bryce* court did not have the benefit of the Supreme Court's adoption of the ministerial exception (and in *Bryce*, the plaintiff-employee—the church's "Youth Minister"—seems clearly to fall within that exception, *see* 289 F.3d at 651, such that any holding with respect to her sheds no light on whether church autonomy extends beyond that exception in the context of employment).

potential liability for firing or refusing to hire non-ministerial employees for a discriminatory reason.

Equally unavailing is Plaintiffs' invocation of several out-of-circuit trial court cases, Pl. Br. 23-24, none of which stands for the proposition that the church autonomy doctrine shields all religiously-based employment decisions from employment discrimination laws. In particular, *Butler v. St. Stanislaus Kostka Catholic Academy*, 609 F. Supp. 3d 184 (E.D.N.Y. 2022), is off-point twice over. First, that case principally rests on the conclusion that the plaintiff, a teacher at a Catholic school, fell within the ministerial exception, *id.* at 191-98; the remainder of the opinion is dicta. Second, and in any event, the court's unnecessary discussion of the church autonomy doctrine reaches only the unsurprising conclusion that the plaintiff could not "instigat[e] a debate over whether the Church really believes its position on marriage, or what the precise contours of that position are." *Id.* at 201. The *Butler* court expressly *rejected* the proposition that "religious employers may always escape the *McDonnell-Douglas* pretext inquiry [into whether an employer's purported non-discriminatory reason for adverse employment action is a pretext for discrimination] simply by asserting a religious justification for terminating a non-ministerial employee." *Id.* at 203-04. Instead, the court found that the plaintiff had failed to adduce sufficient *evidence* of pretext. *Id.* at 201-04. Thus, contrary to Plaintiffs' characterization, *Butler* did not hold

9

that the church autonomy doctrine "barred a Title VII sexual-orientation discrimination claim," Pl. Br. 23; it found that the discrimination claim failed for lack of evidence.

In summary, nobody doubts that "the ministerial exception … is one component of the church autonomy doctrine." *McRaney v. N. Am. Mission Bd. of the Southern Baptist Convention, Inc.*, __ F.4th __, 2025 WL 3012553, at *6 (5th Cir. Oct. 28, 2025) (internal quotation marks omitted). As noted *supra* at 6, the church autonomy doctrine indisputably also extends to, for example, control over church property and resolution of internal ecclesiastical disputes. But *in the context of employment*, the church autonomy doctrine *is* the ministerial exception, as the district court correctly concluded. *See* JA 616 (noting that this Court has "made clear that the ministerial exception is the manifestation of the church autonomy principle" where employment is concerned; citing *EEOC v. Roman Cath. Diocese of Raleigh,* 213 F.3d 795, 800-01 (4th Cir. 2000)). The church autonomy doctrine therefore cannot justify the blanket exemption from antidiscrimination laws that Plaintiffs seek in this case.

II.   **The First Amendment right to expressive association does not justify the blanket exemption that Plaintiffs seek.**

   A.   **The right to expressive association applies to group membership, not employment.**

Similarly unavailing is Plaintiffs' reliance on the First Amendment right to expressive association. Plaintiffs have requested an order relating specifically to their "hiring practices," JA 511—that is, how they conduct themselves *in the job market*. They have not requested any order relating to the question of *membership* in the religious organization of which they are a part. And the Supreme Court's cases on expressive association are about *group membership*, not *employment relationships*—with one exception, *Hishon v. King & Spalding*, in which the Supreme Court unanimously rejected an employer's expressive association claim. 467 U.S. 69, 78 (1984) (dismissing claim that holding law firm liable for sex discrimination in partnership admission "would infringe constitutional rights of expression or association"); *see also Christian Legal Soc. v. Martinez*, 561 U.S. 661, 682 (2010) ("The expressive-association precedents … involved regulations that compelled a *group* to include unwanted *members*, with no choice to opt out." (citing *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000)) (emphasis added)).

Cabining the expressive association doctrine to group membership makes sense, as hiring a person to do a job is qualitatively different from allowing the

person to join a group.  And, as the Second Circuit has recognized, the "significant differences between voluntary associations and employment relationships, and the long and complex history of regulation of employment relationships," mean that "the Supreme Court's decisions regarding the freedom of expressive association … do not apply neatly to employers."  *CompassCare v. Hochul*, 125 F.4th 49, 60 (2d Cir. 2025).[5]  Indeed, recent scholarship has examined key aspects of employment that are generally absent from group membership, including "coercion through economic benefits" and "control under a hierarchical relationship," and concluded that the "[f]acts of economic coercion and workplace control support a general conclusion that employers and employees do not form expressive associations." Elizabeth Sepper, *et al.*, *Expressive Association at Work*, 126 Mich. L. Rev. __

---

[5] While the Second Circuit has concluded that associational rights apply to employment relationships in some circumstances, *see Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), that court later explained that those circumstances are very narrow.  *See CompassCare*, 125 F.4th at 61 (holding that an employer's expressive association claim regarding a particular employee "require[s] assessment of (1) the responsibilities of the position at issue, including whether it is client-facing and whether it involves expressly or implicitly speaking for the organization, and (2) the particular conduct or attribute of the employee that renders the employment of that person, in that position, a threat to the employer's mission.").  The Second Circuit thus would not recognize the across-the-board exemption from employment discrimination laws that Plaintiffs here seek.

(forthcoming 2026), *available at* https://papers.ssrn.com/sol3/papers.cfm?
abstract_id=5176842, at 37, 62.[6]

Perhaps recognizing the essential mismatch between employment and
expressive association, Plaintiffs attempt to collapse the two, urging that "[f]or
many religious organizations, including the Church, employment is inextricable
from membership."  Pl. Br. 25.  Thus, they claim that "[t]he Church's right to
decide who is religiously qualified for membership inherently includes the right to
decide who is religiously qualified to work on its behalf."  *Id.* at 26-27.  But
Plaintiffs cite no authority for those bold assertions, and no court of which *Amici*
are aware—certainly not the Supreme Court or this Court—has ever endorsed

---

[6] Earlier commentators from across the ideological spectrum also recognized that
employment differs meaningfully from group membership, and that principles
applicable in one context do not necessarily carry over to the other.  *See, e.g.*,
Samuel R. Bagenstos, *Employment Law and Social Equality*, 112 Mich. L. Rev.
225, 260-61 (2013) ("[A] commercial enterprise's hiring and retention of an
employee—at least where the employee is not hired specifically to express a
message—seems a far cry from an expressive association's decision to admit an
individual to membership."); Michael Stokes Paulsen, *A Funny Thing Happened
on the Way to the Limited Public Forum: Unconstitutional Conditions on "Equal
Access" for Religious Speakers and Groups*, 29 U.C. Davis L. Rev. 653, 675-76,
693 (1996) (arguing that "where the alleged exclusion or discrimination in
*membership* is the consequence of a sincere religious belief, the exclusion must
(outside of a commercial context) be permitted as part of the group's First
Amendment free speech right of expressive disassociation," but also that "[f]ew
these days would take seriously an *employer's* argument that racially
discriminatory employment practices are protected as 'free speech'" (emphasis
added)).

them.  And for good reason: adopting that position would require that *any* regulation of religious organizations' employment practices must satisfy the demanding standard of strict scrutiny.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).  That would be a privilege far beyond what the First Amendment's religion clauses require, and one that secular employers do not enjoy.

Moreover, even if Plaintiffs could show that their employment decisions implicate their expressive associational rights to some degree, they are not entitled to the blanket exemption they seek—which would effectively require absolute deference to Plaintiffs' assessment of when their associational freedoms are infringed.  *See* JA 511-12 (proposed order).  The Supreme Court has not adopted that theory, instead making clear that courts have an obligation to independently scrutinize claimed infringements of expressive associational rights.  Even in the membership context, *Boy Scouts of America v. Dale*, a foundational expressive association case, squarely rejected the notion that "an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message."  530 U.S. at 653.  While *Dale* does indicate that courts "give deference to an association's view of what would impair its expression," *id.*, "deference does not imply … abdication," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  *Dale* accepted the Boy Scouts' view concerning a gay scoutmaster's effect on the

organization's expression about homosexuality only after independently concluding that "Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message" that it did not wish to send. 530 U.S. at 653. And *Dale* did not address whether similar "deference" applies at all in the employment context.

The Court further clarified the deference point in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), in which a group of law schools claimed that a law requiring them to allow military recruiters on their campuses violated their expressive associational rights. The Court rejected the claim, emphasizing the "critical" distinction between *Dale* and situations not involving a law that "force[s]" an organization "'to *accept members* it does not desire.'" *Id.* at 69 (quoting *Dale*, 530 U.S. at 648) (emphasis added). Under *Rumsfeld*, when outsiders are not "trying … to become *members* of the [organization]'s expressive association," *id.* at 69 (emphasis added), associational rights are not implicated—even if the association itself believes otherwise. Thus, the Court explained, "[t]he law schools *say* that allowing military recruiters equal access impairs their own expression by requiring them to associate with the recruiters, but just as saying conduct is undertaken for expressive purposes cannot make it symbolic speech, so too a speaker cannot 'erect a shield' against laws requiring access 'simply by asserting' that mere association 'would impair its

message.'" *Id.* (quoting *Dale*, 530 U.S. at 653) (emphasis in original; citation omitted). Similarly, here, Plaintiffs *say* that employing "information technology personnel and maintenance workers," Pl. Br. 16, who engage in "conduct inconsistent with the Church's religious beliefs," JA 512, would impair their expression, but under *Rumsfeld*, that is not enough.

**B.    States have a compelling interest in enforcing employment discrimination laws because of the enormous harm that such discrimination causes.**

While *Amici* do not fully address the question whether application of Maryland law to Plaintiffs would survive strict scrutiny, as that question depends on the specific details of the Maryland law at issue, *Amici* emphasize that it is beyond dispute that federal and state governments have a compelling interest in prohibiting discrimination in employment. This Court has already recognized as much, holding in litigation over the interplay between Title VII and the Free Exercise Clause that "Title VII is an interest of the highest order," such that the statute is "properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985); *see also Roman Cath. Diocese*, 213 F.3d at 801 (noting "the profound state interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin" (citation and internal quotation marks omitted)). So too have

16

numerous other circuits. *See, e.g.*, *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 & n.12 (6th Cir. 2018) (noting EEOC's "compelling interest in combating discrimination in the workforce"; collecting cases), *aff'd*, *Bostock v. Clayton County*, 590 U.S. 644 (2020); *EEOC v. Pacific Press Pub. Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982) ("Congress' purpose to end employment discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions."), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991); *EEOC v. Mississippi Coll.*, 626 F.2d 477, 488 (5th Cir. 1980) ("[T]he government has a compelling interest in eradicating discrimination in all forms.").

This universally recognized governmental interest in combating employment discrimination is grounded in the "grave harm" such discrimination creates for both individuals and the marketplace. *United States v. Burke*, 504 U.S. 229, 238 (1992). For individuals, employment discrimination "depriv[es an affected employee or applicant] of her livelihood and harm[s] her sense of self-worth." *Harris Funeral*, 884 F.3d at 592. Congress has noted that employment discrimination leads to "humiliation; loss of dignity; psychological (and sometimes physical) injury; resulting medical expenses; damage to the victim's professional reputation and career; loss of all forms of compensation and other consequential

injuries."  H. Rep. 102-40, 1991 U.S.C.C.A.N. 549, 603 (Apr. 24, 1991).  And

laws prohibiting employment discrimination serve "societal as well as personal

interests."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973).  Left

unchecked, racially discriminatory employment practices "foster[] racially

stratified job environments to the disadvantage of minority citizens"; the same is

true of sex discrimination.  *Id.* at 800.

Unfortunately, in the States' experience, "workplace discrimination remains

a pervasive problem."[7]  Over 60% of American workers report that they have

experienced or witnessed discrimination in the workplace based on race, age,

gender, or LGBTQ status.[8]  Research indicates that Black workers experience

higher unemployment and underemployment rates than white workers across

education levels.[9]  Similarly, studies report a substantial wage gap between men

---

[7] Desta Fekedulegn *et al.*, *Prevalence of workplace discrimination and mistreatment in a national sample of older U.S. workers: The REGARDS cohort study*, 8 SSM – Population Health 1, 1 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6612926/pdf/main.pdf.

[8] Amy Elisa Jackson, *New Study: 3 in 5 U.S. Employees Have Witnessed or Experienced Discrimination*, Glassdoor (Oct. 23, 2019), https://www.glassdoor.com/blog/new-study-discrimination/.

[9] Valerie Wilson & William Darity Jr., *Understanding Black-White Disparities in Labor Market Outcomes Requires Models That Account for Persistent Discrimination and Unequal Bargaining Power*, Econ. Pol'y Inst. (Mar. 25, 2022), at 5, https://files.epi.org/uploads/215219.pdf.

and women,[10] especially for some women of color.[11]  And nearly a quarter of LGBTQ workers in a recent survey reported having suffered adverse treatment at work because of their sexual orientation or gender identity within the last five years—a figure that nearly doubles for transgender and nonbinary workers.[12]

Relatedly, Plaintiffs do not contend that statutes barring employment discrimination are animated by a government interest in the "suppression of ideas"—nor could they.  *See Roberts*, 468 U.S. at 623.  As with the public accommodations law at issue in *Roberts*, employment discrimination statutes reflect a "strong historical commitment to eliminating discrimination," which is a "goal … unrelated to the suppression of expression."  *Id.* at 624; *see also, e.g.*, *N.Y. State Club Ass'n, Inc. v. City of New York*, 505 N.E.2d 915, 921 (N.Y. 1987) (noting that "the City's strong public policy to eliminate discrimination against women and minorities" is a "compelling governmental interest[] unrelated to the suppression of ideas"), *aff'd*, 487 U.S. 1 (1988).

---

[10] U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2023*, at 1 (Aug. 2024), https://www.bls.gov/opub/reports/womens-earnings/2023/home.htm.

[11] Institute for Women's Policy Research, *The 2023 Weekly Gender Wage Gap by Race, Ethnicity, and Occupation*, at 7 (Mar. 2024), https://iwpr.org/wp-content/uploads/2024/03/Occupational-Wage-Gap-2024-Fact-Sheet-1.pdf.

[12] Brad Sears *et al.*, *LGBTQ People's Experiences of Workplace Discrimination and Harassment*, Williams Institute, at 13-15 (Aug. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Aug-2024.pdf.

## <u>CONCLUSION</u>

The decision below should be affirmed.

Respectfully submitted,

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*

*/s/ David C. Kravitz*
David C. Kravitz*
  *State Solicitor*
Adam M. Cambier
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
david.kravitz@mass.gov
(617) 963-2427
    *\*Counsel of Record*

Dated: November 12, 2025

ROB BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General for the District of Columbia*
400 6th Street, NW, Suite 8100
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
115 South LaSalle Street
Chicago, IL 60603

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr.
Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
*Attorney General of Wisconsin*
17 W. Main Street
Madison, WI 53703

**CERTIFICATE OF COMPLIANCE**

1.     This Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), because it contains 4,293 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman style, 14-point font.

/s/ David C. Kravitz
*Counsel of Record*