# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS, AN
UNINCORPORATED ASSOCIATION; AND ADVENTIST RISK MANAGEMENT, INC.,

*Plaintiffs-Appellants,*

v.

CLEVELAND L. HORTON, II; GLENDORA C. HUGHES; STEPHANIE SUERTH;
JANSSEN E. EVELYN; EILEEN M. LEVITT; ANGELA SCOTT;
MAGDALENA S. NAVARRO; JEFF ROSEN; GINA MCKNIGHT-SMITH;
NOAH THOMAS METHENY; AND ANTHONY G. BROWN,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Maryland, Southern Division
Case No. 8:24-cv-02866 – Hon. Theodore D. Chuang

## APPELLANTS' REPLY BRIEF

Todd R. McFarland
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, MD 20904

Eric S. Baxter
Nicholas R. Reaves
Andrea R. Butler
Amanda G. Dixon
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................ii

INTRODUCTION ................................................................................ 1

ARGUMENT ....................................................................................... 3

   I. The Church has shown a likelihood of success. .............................. 3

      A. MFEPA's selective religious exemption
         interferes with the Church's religious autonomy........................ 3

      B. MFEPA's selective religious exemption will
         entangle courts in religious questions and
         religious decision making. .......................................................... 11

      C. MFEPA's selective religious exemption violates
         the Free Exercise Clause. .......................................................... 17

   II. The Church satisfies the remaining injunction factors................. 25

   III. The District Court erred in dismissing Counts II and IV. .......... 28

CONCLUSION .................................................................................. 29

CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION.................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell v. Presbyterian Church (U.S.A.),*
126 F.3d 328 (4th Cir. 1997) .............................................................. 16

*Behrend v. San Francisco Zen Ctr., Inc.,*
108 F.4th 765 (9th Cir. 2024) ........................................................... 14

*Billard v. Charlotte Catholic High Sch.,*
101 F.4th 316 (4th Cir. 2024) ....................................................... 4, 16

*Bryce v. Episcopal Church in Diocese of Colorado,*
289 F.3d 648 (10th Cir. 2002) .............................................................. 9

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ............................................................................ 28

*Canaan Christian Church v. Montgomery County,*
29 F.4th 182 (4th Cir. 2022) ........................................................ 21-22

*Carson v. Makin,*
596 U.S. 767 (2022) ............................................................................ 13

*Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n,*
605 U.S. 238 (2025) ...................................................................... 13, 23

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
483 U.S. 327 (1987) ............................................................. 4, 5, 6, 15

*Cuviello v. City of Vallejo,*
944 F.3d 816 (9th Cir. 2019) ............................................................. 28

*Doe v. Catholic Relief Servs.,*
300 A.3d 116 (Md. 2023) ............................................................. 16, 23

*EEOC v. Roman Catholic Diocese of Raleigh,*
213 F.3d 795 (4th Cir. 2000) ............................................5-6

*Elrod v. Burns,*
427 U.S. 347 (1976) ........................................................ 26

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
*Dist. Bd. of Educ.,*
82 F.4th 664 (9th Cir. 2023) ............................................ 21

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ......................................................... 21

*Giovani Carandola, Ltd. v. Bason,*
303 F.3d 507 (4th Cir. 2002) ........................................... 25

*Holt v. Hobbs,*
574 U.S. 352 (2015) ......................................................... 24

*Hosanna-Tabor Evangelical Lutheran*
*Church & Sch. v. EEOC,*
565 U.S. 171 (2012) .......................................................6-7

*Kean v. Brinker Int'l, Inc.,*
140 F.4th 759 (6th Cir. 2025) ............................................ 9

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox*
*Church in N. Am.,*
344 U.S. 94 (1952) ........................................................ 3, 6

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ......................................................... 13

*Kim v. Bd. of Educ. of Howard Cnty.,*
93 F.4th 733 (4th Cir. 2024) ............................................ 22

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
2 F.4th 330 (4th Cir. 2021) .............................................. 28

*Mahmoud v. Taylor,*
606 U.S. 522 (2025) .............................................25, 26, 27

*Markel v. Union of Orthodox Jewish Congregations of Am.*,
 124 F.4th 796 (9th Cir. 2024) ............................................................ 14

*Mast v. Fillmore County*,
 141 S. Ct. 2430 (2021) ...................................................................... 25

*McRaney v. N. Am. Mission Bd. of
 @S. Baptist Convention, Inc.*,
 --- F.4th ----, 2025 WL 3012553
 (5th Cir. Oct. 28, 2025) ................................................................ 10, 13

*Montrose Christian Sch. Corp. v. Walsh*,
 770 A.2d 111 (2001) ....................................................................... 6, 27

*Myers v. Loudoun Cnty. Pub. Sch.*,
 418 F.3d 395 (4th Cir. 2005) ............................................................ 13

*NLRB v. Catholic Bishop of Chi.*,
 440 U.S. 490 (1979) .......................................................................... 17

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
 591 U.S. 732 (2020) ..................................................................... 3, 14

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull
 Mem'l Presbyterian Church*,
 393 U.S. 440 (1969) .......................................................................... 12

*Rayburn v. General Conf. of Seventh-day Adventists*,
 772 F.2d 1164 (4th Cir. 1985) ........................................................ 4, 17

*Roberts v. Glenn Indus. Grp., Inc.*,
 998 F.3d 111 (4th Cir. 2021) ...........................................................9-10

*Serbian E. Orthodox Diocese v. Milivojevich*,
 426 U.S. 696 (1976) ..................................................................... 3, 12

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
 363 F.3d 299 (4th Cir. 2004) .............................................................. 4

*Sherbert v. Verner*,
 374 U.S. 398 (1963) .......................................................................... 21

iv

*Surinach v. Pesquera De Busquets,*
604 F.2d 73 (1st Cir. 1979) ................................................. 15

*Tandon v. Newsom,*
593 U.S. 61 (2021) ............................................. 8, 18, 19, 20

*UAW v. Johnson Controls, Inc.,*
499 U.S. 187 (1991) ........................................................... 22

*United States v. Hill,*
927 F.3d 188 (4th Cir. 2019) ............................................. 12

*United States v. White,*
836 F.3d 437 (4th Cir. 2016) ............................................. 23

*Williams v. Griffin,*
952 F.2d 820 (4th Cir. 1991) ............................................. 27

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v.
Musgrave,*
553 F.3d 292 (4th Cir. 2009) ............................................. 25

## Statutes

42 U.S.C. § 2000e .................................................................. 10

Md. Code, State Gov't § 20-603 ............................................. 10

## Other Authorities

Wright & Miller, 5A Fed. Prac. & Proc. Civ. (4th ed.) ....................... 27-28

Douglas Laycock, *Towards a General Theory of the Religion
Clauses: The Case of Church Labor Relations and the
Right to Church Autonomy*, 81 Colum. L. Rev. 1373, 1398
(1981) ........................................................... 3, 4-5, 9

Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash.
U. L. Rev. 1701 (2020) ................................................. 11-12

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2119 (2003) ............................................... 13

Russell K. Robinson, *Casting and Caste-Ing: Reconciling Artistic Freedom and Antidiscrimination Norms*, 95 Calif. L. Rev. 1 (2007) ................................................................................. 22

W. Cole Durham & Robert Smith, *Religious Organizations and the Law* (2nd ed. 2025) ................................................................. 4

## INTRODUCTION

Defendants contend that the General Conference, the highest ecclesiastical body of the Seventh-day Adventist Church, and Adventist Risk Management, an entity that exclusively serves the Church, can be forced to hire employees who reject, or even oppose, the Church's religious beliefs. To make that argument is to reveal its absurdity. The Church would have to hire employees whose beliefs and actions make them counter-witnesses to the faith they are called to advance. The Church could not expect those who daily carry out its work to adhere to the same religious standards it asks its members to uphold. And the Church would have to facilitate religious practices that contradict its own religious beliefs—like setting up prayer rooms for Muslims and Jews. Even regular expressions of its own faith or emphasizing certain aspects of its theology could expose the Church to claims of religious discrimination or hostile work environment. Rather than prohibit invidious religious discrimination, such a rule would punish religious expression.

And contrary to Defendants' claims, the Church does not seek a broad exemption from civil rights laws or an extension of the ministerial exception. Allowing the Church to hire based on religious fit simply leaves it—like religious organizations nationwide—where it has always been: on equal footing with secular groups that hire for ideological alignment. And, unlike for ministerial employees, the reasons given for

1

non-ministerial decisions must be religious and can be challenged for pretext.

Defendants concede that forcing the Church to accommodate employees of different faiths "might be constitutionally problematic." Yet they dismiss this concern because "plaintiffs do not hire such employees." But whether the Church can continue that practice is the very question at issue. Defendants would force the Church to *change* its hiring practices, suffer damages, and hire in ways that violate its religious beliefs.

Defendants similarly claim the Church can avoid entanglement by waiving its constitutional protections, ceding to the government's probing inquiries, and subjecting itself to lawsuits and liability—a result *far more* entangling and constitutionally problematic. And Defendants' argument that MFEPA's numerous exemptions—covering over 80% of employers— are irrelevant blinks reality and badly distorts Supreme Court precedent.

Defendants would have this Court be the first in our nation's history to affirm a ruling that the government can prohibit churches and other religious organizations from hiring for religious alignment. But the First Amendment's Religion Clauses countenance no such result. This Court should instead confirm that the Church is free to hire only individuals who embrace and uphold its religious beliefs.

## ARGUMENT

## I. The Church has shown a likelihood of success.

### A. MFEPA's selective religious exemption interferes with the Church's religious autonomy.

Defendants' case turns on a misunderstanding of church autonomy. They claim that, in the context of church employment, this doctrine starts and ends with the ministerial exception. Resp.20. Not so. Church autonomy protects the "freedom for religious organizations" to decide— "free from state interference"—*all* matters of "discipline," "organization," and "internal government" that are "closely linked" to "faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). Requiring those "who will conduct the work of the church" to embrace its beliefs and exemplify its practices "plainly fall[s]" within this scope. Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373, 1398 (1981) ("Laycock").

The religious exemptions found in federal and state nondiscrimination laws nationwide reflect this. Br.50-52. Defendants argue these exemptions are "a matter of legislative grace." Resp.36. But this Court has already recognized such religious accommodations are

"constitutionally inspired, implementing the First Amendment's command to avoid 'intrusive inquiry into religious belief.'" *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024); *see also Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 306 (4th Cir. 2004) (describing Title VII's religious exemption as "based on constitutional principles").

Here, there is no question that state "control of [church] employment and retention decisions" would intrude "deeply upon free exercise." W. Cole Durham & Robert Smith, *Religious Organizations and the Law* § 14:1 (2nd ed. 2025). The General Conference and ARM's entire purpose is to promote faith in Jesus Christ and faithful adherence to biblical teachings. JA38, 71-72; *Rayburn v. General Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1170 (4th Cir. 1985) ("the purpose of the church is fundamentally spiritual"). The Church also seeks to create a "community" of the faithful, "represent[ing] an ongoing tradition of shared beliefs," to sustain and encourage each other in their sacred work. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987). Employees who reject or refuse to uphold these expectations obstruct the Church's mission, dilute the Church's witness to its faith, and invite accusations of hypocrisy. Hiring "only those committed" to the Church's mission is "thus a means by which [the Church] defines itself." *Id*. And "the long-term effect" of "substituting one employee for another as a result of a discrimination charge" would

likely "disrupt 'the free development of religious doctrine.'" Laycock at 1391-92.

The relevant cases also reflect these concerns. Defendants contend *Amos* holds only that religious accommodation is permissible, not "constitutionally required." Resp.28-29. But they ignore the Court's driving concern that secular courts are incompetent to discern religious significance—in that case, the religious import of requiring a building engineer at a church gym to comply with the church's religious teachings. Even just the "[f]ear" that "a judge would not understand" the Church's beliefs, the Court explained, could "affect the way an organization carried out what it understood to be its religious mission." *Amos*, 483 U.S. at 336; *see also id*. at 336 n.14. Thus, as Justice Brennan clarified, it is "vital that, if certain activities constitute part of a religious community's practice, then a religious organization should be able to require that only members of its community perform those activities." *Id*. at 342-43 (Brennan, J., concurring). That is what Plaintiffs seek here.

Defendants also press a myopic view of this Court's ruling in *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000), insisting that it addresses only the ministerial exception, not the broader church autonomy doctrine. Resp.12, 26. But there the Court was concerned with "preserv[ing] the independence of religious institutions in performing their spiritual functions," suggesting that the "First Amendment" has no role only "[w]here no spiritual function is involved."

*Diocese of Raleigh*, 213 F.3d at 801. Defendants' attempt to distinguish the litany of cases applying church autonomy to non-ministers, Resp.26-27, is similarly misguided. Defendants concede that there were religious reasons for the employers' actions in these cases. Resp.26-28 ("doctrinal dispute," "church's policy," "matter of internal church policy and administration"). But Defendants fail to recognize the same is true here: the reason the Church refuses to hire non-Adventists is because doing so would violate "[C]hurch policy," contradict its sincere religious beliefs, and lead to "doctrinal dispute[s]" between the Church and its employees. *Id.*; *see* Br.7-11. As Plaintiffs have said from the start, they seek the freedom to make employment decisions when there is a non-pretextual "religious reason" for doing so. Br.20. That is what these cases confirm.

Both Defendants and the district court assume the default position is one of government authority absent a ruling protecting this exact form of religious exercise. *See, e.g.*, JA615-619. Yet both fail to recognize that the long-standing and wide-spread default has been one of protection for religious exercise. Br.50-52 (surveying other jurisdictions). Indeed, prior to *CRS*, the plain language of Maryland law explicitly exempted Plaintiffs' religious exercise from MFEPA. *E.g.*, *Montrose Christian Sch. Corp. v. Walsh*, 770 A.2d 111, 130 (Md. 2001). And the Supreme Court has made clear that the proper, constitutional baseline is "a spirit of freedom," *Kedroff*, 344 U.S. at 116, a "sphere of deference," *Amos*, 483 U.S. at 345 (Brennan, J., concurring), and a "special solicitude [for] the

rights of religious organizations," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 189 (2012). *See also Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., and Kagan, J., concurring) ("We have long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves[.]"). When it comes to church employment decisions, this protection is not limited to the ministerial exception.

From their ministerial-exception-only argument, Defendants swing to the other extreme. Ruling for Plaintiffs, they claim, will extend the "ministerial exception to cover all employees." Resp.30. That is false. There is no dispute that the Church could fire a ministerial employee for violating church teaching. Similarly, there is no dispute that a non-ministerial employee fired for a non-religious reason has recourse to MFEPA's protections. The question here is much more limited: what should happen when a non-ministerial employee is fired for religious reasons. In this relatively narrow category of claims, the church autonomy doctrine protects churches when they make employment decisions for non-pretextual religious reasons. Thus, even when the church autonomy doctrine applies, it is not a blank check. A church could prevail by showing that the asserted religious reasons were the true reasons. And the employee could prevail by showing pretext—*i.e.*, that the asserted religious reasons are not the real reasons. Recognizing the church autonomy doctrine's application here is hardly the same as

extending the ministerial exception's blanket protection to "all employees." Resp.30.

Defendants next bemoan it is too "easy" to say a decision is "rooted in religious belief" and too "difficult to question that claim." *Id.* Defendants, however, cite no evidence or case law to support this sweeping argument. They also fail to acknowledge that the same could be said in any employment case: it is "easy" to allege "poor performance" or lack of "mission alignment" as the reason for termination and "difficult" for an employee to mount a challenge. But suggesting that religious organizations in particular will pursue "opportunistic claims of immunity," *id.* at 29, is its own form of religious bias. *Cf. Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (government cannot "assume the worst" when regulating religious exercise yet "assume the best" when exempting secular conduct). In any case, the answer to Defendants' concerns is straightforward: when confronted with a claim of pretext, courts can issue tailored orders allowing appropriate discovery into pretext and sincerity.

Protecting church employment decisions rooted in religion would also put religious organizations on equal footing with other ideological organizations that hire and fire for mission alignment. If an environmental organization fired its janitor for wearing a T-shirt that said, "Drill, baby, drill!" and the janitor responded with a claim of sex discrimination, the question for the court would be whether the

employer's reason was the true reason (poor mission alignment) or whether it was pretextual (covert sex discrimination). *E.g.*, *Kean v. Brinker Int'l, Inc.*, 140 F.4th 759, 774-76 (6th Cir. 2025) (finding evidence of age discrimination rebutted employer's assertion that employee was fired for poor "culture" fit). The First Amendment requires the same for religious organizations hiring for religious alignment. *See* Br.27-28. Efforts to eliminate *invidious* religious discrimination cannot restrict religious organizations from the *laudable* (and constitutionally protected) decision to hire individuals who uphold their religious mission.

Defendants' approach also leads to absurd results. It would protect a church's right to control who can join the church, but not who can join the smaller group of church members hired to embody its mission and exemplify its beliefs and practices. Resp.22-23. Yet "selecting and directing the employees who will carry out the work of the church" is itself a religious exercise that the church is "entitled to perform freely." Laycock at 1400-01. Relatedly, in seeking to distinguish *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648 (10th Cir. 2002), Defendants affirm "the right of the church *to engage freely in ecclesiastical discussions*" despite an employee's claim of "sexual harassment." Resp.25. But Defendants offer no principled distinction between an employee's claim for sexual harassment and an employee's claim for wrongful termination—both could be grounds for liability under either Title VII or MFEPA. *E.g.*, *Roberts v. Glenn Indus. Grp., Inc.*, 998

F.3d 111, 117 (4th Cir. 2021) (Title VII claim based on sexual harassment). Nor does the Free Exercise Clause draw a sharp distinction between "*ecclesiastical discussions*," Resp.25, and other forms of internal church governance. Defendants' concession thus confirms why courts routinely avoid interference in a church's hiring practices even outside of the ministerial exception. Br.23-25, 50-52; *see also McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, --- F.4th ----, 2025 WL 3012553, at *17-18 (5th Cir. Oct. 28, 2025) (claims barred under "general church autonomy principles").

Similarly absurd, Defendants do not deny that, under the Maryland Supreme Court's rule, Plaintiffs could be required to hire individuals of other faiths and would be obligated by law to accommodate their religious practices. Resp.24 (conceding such accommodations "might be constitutionally problematic"); *see also* 42 U.S.C. § 2000e(j); Md. Code, State Gov't § 20-603 (requiring religious accommodations). Defendants instead claim this is irrelevant because "the complaint alleges that the plaintiffs do not hire such employees." Resp.24. That's currently true— but only because the Church has been willing to risk government penalties and fines for continuing to adhere to its religious beliefs. The entire point of this lawsuit is to seek protection for that practice. Defendants cannot use the Church's religious sincerity and conviction to assert that the conceded result of their approach will cause no harm.

## B. MFEPA's selective religious exemption will entangle courts in religious questions and religious decision making.

Entanglement remains an Establishment Clause violation, and MFEPA's reinterpreted approach ensnares courts and government entities in such entanglement. Even Defendants admit that "entanglement concerns do remain salient." Resp.31. But they discount the many recent invocations of entanglement because they arose in the context of constitutional avoidance. *Id.* This throws the baby out with the *Lemon*-bathwater, disregarding the Supreme Court's guidance, ignoring the long history of entanglement in the Establishment Clause context, and misapprehending the nature of the entanglement problem. And this Court should reject it.

Defendants suggest the Establishment Clause no longer provides a cause of action for entanglement. Resp.30. Like the district court, they insist entanglement began and ended with *Lemon*. *Id.* But Defendants fail to respond to the long pre-*Lemon* roots of entanglement in the Establishment Clause. They have no answer for the pre-*Lemon* cases guarding against government intrusion into religious governance, decision making, and authority. *See* Br.36-38. Instead, they cursorily insist that Establishment Clause analysis consists only of historical analogues. Resp.30-31. But this does not help Defendants, because the "idea of entanglement linked to government control over religion and intermeddling with religious practices" was present at the Founding.

Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash. U. L. Rev. 1701, 1721 (2020).

Rather than grapple with that history, Defendants suggest the entirety of Establishment Clause entanglement is subsumed under church autonomy, which they artificially and erroneously limit to the ministerial exception. *See* Resp.32. But the fact that entanglement concerns are one of the animating features of the ministerial exception does not mean they arise in no other context. Indeed, that position is deeply inconsistent with the Court's precedents. *See, e.g.*, *Milivojevich*, 426 U.S. at 709 (courts cannot resolve questions of church procedure or "probe deeply" "into the allocation of power"); *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (entangling to resolve matters of doctrine and practice). Nor is Defendants' assessment of Supreme Court precedent accurate. That the Supreme Court has "highlighted" entanglement concerns in the context of constitutional avoidance does not undercut the existence of an independent entanglement claim under the Establishment Clause. *Contra* Resp.31. The Supreme Court frequently applies constitutional principles outside a direct cause of action, and this Court later uses that application to interpret the same constitutional provision on a direct claim. *See, e.g.*, *United States v. Hill*, 927 F.3d 188, 200, 206 (4th Cir. 2019) (applying earlier constitutional-avoidance analysis to address direct Commerce Clause challenge). The same is true here. Br.38

(quoting *Myers v. Loudoun Cnty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005)).

Defendants' other arguments also prove too much. As they admit, in *Carson*, the Court noted that giving effect to a religious-status/religious-use distinction in the Free Exercise context "'would … raise serious concerns about entanglement and denominational favoritism.'" Resp.31 (quoting *Carson v. Makin*, 596 U.S. 767, 787 (2022)). Then, just last term, the Court ruled for a religious organization on a direct denominational-favoritism claim. *Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 250 (2025). Entanglement is no different and can support a direct claim for relief. The death of *Lemon* did not render the Establishment Clause a dead letter. *See* Br.37; *McRaney*, 2025 WL 3012553, at \*17-18. It restored the Establishment Clause to its historic roots, including protecting against government entanglement with religion. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) ("historical practices and understandings"); Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2119 (2003) (control over "the selection of religious personnel" a hallmark of religious establishments).

On the merits of the entanglement claim, Defendants attempt to whistle past the Establishment Clause problems presented by MFEPA. *See* Resp.32-35. Like the Maryland Supreme Court, they assume that

merely *claiming* the analysis "should not" "result in courts being caught in a theological thicket" makes it so. Resp.35. But Defendants' explanation of how the *CRS* test works is noticeably lacking in detail, while abounding in declare-it-so truisms. *See* Resp.32-36. Defendants do not address the chilling effect *CRS*'s test has on operational decisions, the pressure it creates to alter job roles and descriptions, or even how the *CRS* analysis would work given Plaintiffs' mission to embody and reflect the Church's religious beliefs and practices. Br.32-36.

Instead, Defendants hitch their defense to the ministerial exception, asserting that the analysis under MFEPA is no more entangling. Resp.33. But Defendants neglect the ministerial exception's built-in deference to a religious organization's own assertion of its mission and what furthers that mission—deference created precisely to *avoid* unconstitutional entanglement. *Our Lady*, 591 U.S. at 757 (noting the importance of the religious "schools' definition and explanation of [the teachers'] roles"); *Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 803 (9th Cir. 2024) (cleaned up) ("The Religion Clauses require deference to a religious institution's explanation of the role of its employees in the life of the religion in question."); *Behrend v. San Francisco Zen Ctr., Inc.*, 108 F.4th 765, 770 n.3 (9th Cir. 2024) (deferring "[i]n light of the entanglement concerns").

Defendants also suggest that entanglement can be avoided by focusing on the activities of religious organizations, not their religious tenets.

Resp.34 (analyzing "what the entity principally seeks to *do*, not what it principally *believes*"). But here too, Defendants fail to grapple with what *CRS* requires and how this analysis would work in practice. Assessing whether an activity is a "core mission" is—as the Maryland Supreme Court acknowledged—a "fact intensive" inquiry probing the "totality of the pertinent circumstances," including how the organization describes "its mission(s)," who the organization serves, and what the organization does. Br.14-15. Defendants' focus on an entity's "activities" thus dramatically oversimplifies what *CRS* requires.

Moreover, in practice there is no way to assess an organization's mission by looking *solely* at its activities. An organization might, for example, hire employees to keep its facilities clean, but that wouldn't suggest the organization's mission is to foster cleanliness. *See, e.g.*, *Amos*, 483 U.S. at 332, 336 & n.14 (recognizing the difficulty in understanding a religious organization's "sense of mission").

Defendants claim *CRS* avoids entanglement concerns, quoting the line that "[f]or purposes of MFEPA's exemption, a religious entity's core mission is not synonymous with the entity's religious doctrine." Resp.34. But a church's core mission will almost always implicate its doctrine. *See, e.g.*, *Surinach v. Pesquera De Busquets*, 604 F.2d 73, 78 (1st Cir. 1979) (how religious school spends its money is "intimately bound up in their mission"). By instructing courts that they must "analyze the activities of a religious entity" before accepting, for example, that "all of its employees'

work … is inextricably intertwined with the values of its religion," *CRS* is directing courts to resolve a religious question. *Doe v. Catholic Relief Servs.*, 300 A.3d 116, 137 n.20 (Md. 2023). This doesn't decrease entanglement, it amplifies it: instead of following the Supreme Court's deferential approach in *Our Lady*, *CRS* tells courts to *second guess* what religious organizations say and independently determine what their religious mission(s) is. *Contra Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997) ("[C]ourts must defer to the decisions of religious organizations 'on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law.'").

Defendants next suggest the Church can avoid entanglement by "declin[ing] to invoke the statutory religious exemption." Resp.36. But to "decline" the exemption would mean the Church would be liable for engaging in the precise religious exercise—hiring only church members in regular standing—it brought this case to protect. Ceding to legal liability for constitutionally protected religious exercise is no solution to *CRS*'s entanglement. What is more, Defendants' argument ignores that entanglement does not harm the Church alone. Instead, entanglement is a structural constitutional trespass that risks wrongly enmeshing the government, including courts, in ecclesiastical affairs. *Cf. Billard*, 101 F.4th at 325 (structural restrictions in the Religion Clauses do "not protect the church alone"; they "also confine[] the state and its civil courts to their proper roles").

Finally, none of Defendants' arguments come close to distinguishing *Catholic Bishop*. Nothing in that decision suggests the intrusive inquiry *CRS* requires here is less constitutionally problematic outside the school setting. *See NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490 (1979). And inquiries into the religious motivation for staffing decisions and "terms and conditions of employment" within *Church headquarters* certainly implicate concerns at least as sensitive as inquiries into lay teachers at church-operated schools. *Id.* at 502-03. As with the schools in *Catholic Bishop*, the Church's activity here "involve[s] substantial religious activity and purpose" and has a "substantial religious character," because the very purpose of the activity is the maintenance and "propagation of a religious faith." *Id.* at 503. It makes no sense to treat schools controlled by a church better than the church. *Rayburn*, 772 F.2d at 1170 ("the church itself" is "the institution with which the danger of entanglement is most sensitive"); *contra* Resp.38, 40.

### C. MFEPA's selective religious exemption violates the Free Exercise Clause.

Laws that burden religious activity and are not neutral and generally applicable trigger strict scrutiny. Br.38-40. Here, Maryland does not dispute that the Church's religious exercise is burdened. *See* Resp.38. And Maryland' arguments that MFEPA is neutral and generally applicable miss the mark.

***Categorical exemptions.*** Maryland claims that MFEPA's categorial exemptions (for small employers, bona fide seniority systems, and private membership clubs, Br.40) don't trigger strict scrutiny because "[e]ach of these exceptions applies to secular and religious employers alike." Resp.39. This misunderstands *Tandon's* comparability analysis. As *Tandon* explains, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest," and the "risks" that different "activities" pose to that interest. *Tandon*, 593 U.S. at 62; *id.* ("Comparability is concerned with the risks various activities pose."). Here, both sides agree that the government's interest in enforcing MFEPA is in "eliminating discrimination in employment." Resp.50. But allowing blanket, status-based exemptions for secular reasons (*e.g.*, to unburden small businesses, reward seniority, and protect private clubs) poses not just a "comparable," but a *far greater*, "risk[]"to Defendants' nondiscrimination interest. *Tandon*, 593 U.S. at 62. Indeed, these secular exemptions excuse qualifying employers from liability for all forms of otherwise-unlawful discrimination—including truly *invidious* discrimination, which lies at the heart of the state's interest. Plaintiffs, in contrast, seek not a blanket exemption, but preservation of a constitutionally protected, nationally recognized, historical right to hire employees who uphold their religious mission. Because MFEPA has secular exemptions that turn a blind eye to truly invidious discrimination, Defendants cannot refuse a religious

exemption rooted in constitutionally protected religious exercise and freedom of association without at least satisfying strict scrutiny.

This analysis doesn't change just because some religious employers also benefit from MFEPA's small-business and seniority-system exemptions. *Contra* Resp.39. As *Tandon* explains, strict scrutiny is triggered whenever the government "treat[s] *any* comparable secular activity more favorably," and it is "no answer" to say that some religious activity is treated the same. *Tandon*, 593 U.S. at 62. Thus, regardless of whether a different church with fewer than fifteen employees is exempt from MFEPA's religious nondiscrimination requirement for a secular reason (unburdening small businesses), there is no dispute that *Plaintiffs'* religious activity here is treated worse. That is what matters under *Tandon*. Tellingly, Defendants offer nothing to distinguish this case from the two cases Plaintiffs cite that apply *Tandon* this same way. *See* Resp.43.

Defendants suggest that the comparability analysis is limited to comparing, for example, whether *large* secular employers and *large* religious employers are treated the same under MFEPA. Resp.41. This too ignores *Tandon*, which found exceptions for large commercial establishments ("movie theaters," "private suites at sporting events and concerts," "indoor restaurants") comparable to exceptions for "religious exercise at home" because both undermined the government's asserted interest in a similar way. The Court did not compare only similarly sized

gatherings. 593 U.S. at 63-64 (rejecting Ninth Circuit's attempt to distinguish "public buildings" from "private buildings").

Finally, Maryland exposes its anti-religious bias when it argues that ensuring secular mission alignment is completely fine, but Plaintiffs' identical requirement, rooted in their sincere religious beliefs, is "prohibited discrimination." Resp.42. Plaintiffs are not asking for "broad," *id.*, permission to invidiously discriminate. Instead, like a secular company or non-profit that asks all employees to embrace its brand or mission, the Church here merely asks all employees to embrace its faith commitments. "The State cannot assume the worst when" religious groups seek to hire mission-aligned employees, "but assume the best when" secular employers do the same. *Tandon*, 593 U.S. at 64 (cleaned up). Merely labeling the Church's sincere religious exercise "discrimination" is no answer to the unique disadvantage MFEPA imposes on religious employers.

***Discretionary exemptions.*** Both sides agree that discretionary exemptions can also trigger strict scrutiny, and that discretion need not be "unfettered" to count. Br.45-47; Resp.47. There is also agreement that MFEPA's Bona Fide Occupational Qualification (BFOQ) exemption permits employers to engage in otherwise-prohibited discrimination that is "reasonably necessary to the essence" of an employer's business or to its "normal operation." Resp.46-47. Defendants, however, claim this discretion "contrast[s] sharply" with the discretion held to undermine

general applicability in *Fulton*. Resp.47. Defendants are wrong. Citing *Sherbert*, the Supreme Court in *Fulton* explained that whenever the government has case-by-case discretion to grant exceptions "based on the circumstances underlying each application," strict scrutiny is triggered. *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). In *Sherbert v. Verner*, this was true even though the discretion was not unfettered but instead required a finding of "good cause." 374 U.S. 398, 401 (1963); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 687-88 (9th Cir. 2023) ("[A]ssertion that *Fulton* was only concerned with 'unfettered' discretion, is overly narrow.").

Here, for purposes of general applicability analysis, the BFOQ's "reasonably necessary" standard is indistinguishable from the "good cause" standard in *Sherbert*. Br.45-46. Both permit exceptions based on the particular "circumstances underlying each application," *id.*, and both impose some discretion-limiting criterion.

This is consistent with the approach Judge Richardson took in *Canaan Christian*. *Contra* Resp.47 n.10. As his concurrence explained, "'individualized exemptions' are those that look to the particular justifications of an individual and weigh them under overly flexible and discretionary standards like 'good cause' or '*necessity*' or '*reasonableness*,' and without objective standards." *Canaan Christian Church v. Montgomery County*, 29 F.4th 182, 203 (4th Cir. 2022) (Richardson, J., concurring) (emphasis added). A "*reasonably necessary*" standard—by

definition—is not objective, instead leaving room for the decision maker to exercise discretion in its application.[1] *Id.* Indeed, the BFOQ exemption is often interpreted generously to *maximize* employer discretion. *E.g.*, Russell K. Robinson, *Casting and Caste-Ing: Reconciling Artistic Freedom and Antidiscrimination Norms*, 95 Calif. L. Rev. 1, 10, 31 (2007) (noting that as many as 94% of casting calls discriminate based on sex in reliance on the EEOC's interpretation of the BFOQ exception).

*Kim* is not to the contrary. *Contra* Resp.41. This Court's explanation that the law there "makes no distinction between religious and secular" schools merely confirmed it offered *no* exemptions—religious or secular. *Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 748 (4th Cir. 2024). Because the law had no exemptions, *Kim* did not weigh in on the types of exemptions *Tandon* would consider comparable.

***Neutrality.*** Ensuring religious neutrality is a component of Free Exercise that Plaintiffs raised in their preliminary injunction motion and thus fairly included in Count III. *See* Dist. Ct. ECF 15-1 at 21 (strict

---

[1] Amici Religious and Civil Rights Organizations misread *UAW v. Johnson Controls, Inc. See* ECF 48-1 at 21-22 (claiming BFOQ defense imposes objective standard). *Johnson Controls* concludes that the employer's hiring criteria (not the BFOQ exception) should be "objective" and "verifiable," not "subjective." *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991). *Johnson Controls* instead explains that the BFOQ exception permits substantial discretion by allowing employers to impose otherwise-discriminatory "qualifications" whenever they "affect an employee's ability to do the job." *Id.*

scrutiny applies to burdens on religious exercise "that are either not neutral or not generally applicable"). What is more, the neutrality arguments Plaintiffs emphasize on appeal are rooted in *Catholic Charities Bureau*, an intervening Supreme Court decision. Br.47-48; *see also* Dist. Ct. ECF 39 (notice of supplemental authority). Plaintiffs may thus "timely" raise this argument "based on that decision." *United States v. White*, 836 F.3d 437, 443-44 (4th Cir. 2016), *abrogated on other grounds by United States v. Stitt*, 586 U.S. 27 (2018); *contra* Resp.48.

In *Catholic Charities*, the Court explained that granting a religious exemption only to those religious groups which, *inter alia*, employ and "serve only co-religionists" "establishes a preference for certain religions based on the commands of their religious doctrine." 605 U.S. at 250. Here, the criteria *CRS* requires courts to consider when granting a religious accommodation—assessing who the religious group serves, what services they provide, and how they spend money, Br.48, also involve "inherently religious choices." *Catholic Charities*, 605 U.S. at 250. In fact, *CRS* asks courts to employ at least one of the *same* "inherently religious" criteria found problematic in *Catholic Charities*: to determine what constitutes a "core mission," courts may consider "the people the entity seeks to benefit." *CRS*, 300 A.3d at 137. By directing courts to consider who a religious organization serves—a consideration the Supreme Court has said establishes a preference for certain religions along theological lines—*CRS*'s interpretation of MFEPA is not neutral. Br.47-48.

***Strict Scrutiny.*** Defendants hardly offer any response to the Church's strict scrutiny arguments. They state, without argument or explanation, that the government's interest in eliminating discrimination is "compelling." Resp.50. But they say nothing about the Church's arguments that (1) the long history of protecting religious hiring by religious organizations shows the government does not have a compelling interest in enforcing MFEPA against the Church's sincere religious exercise, Br.48-49; (2) the government's broadly formulated interest cannot be compelling at such a high level of generality, Br.49; and (3) MFEPA's numerous secular exceptions undermine this asserted interest, Br.49-50.

On least restrictive means, Defendants again dodge. They merely assert that "by definition" there is "no less restrictive approach" and that MFEPA's religious accommodation is broader than what (it claims) "the First Amendment requires." Resp.51. But MFEPA fails the least restrictive means analysis multiple times over. Br.50-53. By exempting at least 80% of secular employers *and* all religious schools, MFEPA is vastly underinclusive. *See* Resp.39-40; Br.41 & n.5. And the fact that Plaintiffs' religious exercise would be protected in 48 other states and the District of Columbia (something Defendants do not dispute) is further evidence that burdening Plaintiffs' religious exercise is not the least restrictive means of advancing the government's interest in preventing discrimination. Br.50-51 (citing *Holt v. Hobbs*, 574 U.S. 352, 369 (2015)

and *Mast v. Fillmore County*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J., concurring)). Defendants thus all but concede that once strict scrutiny is triggered, MFEPA fails the analysis.

## II. The Church satisfies the remaining injunction factors.

The Church also satisfies the remaining injunction factors, and Defendants' contrary arguments fail.

***Irreparable Harm.*** The Church faces irreparable harm absent an injunction. Br.53-54. When First Amendment rights are at stake, irreparable harm is "inseparably linked" to the likelihood of success. *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). This is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025). And even the "*threat* of a substantial fine" for exercising First Amendment rights satisfies the irreparable injury requirement. *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (emphasis added). "[W]hen a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur" before seeking injunctive relief. *Mahmoud*, 606 U.S. at 559-60.

Defendants nowhere acknowledge this binding precedent. Indeed, the *only* case they cite analyzing potential irreparable harm to First Amendment rights is *Elrod v. Burns*. *See* Resp.54. But that case—which *Mahmoud* expressly relies on—*supports* the Church's position that it is

entitled to injunctive relief where its First Amendment rights are even "threatened." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Mahmoud*, 606 U.S. at 569 (quoting *Elrod*).

Defendants' own concessions make clear the government could enforce MFEPA against the Church at any time. Defendants concede they "investigate violations" of MFEPA and "sue violators in state court," and that private individuals "may bring a civil action" against the Church. Resp.5. And nowhere do Defendants dispute that they routinely investigate potential violations and bring enforcement actions seeking monetary penalties against violators. *See* Resp.9-10. They also don't dispute that the Church's current practices violate MFEPA. Nor do Defendants claim they *won't* enforce MFEPA against the Church, only that they haven't *yet*. *See* Resp.54 n.12. Indeed, Defendants argue the government has such "a strong interest in ensuring equal employment opportunity for all, including freedom from discrimination on the basis of religion, sexual orientation, and gender identity" that an injunction protecting Plaintiffs here would "directly restrain[] it from enforcing its anti-discrimination laws," Resp.55-56, undercutting the argument that the Church has no genuine fear of enforcement. And the Church has been subject to complaints about its religious hiring practices in the past. *E.g., General Conf. of Seventh-day Adventists v. Montgomery County*, No. 8:00-cv-01024 (D. Md.) (lawsuit filed following administrative decision

determining the Church's hiring practices were unlawful).[2] The Church is now "put to a choice" of risking substantial liability or giving up its religiously motivated hiring practices, *Mahmoud*, 606 U.S. at 569, entitling it to injunctive relief.

Nor does the Church's supposed delay in bringing suit undermine irreparable harm. "[D]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). Even a year's delay in seeking injunctive relief in *Cuviello* did not preclude relief when the alleged harm is "ongoing," and "First Amendment rights [are] being chilled daily." *Id.* Here, the Church's slight delay—the time it took for the Church to learn about this change in the long-standing law, assess its impact, seek a legislative solution, retain counsel, and prepare a lawsuit—does nothing to undermine the irreparable and ongoing loss of its First Amendment rights.

And Defendants' suggestions that the verified complaint is somehow inadequate to support a preliminary injunction and that the Church cannot "'fear' anything" make little sense. *See* Resp.53 n.11. First, "a *verified* complaint is the equivalent of an … affidavit." *Williams v.*

---

[2] This complaint was made before the Maryland courts clarified that MFEPA allowed churches to hire only those who shared their beliefs. *See Montrose Christian*, 770 A.2d at 120 (clarifying pre-*CRS* that MFEPA did "not prohibit discrimination by religious organizations based on religious creed").

*Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *see also* Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1339 (4th ed.) ("[A] verified pleading may be treated as an affidavit and used in the action in any way in which an affidavit would be suitable."). And there's no doubt that the First Amendment protects the rights of religious organizations like the Church here. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707 (2014) ("[P]rotecting the free-exercise rights of corporations … protects the religious liberty of the humans who own and control those companies."). To hold that Plaintiffs here—the Church itself—cannot seek protection because they cannot "fear" a violation of their religious rights would beggar the First Amendment.

***Balance of the equities and public interest.*** The remaining injunction factors also favor the Church. Br.54-55. The government suffers no harm from an injunction against "enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). And despite Defendants' claim that enforcing MFEPA against the Church is vital to the public interest, Resp.55-56, they do not dispute that an injunction will simply permit employment practices that have been legal for decades under Maryland law and are still permitted for most Maryland employers. *See* Br.54-55.

## III. The District Court erred in dismissing Counts II and IV.

This Court should also reverse the district court's dismissal of the Church's entanglement claim (Count II) and its denominational discrimination claim (Count IV). Defendants do not dispute that this Court has pendant jurisdiction over the entanglement claim—they only contend that claim fails on the merits. Resp.57. That is wrong, for the reasons outlined above, *supra* Section I.B, and this Court should reverse.

The Court also has jurisdiction over Plaintiffs' denominational discrimination claim. The district court determined that MFEPA is neutral, JA626, and this Court must evaluate that conclusion on appeal. There is direct overlap between that question and whether MFEPA discriminates among religions, as the statute prefers certain denominations based on how their employees further the church's mission. *Supra* 22-23 This Court accordingly has jurisdiction and should reserve the dismissal of the denominational discrimination claim for the same reasons.

## CONCLUSION

The district court's ruling should be reversed.

Dated: November 25, 2025

Respectfully submitted,

/s/ *Eric S. Baxter*

Todd R. McFarland
GENERAL CONFERENCE OF
SEVENTH-DAY ADVENTISTS
12501 Old Columbia Pike
Silver Spring, MD 20904

Eric S. Baxter
Nicholas R. Reaves
Andrea R. Butler
Amanda G. Dixon
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, DC 20006
(202) 955-0095
*ebaxter@becketfund.org*

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

This document complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,494 words.

This document complies with the typeface requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: November 25, 2025      /s/ *Eric S. Baxter*
                                        Eric S. Baxter